**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 520 | § § § § § | |
| v. | § § | CIVIL ACTION NO. 1:25-cv-1643 |
| A.S.H. ELECTRICAL SERVICES, LLC | § § § | |

**DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE DAVID A. EZRA:

**REQUESTED RELIEF**

Defendant/Counter-Plaintiff A.S.H. ELECTRICAL SERVICES, LLC (ASH) asks the

Court to grant summary judgment on its Counterclaim to Invalidate Arbitration Award[1] Under

LMRA Section 301.

**SUMMARY OF THE ARGUMENT**

The International Brotherhood of Electrical Workers Local 520 (IBEW) did not have the

unilateral right to submit their request for a new collective bargaining agreement (CBA) to

arbitration with the Council on Industrial Relations (CIR)[2], and the CIR had no authority to issue

a decision compelling a new CBA on ASH because the CBA terminated on June 1, 2024.

Alternatively, the date on which the CBA terminated is disputed and the CIR had no authority or

---

[1] Plaintiff failed to file an answer to Defendant's Counterclaim and is in default.
[2] "The Council on Industrial Relations ("CIR") is a standing body created jointly by the National Association and the IBEW to adjudicate contractual disputes designated for arbitration in the collective bargaining agreements. CIR's membership consists of an equal number of representatives from management and from the union." *Local Union No. 637, Int'l Bhd. of Elec. Workers v. Davis H. Elliot Co.*,13, F.3d 129, 130 (4th Cir. 1993)

jurisdiction to arbitrate any controversy regarding the termination or duration of the CBA, as those are matters a court must decide. The award also did not draw its award from the essence of the agreement and ASH's signing of the letter of assent was procured by fraud, mistake, misrepresentation or lack of a meeting of the minds and is therefore unenforceable.

### GROUNDS FOR SUMMARY JUDGMENT

1.  There is no genuine dispute as to any material fact that ASH revoked its letter of assent assigning its bargaining rights to the Central Texas Chapter of the National Electric Contractors Association (NECA) and terminated the Inside Agreement Collective Bargaining Agreement (CBA) between NECA and the International Brotherhood of Electrical Workers (IBEW).

2.  There is no genuine dispute as to any material fact that the CBA terminated on June 1, 2024.

3.  There is no genuine issue as to any material fact that any dispute as to whether the CBA had terminated was not an arbitrable dispute under the CBA.

4.  There is no genuine issue as to any material fact that IBEW did not have a contractual basis to unilaterally submit the alleged unresolved bargaining issues to the Council for Industrial Relations (CIR) for arbitration since there was a dispute as to when the CBA terminated.

5.  There is no genuine issue that Defendant's assent to the CBA was obtained by fraud, misrepresentation, mutual mistake or a lack of the meeting of the minds and is unenforceable and void.

6.  There is no genuine issue as to any material fact that the CIR had no authority to impose a new CBA on ASH after termination of the bargaining relationship between ASH and IBEW or because of a legitimate dispute as to when the CBA terminated.

7.    There is no genuine issue as to any material fact that the CIR award does not draw its essence from the CBA.

### SUMMARY JUDGMENT EVIDENCE

The summary judgment evidence on which Defendant relies is contained in Defendant's Appendix in Support of Defendant/Counter-Plaintiff's Motion for Summary Judgment.  All factual and evidentiary references in this motion are to the Appendix.

### FACTUAL SUMMARY

On May 13, 2021, ASH signed a letter of assent with IBEW 520 and agreed to be bound by the existing Inside Agreement between the Central Texas Chapter of The National Electrical Contractors Association (NECA) Collective Bargaining Agreement (CBA) (Appx. 1).  The CBA that was in effect at all relevant times was the 2022-2025 agreement. (Appx. 2). The CBA provided that it took effect on June 2, 2019, and would remain in effect until June 1, 2022, at which time it would continue in effect from year to year thereafter from the first pay period in June through the last pay period in May of each year unless changed or terminated as provided in the agreement. (Appx. 4).

It further provided in Section 1.02

"(a) Either party desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations for the Electrical Contracting Industry (CIR) may be submitted jointly or unilaterally to the Council for adjudication. Such unresolved issues or disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date. The Council's decisions shall be final and binding.

(e) When a case has been submitted to the Council, it shall be the responsibility of the negotiating committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of the Council.

(f) Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change. (Appx. 5).

On May 30, 2023, ASH sent letters to IBEW 520 and NECA withdrawing the letter of assent agreement and notifying IBEW of its intent to terminate the CBA. (Appx. 40).  Under the terms of the letter of assent this withdrawal became effective if it was given prior to 150 days before the next anniversary date of the applicable labor agreement. (Appx. 1).

August 7, 2023, IBEW 520 replied to ASH with a letter confirming receipt of the notice to terminate.  (Appx. 41). That letter stated, "At the conclusion of this contract term we will resolve our contractual dispute per Article 1 of the agreement."  The letter did not state what the nature of the "contractual dispute" was other than to say, "According to our records, you have not paid the required employee benefit contributions since May 2023. We request that you make all employees whole." (Id). ASH never received this letter.

Believing that IBEW had not responded to its May 30, 2023, letter, on December 27, 2023, ASH's attorney sent a letter to IBEW providing a second formal notice of termination of the CBA (Appx. 42). This was more than 90 days before the next anniversary date of June 1, 2024, as required by the CBA. (Appx. 5).

January 3, 2024. IBEW sent a letter responding to ASH's attorney's letter notifying him that its position was that the CBA remained in effect and if counsel did not confirm this by January 16, 2024, the union would initiate legal action to enforce the agreement. (Appx. 44). This letter did not state a termination date of the CBA.

January 9, 2024, ASH's counsel replied to IBEW stating it was not clear which date IBEW was claiming was the termination date of the CBA as the IBEW's letter of August 7, 2023, implied that the anniversary date would be May 13, 2024, and that the January 3, 2024, response appeared to suggest that ASH was bound by the CBA until June 1, 2025. (Appx. 45). Counsel asked IBEW to make its position clear after which it would evaluate its next steps. (Id.).

January 22, 2024, IBEW 520 replied by letter that, "The duration of the collective bargaining agreement was from June 22, 2022, through June 1, 2025." (Appx. 46).  It also stated that IBEW accepted the December 27, 2023, letter as written notice of intent to terminate. (Id.). It also stated, "You should expect that the Local Union will timely provide notice to your client of the Union's proposed changes to the agreement. The agreement remains in full force and effect until a conclusion is reached, resolving our forthcoming dispute over your desire to terminate the agreement and the Local Union's desire to modify it. Section 1.02(c). Note that Section 1.02(f) provides that your notice of the desire to terminate the agreement shall be handled in the same manner as the Local Union's forthcoming proposed changes." (Id.)

The same day, IBEW sent a letter dated January 22, 2024, that was identical to the previous acknowledgement letter that it had received notice of intent to terminate that had been

sent on August 7, 2023 (Appx. Tab 47).[3] The only difference between the two was that the January 22 letter was unsigned and the date was different.  The certified return receipt number listed at the top of the letter was identical to the one in the August 7, 2023, letter. (Compare Appx. 41 with 47).

IBEW also sent another letter, to Adam Johnke, on January 22, 2024, requiring that he appear before the Trial Board of Local Union 520, IBEW to answer charges filed against him by IBEW because he sought to terminate the CBA with IBEW. (Appx. 48). In response, Adam Johnke resigned his personal membership in IBEW by letter date January 30, 2024. (Appx. 51).

The same day, January 30, 2024, ASH (representing itself) responded to IBEW stating that while it disagreed with IBEW 520's position as to when the CBA would terminate, it would agree to abide by the agreement until May 31, 2024 (Appx. 53). The letter also stated, "Termination of CBA between A.S.H. Electrical Services, LLC and IBEW LU 520 shall become effective Friday, May 31, 2024, at close of business day. (Id.). The letter demanded that IBEW 520 accept or deny these terms by February 19, 2024. (Id).

Diarmid Campbell, the person who filed charges against Adam Johnke, sent a letter to him dated February 29, 2024, which said they would like to meet in good faith to discuss and resolve "any issue that A.S.H. Electrical Services, LLC may feel that they have. The Charges against Mr. Johnke have also been with[]drawn in a good faith measure to work towards a resolution." (Appx. 55). The letter stated that IBEW had unilaterally scheduled a meeting to take place in Austin, Texas on March 28, 2024. (Id.). Adam Johnke replied by letter on March 20,

---

[3] Defendant did receive this letter.

2024, stating that he would be happy to meet in San Angelo, but would not travel to Austin for such a meeting. (Appx. 56). He asked that the meeting be rescheduled. (Id.). IBEW and Mr. Campbell made no response to this letter, and the meeting was never rescheduled.

May 30, 2024, IBEW sent a letter to ASH asserting again that the CBA did not expire until June 1, 2025. (Appx 57). The letter goes on to explain how termination and modification of the CBA worked according to Mr. Brenneman of IBEW 520. (Id.).

On January 20, 2025, ASH sent IBEW 520 another letter stating that it had not heard anything from IBEW 520 in over a year since ASH's "notice of our intent to terminate current collective bargaining agreement upon expiration, June 1, 2025, was sent and received by your office." (Appx. 59). The letter goes on to say, "A.S.H. Electrical Services, LLC deems it prudent at this time to once against send due notification that this company will not be bound by the collective bargaining agreement . . . after June 1, 2025, . . ." (Id). It also stated, "Please note this letter will not supersede previous letter yet shall serve as a reminder of our intentions going forward." (Id).

February 3, 2025, IBEW sent a letter to ASH notifying it of its desire to modify the terms and conditions of the CBA. (Appx. 61). This letter did not provide notice of the proposed changes at the time of the notice but stated they would be provided no later than the first bargaining session. (Id.).

Ultimately, three negotiation sessions took place, one on March 18, 2025, April 8, 2025, and April 28, 2025. (Appx 240). After the second meeting, on April 16, 2025, IBEW representative Diarmid Campbell emailed ASH's representative Adam Johnke stating that if the parties could not come to an agreement by April 20, he would like to ask that the parties file jointly for CIR. (Appx 62). Johnke responded for ASH the same day with a letter stating that

impasse had not been reached, that ASH had not yet submitted its non-economic/economic proposals and that the request to submit the case to CIR was negotiating in bad faith. (Appx. 63). Without further discussion, IBEW unilaterally filed with the CIR on or about April 17, 2025. (Appx. 65).

In its submission to CIR, IBEW 520 summarized its position and what it was asking CIR to do as follows:

> Our difficulties in getting bargaining proposals from Mr. Jonke and the way A.S.H. Electrical has acted in a hostile manner, we believe that A.S.H. Electrical is just "surface bargaining" and has left us unable to resolve this contract. We therefore request that the CIR award a contract like what has been agreed upon by other union electrical contractors in our jurisdiction. (Appx 69).

ASH responded in its brief asserting that IBEW had ignored its request to terminate the agreement and engaged in "surface bargaining and did not negotiate in good faith. (Appx 124-126). There was never an impasse as negotiations were ongoing, IBEW never submitted notice of intent to file unilaterally as required by CIR rules and IBEW only submitted a take it or leave it position as to its demand that a new three-year agreement be entered at higher wages. (Id). The parties had only met twice for negotiations before IBEW 520 filed with CIR. (Id.) ASH requested termination of the CBA or alternatively a 1-year agreement and modified CIR language. (Id.)

CIR issued its preliminary decision on May 13, 2025, which without reasoning or explanation stated only,

> "In the instant case, the parties are directed to sign and immediately implement the Collective Bargaining Agreement which is attached hereto and hereby made a part of this decision. The Council retains jurisdiction over disputes pertaining to this Agreement including any wage/fringe opener(s) contained therein and such disputes are to be returned to Council through the normal procedures if the parties are unable to reach agreement." (Appx. 139)

It also attached a new, complete CBA between ASH and IBEW that was effective from June 2, 2025, through June 4, 2028. (Id). ASH requested the CIR reconsider this decision which the CIR denied on June 10, 2025. (Appx. 235). CIR's final decision was issued on or about June 13, 2025, but dated May 13, 2025. (Appx. Tab 187).

Defendant refused to sign the New CBA or abide by its terms and this lawsuit resulted.

### ARGUMENT AND AUTHORITIES

A U.S. District Court has authority over suits for violations of contracts between an employer and a labor organization under Section 301 of the Labor Management Relations Act. (LMRA). 29 U.S.C. § 185 (2026). This includes the authority to review, enforce or vacate labor arbitration awards. *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995).

Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which it has not agreed to submit. *AT&T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 648 (1986). Arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration. *Id*., at 649 (citing *Gateway Coal Co. v. Mine Workers*, 414, U.S. 368, 374 (1974)). Whether a CBA creates a duty for parties to arbitrate is an issue for judicial determination. *Id*. Unless the parties clearly and unmistakably provide otherwise, the question of whether parties agreed to arbitrate is decided by the court, not the arbitrator. *Id*., (citations omitted); see also, *Granite Rock Co. v. Int'ld Bhd of Teamsters*, 561 U.S. 287, 297 (2010). Whether a CBA has terminated or remains in effect is a question of contract interpretation that is for the courts to decide, not an arbitrator. *Litton Fin Printing Div. v. NLRB*, 501 U.S. 190, 209 (1991). The object of an arbitration clause is to implement a contract, not to transcend it. *Id*., at 205.

It is up to a court to determine whether a CBA requires arbitration. The first question in this case is whether the CBA terminated before IBEW submitted its case to the CIR. It is also secondarily about whether the award did not draw its essence from the agreement and whether the CIR exceeded its authority and added new terms and conditions in its award.

CIR arbitration awards are not enforceable where the agreement expired before the union submitted unresolved negotiation issues to arbitration. *Local Union No. 898 of the I.B.E.W v. XL Electric Inc.*, 380 F. 3d. 868 (5th Cir. 2004).  XL had signed a Section 8(f) pre-hire agreement. *Id.*, at 869. The letter of assent provided that it would remain in effect until termination by written notice to Red River 150 days prior to the current anniversary date of the Agreement, which was May 31, 2000. *Id*. The agreement contained an interest arbitration clause which provided:

> "Unresolved issues in negotiations that remain on the 20th of the month preceding the next regular meeting for the Council on Industrial Relations, may be submitted jointly or unilaterally by the parties to this Agreement to the Council for adjudication prior to the anniversary date of the agreement." *Id.*

XL sent a letter to the NECA Chapter and the union on November 12, 1999, stating that it was withdrawing from the NECA agreement and would negotiate its own agreement. *Id*. The letter included proposals and terms XL wanted to negotiate. *Id*.  The parties never reached agreement and on July 10, 2000, XL sent a letter informing the union that their relationship had ended on June 1, 2000, when the letter of assent expired. *Id*. In August of 2000, the union submitted the unresolved issues between itself and XL Electric to the CIR. Id.  The CIR found that XL had properly terminated the letter of assent, but it had not followed the proper procedure for terminating the Agreement.  *Id*. CIR held XL was bound by a new Inside Agreement effective June 1, 2000, to May 31, 2003. Id.

The union filed suit against XL to enforce the terms of the arbitration award. *Id.*, at 870. After a bench trial, the district court denied enforcement and concluded that XL was not bound by the interest arbitration clause after the agreement expired on May 31, 2000, and the CIR award was not enforceable. Id. The union appealed and the Fifth Circuit affirmed the decision of the district court to not enforce the CIR award. Id., at 871.

The Fifth Circuit opinion notes at the very beginning that this dispute was a threshold question of whether there is a valid agreement in place under which the union's claims could be arbitrated. Id. at 870.  That is the same question the Court is faced with here. "Was there or wasn't there an agreement in effect for which a dispute could be submitted to arbitration." Id.  In *XL* the Fifth Circuit agreed with the district court that questions of arbitrability were questions for the court, thus the district court did not err in analyzing whether the dispute between XL and the Union was subject to the Agreement. Id., 870-871 (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 208–09 (1991), and *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 651, (1986)). The Fifth Circuit went on to conclude that the arbitration clause only provided for issues to be submitted to arbitration while the agreement was effective. *Id.*, at 871. "Accordingly, the question of whether there is an agreement to arbitrate depends on whether the Agreement was terminated." Id.

Similarly, in *Local Union No. 637, Int'l Bhd. of Elec. Workers v. Davis H. Elliot Co.*, 13 F.3d 129 (4th Cir. 1993) the Fourth Circuit also concluded that a dispute about arbitrability was for the court to decide, not the arbitrator.  In that case, Elliot signed a letter of assent to be represented by the National Electrical Contractors Association (NECA) and was subject to a CBA negotiated by NECA. *Id.* The CBA was set to expire on August 30, 1992. *Id.*, at 130. Elliot revoked its letter of assent and notified IBEW that it was terminating the collective bargaining

agreement's expiration date on August 30, 1992. *Id.* On May 27, 1992, the union invited Elliot to negotiate for a new agreement which would succeed the multi-employer agreement. *Id*. Elliot did not respond to the request and IBEW unilaterally submitted the dispute to the Council for Industrial Relations (CIR). Elliot advised the CIR that it did not possess the power to set an agreement because the agreement had expired. *Id*. CIR rendered an award for a new agreement, Elliot refused to sign it and IBEW sued to enforce the arbitration award. *Id*. The district court refused to enforce the award and IBEW appealed. *Id*., at 131. The Fourth Circuit affirmed the district court holding that "…whether the parties have agreed to submit a case to arbitration is one of contract interpretation, resolution of the question is a judicial matter of the court." *Id*. at 132. It reasoned that the interest arbitration clause but only those changes proposed 90 days before the expiration date, and on which no agreement through negotiation had been reached. Id. at 134. Disputes about formation, existence or duration of the CBA itself are threshold questions a court must resolve. *Granite Rock*, 561 U.S. at 304 [formation date question required judicial resolution.]

**CONTRACT ENDED JUNE 1, 2024**

The plain language of the 2022-2025 CBA in effect at the time this dispute arose specifically states that after the June 1, 2022, the CBA would renew on an annual basis unless it was changed or terminated as otherwise provided in the agreement.[4] ASH timely withdrew its assent to this agreement as provided for in Section 8(f) of the National Labor Relations Act. 29

---

[4] These so called "evergreen clauses" (providing for automatic yearly renewal unless notice is given) are strictly interpreted and enforced on the clear and specific terms of the notice. *Irwin v. Carpenters Health & Welfare Trust Fund*, 745 F.2d 553, 556 (9th Cir. 1984).

U.S.C. § 158(f) (2026). It gave timely notice of its intent to terminate the CBA on both May 30, 2023, and December 27, 2023. Therefore, the termination date of the CBA as it related to ASH was June 1, 2024. IBEW never sought modification or renewal of the CBA under the interest arbitration clause in Section 1.02 of the CBA until after the termination of the agreement on June 1, 2024.

The CBA in this case provided that only unresolved issues may be submitted to the CIR no later than the next regular meeting of the Council following the expiration date of the agreement or any subsequent anniversary date.  This means that after June 1, 2024, IBEW had until the next regular meeting of the CIR to submit any dispute for arbitration after negotiations had been attempted and no agreement could be reached. The next session after the termination on June 1, 2024, was in August of 2024.

The Council for Industrial Relations Council Policy III Council Meeting Schedule provides:

> "Meetings of the Council are scheduled quarterly, in the months of February, May, August and November. The Council may vary this schedule when necessary. If no cases are filed, the Secretary shall notify the Council members of the cancellation of that particular meeting." [5]

IBEW 520 failed to initiate negotiations under March 18, 2025, and failed to submit any dispute related to the CBA to CIR until April 17, 2025, long after the CBA expired and long after the deadline to submit any dispute it had to CIR. Therefore, there was no contract in effect under with IBEW was able to submit any dispute to the CIR, and the CIR had no authority or jurisdiction to enter the award on May 13, 2025.

---

[5] Council for Industrial Relations, Council Policy, http://www.thecir.org/Policy.htm (accessed July 30, 2026.)

If the Court determines that language of the 2022-2025 CBA is not clear and unambiguous, then the term of the agreement and the date of its termination is a dispute about the formation, duration and term of the CBA.  It does not arise under the CBA.  It predates and falls outside the CBA. This was not a dispute subject to arbitration with CBA because it relates to the formation of the agreement and its duration.  It is not an interpretation of the language of the CBA; it is a question about whether an agreement to arbitrate exists and that does not fall within the purview of CIR. Therefore, the award was issued without authority and should be set aside.

**IBEW DID NOT GIVE TIMELY NOTICE OF CHANGES**

Even if the CBA was effective through June 1, 2025, IBEW failed to provide timely notice of the changes as required by the CBA before negotiations. Section 1.02(a) required IBEW to provide written notification of its wish to change the agreement at least 90 days prior to the expiration of the Agreement or any anniversary dates occurring thereafter.  Subsection (b) provided that "Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise. (Appx. 5). Ninety days before June 1, 2025, was March 3, 2025. While IBEW sent a letter before March 3 about wanting to schedule a meeting for negotiations, it did not provide written notice of the changes desired until March 18, 2025. This did not meet the 90-day notice requirement. The CBA only permits arbitration of changes when notice has been given 90 days before termination and that remain unresolved after negotiations. The fact that the CBA allows notice of the changes to be given no later than the first negotiating meeting does not extend the 90-day notice deadline. If that were the case, then the 90-day notice provision means nothing.

The notice of the changes could be provided just a month or even weeks or days before the termination of the agreement, which completely does away with the 90-day notice requirement.

Under the terms of the CBA, there was no agreement to arbitrate changes to the CBA until the party seeking changes had provided a minimum of 90 days' notice of those changes in writing, negotiations on those changes had been held and no agreement could be reached. Because IBEW failed to provide written notice of the request changes or modification it wished until after March 3, 2025, IBEW had no contractual right to submit the dispute to the CIR.

**IBEW BREACHED CBA BECAUSE DID NOT NEGOTIATE IN GOOD FAITH.**

In submitting the case to CIR, IBEW was hoping to short circuit negotiations as it did not negotiate in good faith. There was a pattern of retaliation by IBEW against ASH for asserting its right to terminate its agreement to the CBA. The most obvious evidence of this is that the same day IBEW finally acknowledged receipt of notice of termination, IBEW filed a disciplinary action against Adam Johnke, a 25-year member of the IBEW, because he sought to terminate the CBA as being in the best interests of his company. They withdrew those charges only after Adam resigned his membership with IBEW because they had no jurisdiction over a non-member.

IBEW ignored ASH's efforts to discuss termination of the agreement and its view that the language of the contract provided for termination on June 1, 2024. IBEW simply responded that the agreement did not expire until June 1, 2025, contrary to the express language of the agreement, and took no action to provide any basis that the agreement terminated in 2025 other than "because we say so."

When IBEW finally did seek to enter negotiations it was only interested in discussing renewal of the agreement and imposing onerous conditions and terms on ASH that were not in the current agreement. (Appx. 239-241). IBEW refused to enter into any substantive negotiations

claiming its hands were tied because ASH sought termination.  (Appx. 240). No explanation for this position was ever provided. IBEW's representative also did not have authority to enter into an agreement or change any of the proposals made. (Appx. 240).

IBEW only took one position during negotiations, they refused to discuss ASH's desire to end the relationship and insisted only on forcing an onerous agreement on ASH for an additional three years. It also refused to consider discussing any reasonable increase in wages and insisted on raising wages from $29/hr to $36.50 staring June 1, 2025, and continuing large increases up to $42.50 by 2028. (Appx. 202) This is an immediate increase in wages of 25.86% and additional increases of wages of 46.55% in three years.

It provided no justification for these increases related to the market in which ASH works. No evidence was submitted to CIR about wage conditions relevant to San Angelo, Tom Green County or West Texas. In its response brief, at CIR Defendant submitted the Zone III memorandum that was negotiated and included as part of the 2025-2028 that IBEW negotiated with NECA. (Appx. 137).  This was the same Zone III and wages that IBEW insisted could not be applied to any renewal agreement with ASH.  It showed the Zone III wage rates went from $29.00 to $29.34, only a 1.14 %. The obvious intent was not to create uniformity among its agreements as IBEW stated to the CIR, but to punish and impose conditions on ASH so onerous that it would force him out of business.

ASH objected to submission to CIR because he believed there was no impasse. ASH had agreed to some of the terms, including dropping the most favored nation clause and discussions were on going on other issues at the time the union filed with CIR.  Nevertheless, IBEW

submitted the permissive bargaining issue of the most favored nations clause to the CIR along with its other demands on which it offered no real compromise.[6] In fact, the CIR submission was made after only two initial negotiating sessions and before ASH could even respond to IBEW's proposals.  IBEW also failed to continue to negotiate while the CIR matter was pending contrary to the agreement.

ASH raised all these issues and others in its brief to the CIR. (Appx. 122). Yet, the CIR did not even consider them and in a few short lines without any reasoning imposed on ASH an entirely new agreement setting out onerous and unfair terms. The interest arbitration clause does provide for arbitration with CIR, but only after formal notice has been given and after the parties have had a meaningful chance to engage in good faith negotiations. That did not happen here.

### DEFENDANT'S ASSENT TO INSIDE AGREEMENT WAS OBTAINED BY FRAUD, MISREPRESENTATION, MUTUAL MISTAKE OR LACK OF A MEETING OF THE MINDS

In the event the Court determines that the CBA did not terminate until June 1, 2025, then Defendant's assent to that agreement is unenforceable because it was obtained by fraud, mutual mistake, misrepresentation or there was no meeting of the minds.

There is no dispute in this case that neither of the owners of ASH had any prior experience in dealing with Inside Agreements or Section 8(f) of the NLRA. (Appx. 236-237). They relied on the representations made to them by IBEW representatives that their agreement to participate in the NECA Inside Agreement would only be a one-year commitment and they could get out after a year if they wished. (Appx. 237, 246). What they were not informed of was that a

---

[6] In fact, IBEW's representative had previously acknowledged in a Zoom conference that the parties had agreed on removing the Most Favored Nations's clause. (Appx. 242-243).

new agreement would be entered into at the end of that year that would then bind them to another three-year agreement through June of 2025 and they could not get out of it until then.  They also were never informed of the interest arbitration clause which meant that IBEW could keep them in a captive contract relationship for years beyond 2025. They were never provided a copy of either the 2019-2022 CBA when the signed the letter of assent or the new 2022-2025 Inside Agreement CBA when it was signed.  Defendant did not obtain a copy of the CBA it was bound to until after this dispute arose. Therefore, the CBA is unenforceable against ASH.

**AWARD FAILS TO DRAW ITS ESSENCE FROM UNDERLYING AGREEMENT**

If the court finds that CIR had authority to issue the award, it still must be set aside because it does not draw its essence from the underlying agreement.

An arbitration award may be vacated under the following circumstances: if it fails to draw its essence from the agreement, (*Teamsters Local No. 5 v. Formosa Plastics Corp*., 363 F.3d 368, 371(5th Cir. 2004)); if the arbitration proceedings were fundamentally unfair (*Gulf Coast Indus*., 70 F.3d at 850); if the arbitrators exceeded their powers or so imperfectly executed them that a mutual, final, and definite award was not made (9 U..S.C § 10); or,  if the award conflicts with a NLRB decision, or where an inescapable conflict exists between the promises of the contract and the demand of a federal statute or public policy. *General Warehouseman & Helpers v. Standard Brands., Inc*. 560 F.2d 700, 704 (1977). This applies where a conflict between the promises of a contract and the demands of a statute would preclude ordering arbitration under the contract or enforcement of an arbitration award. *Id.*

The award is unenforceable because it does not draw its essence from the underlying agreement. An arbitration award in a labor dispute fails to draw its essence from the underlying agreement when the arbitrator's decision is not an interpretation of application of the agreement

but instead reflects the arbitrator's own notions of industrial justice. *United Steelworkers of America v. Enterprise Wheel & Car Corp*. 363 U.S. 593, 597 (1960) [Arbitrator is confined to interpretation and application of the collective bargaining agreement.]. The award must have a basis that is rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. *Executone Info. Sys. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994) (citing *Brotherhood of R.R. Trainmen v. Central of Ga. Ry*., 415 F.2d 403, 412 (5th Cir. 1969), cert. denied, 396 U.S. 1008 (1970).

The Fifth Circuit has established a four factor test for the failure to draw its essence standard: (1) The award conflicts with the express terms of the agreement; (2) the award imposed additional requirement that are not expressly provided in the agreement;(3) the award is without rational support or cannot be rationally derived from the terms of the agreement; or, (4) the award is based on general considerations of fairness and equity rather than the precise terms of the agreement. *Am. Eagle Airlines v. Air Line Pilots Ass'n*, 197 F. Supp. 2d 580, 585 (N.D. Tex. 2002) (citing *Airline Prof'ls Ass'n v. ABX Air, Inc*., 274 F.3d 1023, 1030 (6th Cir. 2001).

As already argued above, the award conflicts with the express terms of the agreement because the agreement between Plaintiff and Defendant terminated on June 1, 2024. Additionally, the award imposed additional requirements that are not expressly provided in the agreement. What the CIR imposed was not a termination, change, renewal or modification of the agreement, but an entirely new agreement.

The new agreement removed the Zone III Memorandum of understanding which provided for different wages in the counties in which Defendant works, including Tom Green County and the surrounding areas. (Appx. 30).  Instead, it added a long and complex Construction Wireman/Construction Electrician MOU, and a Four-Year Apprenticeship MOU. It

also imposed the wage scale for Zone I (Austin, Texas) which would make the wages Defendant paid go from $29/hr to $36.50 staring June 1, 2025, and would go up to $42.50 by 2028. (Appx. 202) This is an immediate increase of wages of 25.86% and additional increases of wages of 46.55% in three years.

This is directly in contrast to the Zone III Memorandum that IBEW negotiated and agreed to with NECA at the same time as it was refusing to give any consideration to local conditions in negotiations with ASH.  The Zone III Memorandum adopted by IBEW for the 2025-2028 multi-employer agreement provided for wages in the counties of Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason and Kimble to go from $29.00 in 2025 to $29.34 in 2027.  (Appx. 137). This is a 1.14% increase in wages during the same period when the award imposes a 46.55% increase on ASH.  No rationale or explanation was provided for the hyper-increase in wages. The award also included Steward language and imposed break requirements that were not contained in the prior agreement.

WHEREFORE, Defendant asks the Court to grant it summary judgment vacating the award, dismissing all of Plaintiff's claims against it with prejudice, and for its costs and attorneys in prosecuting this action as provided in Fed. R. Civ. P. 54 and Local Rule 54.

Respectfully submitted,

By: /s/ *Jon Mark Hogg*
      Jon Mark Hogg
      State Bar No. 00784286

JON MARK HOGG PLLC
1 East Twohig Ave, 2nd Floor
San Angelo, Texas 76903
(325) 777-0455

jmh@jmhogglaw.com

ATTORNEY FOR DEFENDANT A.S.H.
ELECTRICAL SERVICES

## CERTIFICATE OF SERVICE

This is to certify that on August 4, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record on file.

*/s/ Jon Mark Hogg*
Jon Mark Hogg