## LETTER OF ASSENT - A

In signing this letter of assent, the undersigned firm does hereby authorize[1] Central Texas Chapter, NECA
as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent
approved[2] Inside _____ labor agreement between the

[1] Central Texas Chapter, NECA _____ and Local Union[3] 520 , IBEW.

In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the[4] 13ᵗʰ day of May , 2021 .

It shall remain in effect until terminated by the undersigned employer giving written notice to the

[1] Central Texas Chapter, NECA _____ and to the Local Union at least one hundred fifty (150)
days prior to the then current anniversary date of the applicable approved labor agreement.

The Employer agrees that if a majority of its employees authorize the Local Union to represent them in collective bargaining, the Employer will recognize the Local Union as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

In accordance with Orders issued by the United States District Court for the District of Maryland on October 10, 1980, in Civil Action HM-77-1302, if the undersigned employer is not a member of the National Electrical Contractors Association, this letter of assent shall not bind the parties to any provision in the above-mentioned agreement requiring payment into the National Electrical Industry Fund, unless the above Orders of Court shall be stayed, reversed on appeal, or otherwise nullified.

SUBJECT TO THE APPROVAL OF THE INTERNATIONAL PRESIDENT, IBEW

A.J.H. Electrical Services, LLC
[5] Name of Firm

P.O. Box 61905
Street Address/P.O. Box Number

San Angelo Texas
City, State (Abbr.) Zip Code

[6] Federal Employer Identification No. 83-4418735

SIGNED FOR THE EMPLOYER Adam C Johnke - Co-Owner
BY[7] Shannon Carpenter - Co-Owner
(original signature)
NAME[8] Shannon Carpenter   Adam Johnke
TITLE/DATE Co-Owners  5-13-2021

SIGNED FOR THE UNION[3] 520 , IBEW
BY[7] Ben Brenneman
(original signature)
NAME[8] Ben Brenneman
TITLE/DATE Business Mgr./Financial Secretary

**APPROVED**
INTERNATIONAL OFFICE - I.B.E.W.
*May 18, 2021*
Lonnie R. Stephenson, Int'l President
This approval does not make the International a party to this agreement

INSTRUCTIONS (All items must be completed in order for assent to be processed)

[1] NAME OF CHAPTER OR ASSOCIATION
Insert full name of NECA Chapter or Contractors Association involved.
[2] TYPE OF AGREEMENT
Insert type of agreement. Example: Inside, Outside Utility, Outside Commercial, Outside Telephone, Residential, Motor Shop, Sign, Tree Trimming, etc. The Local Union must obtain a separate assent to each agreement the employer is assenting to.
[3] LOCAL UNION
Insert Local Union Number.
[4] EFFECTIVE DATE
Insert date that the assent for this employer becomes effective. Do not use agreement date unless that is to be the effective date of this Assent.

[5] EMPLOYER'S NAME & ADDRESS
Print or type Company name & address.

[6] FEDERAL EMPLOYER IDENTIFICATION NO.
Insert the identification number which must appear on all forms filed by the employer with the Internal Revenue Service.

[7] SIGNATURES
[8] SIGNER'S NAME
Print or type the name of the person signing the Letter of Assent. International Office copy must contain actual signatures-not reproduced-of a Company representative as well as a Local Union officer.

A MINIMUM OF FIVE COPIES OF THE JOINT SIGNED ASSENTS MUST BE SENT TO THE INTERNATIONAL OFFICE FOR PROCESSING. AFTER APPROVAL, THE INTERNATIONAL OFFICE WILL RETAIN ONE COPY FOR OUR FILES, FORWARD ONE COPY TO THE IBEW DISTRICT VICE PRESIDENT AND RETURN THREE COPIES TO THE LOCAL UNION OFFICE. THE LOCAL UNION SHALL RETAIN ONE COPY FOR THEIR FILES AND PROVIDE ONE COPY TO THE SIGNATORY EMPLOYER AND ONE COPY TO THE LOCAL NECA CHAPTER.

IBEW FORM 302 REV. 9/01



# June 2, 2022 – June 1, 2025

## AGREEMENT
### Between

## The CENTRAL TEXAS CHAPTER of the NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC.
### and

## LOCAL UNION NO. 520 of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
### Austin, Texas

Def. MSJ Appx.000002

**TABLE OF CONTENTS**

Parties Clause ...........................................................................................................1

Basic Principles .........................................................................................................1

Article I – *Effective Date, Changes, Grievances, Disputes* ............................................1

Article II – *Employers Rights, Union Rights, Favored Nations Clause* ..........................3

Article III – *Standard Inside Referral, Journeyman Wireman – Journeyman Technician*...........8

Article IV – *Hours, Wage Payment* .........................................................................12

Article V – *General Rules*.......................................................................................16

Article VI – *Standard Inside Apprenticeship Language*................................................19

Article VII – *Vacation* ...........................................................................................23

Article VIII – *Annuity Plan*.....................................................................................23

Article IX – *401(k) Savings Plan*.............................................................................24

Article X – *Health and Welfare* ..............................................................................24

Article XI – *National Labor Management Cooperative Committee* ..............................24

Article XII – *P.A.C. Fund* .......................................................................................25

Article XIII.............................................................................................................26

Article XIV – *Substance Abuse Language* ................................................................26

Article XV – *Code of Excellence, Separability Clause* ...............................................26

Def. MSJ Appx.000003

**June 2, 2022 – June 1, 2025**
**AGREEMENT**
**Between**

**The CENTRAL TEXAS CHAPTER of the**
**NATIONAL ELECTRICAL CONTRACTORS**
**ASSOCIATION, INC.**
**and**

**LOCAL UNION NO. 520 of the**
**INTERNATIONAL BROTHERHOOD OF**
**ELECTRICAL WORKERS**
**Austin, Texas**

## PARTIES CLAUSE

Agreement by and between the CENTRAL TEXAS CHAPTER, NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION and LOCAL UNION 520, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS. As used hereinafter in this Agreement, the term "Chapter" shall mean the CENTRAL TEXAS CHAPTER, NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, and the term "Union" shall mean LOCAL UNION NO. 520, IBEW. The term "Employer" shall mean an individual firm who has been recognized by an Assent to this Agreement.

## BASIC PRINCIPLES

The Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union, and the Public. Progress in Industry demands a mutuality of confidence between the Employer and the Union. All will benefit by continuous peace, and by adjusting any differences by rational, common sense methods. Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
## EFFECTIVE DATE/CHANGES/GRIEVANCES/DISPUTES

Section 1.01: This Agreement shall take effect on June 2, 2019 and shall remain in effect through June 1, 2022, unless otherwise specifically provided for herein. It shall continue in effect from year to year thereafter, from the start of the first full pay period in June through the last pay period starting in May of each year, unless changed or terminated in the way later provided herein.

1

Section 1.02(a): Either party desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations for the Electrical Contracting Industry (CIR) may be submitted jointly or unilaterally to the Council for adjudication. Such unresolved issues or disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date. The Council's decisions shall be final and binding.

(e)When a case has been submitted to the Council, it shall be the responsibility of the negotiating committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of the Council.

(f)Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

Section 1.03: This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto.

Section 1.04: During the term of this Agreement, there shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

**GRIEVANCES/DISPUTES**

Section 1.05: There shall be a Labor-Management Committee of three representing the Union and three representing the Employers. It shall meet regularly at such stated times as it may decide. However, it shall also meet within 48 hours when notice is given by either party. It shall select its own Chairman and Secretary. The Local Union shall select the Union representatives and the Chapter shall select the management representatives.

Section 1.06: All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.

Def. MSJ Appx.000005

Section 1.07: All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

Section 1.08: Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding.

Section 1.09: When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

Section 1.10: The Labor-Management Committee shall not recognize any grievance or dispute unless written notice of the charge is given within thirty (30) days after the representatives of the parties to this Agreement first became aware, or reasonably should have been aware, of a violation of this Agreement. This shall not apply to any Section which requires money to be deposited to any Trust Fund.

## ARTICLE II
## Employers Rights - Union Rights
## Favored Nations Clause

Section 2.01: The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under this Agreement and the Union shall immediately notify the Employer of any such concession.

Section 2.02: The Employer recognizes the Union as the exclusive representative of all its employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment.

Section 2.03(a): Certain qualifications, knowledge, experience, and financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm, or corporation, having these qualifications and maintaining a place of business and suitable financial status to meet payroll requirements and employing at least one Journeyman Wireman.

(b) All Employers subject to the terms of this Agreement shall carry an Indemnity Bond, issued by a company authorized to do business in the State of Texas, the minimum for all employers shall be $5,000.00 as evidence of financial responsibility, and to insure proper payments to the Electrical Joint Apprenticeship and Training Trust Fund, the National Employees Benefit Board, the Austin Vacation Trust Fund, IBEW Local Union 520 Annuity Plan and Health

Def. MSJ Appx.000006

and Welfare Plan, 401(k), and P.A.C. deductions, to Local Union 520, for any union dues or assessments withheld on behalf of employees, and wages required under this Agreement be paid directly to the affected employee(s). Bond amounts greater than $5000 shall be required based on the following formula outlined below:

(c) Each employer signatory to the collective bargaining agreement shall be required to secure a welfare bond of at least $5000. Employers shall be required to secure larger bonds based on the following formula: Employers shall provide a welfare bond based on the average monthly hours worked utilizing the previous three years to calculate the average. This number shall be multiplied by the aggregate amount of the benefit package and rounded up to the next one thousandth. If an employer has been delinquent in the payment of benefits more than twice, they shall be required to pay benefits timely on a weekly basis for a period of six months and secure the required bond. After a period of six months of timely benefit payments the employer may return to the monthly schedule. If an employer has no previous experience in the jurisdiction the bond shall be based on the estimated monthly hours of the project to be worked. The maximum bond for any employer shall be $50,000.

The aforesaid Bond shall be executed for a period of time to conform to the time limitations set forth in this Agreement and shall be renewed as provided for in subsequent Agreements.

The Bond shall provide that it may not be canceled by either the Employer or the insurance carrier without thirty (30) days written notice in advance to the Union by Certified, Registered, or Insured mail from the Surety. Proof of the execution of the Bond, in the form of an affidavit executed by the insurance carrier, shall be furnished the Union for each Employer. Such affidavit shall show on its face that it may not be canceled by either the insurance carrier of the Employer without prior notification to the Union. The Local Union shall furnish a copy of the affidavit of Bond to each Fund.

The Obligee (Local Union 520, IBEW) shall notify the Surety within thirty (30) days after having knowledge of a breach of this Agreement by the principal hereof.

(d) Fringe benefits provided for under this Agreement are due and payable on or before the 15th day of the month following the month, covering the hours worked by each employee. Each Employer shall file a monthly report for each fringe benefit, in the form established, therefore, each report shall be filed, regardless of whether or not the Employer has employed any employee in the month covered by said report.

Any Employer who fails to file a report and pay contributions for any of the fringe benefits by the 15th day following the month in which such report or payment is due shall be considered delinquent and is in violation of this Agreement. If payments are not mailed in time to reach the Benefit Fund by the prescribed time, interest at the rate of 1½% monthly will be due and payable. Each Employer shall make available applicable books and records for the purpose of auditing same to determine the amount of his liability and shall pay the expense of audit if delinquencies are found, under guidelines of the Funds. Action to collect contributions may be brought in the name of the respective Fund involved, its Trustees and any assignee or agent

designated by said Trustees. Employer hereby accepts and agrees to the terms of each trust agreement and plan for such fringe Benefit Fund.

A delinquent Employer shall be liable to any employee affected by such delinquency for all benefits lost by such employee by virtue of such delinquency, and such delinquent Employer shall also be liable for reasonable attorneys' fees for any action brought to recover the amount of said benefits.

"This section does not waive or deny any remedies of collection in other sections of this Agreement, Trust or a remedy at law".

Section 2.04: For all employees covered by this Agreement the Employer shall carry Workman's Compensation Insurance with a Company authorized to do business in this State, Social Security, and such other protective insurance as may be required by the laws of this State and shall furnish satisfactory proof of such to the Union. He shall also make contributions to the State Unemployment Compensation Commission.

Section 2.05(a): It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to three percent (3 %) of the gross monthly labor payroll, paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by the suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

(b)     An individual Employer who fails to remit as provided above shall be additionally subject to having his Agreement terminated upon seventy-two (72) hours' notice in writing being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this Agreement.

Section 2.06: The Union reserves the right to discipline its members for violations of its laws, rules, and agreements.

Def. MSJ Appx.000008

Section 2.07: The Local Union is part of the International Brotherhood of Electrical Workers and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this Section, will be sufficient cause for the cancellation of his Agreement by the Local Union after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual Employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its Local Unions as the collective bargaining representative of his employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

Notwithstanding anything in this Agreement, the Employer may sublet, assign, or transfer the installation of wiring and devices for fire alarm or security systems if those systems are low voltage system, the installation of lightning protection system, trenching and backfilling excavation to a specialty contractor.

The Employer may also sublet, assign, or transfer any work requiring employees to place themselves in any trench that is greater than a depth of five feet.

The following work, systems and/or functions shall not be covered by the terms of this agreement: field instrumentation and installation, process control instrumentation and installation, instrument and control loop testing and certification, instrument calibration, instrument certification, PLC equipment, PLC programming, distributed control and SCADA systems, control system SCADA & HMI software development and programming, radio telemetry systems, and manufacture of control panels.

Nothing in this Agreement should be construed to require the Employer to purchase manufactured products from employers signatory to a collective bargaining agreement.

All charges of violation of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

Section 2.08: No member of Local Union 520, while he remains a member of such Local Union and subject to employment by the Employers operating under this Agreement shall himself become a contractor for the performance of any electrical work.

Section 2.09: Only two individuals connected with an employing concern as owner, manager, superintendent, partner, or member of a Board of Directors shall perform any manual electrical work where it displaces the service of a Journeyman; and then only when he has at least one Journeyman, working under the terms of this Agreement, employed and working the same hours including overtime, with the exception of emergency repairs not to last over two (2) hours.

Def. MSJ Appx.000009

Section 2.10(a): The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the collective bargaining agreement, in planning, directing, and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying off employees, in transferring employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

(b)     The employer shall have the right to call a Foreman by name provided:

A)     The employer shall notify the business manager in writing of the name of the individual who is to be requested for employment as a Foreman. Upon such request, the business manager shall refer said Foreman provided the name appears on the highest priority group.

B)     When an employee is called as a Foreman, he must remain as a Foreman for 500 hours or must receive a reduction in force.

## Portability

Section 2.11: The Employer if signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, may bring an unlimited amount of Supervisory bargaining unit employees employed in that Local Union's jurisdiction into Local Union 520's jurisdiction to perform supervisory work. Supervisory bargaining unit employees are defined as those that direct bargaining unit employees. The Employer may also bring one (1) bargaining unit employee employed in that Local Union's jurisdiction into Local Union 520's after the Employer employs one (1) Local Union 520's bargaining unit employee; if necessary this process will continue to alternate. The Employer shall maintain a minimum of a one (1) to one (1) ratio of Local Union 520's bargaining unit employees to those that are brought in through this Portability provision. The employees brought in through portability may remain on the specific job until the job is complete. All employees brought in through this portability provision must check in with the Business Manager of IBEW Local Union 520 and all working assessments shall be paid to Local Union 520. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of the Agreement for the handling of grievances with the exception that any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

Section 2.12:  The Union has the right to appoint a Steward at any shop and/or job where workmen are employed under the terms of this Agreement.  The Employer shall be notified in writing of who the Steward is.  No Steward shall be discriminated against by the Employer because of the faithful performance of his duties as Steward.

## ARTICLE III
## Standard Inside Referral

Section 3.01:  In the interest of maintaining an efficient system of production in the Industry, providing for an orderly procedure of referral of applicants for employment preserving the legitimate interests of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

Section 3.02:  The Union shall be the sole and exclusive source of referral of applicants for employment.

Section 3.03:   The Employer shall have the right to reject any applicant for employment.

Section 3.04:   The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements.  All such selection and referral shall be in accord with the following procedure.

Section 3.05:   The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below.  Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

### Journeyman Wireman - Journeyman Technician

**GROUP I**     All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or has been certified as a Journeyman Wireman by any inside Joint Apprenticeship and Training Committee, and, who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement.

Group I status shall be limited to one Local Union at one time. An applicant who qualifies for Group I in a local union shall be so registered electronically and remain on Group I in that local union unless and until the applicant designates another local union as his or her Group I local union. If an applicant qualifies for Group I status in a local union other than his or her home local union and designates that local as his or her Group I local union, the business manager of the new Group I status local union shall by electronic means notify the business manager of the applicant's former Group I status local union.

**GROUP II**    All applicants for employment who have four or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the IBEW or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

**GROUP III**    All applicants for employment who have two or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, and who have been employed for at least six months in the last three years in the geographical area covered by the collective bargaining agreement.

**GROUP IV**    All applicants for employment who have worked at the trade for more than one year.

Section 3.06: If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within 48 hours from the time of receiving the Employer's request, Saturdays, Sundays and holidays excepted, the Employer shall be free to secure applicants without using the Referral Procedure. But such applicants, if hired, shall have the status of "temporary employees".

Section 3.07: The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "temporary employees" and shall replace such "temporary employees" as soon as registered applicants for employment are available under the Referral Procedure.

Section 3.08: "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent thereto which includes the area from which the normal labor supply is secured: Travis, Bastrop, Hays, Blanco, Burnet, Williamson, Lee, Llano, San Saba, Burleson, Caldwell, Fayette, Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason, Kimble and parts of Coryell and Bell Counties to include that part of Fort Hood in Coryell County south of Cowhouse Creek, and not to extend more than two (2) miles into Bell County from the Southeast boundary line of Coryell County, Gray Field, and the City of Killeen, and parts of Lampasas, Bell and Milam Counties, which are nearer to Austin than Waco, in the State of Texas.

The above geographical area is agreed upon by the parties to include the area defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which the Agreement applies.

Section 3.09: "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

Section 3.10: "Examinations" - An "Examination" shall include experience rating tests if such examination shall have been given prior to the date of this procedure, but from and after the date

Def. MSJ Appx.000012

of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the IBEW.  Reasonable intervals of time for examinations are specified as ninety (90) days.  An applicant shall be eligible for examination if he has four years' experience in the trade.

Section 3.11:  The Union shall maintain an "Available for Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

Section 3.12(a):   An applicant who is hired and who receives, through no fault of his own, work of forty hours or less shall, upon re-registration, be restored to his appropriate place within his Group.

     (b)    An applicant who has registered on the "Available for Work List" must renew his application every thirty (30) days or his name will be removed from the "List."

Section 3.13:  Employers shall advise the Business Manager of the Local Union of the number of applicants needed.  The Business Manager shall refer applicants to the Employer by first referring applicants in GROUP I in the order of their place on the "Available for Work List" and then referring applicants in the same manner successively from the "Available for Work List" in GROUP II, then GROUP III, and then Group IV.  Any applicant who is rejected by the Employer shall be returned to his appropriate place within this GROUP and shall be referred to other employment in accordance with the position of his GROUP and his place within his GROUP.

Section 3.13(a):   An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral.  The neutral member of the Appeals Committee shall, within three business days, review the qualifications of the applicant and the reasons for the discharges.  The neutral member of the Appeals Committee may, in his or her sole discretion:  (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks, or longer, depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list.

Section 3.14:  The only exceptions which shall be allowed in this order of referral are as follows:

     (a)    When the employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

     (b)    The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age.  Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

Section 3.15:  An Appeals Committee is hereby established, composed of one member appointed by the Union, one member appointed by the Employer or by the Association, as the case may be, and a Public Member appointed by both these members.

Section 3.16:  It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the administration by the Local Union of Sections 4 through 14 of this Agreement.  The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union.  The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions to this Agreement and its decisions shall be in accord with this Agreement.

Section 3.17:  A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

Section 3.18:  A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

Section 3.19:  Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the parties.

Section 3.20:  When making reductions in the number of employees due to lack of work, Employers shall use the following procedure:

(a)     Temporary employees, if any are employed, shall be laid off first. Then employees in Group IV shall be laid off next, if any are employed in this Group. Next to be laid off are employees in Group III, if any are employed in this Group, then those in Group II, and then those in Group I.

(b)     Paragraph (a) will not apply as long as the special skills requirement as provided for in Section 14(a) is required.

(c)     Supervisory employees covered by the terms of this Agreement will be excluded from layoff as long as they remain in the supervisory capacity.  When they are reduced to the status of Journeyman, they will be slotted in the appropriate group in Paragraph (a) above.

Section 3.21:  Effective January 1, 2020 all Journeymen and Apprentices are required to provide proof of completion, by originally issued card or certificate, of an OSHA 10 safety training course.

Def. MSJ Appx.000014

## ARTICLE IV
## Hours - Wage Payment

Section 4.01(a):   Eight hours work between the hours of 6:00 A.M. and 6:30 P.M. with thirty (30) minutes for a lunch period, shall constitute a workday.  Forty (40) hours within (5) days, Monday through Friday, inclusive, shall constitute the work week. Saturday may be used for a make-up day due to inclement weather.  If Saturday is used as a make up day, a minimum of eight (8) hours will be scheduled.  The payroll week shall end on Sunday midnight of each week. Any workman required to punch a time clock that requires more than five (5) minutes to check out shall be paid for any additional time used in checking out.  Workmen reporting to the shop or job shall not report earlier than 15 minutes prior the starting time.  If practical, workmen directed to report to the job shall be at their place of work at the starting time and shall remain at their place of work until quitting time unless otherwise instructed by the Employer.

(b)    Any change from the regular working hours must be five (5) or more day's duration.  When any change in the starting time is made, lunch period, overtime, and shifts may be changed accordingly.

(c)    On jobs where it is required by the general contractor or owner that four ten-hour days be scheduled, the first ten hours of work per day shall be paid at the straight time hourly rate of pay.  The four-day work week will be Monday through Thursday.  Friday may be used for a make-up day due to inclement weather.  If Friday is used as a make-up day, a minimum of 8 hours will be scheduled.

Section 4.02:  All work performed outside of regularly scheduled hours will be paid at one and one-half times the regular straight-time rate, provided the employee works all of the regular scheduled hours made available, as defined in Art. IV Sec. 4.01(a) and Sec. 4.01(c).  In the event the employee does not work all of the regularly scheduled hours available he will receive no premium rate until after he has worked 40 hours.  Work on Sundays shall be paid at double the straight-time rate.  The following holidays:  New Year's Day, Memorial Day, Fourth of July, Labor Day, Veteran's Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas Day, shall be paid at double the straight-time rate.  Holidays shall be recognized only on the day on which they fall.

Section 4.03:  The minimum regular straight-time rate of wages for Journeyman Inside Wireman (JIW) shall be as follows:

Effective June 6, 2022:  $32.00
Effective January 2, 2023:  $34.00
Effective January 1, 2024:  $35.00
Effective January 6, 2025:  $35.75

Def. MSJ Appx.000015

| APPENDIX A – MINIMUM BENEFITS | | | | | |
|---|---|---|---|---|---|
| **Multiplier** | **Classification** | **NEBF** | **Annuity** | **Medical** | **JATC** |
| 130% of JIW wage rate | General Foreman (area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | General Foreman (no area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | Area Foreman | 3% | 8% | $5.45 | 1%*** |
| 110% of JIW wage rate | Foreman | 3% | 8% | $5.45 | 1%*** |
| 100% | Journeyman Inside Wireman | 3% | 8%* | $5.45 | 1%*** |
| **Apprentice Wireman** | | | | | |
| 50% of JIW wage rate | 1st Year - Period 1 | 3% | ** | $3.70 | 1%*** |
| 55% of JIW wage rate | 1st Year - Period 2 | 3% | 3% | $3.70 | 1%*** |
| 60% of JIW wage rate | 2nd Year - Period 3 | 3% | 3% | $3.70 | 1%*** |
| 70% of JIW wage rate | 3rd Year - Period 4 | 3% | 5% | $3.70 | 1%*** |
| 75% of JIW wage rate | 4th Year - Period 5 | 3% | 5% | $3.70 | 1%*** |
| 80% of JIW wage rate | 5th Year - Period 6 | 3% | 8% | $3.70 | 1%*** |
| | Unindentured Apprentice | 3% | | $3.70 | 1%*** |

* 9% effective January 6th 2025

** 1% effective January 6th 2025

*** 1% of Journeyman Straight-Time Rate

<u>Section 4.04</u>: The Employer shall pay all wages in cash or check weekly, not later than quitting time on Friday. The Employer may pay wages by direct deposit, through debit card by cash or by check. Employees may be required to execute authorization forms for direct electronic deposit of wages on a weekly basis to the bank or credit union of the employee's choice. This manner of payment, once adopted, may not be changed by the Employer except upon 14-day advance written notification to the employee with notification to the Union. In the event that employees are not paid by the above-stated time, waiting time at the regular straight time rate (not to exceed eight (8) hours in any one twenty-four (24) hour period) shall be charged until payment is made. The previous sentence only applies in the event that there has been a previous instance within the

preceding twelve (12) months of the Employer failing to timely pay wages. Otherwise, paid waiting time only begins if payment has not been received by quitting time on Friday.

Section 4.05:  Should an Employer issue a paycheck that does not clear the bank for payment, provided the employee does not hold said check for more than thirty (30) days before making attempt to cash said check, then said Employer, while in the jurisdiction of the Local Union, thereafter shall pay in cash.

Section 4.06:  When Friday is a recognized holiday, wages shall be paid Thursday for all work during that week. An itemized statement shall be furnished each workman, showing total hours worked, total wages earned, and any deductions from such wages.

Section 4.07:  Any man reporting for work and being laid off, not having been notified the day previous of such layoff shall receive not less than two (2) hours wages in order to gather his tools and personal belongings and shall be paid off in full immediately. In the event the employee is not paid off, waiting time at the regular rate (not to exceed eight [8] hours in any one twenty-four [24] hour period) shall be charged until payment is made. Two (2) hours wages for gathering tools and personal belongings will not be paid if the employee has not notified the Employer of a previous day's absence. An employee who voluntarily quits shall receive the employee's final paycheck on the next contractually scheduled pay day.

Section 4.08(a):  When men are directed to report to a job or shop and do not start to work due to causes other than weather conditions, they shall receive two (2) hours pay.

(b)     When men receive two (2) hours pay as show-up time, they shall remain available for work for a full two (2) hour period.

(c)     If requested by the Employer, during inclement weather conditions, men shall remain on the job available for work and shall receive two (2) hours pay.

(d)     When men are directed to report to a job and are instructed to go to work by the Employer or his representative, weather conditions permitting, and they refuse, they shall not receive the two (2) hours show-up time.

(e)     When men are called out on trouble or emergency calls outside of regularly scheduled working hours, they shall be paid from the time they leave home until they return at the overtime rate, with a minimum of one (1) hour's work.

Section 4.09:  The Employer shall pay for traveling time and provide for at least one of the following provisions:

(i)     Furnish transportation from shop to job and job to job and job to shop during the regular working hours; or

(ii)     Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service for actual mileage from shop to job and job to job and job to shop during all the regular working hours to be reimbursed.

On work outside the jurisdiction of the Union, the Employer shall provide one of the following:

(i)    Furnish transportation, board and all other necessary expenses;

(ii)    Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service and furnish board and all other necessary expenses.

Section 4.10:  No traveling time shall be paid before or after working hours to workmen for traveling to or from any job when workmen are ordered to report to the job, provided his day ends at such job.

Section 4.11:  The Employer shall furnish a monthly payroll report to Local Union 520 postmarked no later than 15th day of the following month, giving workman's name, classification, wage rate, straight-time hours worked, overtime hours and gross wages paid to all workmen.  This report shall identify the exact date of all employees who have quit or been discharged during the working period covered by this report.

A monthly payroll report to the Local Union and to all Trust Funds shall be completed and mailed each month, whether the Contractor has workmen employed or not.

Section 4.12:  Workmen being laid off or discharged by an Employer or workmen severing their employment shall be given a termination slip stating the reason for termination and signed by their immediate supervisor or their Employer, and a copy shall be sent to Local Union 520 and the Central Texas Chapter, N.E.C.A.  Additionally, employers shall provide a termination slip to the JATC Training Director in the case of an apprentice.

Section 4.13:   When so elected by the contractor, multiple shifts of eight (8) hours for at least five (5) days' duration may be worked.  When two (2) ore three (3) shifts are worked:

The first shift (day shift) shall consist of eight (8) consecutive hours worked between the hours of 8:00 A.M. and 4:30 P.M. Workmen on the "day shift" shall be paid at the regular hourly rate of pay for all hours worked.

The second shift (swing shift) shall consist of eight (8) consecutive hours worked between the hours of 4:30 P.M. and 1:00 A.M. Workmen on the "swing shift" shall be paid at the regular hourly rate of pay plus **10%** for all hours worked.

The third shift (graveyard shift) shall consist of eight (8) consecutive hours worked between the hours of 1:00 A.M. and 9:00 A.M. Workmen on the "graveyard shift" shall be paid at the regular hourly rate of pay plus **15%** for all hours worked.

The Employer shall be permitted to adjust the starting hours of the shift by up to two (2) hours in order to meet the needs of the customer.

If the parties to the Agreement mutually agree, the shift week may commence with the third shift (graveyard shift) at 12:30 A.M. Monday to coordinate the work with the customer's work

Def. MSJ Appx.000018

schedule. However, any such adjustment shall last for at least five (5) consecutive days duration unless mutually changed by the parties to this Agreement.

An unpaid lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required before the established start time and after the completion of eight (8) hours of any shift shall be paid at one and one-half times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight time rate shall be the maximum compensation for any hour worked. There shall be no requirement for a day shift when either the second or third shift is worked.

## UNION DUES DEDUCTION

Section 4.14: Upon receipt of a voluntary written authorization the Employer agrees to deduct and forward to the Financial Secretary of the Local Union - the additional working dues from the pay of each employee. The amount to be deducted shall be the amount specified in the approved Local Union Bylaws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

## ARTICLE V
## General Rules

Section 5:01: In order to comply with existing laws, nothing in this Agreement shall be construed as limiting the right of Employers to move, transfer, or assign employees from his shop to any specific job or from any job to any other job upon which said Employer holds a contract for the performance of the electrical work. An employee, once on the Employer's payroll, may be worked by him at any location at the discretion of the Employer.

Section 5.02: When the Employer has no shop located in the jurisdiction of this Union, then under such circumstances the job site shall be considered the city in which the shop is located with one job site designated as the permanent shop.

Section 5.03: On all jobs requiring five (5) or more Journeymen, at least every fifth Journeyman, if available, shall be fifty (50) years of age or older.

Section 5.04(a): Journeyman shall provide themselves with the following tools:

| | |
|---|---|
| One tester not over 1000 volts or one Multi Volt Tester | Combination square-Tri-square Adjustable 12" blade |
| Knife | Hacksaw frame |
| Crescent wrench 8" to 12" | Two pair channel lock type pliers |
| Screw drivers | One pair long nose pliers |
| Hammer | One pair Dyke pliers |
| Small level | One chalk line |
| Plumb bob | Keyhole saw |
| Awl or Center punch | One steel measuring tape at least |

16

| | |
|---|---|
| Pencil | 16' long |
| One pair side cutting pliers | Pipe wrench 12" to 14" or small |
|   7" or larger | Chain tong |
| Wire stripper | |

(b)    Journeyman may furnish other similar tools but shall not be required to do so.

(c)    A Journeyman may carry or store in his toolbox small tools furnished by and belonging to his Employer (power tools excluded). Such tools must be the property of the Employer, to be returned to him upon request or termination of the employee but are not to be replaced by the employee if broken or stolen.

(d)    Apprentices shall provide themselves with the following tools only, except that first-year Apprentice may provide himself with a small toolbox and a third- or fourth-year Apprentice may have a toolbox on the job and start building up his tool list towards that of a Journeyman.

| | |
|---|---|
| 2 pair channel lock type pliers | Pencil |
| 1 pair side cutters pliers - 7" | Hammer |
|   or larger | One voltage tester not over 1000 or Multi Volt |
| | Tester |
| One steel measuring tape at least 16' long | Small level |
| Screw drivers | Hacksaw frame |
| Knife | Wire stripper |
| Awl | |

He may furnish one pair of long-nose and one pair of Dyke pliers if he desires.

(e)    The Employer shall furnish necessary locked storage to reasonably protect tools from the weather and vandalism on large jobs where it is necessary to leave tools on the job.

Section 5:05:  The Employer shall furnish all other necessary tools or equipment. Workmen will be held responsible for the tools or equipment issued to them providing the Employer furnishes the necessary lockers, toolboxes, or other safe place of storage. Tools must be taken out and put away during working hours.

Section 5.06:  Workmen shall install all electrical work in a safe and workman like manner in accordance with applicable code and contract specifications.

Section 5.07:  The representatives of the Union shall be allowed access to any building at any reasonable time where members of the Union are employed.

Section 5.08:  In all shops or on all jobs where four (4) or more Journeymen are employed, one Journeyman shall be designated as a Foreman.

Def. MSJ Appx.000020

On all jobs, the first working crew may consist of a maximum of eleven (11) men, that is, ten (10) Journeyman and one (1) working Foreman.

When a second crew is established, it may consist of a maximum of eleven (11) men, that is, ten (10) Journeymen and one (1) working General Foreman.

When a third or subsequent crew is established, it may consist of a maximum of eleven (11) men, that is, ten (10) Journeymen and one (1) working Foreman. Each crew shall be supervised by a Foreman and the Foremen shall be supervised by the General Foreman.

No General Foremen shall supervise more than fifty-five (55) men, including Journeymen and Foremen. For each additional fifty-five (55) men, the above procedures shall repeat except that the sixth and subsequent Foremen shall be supervised by an Area Foreman.

Section 5.09: Foremen, Area Foremen, and General Foremen shall be permitted to use tools. This shall not mean that they cannot handle material. Foremen may be required to attend and complete Foremen courses when provided.

Section 5.10: On jobs requiring a Foreman, workmen are not to take directions, orders or accept the layout from anyone other than their Foreman. Foremen are to take directions, orders, or layout from their Area Foreman only, when Area Foremen are required. When Area Foremen are not required, Foremen shall take directions, orders or layouts from the General Foreman only. Area Foremen shall take directions, orders or layout from the General Foreman only.

Section 5.11: No workman on one job shall replace a workman on another for any overtime work. All overtime work on any job shall be distributed fair and equal to all workmen. Exceptions to the two conditions above shall include the need for special skills or when workmen have not worked the available straight time hours during the "work week" as defined in Article IV, Section 1.

Section 5.12: The Employer shall see that cold water (in warm weather) and first-aid kits are available on all jobs and/or trucks.

Section 5.13: The Employer shall furnish protective equipment for workmen on energized circuits or equipment carrying 300 volts or more. On all energized circuits or equipment carrying 440 volts or over, as a safety measure, two (2) or more Journeymen must work together.

Section 5.14: All conduit shall be cut and threaded by workmen covered by this Agreement.

Section 5.15: Where pipe cutting and threading machines, electric drills, electric benders, electric chipping hammers, sanders, similar portable tools and all other power-driven equipment are used, such shall be operated by workmen covered by this agreement in the jurisdiction of the IBEW.

Def. MSJ Appx.000021

Section 5.16:  All pulling of wire or cable shall be done by workmen covered by this Agreement.

Section 5.17:  Journeyman cable splicers shall furnish only hand tools.  On all work of joining, splicing and insulating and the placing of flame-proof covering where wiped lead joints are necessary, it shall be performed by cable splicers.  Journeymen only shall be used in assisting cable splicers, except that one de-energized enclosures, an Apprentice may be used.  Cable splicers shall not be required to work on wires or cables when the difference in potential is over 200 volts between any two conductors or between any conductor and ground, unless assisted by one Journeyman.  In no case shall cable splicers be required to work on energized cables carrying in excess of 480-volt circuit.

Section 5.18:  Welders gloves, sleeves, hoods and all hard hats shall be furnished by the Employer. Workmen may be required to sign a payroll deduction form to authorize the deduction from their final paycheck to cover reimbursement of unreturned hard hats.  Charges shall not exceed actual cost paid by the Contractor.

Section 5.19:  The installation of all electrical raceways whether metal, wood, fiber, plastic clay or of any other conceivable composition, when used to contain electrical or grounding system conductors, and the installation, preparation and connection of all electrical and/or grounding or bonding conductors shall be performed by workmen employed under the terms of this Agreement and paid the hourly applicable negotiated wage rate contained herein unless it is an integral part of the building structure.

Section 5.20:  No work shall be performed on Labor Day except in case of emergency.

Section 5.21:  On any job of five (5) or more days duration on the main campus of the University of Texas, the Employer will either provide for employee parking within three blocks of the job or arrange for covered transportation from a parking area within two miles of the job.

## ARTICLE VI
### Standard Inside Apprenticeship Language

Section 6.01:  There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of 6 or 8 members who shall also serve as Trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study.  All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (un-indentured, intermediate journeymen, etc.).

Def. MSJ Appx.000022

Section 6.02:  All JATC member appointments, reappointments, and acceptance of appointments shall be in writing.  Each member shall be appointed for a 3-year term, unless being appointed for a lesser period of time to complete an expired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent, or they voluntarily resign. All vacancies shall be filled immediately

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

Section 6.03:  Any issue concerning an apprentice, or an apprenticeship matter shall be referred to the JATC for its review, evaluation, and resolve, as per standards and policies.  If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article One of this Agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

Section 6.04:  There shall be only one (1) JATC and one (1) local apprenticeship and training trust.  The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunications apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

Section 6.05:  The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties, and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC.  All employees of the JATC shall serve at the pleasure and discretion of the JATC.

Section 6.06:  To help ensure diversity of training, provide reasonable continuous employment opportunities, and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprenticeships with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

Section 6.07:  All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selections procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship.  Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

Section 6.08:  The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs.  The JATC is authorized to indenture the number of apprentices necessary to meet the jobsite ratio as per section 6.12.

Section 6.09:  Though the JATC cannot guarantee any number of apprentices, if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request.  If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants.  An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

Section 6.10:  To accommodate short-term needs when apprentices are unavailable, the JATC shall assign un-indentured workers who meet the basic qualifications for apprenticeship.  Un-indentured workers shall not remain employed if apprentices become available for OJT assignment.  Un-indentured workers shall be used to meet job site ratios except on wage-and-hour (prevailing wage) job sites.

Before being employed, the un-indentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an un-indentured, that they are subject to replacement by indentured apprentices, and that they are not to work on wage-and-hour (prevailing wage) job sites.

Should an un-indentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked as an un-indentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to un-indentured; such as Math Review, English, Safety, Orientation/Awareness, introduction to OSHA, First-Aid and CPR.  Participation shall be voluntary.

Section 6.11:  The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and un-indentured. Contributions to other benefit plans may be addressed in other sections of this agreement.  (See Article IV Section 4.03).

Section 6.12:  Each job site shall be allowed a ratio of one (1) apprentice(s) for everyone (1) Journeyman Wireman.

Def. MSJ Appx.000024

| Number of Journeymen | Maximum Number of Apprentices/ Unindentured |
|---|---|
| 1 to 3 | 1 to 3 |
| 4 to 6 | 4 to 6 |
| etc. | etc. |

The first person assigned to any job shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

Section 6.13: An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in-sight-of a Journeyman Wireman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

Section 6.14: Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

Section 6.15: The parties to this Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor-Management Relations Act of 1947 as amended, ERISA, and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials, or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

Section 6.16:  All employers subject to the terms of this Agreement shall contribute the amount of funds specified by the party's signatory to the local apprenticeship and training trust agreement.  The current rate of contribution is:  1% of the Journeyman straight-time rate per hour for each hour worked. This sum shall be due the Trust Fund by the same date as is their payment to the NEBF under the terms of the Restated Employers Benefit Agreement and Trust.

## ARTICLE VII
### Vacation

Section 7.01:  Upon written authorization from the employee, the Employer shall make a weekly payroll deduction of six percent (6%) from the gross pay of each employee. The employee shall request the payroll deduction at the beginning of employment with an employer. The employee shall notify the employer, in writing of any modifications to their participation status for the voluntary payroll deduction in the month of January or July. Payroll deduction revisions will be made effective on the first payroll of the following month. The Employer monthly shall forward the amount of individual deductions from each employee as shown on the monthly payroll to Velocity Credit Union, ATTN: Teller Operations, P.O. Box 1089, Austin, TX, 78767, for deposit to that employee's Velocity Credit Union vacation account, and simultaneously shall provide the Local Union with a written report which sets forth, for each employee, the number of hours worked, the employee's classification and pay rate, the employee's gross pay, and the amounts deducted.

Section 7.02:  The payment and payroll report shall be mailed to reach the Velocity Credit Union no later than the 15th day of the month following the end of each benefit period.

Section 7.03:  Each employee shall be allowed to take two (2) weeks of annual vacation between February 1st and January 31st.

Section 7.04:  An Employer's failure to timely remit the payroll deductions or payroll report to the Velocity Credit Union, or the payroll report to the Local Union, as required above shall be treated as a delinquent contribution under the terms of the applicable Inside Construction Agreement.

## ARTICLE VIII
### Annuity Plan

It is mutually agreed between the parties hereto and in accordance with the IBEW Local Union 520 Annuity Plan entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, the Employer will forward to the Annuity Plan an amount equal to the percentage levels per Appendix A (See Article IV Section 4.03) of the gross wages of all classifications of employees for all hours worked within the geographical limits of the Union's jurisdiction when work is performed for any Employer operating under this Agreement. The payment shall be made monthly, together with the payroll report forms specified in Article IV.

Def. MSJ Appx.000026

## ARTICLE IX
## 401(k) Savings Plan

All employers signatory to this Agreement and/or employing workmen under the terms of this Agreement, shall deduct from each employee's Gross Weekly Payroll of employees who wish to participate, a voluntary deductible amount to be deposited into a 401(k) savings plan, upon the written request of each employee.  Employees may enroll at the beginning of the employment with an Employer and enroll or change withholding each year during the month of January or July. Withholding will be made effective on the first payroll of the following month.

## ARTICLE X
## Health and Welfare

It is hereby mutually agreed between the parties hereto and in accordance with the Benefit contract governing the electrical benefit fund entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, that the Employer will forward to the Central Texas Health and Benefit Plan the following contributions as per Appendix A (See Article IV Section 4.03) for all hours actually worked by each employee (both straight time and overtime) within the geographical limits of the Union's jurisdiction when work is performed for any Employers operating under the terms of the basic Agreement for all Employers.  Payments shall be made monthly together with a monthly payroll report on a form that will be furnished for that purpose by the Trustees of the Electrical Benefit Plan.

It is agreed that employers shall contribute solely up to $5.45 per hour of increases declared by the Trustees of the Plan. Any increases above $5.45 shall be split equally between the employer and employee through a wage reduction of the JIW rate of pay, all other classifications shall adjust accordingly.

## ARTICLE XI

## National Labor Management Cooperative Committee

Section 11.01:  The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C. §186(c)(9).  The purposes of this Fund include the following:

(1)     to improve communication between representatives of labor and management;
(2)     to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;
(3)     to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;
(4)     to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

24

(5)    to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

(6)    to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

(7)    to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

(8)    to engage in public education and other programs to expand the economic development of the electrical construction industry;

(9)    to enhance the involvement of workers in making decisions that affect their working lives; and

(10)    to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

Section 11.02:  The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

Section 11.03:  Each employer shall contribute one cent ($.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year.  Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. The Central  Texas Chapter, NECA, or its designee, shall be the collection agent for this Fund.

Section 11.04:  If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.  Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE XII
## P.A.C. Fund

The Employer agrees to deduct and transmit to the Local Union 520, IBEW, Committee on Political Education (IBEW-COPE) .05 cents for each clock hour worked from the wages of those employees who voluntarily authorize such contributions on the forms provided for that purpose by IBEW-COPE.

The deductions will be made monthly and reported and remitted in accordance with Article IV, Section 11 of this Agreement.

Any Employee may revoke the voluntary authorization at any time by notifying the Company and IBEW-COPE in writing of a desire to do so.

The Union will indemnify and save the Company harmless from any claims, suits, or any other form of liability as a result of making payroll deductions described above.

## ARTICLE XIII

This Agreement set forth the entire contract between the Chapter and the Union and supersedes all previous understandings and Agreements between them and amendments thereto.

## ARTICLE XIV
## Substance Abuse Language

The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state, and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

## ARTICLE XV
## Code of Excellence

The parties to this Agreement recognize that to meet the needs of our customers, both employer and employee must meet the highest levels of performance, professionalism, and productivity. The Code of Excellence has proven to be a vital element in meeting the customers' expectations. Therefore, each IBEW local union and NECA chapter shall implement a Code of Excellence Program. The program shall include minimum standards as designed by the IBEW and NECA.

ARTICLE XV1 – Local Union 520 Administrative Fund

(a) Effective June 6, 2022, all employers subject to the terms of this Agreement shall contribute an amount equal to ten cents($.10) per hour worked by each employee working under the terms of this agreement. The sum shall be due no later than the 15th of the month following the end of the calendar month in which the work was performed on a form provided by the Administration Fund.

(b) These funds are for the administration of the benefits processing and the Administrator of the "Fund" shall be appointed by the Central Texas Chapter, NECA. The Administrator and CTXNECA will indemnify and save the Union harmless from any claims, suits, or any other form of liability as a result or administering this fund as described above.

(c) No part of the funds collected under this fund shall be used for any purpose which is held to be in conflict with the interests of the IBEW and its Local Unions.

(d) The failure of an individual employer to comply with the applicable provisions of the fund shall constitute a breach of this labor agreement and shall be subject to the same delinquency requirements as pertain to the other trust funds set forth in this agreement. It shall be the responsibility of the fund and/or the fund administrator, not the Local Union to enforce this provision.

## **Separability Clause**

Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provision shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

SIGNED FOR THE UNION:                              SIGNED FOR THE EMPLOYER:

Local Union No. 520 of the International            Central Texas Chapter National Electrical
Brotherhood of Electrical Workers                  Contractors Association

By: _____              By: _____
       Ben Brenneman                                      Don Kanetzky
       Business Manager/Financial Secretary               Chapter Manager

Date: ___6/1/2022___                          Date: ___6-1-2022___

27

## ZONE III MEMORANDUM OF UNDERSTANDING

It is mutually agreed between IBEW Local Union 520 and Central Texas Chapter, NECA, effective June 6, 2022, that the following counties shall be designated as "Zone III":

Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason, and Kimble

It is further agreed that, within Zone III, the JIW rate of pay shall be as follows:

| June 6, 2022: | $28.52 |
| January 1, 2023: | $28.52 |
| January 2, 2024: | $28.75 |
| January 6, 2025: | $29.00 |

Wage rates for CEs shall be set per the following table for the period of June 6, 2022 – June 2, 2025:

| CE 1 | CE 2 | CE 3 | CE 4 | CE 5 | CE 6 | CE 7 | CE 8 | CE 9 | CE 10 |
|------|------|------|------|------|------|------|------|------|-------|
| 45% | 45% | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 90% |

All other terms and conditions of employment will be those set forth in the AGREEMENT Between The CENTRAL TEXAS CHAPTER of the NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC. and LOCAL UNION NO. 520 of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS.

SIGNED FOR THE UNION:                          SIGNED FOR THE CHAPTER:

Local Union No. 520 of the                     Central Texas Chapter
International Brotherhood of                    National Electrical Contractors
Electrical Workers                             Association, Inc.

Ben Brenneman                                  Don Kanetzky
Business Manager                               Chapter Manager

6/7/2022                                       6-7-2022
Date                                           Date

Def. MSJ Appx.000031

**1st YEAR APPRENTICE WAGE**
**MEMORANDUM OF UNDERSTANDING**

**BETWEEN**

**CENTRAL TEXAS CHAPTER, NECA**

**AND**

**IBEW LOCAL UNION 520**

It is mutually agreed upon between IBEW Local 520 and Central Texas Chapter, NECA, effective May 27, 2019, that the minimum wage for a first-year apprentice shall be $15.00 per hour. This MOU shall remain in effect until such time as 50% of the JIW wage rate is greater than $15.00 per hour.

SIGNED FOR THE UNION:                          SIGNED FOR THE EMPLOYER:

Local Union No. 520 of the International           CENTRAL TEXAS CHAPTER, NECA
Brotherhood of Electrical Workers

By: _____                      By: _____
Ben Brenneman                                      Don Kanetzky
Business Manager/Financial Secretary               Executive Director

Date 6/1/2022                                      Date 6-1-2022

# CE ADVANCEMENT
# MEMORANDUM OF UNDERSTANDING

## BETWEEN

## CENTRAL TEXAS CHAPTER, NECA

## AND

## IBEW LOCAL UNION 520

A CE shall obtain a Texas State Journeyman's License before being upgraded to JIW status.

SIGNED FOR THE UNION:

Local Union No. 520 of the International
Brotherhood of Electrical Workers

By: _____
Ben Brenneman
Business Manager/Financial Secretary

Date  6/1/2022

SIGNED FOR THE EMPLOYER:

CENTRAL TEXAS CHAPTER, NECA

By: _____
Don Kanetzky
Executive Director

Date  6-1-2022

Def. MSJ Appx.000033

## 2022 Residential MOU

**Scope:** This MOU shall apply to all dwelling units including single family dwellings, apartments, and condominiums four stories and below. This MOU shall not apply to the commercial portion of mixed-use developments.

1. A CW/CE, having attained a Residential Journeyman's License, shall be awarded 2000 SBCs/ OJT hours. This CW/CE shall be allowed to work unsupervised on residential construction/service work.
2. A worker holding a Residential or Unrestricted Journeyman's License shall be the first person assigned to any residential project.
3. On all residential projects with four or more workers, a worker holding a Residential Journeyman's License shall be designated Residential foreman. This Residential foreman shall be allowed to supervise a crew of up to 10 workers of his classification or below, including first- and second-year apprentices. This Residential foreman shall receive a 10% pay premium above his/her classification.
4. On all residential projects requiring more than 11 workers, one shall be designated Residential General Foreman. The Residential General Foreman shall receive a 20% pay premium above his/her classification.
5. There shall be one foreman per 10 workers.
6. A CW/CE with a Residential Journeyman's License shall continue to accrue SBCs/OJT hours and be advanced in the CW/CE program accordingly.

SIGNED FOR THE UNION:

Local Union No. 520 of the International
Brotherhood of Electrical Workers

By: _____

Ben Brenneman
Business Manager/Financial Secretary

Date: 6/7/2022

SIGNED FOR THE EMPLOYER:

Central Texas Chapter National Electrical
Contractors Association

By: _____

Don Kanetzky
Chapter Manager

Date: 6-7-2K22

Def. MSJ Appx.000034

**SHORT CALL EXTENSION**

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN**
**CENTRAL TEXAS CHAPTER, NECA**
**AND**
**IBEW LOCAL UNION 520**

In order to accommodate short term employment needs of the employer signed to this agreement, and the needs of our customers, the union and employer agree to the following:

Article III, Section 3.12 of the Inside Agreement between Central Texas Chapter, NECA and Local Union 520, of the International Brotherhood of Electrical Workers, shall have the following language added to the existing language contained in Article III, Section 3.12:

> A forty (40) hour call may be extended an additional forty (40) hours by the employer is job conditions warrant such extension. An applicant is not required to stay for the second forty (40) hour period unless told in advance the job as for eighty (80) hours. For the purposes of calculating hours worked under this Memorandum, only the straight time hours worked will be used. Any overtime worked during the one (1) or two (2) week period covered by this Memorandum will not affect the applicant's position on the Out-of-Work List.

This Memorandum shall continue in effect from year to year hereafter unless changed or terminated in the same manner as prescribed for the Inside Agreement.

By: _____
Chris Wagner
Business Manager/Financial Secretary
IBEW Local Union 520

Date __6/1/202__

By: _____
Don Kanetzky
Executive Director
Central Texas NECA

Date __6-1-2022__

**SMALL WORKS**
**MEMORANDUM OF UNDERSTANDING**

**BETWEEN**

**CENTRAL TEXAS CHAPTER, NECA**

**AND**

**IBEW LOCAL UNION 520**

IBEW Local Union 520 and Central Texas Chapter NECA bargaining unit employers have repeatedly discussed possible solutions to gaining market share within the small works arena. In an effort to assist all signatory contractors in this arena, Local 520 offers the following:

**Four Person Crew**

Effective June 6, 2022 the Union agrees on any/all jobs throughout the Local 520 jurisdiction, with four (4) or less employees, the signatory contractor may utilize the services of a Construction Electrician (CE) and/or a 6th period apprentice. This CE or apprentice must be in possession of a State of Texas Journeyman License and may work alone, if necessary.

Additionally, the licensed CE may supervise up to three (3) additional equal or lower classified workers (CE's and/or CW's). This crew mix would not include Apprentice Wiremen. As long as the jobsite requires 4 or less employees, there will be no need for a Journeyman Inside Wireman (JIW) nor a Foreman (F). Should the four-person crew increase to five (5) or more, a licensed JIW or a licensed Foreman must be utilized.

Due to the market conditions, the parties recognize this agreement to be a variance to Article VI Section 6.12 of the inside agreement that necessitates the JIW being the first person on the job. The parties recognize Apprentices and CW/CEs operate under a formal training program where OJT under direct and indirect supervision by a JIW is still an important component to their development. Therefore, employers must be diligent to ensure CW/CE employees receive OJT training supervised by a JIW outside of these qualifying projects.

Signatory Contractors are not limited to any number of Four Person Crew jobsites. Pay rates and applicable benefits for the above classified workers shall be the ones listed in the Local 520 Inside Collective Bargaining Agreement between IBEW Local Union 520 and Central Texas Chapter NECA.

This Memorandum of Understanding will expire on June 2, 2025 unless both Parties agree to extend it for an additional timeframe.

SIGNED FOR THE UNION:

Local Union No. 520 of the International Brotherhood of Electrical Workers

By: _____

Ben Brenneman
Business Manager/Financial Secretary

Date  6/1/2022

SIGNED FOR THE EMPLOYER:

CENTRAL TEXAS CHAPTER, NECA

By: _____

Don Kanetzky
Executive Director

Date  6-1-2022

Def. MSJ Appx.000037

**Memorandum of Understanding**
**Summer Worker Program**

1.  Must be by informal understanding between the local Union, the Employer and the JATC, with written guidelines.

2.  The guidelines should specify the following conditions:

    a.  The maximum number to be employed.

    b.  Effective only when placement will not displace an Apprentice or Intermediate Journeyman.

    c.  Qualifications:
        1. At least 16 years old
        2. A bona fide student (evidence required)
        3. Summer worker and employer signatures on statement of understanding (sample attached)

    d.  Placement for a specific period of time, not to exceed 90 days. (Ending with the first pay period in September).

    e.  Placed as a Summer Worker. NOT as an apprentice. (Cannot be referred, or worked on jobs requiring registered apprentices).

    f.  Rate of pay shall be equal to that of a first period indentured apprentice.

    g.  Work performed as a Summer Worker is not counted towards apprenticeship.

    h.  Wages paid to Summer Workers are included in gross labor payroll, and the 3% of gross labor payroll payment to NEBF must include Summer Workers wages.

    i.  Limited electrical work (same as unindentured apprentice).

By: _____

Benn Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

Date  4/1/2022

By: _____

Don Kanetzky
Executive Director
Central Texas NECA

Date  6-1-2022

Def. MSJ Appx.000038

**REVISED (Date corrected)**
**Memorandum of**
**Understanding**

**Between**
**IBEW Local Union**
**520 and**
**Central Texas Chapter, NECA**

Effective June 6, 2022 through June 2, 2025.

On jobs of five (5) or more days duration on the main campus* of the University of Texas, if parking is not provided, the employer will reimburse $6.00 per day for parking to each employee who reports to work on time and works all regular hours available to him. The employer is not responsible to provide transportation to and from parking areas.

By: _____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

By: _____

Don Kanetzky
Executive Director
Central Texas NECA

Date: 6/1/2022

Date: 6-1-2022

*from I-35 to Guadalupe Street, from East & West Dean Keeton Street to East & West Martin Luther King, Jr. Blvd.

EXHIBIT 3



**A.S.H. ELECTRICAL SERVICES, LLC**
**P.O. BOX 61905**
**SAN ANGELO, TEXAS, 76904**
**325.716.6696**

**I.B.E.W. LOCAL UNION 520**
**CENTRAL TEXAS CHAPTER, NECA**

**May, 30, 2023**

In accordance with the provisions of the Letter of Assent- A, between A.S.H. Electrical Services, LLC, Central Texas Chapter, NECA, and IBEW Local Union 520, this letter shall serve as notice of A.S.H. Electrical Services, LLC intent to terminate our partnership with I.B.E.W. Local Union 520 and the Central Texas Chapter, NECA.  It is the position of A.S.H. Electrical Services, LLC that due to lack of qualified craftsmen, the local union HAS NOT and CANNOT provide employees which are crucial to furthering of our business plan/model.  To provide qualified men and women to the employer was the very basis of the agreement.  Unfortunately, conversely, it seems as though our purpose has been to provide the local union with membership.  Furthermore, much emphasis was placed upon the Code of Excellence program. Issues which were brought before representatives of Local Union 520 were conveniently "brushed under the rug" with no regard as to the negative impact upon the contractor.  Quite frankly, I find it absurd a program exists in which- A: the content is not enforced, rather it becomes just another "training class "and box to check. B: Program attempts to instruct an individual to be a responsible, ethical, adult when accepting and continuing employment with a contractor. For these reasons, A.S.H. Electrical Services, LLC will no longer participate in a single sided equation in which there exists one beneficiary.  This letter shall serve as our 150-day notice to terminate the Letter of Assent- A, signed May 13, 2021.

Respectfully,

_Adam C. Johnke_

**Adam C. Johnke- Partner**

**Date:** _May 30, 2023_

_Shannon J. Carpenter_

**Shannon J. Carpenter- Partner**

**Date:** _May 30, 2023_

Def. MSJ Appx.000040



**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

LOCAL UNION 520

Local 520

4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741
512.326.9540 • Fax 512.326.9596

August 7, 2023

SENT VIA CMRRR 94148118987654187116561
& FIRST CLASS MAIL

A.S.H. Electrical Services, LLC
3214 Sunset Drive
San Angelo, TX 76904

**Re: Response to 'Notice to Terminate' from A.S.H. Electrical Services, LLC**

Dear Adam:

We have received your notice to terminate your contract with Local 520. At the conclusion of this contract term, we will resolve our contractual dispute per Article I of the agreement.

This letter is a reminder that A.S.H. Electrical Services, LLC is bound to all terms and conditions of the agreement until its termination, including wage rates and payments to all trust funds. According to our records, you have not paid the required employee benefit contributions since May 2023. We request that you make all employees whole.

Please contact me if you have any questions.

Sincerely,

Ben Brenneman, Business Manager/Financial Secretary
IBEW Local Union No. 520

BB/bm



INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL UNION 520
**FILE COPY**
LOCAL
DATE: 12:03 pm, Aug 07 2023
BLAKE MILLER, OFFICE MANAGER

Def. MSJ Appx.000041



JAY WALLACE
TEL: 214.740.1407
FAX: 214.740.1407
JWALLACE@BELLNUNNALLY.COM

December 27, 2023

**VIA CMRRR #9414 7266 9904 2221 4527 24**
I.B.E.W. Local Union 520
Attn: Diarmid Campbell
909 Caddo Street
San Angelo, Texas 76901

**VIA CMRRR #9414 7266 9904 2221 4527 31**
Central Texas Chapter, NECA
Attn: Don Kanetzky
4000 Caven Road
Austin, Texas 78744

Re:   Confirmation of May 30, 2023 Termination of Letter of Assent-A, Labor Agreement, and Bargaining Rights Assigned to NECA and IBEW, Local Union No. 520

To Whom it May Concern:

This firm represents A.S.H. Electrical Services, LLC ("A.S.H."). Direct all future communications regarding your contractual relationship with A.S.H and its termination to me.

As you are aware, A.S.H. sent a letter to both Central Texas Chapter, NECA and I.B.E.W. Local Union 520 ("Local Union") dated May 30, 2023 stating its intent to terminate its contract with both entities upon 150 days' notice and detailing the Local Union's failures to uphold its obligations under the collective bargaining agreement. According to the terms set forth in the Letter of Assent-A, A.S.H.'s May 30, 2023 letter, receipt of which has been confirmed, dutifully informed Local Union and Central Texas Chapter, NECA of its intent to terminate.

With regard to the Local Union's failures, specifically, the Local Union fraudulently induced A.S.H. into the Letter of Assent-A by promising to provide qualified craftsmen and women knowing that it could not fulfil this promise.

Furthermore, the Local Union made additional promises to A.S.H. that the union craftsmen in A.S.H.'s workforce would be subject to the Code of Excellence program, ensuring that the workers would adhere to certain rules and regulations. However, when issues with drug use by craftsmen **on the job** were brought before the Local Union, the Local Union took no action, despite such behaviors by craftsmen putting A.S.H. at high risk of liability, as well as its clients' and the general public's safety in risk.   A.S.H. will not and cannot tolerate the Local Union's negligent operations within its business.

Def. MSJ Appx.000042



I.B.E.W. LOCAL UNION 520
CENTRAL TEXAS CHAPTER, NECA

For these reasons, among others, A.S.H. properly provided notice of termination on May 30, 2023. Accordingly, A.S.H. considers its contractual relationship with IBEW to be terminated as of November 1, 2023 and withdrawals and/or revokes all collective bargaining rights assigned to the Local Union and Central Texas Chapter, NECA.

Sincerely,

Jay Wallace

Def. MSJ Appx.000043



# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

Local 520

## LOCAL UNION 520

4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741
512.326.9540 • Fax 512.326.9596

January 3, 2024                                          SENT CMRR

Jay Wallace
Bell Nunnally
2323 Ross Ave., Ste. 1900
Dallas, TX

Dear Mr. Wallace,

Regarding your December 27, 2023 letter whereby you assert, among other things, A.S.H.'s intent to effect a mid-term repudiation of the Labor Agreement, I direct your attention to *Rome Electrical Systems, Inc.*, 349 NLRB 745 (2007) (termination of agency does not terminate CBA). After you have carefully reviewed this case, I am confident that you will find that the CBA remains in effect.

As to your expression of A.S.H.'s dissatisfaction with the Union's performance under the CBA, I disagree with any suggestion that the Local Union has not performed its obligations. There is a procedure described in Article I, Sections 1.05 through 1.10 to resolve this or any other differences that may arise between us during the life of the CBA.

*Please confirm your understanding that the Labor Agreement is valid and remains in effect by January 16, 2024.* Barring your confirmation by then, IBEW Local 520 will initiate action to enforce the Agreement.

Thank you,

Ben Brenneman
Business Manager
IBEW Local 520





JAY WALLACE
TEL: 214.740.1407
FAX: 214.740.1407
JWALLACE@BELLNUNNALLY.COM

January 9, 2023

**VIA CMRRR #9414 7266 9904 2221 4511 16**

I.B.E.W. Local Union 520
Attn: Ben Brenneman
Business Manager
IBEW Local 520
4818 East Ben White Boulevard, Suite 300
Austin, Texas 78741

Re:    A.S.H. Termination of Letter of Assent-A, Labor Agreement, and Bargaining Rights Assigned to NECA and IBEW, Local Union No. 520

Mr. Brenneman:

Your January 3, 2024 Response Letter, along with the Local Union's response to the May 30, 2023 Termination contains no specifics supporting your argument as to how the CBA is still in place despite A.S.H's termination, aside from misplaced reliance on case law that is distinguishable from this matter.

Moreover, and more concerning, your response does not state the Local Union's position as to how long A.S.H. remains bound by the CBA and when the CBA ceases to be in force and effect. To date, A.S.H. has received differing and confusing stances from the Local Union on this matter. As such, nothing the Local Union has argued thus far suggests A.S.H.'s Termination is not effective.

Specifically, in response to the May 30, 2023 Termination of Letter of Assent- A, the Local Union stated that termination could not be effective until May 13, 2024, the 3rd anniversary of the Letter of Assent-A. Conversely, your Response Letter appears to suggest that A.S.H. is contractually obligated until June 1, 2025.

Accordingly, A.S.H. demands that the Local Union make its position clear as to when A.S.H.'s termination of the CBA is effective by January 22, 2024. Depending on the Local Union's response, A.S.H. will evaluate its next steps.

Sincerely,

Jay Wallace

2323 ROSS AVENUE · SUITE 1900 · DALLAS, TEXAS 75201 | 214·740·1400 | WWW.BELLNUNNALLY.COM

Def. MSJ Appx:000045



Local 520

# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

## LOCAL UNION 520

**4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741**
**512.326.9540 • Fax 512.326.9596**

January 22, 2024

Jay Wallace                                          VIA EMAIL AND CCMR
Bell Nunnally
2323 Ross Ave., Ste. 1900
Dallas, TX 75201

Mr. Wallace,

Dear Mr. Wallace,

In answer to your January 9, 2024 demand, IBEW Local 520's position is that your client's termination of Central Texas Chapter NECA's authority to bargain on its behalf does not effect a termination of the collective bargaining agreement. That agreement remains in effect unless changed or terminated in accordance with its terms. The duration of the collective bargaining agreement is from June 2, 2022 through June 1, 2025.

Article I of the agreement spells out the procedure for changing or terminating the agreement. Local 520 will accept your December 27, 2023 as the written notice required under Section 1.02(a) of the Agreement, despite the fact that it comes well over a year before its due date. Though your notice is then timely, it is just that—notice. You should expect that the Local Union will timely provide notice to your client of the Union's proposed changes to the agreement. The agreement remains in full force and effect until a conclusion is reached resolving our forthcoming dispute over your desire to terminate the agreement and the Local Union's desire to modify it. Section 1.02(c). Note that Section 1.02(f) provides that your notice of the desire to terminate the agreement shall be handled in the same manner as the Local Union's forthcoming proposed changes.

Absent your confirmation that the collective bargaining agreement remains in full force and effect and that your client will comply with its terms until our dispute over proposed changes or termination is resolved in accordance with the procedure spelled out in Article I, the Local Union will take immediate action to enforce it.

I will need your confirmation by February 5, 2024.

Sincerely,

Ben Brenneman
Business Manager
IBEW Local 520

Def. MSJ Appx.000046



Local 520

# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

## LOCAL UNION 520

**4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741**
**512.326.9540 • Fax 512.326.9596**

January 22, 2024

SENT VIA CMRRR 9414811898765418716561
& FIRST CLASS MAIL

A.S.H. Electrical Services, LLC
3214 Sunset Drive
San Angelo, TX  76904

**Re: Response to 'Notice to Terminate' from A.S.H. Electrical Services, LLC**

Dear Adam:

We have received your notice to terminate your contract with Local 520. At the conclusion of this contract term, we will resolve our contractual dispute per Article I of the agreement.

This letter is a reminder that A.S.H. Electrical Services, LLC is bound to all terms and conditions of the agreement until its termination, including wage rates and payments to all trust funds. According to our records, you have not paid the required employee benefit contributions since May 2023. We request that you make all employees whole.

Please contact me if you have any questions.

Sincerely,


Ben Brenneman, Business Manager/Financial Secretary
IBEW Local Union No. 520

BB/bm

Def. MSJ Appx.000047

# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

## LOCAL UNION 520

### 4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741
### 512.326.9540 • Fax 512.326.9596

Local 520

January 22, 2024

SENT VIA CMRRR & FIRST CLASS MAIL

Adam Johnke
32.14 Sunset Dr 4000 Caven Road
San Angelo, TX 76904

DEAR BROTHE **JOHNKE**,

You are hereby notified to appear before the Trial Board of Local Union 520, IBEW, meeting at 4818 East Ben White Boulevard, Austin, Texas, upstairs in the Executive Board Room, Suite 300, on **Tuesday, February 6, 2024**, at **6:00 p.m.**, to answer charges filed against you by Brother **Diarmid Campbell**, Card No. **8260332**, for an alleged violation of the ***IBEW Constitution, Article XXV, Section 1 Subsections (a), (d), (e), (f), and (q)***.

Enclosed is a copy of the original charge filed against you. You may bring witnesses to give evidence in your behalf. You will be afforded the opportunity at the hearing to present any relevant evidence and to cross-examine any witnesses of the charging party. You may, if you desire, have an active <u>IBEW *member*</u> in good standing act as your counsel.

This will also serve to notify you that in the event you fail to notify the Business Manager's office at least seventy-two (72) hours prior to the designated time, of your inability to appear on the above appointed date and time, you will be tried in absentia.

Fraternally,

Elizabeth Brink

Recording Secretary

Local Union 520, IBEW

Def. MSJ Appx.000048

1

January 12, 2024                                  SENT VIA HAND DELIVERY

Elizabeth Brink
Recording Secretary
Local Union 520, IBEW
4818 East Ben White Boulevard, Suite 300
Austin, Texas 78741

RECEIVED ON
JAN 12 2024
DUES OFFICE

Dear Sister Brink,

I, Diarmid Campbell, Card No. 8260332, a member in good standing of IBEW Local Union 520, hereby wish to prefer charges against Brother Adam Johnke Card No. D897662, a member of IBEW Local Union 72, whose last known mailing address was 3214 Sunset Dr, San Angelo, TX 76904, for violation of the following:

## IBEW *CONSTITUTION*

> **Article XXV, Section 1.** Any member may be penalized for committing any one or more of the following offenses:
>
> **Subsection (a):** Violation of any provision of this Constitution and the rules herein, or the bylaws, working agreements, or rules of the L.U.
>
> **Subsection (d):** Engaging in activities designed to bring about a withdrawal or secession from the I.B.E.W. of any L.U. or any member or group of members, or to cause dual unionism or schism within the I.B.E.W.
>
> **Subsection (e)** Engaging in any act or acts that are contrary to the member's responsibility toward the I.B.E.W., or any of its L.U.'s, as an institution, or which interfere with the performance by the I.B.E.W. or a L.U. with its legal or contractual obligations.
>
> **Subsection (f)** Working for, or on behalf of, any employer, employer supported organization, or other union, or the representatives of any of the foregoing, whose position is adverse or detrimental to the I.B.E.W.
>
> **Subsection (q)** Working for any individual or company declared in difficulty with a L.U. or the I.B.E.W., in accordance with this Constitution.

Def. MSJ Appx.000049

2

The violations occurred as follows; On or about February 9, 2018, Brother Adam Johnke, a member in good standing of the IBEW Local Union 72, started A.S.H. Electrical Services LLC, an open-shop electrical contracting business in the jurisdiction of the IBEW Local Union 520. A.S.H. Electrical Services, LLC did not become a signatory contractor with the IBEW Local Union 520 nor any other IBEW Local Unions until May 18, 2021. During the span of time from February 9, 2018 to May 18, 2021 Brother Johnke was working in direct competition with the IBEW Local Union 520's signatory contractors.

On or about May 2023 Brother Johnke sent a letter to withdraw A.S.H. from their contract to IBEW Local Union's San Angelo office. On or about November 2023 Brother Johnke told his employees that A.S.H. would withdraw from the contract with the IBEW Local Union 520. On or about the middle of December 2023 Brother Jared Elkins and Brother Hunter Lake (still working at A.S.H.) withdrew from the IBEW Local Union 520. On or about late December 2023, Jay Wallace representing Bell Nunnally, Attorneys & Counselors (the firm representing A.S.H. Electrical Services LLC), sent a certified letter stating that A.S.H. considers its contractual relationship with IBEW to be terminated.

Sincerely,

Diarmid Campbell

Card No. 8260332

IBEW Local Union 520

Def. MSJ Appx.000050

January 30, 2024

Adam C. Johnke                           SENT VIA CMRR, FIRST CLASS MAIL, AND EMAIL
Card # D897662
3214 Sunset Drive
San Angelo, Texas, 76904


Mr. Craig Miller
Business Manager
IBEW LU 72
1813 Orchard Lane
Waco, Texas 76705

Brother Miller,

    It is with heavy heart and under extreme duress that I formally submit this letter of resignation from the IBEW effective immediately.  Over the course of the last year, beginning April 2023, relations between myself, A.S.H. Electrical Services, LLC (A.S.H.) of which I am a partner, and IBEW LU 520 have deteriorated and intensified in a negative fashion as A.S.H. has submitted due notice and requested termination of the Collective Bargaining Agreement between itself and IBEW LU 520.

    Portions of A.S.H. discontent and difficulties include:

1.  Failure to provide adequate, qualified workmen
2.  Failure to adhere to dispatch procedures outlined in CBA
3.  Failure to adhere to the IBEW Code of Excellence Program
4.  Prejudice in referral of members
5.  Knowledge of Members engaging in side work or "moonlighting"
6.  Dispatching of unqualified/misclassified workmen

    You are quite aware of A.S.H. ongoing struggle as I have reached out to you and solicited your council regarding some of these issues in recent months.  Unfortunately, this situation further declined as I was made aware of charges preferred upon me by the acting Assistant Business Manager, Diarmid Campbell, LU 520 Zone 3, San Angelo.  Enclosed is a copy.  Many if not all charges are baseless and stand in direct violation of IBEW Constitution more especially, Article XXV Sec. 1. (a), (b), (g). Furthermore, Mr. Campbell stands in direct violation of IBEW Constitution Article XXV Sec. 4. It is clear Mr. Campbell possesses limited knowledge of the Constitution and willfully engaged to bring about harm upon my person. Pursuing of charges of which it is easily proven he had knowledge of for over 3 calendar years is consistent with retaliation and harassment.

    Remaining alleged charges are a result of my affiliation with A.S.H. Electrical Services, LLC of which I am a partner.  In the same sense that an employee of General Motors does not adhere to the same thoughts, ideas, and precepts as that of his employer, I cannot legally be held liable for my actions as rendered by the other principal(s) of A.S.H. Electrical Services, LLC. A.S.H. Electrical Services, exists as an LLC thus, by law, is an entity unto itself.

As a result of charges preferred, I reached out to Brother Chris Wagner, requesting his intercession as it relates to this matter as it is quite apparent officers of LU 520 have set out to harm me, my family, and business and will stop at nothing, while violating the very Constitution they have sworn, as did I, to uphold.  Unfortunately, my request has fallen upon deaf ears. Why you may ask yourself as his office should give due consideration to any formal complaint or request made by a member of District 7? Let it be known I am very aware of the fact Chris Wagner; Seventh District International Vice President is both a former officer and member of none other than IBEW LU 520.  I believe we can each see the prejudice mounting at even greater levels.

I need you to understand, whether it be my person, my wife, or A.S.H. Electrical Services, LLC, acts of retaliation, prejudice, harassment, sexual harassment, defamation of character and slander are allegations of which evidence most certainly exists wherein it involves IBEW LU 520 and its officers.

Brother Miller, you have known me and known of me for years.  I apologize for the verbosity of this letter, however felt it necessary for one to have knowledge of what has been endured and continues to this day.  I have repeatedly asked myself "what I would be fighting for" should I choose to remain a member of an organization which, at one time, I dearly loved yet now has turned its back upon me refusing representation, allowing not just another member but an officer to file charges upon a brother in a senseless act of retaliation?  Yes, I suppose I could prefer charges upon Mr. Campbell with the Seventh District International Vice President but at what cost.  Mr. Wagner has already chosen sides and his side is certainly not one of truth, justice, and what is morally and ethically correct.  I am bucking a stacked deck and fully realize it.

In closing, I am willing to give up what once meant the most to me, that Yellow Ticket to anywhere I chose to be, regarding me as an IBEW Journeyman Inside Wireman. The IBEW never defined who I was, sadly, along with the many brothers who I admired, who taught me, mentored me and are now passed, it is time for me to turn the page in my life as well.  Please cease in the collection of monthly dues and accept my resignation for the reasons specified.

Respectfully,

Adam C. Johnke



January 30, 2024

A.S.H. Electrical Services, LLC                    SENT VIA CMRR, FIRST CLASS MAIL, AND EMAIL
P.O. Box 61905
San Angelo, Texas, 76906

Mr. Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520
4818 East Ben White Boulevard, Suite 300
Austin, Texas 78741

RE: A.S.H. Termination of Letter of Assent-A, Labor Agreement, and Bargaining Rights assigned to NECA and IBEW Local Union 520

Mr. Brenneman,

All responses regarding your contractual relationship with A.S.H. Electrical Services, LLC and its termination shall be directed to A.S.H. Electrical Services, LLC until further notice

Your January 22, 2024 response letter, while appreciated, fails to specify your reasoning as to why A.S.H. Electrical Services, LLC termination of CBA is not effective.

It is agreed Article 1 spells out the procedure for changing or terminating the agreement. **Article I, Section 1.02(a): Either party desiring to change or terminate this Agreement must provide written notification at least at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.** A.S.H. Electrical Services, LLC has dutifully made notification of our intent to terminate the CBA. Reasoning for desire to terminate has been clear in letters dated May 30, 2023 and December 27, 2023.

Representatives of Local Union 520 have specified termination could not be effectuated until May 13, 2024 as that is the 3rd anniversary of initial signing.

Furthermore, CBA states: **Article I, Section 1.01: This Agreement shall take effect on June 2, 2022 and shall remain in effect through June 1, 2025, unless otherwise specifically provided for herein. It shall continue in effect from year to year thereafter, from the start of the first full pay period in June through the last pay period starting in May of each year, unless changed or terminated in the way later provided herein.** Clearly an anniversary date is established annually, commencing the first full pay period in June and terminating last pay period in May.

Def. MSJ Appx.000053



January 30, 2024

A.S.H. Electrical Services, LLC position is and will remain that utilization of either anniversary date, whether it be date of initial signing of Letter of Assent "A" dated May 13, 2021, or, anniversary date of contract ending last pay period of May 2024, A.S.H. Electrical Services, LLC notification to terminate CBA is, and remains valid.

In token of right-mindedness, A.S.H. Electrical Services, LLC will agree to adhere to the terms of agreement until May 31, 2024.  Proposed date suffices for either anniversary date and shall serve to satisfy the terms of agreement. Termination of CBA between A.S.H. Electrical Services, LLC and IBEW LU 520 shall become effective Friday, May 31, 2024 at close of business day.  A.S.H. Electrical Services, LLC shall receive written notification from both your office and Central Texas Chapter NECA observing termination of agreement between parties.

A.S.H. Electrical Services, LLC maintains agreement to terms previously set forth is amicable to all parties. Letter received by your office, Central Texas Chapter, NECA, and LU 520 satellite office located in San Angelo, Texas established well over 9 months ago continued difficulties experienced by A.S.H. At no time has A.S.H. been contacted by representatives of IBEW LU 520 in attempts to resolve matters, propose changes, or work towards mediation.

A.S.H. Electrical Services, LLC demands IBEW Local Union 520 make its position clear as to acceptance or denial of terms by February 19, 2024. Pending your response A.S.H. Electrical Services, LLC will evaluate future actions.

Sincerely,

Adam C. Johnke
Partner- A.S.H. Electrical Services, LLC

Def. MSJ Appx.000054



# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

## LOCAL UNION 520

**4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741**
**512.326.9540 • Fax 512.326.959**

Local520

February 29, 2024

IBEW Local 520 San Angelo                                                    SENT VIA EMAIL, FIRST CLASS MAIL
909 Caddo St.
San Angelo, Texas, 76901

Mr. Adam Johnke
Partner- A.S.H. Electrical Services, LLC
A.S.H. Electrical Services, LLC
P.O. Box 61905
San Angelo, Texas, 76906

RE: Letter sent by A.S.H. Electrical Services, LLC on January 30, 2024, to the IBEW Local 520 acknowledging to adhere to the terms of the agreement.

Mr. Johnke,

In response to the January 30, 2024, letter that A.S.H. Electrical Services, LLC sent to the IBEW Local 520, we would like to in good faith have an in person meeting to discuss and resolve any issues that A.S.H Electrical Services, LLC may feel that they have. The Charges against Mr. Johnke have also been with drawn in a good faith measure to work towards a resolution.

The date set for the meeting is Thursday March 28, 2024, at 4818 East Ben White Blvd. Suite 300, Austin, TX. 78741 at 1:30pm. As this is approximately a month away, we feel that this should be ample time for both parties to make arrangements and have ample time to plan, we also know that A.S.H. Electrical Services, LLC would like to resolve any issues in a timely manner. Thank you and the IBEW Local 520 looks forward to meeting with A.S.H. Electrical Services, LLC to work towards a resolution.

In Solidarity,

Diarmid Campbell
Organizer IBEW Local 520 San Angelo

Def. MSJ Appx.000055



**325-716-6696**

March 20, 2024

A.S.H. Electrical Services, LLC                    **SENT VIA CMRR, FIRST CLASS MAIL, AND EMAIL**
P.O. Box 61905
San Angelo, Texas, 76906


**Mr. Diarmid Campbell**
**Assistant Business Manager**
**IBEW Local Union 520**
**909, Caddo Street**
**San Angelo, Texas 76901**

Mr. Campbell,

A.S.H. Electrical Services, LLC respectfully declines meeting invitation set for March 28, 2024. As stated in previous communication, travel to Austin is impractical and places unreasonable constraints upon the business continuity of A.S.H. Electrical Services, LLC.  A.S.H. Electrical Services, LLC conducts business within the Geographical area of San Angelo, Texas.  Previous business between A.S.H. Electrical Services, LLC and IBEW LU 520 has been conducted within San Angelo, Texas, there exists no valid reasoning to do otherwise.

A.S.H. Electrical Services, LLC is more than happy to attend meeting held within the jurisdictional city limits of San Angelo, Texas.  Please reschedule meeting.  A roster of intended meeting attendees as well as meeting agenda is requested prior to acceptance of meeting invitation.

Sincerely,

Adam C. Johnke
Partner- A.S.H. Electrical Services, LLC

Def. MSJ Appx.000056



Local 520

# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

## LOCAL UNION 520

**4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741**
**512.326.9540 • Fax 512.326.9596**

May 30, 2024

Adam Johnke
ASH Electrical Services
3214 Sunset Dr
San Angelo, TX 76904

Mr. Johnke,

I appreciate your commitment, as stated in your January 30, 2024 letter, to continue to abide by the terms of the CBA, at least through May 31, 2024. However, the CBA does not expire until June 1, 2025. In order to head off the litigation that will ensue the moment you prematurely move to terminate the CBA I will make one more attempt at explaining to you how termination or modification of the Agreement works.

As you note, Article I, Section 1.02(a) provides that "either party desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement…" Though you provided the notice well over a year in advance of the expiration date of the Agreement, the Union will recognize that notice as you giving the Union a heads-up well in advance of the Agreement's expiration date that, once the Agreement expires on June 1, 2025, you wish to terminate the Agreement. The next phrase in Article I, Section 1.02 (a) states "…or any anniversary date occurring thereafter." This phrase means that, had you failed to timely provide notice 90 days prior to the expiration date, you would not forever waive your right to bargain for a termination of the Agreement, but rather you would again have a chance 90 days before the anniversary of the previous expiration date to again attempt to provide timely notice. Note that the duty to provide 90 days notice of a desire to change or terminate the Agreement applies to both parties. Thus, if the Local Union desires that the Agreement NOT be terminated, but instead to be "changed," the Union must provide you with notice at least 90 days prior to the June 1, 2025 expiration date. You can be assured that you will receive from the Union such notice at some point at least 90 days prior to the June 1, 2025 expiration date.

The exchange of notifications described in the paragraph above does not effect any change or termination of the Agreement. This merely begins a negotiation process wherein the parties must meet and confer to attempt to come to a mutual agreement. If none is reached then the parties may jointly or unilaterally submit the unresolved dispute to the Council on Industrial Relations (CIR). See Article I, Section 1.02(d). The CIR will then resolve the dispute by either authorizing your desired termination of the Agreement, or by imposing a new CBA with its own

Def. MSJ Appx.000057

expiration date. Until the dispute is resolved the current Agreement's terms remain in effect. See Article I, Section 1.02(c).

In your January 30, 2024 letter you cite to the CBA's Article I, Section 1.01 to claim that Article I allows parties to terminate the Agreement on an annual basis. This is a misreading of the language. What the language actually means is that, in the event the parties do not timely exchange the required notifications and just let the expiration date pass without terminating or changing the Agreement, there is another opportunity to terminate or to make changes by providing the required notifications prior to the anniversary of the CBA's expiration date. And if they fail to provide the notifications after the first anniversary, they may do so at the next one, and so on.

Please confirm your understanding that the CBA remains in effect until changed or terminated in accordance with the terms of Article I, which contains no provisions allowing either party to unilaterally change or terminate it. Also, to the extent you believe that the Local Union has not, in any way, abided by the Agreement, Article I, Sections 1.05-1.10 sets forth a grievance procedure for adjudicating your claims. Please feel free to make use of that procedure.

Kind Regards

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local 520

Def. MSJ Appx.000058



January 20, 2025

**A.S.H. Electrical Services, LLC**            **SENT VIA CMRR, FIRST CLASS MAIL**
**P.O. Box 61905**
**San Angelo, Texas, 76906**

**Mr. Ben Brenneman**
**Business Manager/Financial Secretary**
**I.B.E.W. Local Union 520**
**4818 East Ben White Boulevard, Suite 300**
**Austin, Texas 78741**

**CC: Central Texas Chapter, NECA**

**Dear Mr. Brenneman,**

**Over a year has passed since letter(s) were sent revoking the authority of the Central Texas Chapter, NECA to represent this company in any and all collective bargaining or labor relations matters with your organization. At that same time, notice of our intent to terminate current Collective Bargaining Agreement upon expiration, June 01, 2025 was sent and received by your office. \*   Regrettably, our position remains unchanged.  A.S.H. Electrical Services, LLC deems it prudent at this time to once again send due notification that this company will not be bound by the Collective Bargaining Agreement between Central Texas Chapter, NECA and Local Union No. 520 of the International Brotherhood of Electrical Workers after June 01, 2025, nor will this company be bound thereafter by any negotiations, renegotiations, amendment, extension or renewal of said Collective Bargaining Agreement. Please note this letter shall not supersede previous letters yet shall serve as a reminder of our intentions moving forward.**

**We do believe that A.S.H. Electrical Services, LLC is not party to an independent agreement binding this company to the obligation of any collective bargaining agreement with your organization. However, out of an abundance of caution, this letter, once again, constitutes notice that A.S.H. Electrical Services, LLC desires to terminate any such independent collective bargaining agreement.**

Def. MSJ Appx.000059

Def00172

**This notice remains in compliance with Sections 8(d) of the National Labor Relations Act, as amended, as well as the termination provisions of the agreement.**

**We hereby offer to meet with your official representatives at any mutually agreeable time, at a neutral location within area of Zone 3 per CBA at which time we may discuss specific proposals regarding a new agreement with your organization.**

**Very truly yours,**

**Adam C. Johnke**
**Partner- A.S.H. Electrical Services, LLC**

**\* REF:  Letter of Termination dated, January 30, 2024 sent CCMR, EMAIL**
**\* REF:  Letter of Termination dated, December 27, 2023 sent CMRRR, EMAIL**
**\* REF:  Letter of Termination dated, May 30, 2023 sent CMRRR**

Def00173



Local 520

# INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

### LOCAL UNION 520

**4818 East Ben White Boulevard, Suite 300 • Austin, Texas 78741**
**512.326.9540 • Fax 512.326.9596**

2/3/2025

Adam Jhonke
A.S.H. Electrical Services
4000 Caven Rd.
Austin, TX 78745

RE: Changes to the A.S.H. Electrical Services/IBEW 520 Agreement

Mr. Johnke,

As I assured you by letter of May 30, 2024, this is notice, per Article I, Section 1.02(a) of the Inside Agreement, of IBEW Local 520's desire to modify the terms and conditions of said Agreement. Further, per Section 1.02(b) of said Article, the proposed changes will be specified in writing and provided to you no later than the first bargaining session. I propose that we meet on February 20, 2025 to begin negotiating a successor Agreement. I am, of course, open to considering any alternative dates you might propose.

Should there be any questions concerning the nature of this notice, please contact me at your earliest convenience.

Thank you,

Ben Brenneman
Business Manager
IBEW Local 520

Def. MSJ Appx.000061



**From:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Sent:** Wednesday, April 16, 2025 8:29 AM
**To:** adam@ashelectricalservices.com
**Subject:** Negotiations

Good morning, I'm emailing regarding negotiations and our lack to reach common ground. If we cannot come to an agreement by April 20th,  I would like to ask that we file jointly for CIR. Please let me know and we can proceed accordingly. Thank you

Get Outlook for iOS

Def00014



April 16, 2025                                                    **VIA EMAIL AND CMRR**

Mr. Diarmid Campbell
Organizer/Assistant Business Agent
IBEW Local 520
909 Caddo St
San Angelo, TX 7901

Mr. Campbell,

This letter is to recap the party's bargaining history, our (A.S.H. Electrical Services, LLC) position with regard to accepting language presented by the Local, and response to an email I received from you today.

As you are aware, you represented I.B.E.W. Local Union # 520, along with Ms. Shannon Carpenter, and myself during 2 collective bargaining sessions, specifically on:

- March 18, 2025, and
- April 8, 2025.

During the March 18, 2025, session you presented us with a comprehensive proposal (Attachment 1).

During the April 8, 2025, session the parties walked through and discussed the Union's proposal in great detail. We are willing to accept and tentatively agree to your Item #2 from the proposal. However, your statements from that meeting are quoted below and are followed by our response:

> "……. everything that is proposed today, I would run by Austin because I know Thursday they're actually meeting."

> "……no, I don't believe anything could be signed just because that is the process we are in."

Our acceptance of the Union's proposal #2 was your language! I would be surprised if you were not aware that it is unlawful under the National Labor Relations Act to send representatives to the bargaining table without actual table authority to bargain. Therefore, we expect that in keeping with the Act, you formally tentatively agree to language that we accepted from your proposal on April 8, 2025.

> "……we would have to run it by the attorney and everything like that to make sure that what were signing off isn't going against NECA. It can't be better than NECA."

To be clear, we also clarified for you during the April 8, 2025, meeting that A.S.H. Electrical Services, LLC, withdrew from NECA and asked you who drafted the Union's original proposal. You responded, "This is what Austin proposed, so I took their proposal and put them here because that's what was given to NECA, since it's the CBA".

Def00016



Finally, I am in receipt of your Wednesday, April 16, 2025, email (Attachment 2). I am very confused as Article 1.02, (d) of the current CBA states:

> (d) Unresolved issues of disputes arising of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations for the Electrical Contracting Industry (CIR) may be submitted jointly or unilaterally to the Council for adjudication. Such unresolved issues of disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date. The Council's decisions shall be final and binding.

We are currently in contract until June 1, 2025. We have yet to formally propose non-economic/economic proposals to you. We have not claimed impasse, in fact as mentioned previously, have agreed to your #2 proposal.  Furthermore, it is of the opinion of A.S.H. Electrical Services, LLC representatives' that to make request to submit negotiations to the Council of Industrial Relations (CIR) at this time is predominately a tactic of "bad faith negotiating" as on its face this constitutes an attempt to suspend the duty to bargain. This "threat" has been mentioned at each negotiation meeting.  The CIR does not exist as a "safety net" to exclaim IMPASSE!  Each party has a lawful obligation to have engaged in serious negotiations and make a reasonable effort to reach some basis of agreement. Secondly, in our opinion, to request submittal to CIR is in direct violation of the CBA of which both parties, I.B.E.W. Local Union 520 and A.S.H. Electrical Services, LLC are currently bound.  Therefore, I reject your proposal to file jointly requesting arbitration on behalf of the Council of Industrial Relations as it is both premature and unlawful at the current time.

I look forward to your response.

Sincerely,

Adam Johnke

Def. MSJ Appx.000064

Def00017

# THE COUNCIL ON INDUSTRIAL RELATIONS
## FOR THE ELECTRICAL CONTRACTING INDUSTRY

OFFICE OF THE SECRETARY • 900 7th STREET, N.W. • WASHINGTON, D.C. 20001
PHONE (202) 728-6165 • FAX (202) 728-6168 • WEBSITE: WWW.THECIR.ORG

April 17, 2025

**PARTY REQUESTING FORMS**
Ben Brenneman, Business Manager
IBEW Local Union 520
4818 East Ben White Boulevard
Austin, TX  78741

**OTHER PARTY TO AGREEMENT**
Adam Johnke, Owner
A.S.H. Electrical Services LLC
P.O. Box 61905
San Angelo, TX  76909

**ISSUE:  Inside Negotiations**

The next Council on Industrial Relations will begin on Tuesday, May 13, 2025, at the Hilton Washington, D.C. Capitol Hill, 525 New Jersey Avenue NW, Washington, D.C.  Once the Council schedule is completed, all parties will be advised of the date when their particular case is scheduled to be heard.  All parties are responsible for their own hotel arrangements.

Due to the high demand for accommodations in the D.C. area, it is recommended that you book your room at the host hotel as soon as possible - even if you may need to cancel it at a later date (cancellation is permitted up to 72 hours before arrival).  Reservations may be made by calling **202-628-2100** and request the group rate for International Brotherhood of Electrical Workers meeting by mentioning code **IBEW** or by booking directly online at
https://book.passkey.com/go/IBEWMay2025

This discounted rate will be available on a first come, first serve basis until May 1, 2025, or until the block sells out.

In order for a case to be properly submitted you will need to mail the following items postmarked on or before 5/1/25 (either overnight or 2nd day air) to IBEW, Council on Industrial Relations, 900 7th Street NW, Washington, DC  20001.

1. **Submission Form** – 4 copies.  The original completed Submission Form signed by both parties in blue ink **plus** 3 black and white copies**.**
2. **Current Approved Agreement** (include MOU's, amendments, etc.) – 4 copies
3. **Employer and Local Union Briefs** and any exhibits – 4 copies of each
4. A copy of your brief **must** be furnished to the other party on or before the first day of the month in which council is scheduled.

Additionally, log into **"CIR Case Management"** system and upload electronic copies of your agreement, briefs and *signed* submission form in either PDF or Microsoft Word format.

The parties will be limited to a total of four (4) uploads with each upload as a single file:

1. Signed Submission Form
2. Current Approved Agreement(s)/Addendum/MOU(s)
3. Employer Brief
4. Labor Brief

Def. MSJ Appx.000065

Def00027

This means the parties will not be allowed to submit more than four (4) uploads to the Case Management website. If either party attempts to upload more than what is listed above, it will be rejected by the Secretary of the Council.

Due to this requirement, the parties will need to consolidate their brief into one file. There will be no allowance for multiple attachments/exhibits to be uploaded. This does not mean the brief cannot have attachments/exhibits. It means they must be incorporated into the same file as the brief. The file format can either be a Word document or Adobe PDF. The combining of files can either be done digitally or scanned as one file from a scanner.

It should be noted the Case Management website has a 50 Mb upload limit per file. If your file exceeds this limit, it will need to be reduced. Most times this is due to scanning documents at a high resolution. Follow the steps from your scanner manufacturer to lower the resolution of your file when scanning. This will not make the document unreadable. It will make it smaller to submit. It should also be noted the brief should contain only relevant material to the case.

Any party who is unable to upload their proposed submission should immediately contact the Secretary on or before the submittal deadline.

There have been no changes made to the submission deadline for case materials. The deadline remains as no later than 11:59 PM Eastern Time on the first day of the month in which the case is scheduled to be heard. Failure to meet this deadline will result in the case not being heard.

Please Note: Anything uploaded, sent or postmarked after May 1, 2025, *will not be accepted.*

Very truly yours,

Al D. Davis
Secretary, CIR

ADD:bag
Copy to Christian J. Wagner International Vice President, IBEW Seventh District
        Frank Piatt, Executive Director, Southern Region, NECA

Rev: June 26, 2023

Def00028

# Negotiations Brief Local 520 and A.S.H Electrical Services May 2025



Def. MSJ Appx.000067

-ASH Electric Brief-

On December 27, 2023, Local 520 received a letter from A.S.H. Electrics' lawyer stating they had removed their bargaining rights from the Central Texas Chapter of NECA and wished to terminate the CBA and bargain with IBEW independently.

Local 520 responded to Jay Wallace and Bell Nunnally Lawyers for A.S.H. Electrical on January 3, 2024, and notified them that the termination of agency does not terminate the CBA.

On January 9, 2024, we received a letter from A.S.H. Electrical Lawyer, Jay Wallace, stating the same case as before regarding A.S.H.'s termination of the CBA.

On January 22, 2024, Local 520 sent a letter to The Lawyers of A.S.H. Electrical stating our cases again.

On January 30, 2024, A.S.H. Electrical sent a letter to Local 520 stating that all notifications shall now be directed to them, A.S.H. Electrical, and not to Jay Wallace or Bell Nunnally, the Lawyers. A.S.H. Electrical once again stated that they would like to terminate the CBA.

On February 28, 2024, a meeting was requested with A.S.H. Electrical for March 28, 2024.

On March 28, 2024, Assistant Business Manager Diarmid Campbell showed up for the meeting, no representatives were there on behalf of A.S.H. Electrical.

On May 30, 2024, Local 520 sent a letter to A.S.H. Electrical explaining in detail the methods for terminating or amending the Agreement.

On January 17, 2025, Business Manager Ben Brenneman notified A.S.H. Electrical of its desire to amend the Agreement and that we would meet in February 2025 on a day and time that would work best for A.S.H. Electrical so we could begin negotiating a successor agreement.

On February 3, 2025, Local 520 sent a second letter to A.S.H. Electrical requesting a meeting in February that would work for them.

On February 25, 2025, Local 520 sent a third letter to A.S.H. Electrical requesting a date for negotiations.

On March 13, 2025, A.S.H. Electrical sent a response asking to meet on March 18, 2025, to begin negotiations.

On March 18, 2025, Local 520 Assistant Business Manager Diarmid Campbell and A.S.H. Electrical owners Adam Jonke and Shannon Carpenter opened negotiations at 909 Caddo Street. Negotiations started with Local 520 giving our opening proposal and ended 10-15 minutes later due to the hostile conduct of the parties representing A.S.H. Electrical.

On April 8, 2025, Local 520 Assistant Business Manager Diarmid Campbell and A.S.H. Electrical owners Adam Jonke and Shannon Carpenter negotiated for a second time at 909 Caddo Street. Local 520 presented our opening proposal again, with us talking for 40-50 minutes and being shut down after A.S.H. Electrical made comments on Assistant Business Manager Diarmid Campbell's religion and faith.

On April 16, 2025, Local 520 asked A.S.H. Electrical to file jointly for CIR.

Receiving no response, On April 17, 2025, Local 520 filed unilaterally for CIR.

On April 28, 2025, Local 520 Business Manager Diarmid Campbell and A.S.H. Electrical owner Adam Jonke negotiated a third time at 909 Caddo Street. A.S.H. Electrical finally presented a counterproposal, with Local 520 also offering a counterproposal and notifying A.S.H. Electrical that Local 520 has filed for CIR.

On April 29, 2025, Local 520 took the counterproposal to its members that A.S.H. proposed. Correspondence has been given to A.S.H. Electrical to see if they are willing to negotiate on portions of their proposal.

Our difficulties in getting bargaining proposals from Mr. Jonke and the way A.S.H. Electrical has acted in a hostile manner, we believe that A.S.H. Electrical is just "surface bargaining" and has left us unable to resolve this contract. We therefore request that the CIR award a contract like what has been agreed upon by other union electrical contractors in our jurisdiction.

Supporting Facts regarding proposed wage increase:

- Solar Farm and Data Center work is being done in Abilene, TX., at $45 an hour.
- Solar Farm project in Tennyson, TX., being bid at $45 an hour minimum.
- The Solar Farm project planned in Brownwood, TX., is being bid at around $40-$45 an hour.
- ASH Electric has bid and gotten work at Austin Scale, plus a 30% added in the scale, showing they can support a $40-$45 wage scale.

Def. MSJ Appx.000069

ASH PROPOSAL

1.  We propose that the Zone 3 MOU be removed from the CBA.

2.  We propose that the Favored Nations Clause be removed from the CBA.

3.  We propose a 3-year contract.

4.  We propose a JATC contribution rate of 1.75& JIW rate.

5.  We propose an increase in Annuity across the board by 1% and add the National Electrical Individual Benefit at 3% of wages for all members, see attachment.

6.  We propose 2 paid 15-minute breaks per day, with an additional 15-minute break before starting planned overtime.

7.  We propose all time required to walk from the parking areas to the work area and back, and pass-through customer security shall be paid as part of the workday.

8.  We propose amending Section 2.12 see attachment.

9.  We propose 4 paid holidays (Thanksgiving and the Day After, Christmas Day, and New Year's Day) as well as PTO, see attachment.

10. We propose the following pay increase over the 3 years of this CBA (refer to breakdown).

    1st year: $45.00
    2nd year: $46.80
    3rd year: $48.67

Def. MSJ Appx.000070

## ASH PROPOSAL #2

1.  We propose that the Zone 3 MOU be removed from the CBA.

2.  We propose that the Favored Nations Clause be removed from the CBA.

3.  We propose a 3-year contract.

4.  We propose a JATC contribution rate of 1.75& JIW rate.

5.  We propose an increase in Annuity across the board by 1% and add the National Electrical Individual Benefit at 3% of wages for all members, see attachment.

6.  We propose 2 paid 15-minute breaks per day, with an additional 15-minute break before starting planned overtime.
    (First Break 10:00 am-10:15 am, Second Break 3:00 pm-3:15 pm)

7.  We propose all time required to walk from the parking areas to the work area and back, and pass-through customer security shall be paid as part of the workday.

8.  We propose amending Section 2.12 see attachment.
    (Please provide language you'd like to see.)

9.  We propose 4 paid holidays (Thanksgiving and the Day After, Christmas Day, and New Year's Day) as well as PTO, see attachment.

10. We propose the following pay increase over the 3 years of this CBA (refer to breakdown).

    June 2025: $37.50
    January 2026: $38.50
    January 2027: $43.75
    January 2028: $45.00

## STATEMENT OF ISSUES
### Joint Submission

> Do not list any issues, which have been settled prior to submitting the case to Council.
>
> Indicate Articles and Sections of agreement affected by the unsettled issues. State the essence of the issues being submitted. List the issues in the order as they appear in the agreement.
>
> Joint Submission Form is used where both parties have come to impasse and both are jointly requesting the services of Council.

Employer Issue of Joint Submission

Union Issue of Joint Submission

☑ ☐ Article 1, Section 1 – Term of Agreement

☑ ☐ Article 2, Section 2 – Favored Nations Clause

☑ ☑ Article 4, Section 4.03 – Wages

☑ ☐ Article 4, Section 4.03 – Wages/Contribution

☑ ☐ Article 4, Section 4.03 – Wages/Contribution

☑ ☐ Article 4, Section 4.01 (a) – Wages

☑ ☐ Article 4, Section 4.03 – Wages/Contribution

☐ ☐

☐ ☐

☐ ☐

Sample Do Not Use

7

Def. MSJ Appx.000072

# Steward Language for CBA

Current:

Section 2.12: The Union has the right to appoint a Steward at any shop and/or job where workmen are employed under the terms of this Agreement. The Employer shall be notified in writing of who the Steward is. No Steward shall be discriminated against by the Employer because of the faithful performance of his duties as Steward.

ADD:

A Steward shall be allowed sufficient time during the regular working hours without loss of pay to perform his/her Steward's duties.

The Steward will be given a list of workers to be terminated at least two (2) hours prior to the termination of those workers. The list shall include name, money earned, hours worked, and the type of termination (layoff, fired, etc.).

The Steward shall be the last person, next to the foreman, to be laid off prior to a work completion. Before a Steward is laid off or transferred, the Local Union Business Manager or his representative shall be notified.

Stewards shall be given a complete list of workers to be paid showing the amount of money earned and hours worked by each worker.

The Steward will monitor the reasonable distribution of overtime. The Steward shall be permitted to be present on all overtime work performed. When overtime has been worked the Steward will be given a complete list of workers that have performed such work and the number of overtime hours worked.

Def. MSJ Appx.000073

# Council on Industrial Relations
## for the
# Electrical Contracting Industry



DECISION NO.    8883

PARTIES IN DISPUTE:
A.S.H. Electric
Local Union No. 520

Austin, Texas
May 13, 2025
Inside

PRESENTATION:
By brief only for A.S.H. Electric
By brief and oral argument for Local Union No. 520

APPEARANCES:
For Local Union No. 520:  B. Brenneman, D. Campbell

MATTERS IN DISPUTE:
1. Article I, Section 1.01 – Length of Agreement
2. Article II, Section 2.01 – Favored Nations
3. Article IV, Section 4.02 – Paid Holidays
4. Article IV, Section 4.03 – Wages
5. Article V – General Rules
6. Article V – Walk Time
7. Article VI, Section 6.16 – Apprenticeship Contribution
8. Article VIII – Annuity Plan

MEMBERS OF COUNCIL SITTING:

| FOR THE EMPLOYER | FOR THE UNION |
| --- | --- |
| D. Laffoon | M. Hager |
| S. Krieg | C. Bergfeld |
| J. Brunia | A. Warwick |
| T. Maloney | D. McInerney |
| F. Piatt | R. Wolf |
| L. Bell | D. Robinson |

DECISION:

After careful consideration of the evidence submitted, the Council rules as follows:

In the instant case, the parties are directed to sign and immediately implement the Collective Bargaining Agreement which is attached hereto and hereby made a part of this decision. The Council retains jurisdiction over disputes pertaining to this Agreement including any wage/fringe opener(s) contained therein and such disputes are to be returned to Council through the normal procedures if the parties are unable to reach agreement.



Sponsored by the National Electrical Contractors Association • International Brotherhood of Electrical Workers®

Office of the Secretary • 900 7th Street, NW • Washington, DC 20001
Phone (202) 728-6165 • Fax (202) 728-6168 • Website: www.thecir.org

Def. MSJ Appx 000074



COUNCIL ON INDUSTRIAL RELATIONS
    FOR THE ELECTRICAL CONTRACTING INDUSTRY               **DECISION NO.**   8883

UNANIMOUSLY ADOPTED:
Washington, DC
May 13, 2025

_____
      Acting Co-Chairman

_____
      Acting Co-Chairman

_____
      Secretary



June 2, 2025 - June 4, 2028

# AGREEMENT
Between

## A.S.H. Electrical Services LLC

and

## LOCAL UNION NO. 520 of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS

Austin, Texas

Def. MSJ Appx.000076

# June 2, 2022 - June 1, 2025
# AGREEMENT

### Between

### A.S.H. Electrical Services LLC

### and

### LOCAL UNION NO. 520 of the
### INTERNATIONAL BROTHERHOOD OF
### ELECTRICAL WORKERS
### Austin, Texas

## PARTIES CLAUSE

Agreement by and between the A.S.H. Electrical Services LLC and LOCAL UNION 520, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS. As used hereinafter in this Agreement, the term "Employer" shall mean A.S.H. Electrical Services LLC, and the term "Union" shall mean LOCAL UNION NO. 520, IBEW.

## BASIC PRINCIPLES

The Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union, and the Public. Progress in Industry demands a mutuality of confidence between the Employer and the Union. All will benefit by continuous peace, and by adjusting any differences by rational, common sense methods. Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

## ARTICLE I
### EFFECTIVE DATE/CHANGES/GRIEVANCES/DISPUTES

Section 1.01: This Agreement shall take effect on June 2, 2025 and shall remain in effect through June 4, 2028, unless otherwise specifically provided for herein. It shall continue in effect from year to year thereafter, from the start of the first full pay period in June through the last pay period starting in May of each year, unless changed or terminated in the way later provided herein.

Section 1.02(a): Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of this Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) In the event that either party, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, has given a timely notice of proposed changes and an agreement has not been reached by the expiration date or by any subsequent anniversary date to renew, modify, or extend this Agreement, or to submit the unresolved issues to the Council on Industrial Relations for the Electrical Contracting Industry (CIR), either party or such an Employer, may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e) By mutual agreement only, the Chapter, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, may jointly, with the Union, submit the unresolved issues to the Council on Industrial Relations for adjudication. Such unresolved issues shall be submitted no later than the next regular meeting of the Council following the expiration date of this Agreement or any subsequent anniversary dates. The Council's decisions shall be final and binding.

(f) When a case has been submitted to the Council, it shall be the responsibility of the negotiating committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of Council.

(g) Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

Section 1.03: This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

Section 1.04: During the term of this Agreement, there shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

## GRIEVANCES/DISPUTES

Section 1.05: There shall be a Labor-Management Committee of trustees representing the Union and three representing the Employers. It shall meet regularly at such stated times as it may decide. However, it shall also meet within 48 hours when notice is given by either party. It shall select its own Chairman and Secretary. The Local Union shall select the Union representatives and the Employer shall select the management representatives.

Section 1.06: All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.

Section 1.07: All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

Section 1.08: Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding.

Section 1.09: When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

Section 1.10: The Labor-Management Committee shall not recognize any grievance or dispute unless written notice of the charge is given within thirty (30) days after the representatives of the parties to this Agreement first became aware, or reasonably should have been aware, of a violation of this Agreement. This shall not apply to any Section which requires money to be deposited to any Trust Fund.

## ARTICLE II
### Employers Rights - Union Rights

Section 2.01: The Employer recognizes the Union as the exclusive representative of all its employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment.

Section 2.02(a): Certain qualifications, knowledge, experience, and financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm, or corporation, having these qualifications and maintaining a place of business and suitable financial status to meet payroll requirements and

employing at least one Journeyman Wireman.

(b) All Employers subject to the terms of this Agreement shall carry an Indemnity Bond, issued by a company authorized to do business in the State of Texas, the minimum for all employers shall be $5,000.00 as evidence of financial responsibility, and to insure proper payments to the Electrical Joint Apprenticeship and Training Trust Fund, the National Employees Benefit Board, the Austin Vacation Trust Fund, IBEW Local Union 520 Annuity Plan and Health and Welfare Plan, 401(k), and P.A.C. deductions, to Local Union 520, for any union dues or assessments withheld on behalf of employees, and wages required under this Agreement be paid directly to the affected employee(s). Bond amounts greater than $5000 shall be required based on the following formula outlined below:

(c) Each employer signatory to the collective bargaining agreement shall be required to secure a welfare bond of at least $5000. Employers shall be required to secure larger bonds based on the following formula: Employers shall provide a welfare bond based on the average monthly hours worked utilizing the previous three years to calculate the average. This number shall be multiplied by the aggregate amount of the benefit package and rounded up to the next one thousandth. If an employer has been delinquent in the payment of benefits more than twice, they shall be required to pay benefits timely on a weekly basis for a period of six months and secure the required bond. After a period of six months of timely benefit payments the employer may return to the monthly schedule. If an employer has no previous experience in the jurisdiction the bond shall be based on the estimated monthly hours of the project to be worked. The maximum bond for any employer shall be $50,000.

The aforesaid Bond shall be executed for a period of time to conform to the time limitations set forth in this Agreement and shall be renewed as provided for in subsequent Agreements.

The Bond shall provide that it may not be canceled by either the Employer or the insurance carrier without thirty (30) days written notice in advance to the Union by Certified, Registered, or Insured mail from the Surety. Proof of the execution of the Bond, in the form of an affidavit executed by the insurance carrier, shall be furnished the Union for each Employer. Such affidavit shall show on its face that it may not be canceled by either the insurance carrier of the Employer without prior notification to the Union. The Local Union shall furnish a copy of the affidavit of Bond to each Fund.

The Obligee (Local Union 520, IBEW) shall notify the Surety within thirty (30) days after having knowledge of a breach of this Agreement by the principal hereof.

(d) Fringe benefits provided for under this Agreement are due and payable on or before the 15th day of the month following the month, covering the hours worked by each employee. Each Employer shall file a monthly report for each fringe benefit, in the form established, therefore, each report shall be filed, regardless of whether or not the Employer has employed any employee in the month covered by said report.

Any Employer who fails to file a report and pay contributions for any of the fringe benefits by the 15th day following the month in which such report or payment is due shall be considered delinquent and is in violation of this Agreement. If payments are not mailed in time to reach the

Benefit Fund by the prescribed time, interest at the rate of 1½% monthly will be due and payable. Each Employer shall make available applicable books and records for the purpose of auditing same to determine the amount of his liability and shall pay the expense of audit if delinquencies are found, under guidelines of the Funds. Action to collect contributions may be brought in the name of the respective Fund involved, its Trustees and any assignee or agent designated by said Trustees. Employer hereby accepts and agrees to the terms of each trust agreement and plan for such fringe Benefit Fund.

A delinquent Employer shall be liable to any employee affected by such delinquency for all benefits lost by such employee by virtue of such delinquency, and such delinquent Employer shall also be liable for reasonable attorneys' fees for any action brought to recover the amount of said benefits.

"This section does not waive or deny any remedies of collection in other sections of this Agreement, Trust or a remedy at law".

Section 2.03: For all employees covered by this Agreement the Employer shall carry Workman's Compensation Insurance with a Company authorized to do business in this State, Social Security, and such other protective insurance as may be required by the laws of this State and shall furnish satisfactory proof of such to the Union. He shall also make contributions to the State Unemployment Compensation Commission.

Section 2.04(a): It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to three percent (3 %) of the gross monthly labor payroll, paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by the suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

(b) An individual Employer who fails to remit as provided above shall be additionally subject to having his Agreement terminated upon seventy-two (72) hours' notice in writing being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this Agreement.

Section 2.05: The Union reserves the right to discipline its members for violations of its laws,

rules, and agreements.

Section 2.06: The Local Union is part of the International Brotherhood of Electrical Workers and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this Section, will be sufficient cause for the cancellation of his Agreement by the Local Union after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual Employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its Local Unions as the collective bargaining representative of his employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

Notwithstanding anything in this Agreement, the Employer may sublet, assign, or transfer the installation of wiring and devices for fire alarm or security systems if those systems are low voltage system, the installation of lightning protection system, trenching and backfilling excavation to a specialty contractor.

The Employer may also sublet, assign, or transfer any work requiring employees to place themselves in any trench that is greater than a depth of five feet.

The following work, systems and/or functions shall not be covered by the terms of this agreement: field instrumentation and installation, process control instrumentation and installation, instrument and control loop testing and certification, instrument calibration, instrument certification, PLC equipment, PLC programming, distributed control and SCADA systems, control system SCADA & HMI software development and programming, radio telemetry systems, and manufacture of control panels.

Nothing in this Agreement should be construed to require the Employer to purchase manufactured products from employer's signatory to a collective bargaining agreement.

All charges of violation of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

Section 2.07: No member of Local Union 520, while he remains a member of such Local Union and subject to employment by the Employers operating under this Agreement shall himself become a contractor for the performance of any electrical work.

Section 2.08: Only two individuals connected with an employing concern as owner, manager, superintendent, partner, or member of a Board of Directors shall perform any manual electrical work where it displaces the service of a Journeyman; and then only when he has at least one Journeyman, working under the terms of this Agreement, employed and working the same hours including overtime, with the exception of emergency repairs not to last over two (2) hours.

Def. MSJ Appx.000082

Section 2.09(a): The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the collective bargaining agreement, in planning, directing, and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying off employees, in transferring employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

(b) The employer shall have the right to call a Foreman by name provided:

A)    The employer shall notify the business manager in writing of the name of the individual who is to be requested for employment as a Foreman. Upon such request, the business manager shall refer said Foreman provided the name appears on the highest priority group.

B)    When an employee is called as a Foreman, he must remain as a Foreman for 500 hours or must receive a reduction in force.

**Portability**

Section 2.10: The Employer, if signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, may bring an unlimited amount of Supervisory bargaining unit employees employed in that Local Union's jurisdiction into Local Union 520's jurisdiction to perform supervisory work. Supervisory bargaining unit employees are defined as those that direct bargaining unit employees. The Employer may also bring one (1) bargaining unit employee employed in that Local Union's jurisdiction into Local Union 520's after the Employer employs one (1) Local Union 520's bargaining unit employee; if necessary this process will continue to alternate. The Employer shall maintain a minimum of a one (1) to one (1) ratio of Local Union 520's bargaining unit employees to those that are brought in through this Portability provision. The employees brought in through portability may remain on the specific job until the job is complete. All employees brought in through this portability provision must check in with the Business Manager of IBEW Local Union 520 and all working assessments shall be paid to Local Union 520. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of the Agreement for the handling of grievances with the exception that any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

Section 2.11: The Union has the right to appoint a Steward at any shop and/or job where workmen are employed under the terms of this Agreement. The Employer shall be notified in writing of who the Steward is. No Steward shall be discriminated against by the Employer because of the faithful performance of his duties as Steward.

## ARTICLE III
## Standard Inside Referral

Section 3.01: In the interest of maintaining an efficient system of production in the Industry, providing for an orderly procedure of referral of applicants for employment preserving the legitimate interests of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

Section 3.02: The Union shall be the sole and exclusive source of referral of applicants for employment.

Section 3.03: The Employer shall have the right to reject any applicant for employment.

Section 3.04: The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

Section 3.05: The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

### Journeyman Wireman - Journeyman Technician

**GROUP I** All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or has been certified as a Journeyman Wireman by any inside Joint Apprenticeship and Training Committee, and, who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement.

Group I status shall be limited to one Local Union at one time. An applicant who qualifies for Group I in a local union shall be so registered electronically and remain on Group I in that local union unless and until the applicant designates another local union as his or her Group I local union. If an applicant qualifies for Group I status in a local union other than his or her home local union and designates that local as his or her Group I local union, the business manager of the new Group I status local union shall by electronic means notify the business manager of the applicant's former Group I status local union.

**GROUP II**  All applicants for employment who have four or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the IBEW or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

**GROUP III**  All applicants for employment who have two or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, and who have been employed for at least six months in the last three years in the geographical area covered by the collective bargaining agreement.

**GROUP IV**  All applicants for employment who have worked at the trade for more than one year.

Section 3.06: If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within 48 hours from the time of receiving the Employer's request, Saturdays, Sundays and holidays excepted, the Employer shall be free to secure applicants without using the Referral Procedure. But such applicants, if hired, shall have the status of "temporary employees".

Section 3.07: The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "temporary employees" and shall replace such "temporary employees" as soon as registered applicants for employment are available under the Referral Procedure.

Section 3.08: "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent thereto which includes the area from which the normal labor supply is secured: Travis, Bastrop, Hays, Blanco, Burnet, Williamson, Lee, Llano, San Saba, Burleson, Caldwell, Fayette, Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason, Kimble and parts of Coryell and Bell Counties to include that part of Fort Hood in Coryell County south of Cowhouse Creek, and not to extend more than two (2) miles into Bell County from the Southeast boundary line of Coryell County, Gray Field, and the City of Killeen, and parts of Lampasas, Bell and Milam Counties, which are nearer to Austin than Waco, in the State of Texas.

The above geographical area is agreed upon by the parties to include the area defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which the Agreement applies.

Section 3.09: "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

Section 3.10: "Examinations" - An "Examination" shall include experience rating tests if such examination shall have been given prior to the date of this procedure, but from and after the date

of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the IBEW. Reasonable intervals of time for examinations are specified as ninety (90) days. An applicant shall be eligible for examination if he has four years' experience in the trade.

Section 3.11: The Union shall maintain an "Available for Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

Section 3.12(a): An applicant who is hired and who receives, through no fault of his own, work of forty hours or less shall, upon re-registration, be restored to his appropriate place within his Group.

(b) An applicant who has registered on the "Available for Work List" must renew his application every thirty (30) days or his name will be removed from the "List."

Section 3.13: Employers shall advise the Business Manager of the Local Union of the number of applicants needed. The Business Manager shall refer applicants to the Employer by first referring applicants in GROUP I in the order of their place on the "Available for Work List" and then referring applicants in the same manner successively from the "Available for Work List" in GROUP II, then GROUP III, and then GROUP IV. Any applicant who is rejected by the Employer shall be returned to his appropriate place within this GROUP and shall be referred to other employment in accordance with the position of his GROUP and his place within his GROUP.

Section 3.13(a): An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral. The neutral member of the Appeals Committee shall, within three business days, review the qualifications of the applicant and the reasons for the discharges. The neutral member of the Appeals Committee may, in his or her sole discretion: (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks, or longer, depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list.

Section 3.14: The only exceptions which shall be allowed in this order of referral are as follows:

(a) When the employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

(b) The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age. Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

Section 3.15: An Appeals Committee is hereby established, composed of one member appointed by the Union, one member appointed by the Employer or by the Association, as the case may be, and a Public Member appointed by both these members.

Section 3.16: It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the administration by the Local Union of Sections 4 through 14 of this Agreement. The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union. The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions to this Agreement and its decisions shall be in accord with this Agreement.

Section 3.17: A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

Section 3.18: A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

Section 3.19: Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the parties.

Section 3.20: When making reductions in the number of employees due to lack of work, Employers shall use the following procedure:

(a) Temporary employees, if any are employed, shall be laid off first. Then employees in Group IV shall be laid off next, if any are employed in this Group. Next to be laid off are employees in Group III, if any are employed in this Group, then those in Group IV, and then those in Group I.

(b) Paragraph (a) will not apply as long as the special skills requirement as provided for in Section 14(a) is required.

(c) Supervisory employees covered by the terms of this Agreement will be excluded from layoff as long as they remain in the supervisory capacity. When they are reduced to the status of Journeyman, they will be slotted in the appropriate group in Paragraph (a) above.

Section 3.21: All Journeymen and Apprentices are required to provide proof of completion, by originally issued card or certificate, of an OSHA 10 safety training course.

## ARTICLE IV
## Hours - Wage Payment

Section 4.0l(a):   Eight hours work between the hours of 6:00 A.M. and 6:30 P.M. with thirty (30) minutes for a lunch period, shall constitute a workday.  Forty (40) hours within (5) days, Monday through Friday, inclusive, shall constitute the work week. Saturday may be used for a make-up day due to inclement weather.  If Saturday is used as a make up day, a minimum of eight (8) hours will be scheduled.  The payroll week shall end on Sunday midnight of each week. Any workman required to punch a time clock that requires more than five (5) minutes to check out shall be paid for any additional time used in checking out.  Workmen reporting to the shop or job shall not report earlier than 15 minutes prior the starting time.  If practical, workmen directed to report to the job shall be at their place of work at the starting time and shall remain at their place of work until quitting time unless otherwise instructed by the Employer.

(b) Any change from the regular working hours must be five (5) or more day's duration. When any change in the starting time is made, lunch period, overtime, and shifts may be changed accordingly.

(c) The Employer with 24-hour notice to the Union may elect to work 4-10 hour days to be scheduled. The first 10 hours of work per day shall be paid at the hourly straight time rate of pay. When working 4-10s, the Employer can schedule the work week for Monday through Thursday, 10 hours per day. A second work week can be scheduled from Tuesday through Friday, 10 hours per day. The 4 day work week will be Monday through Thursday. Friday can be used as a make-up day due to inclement weather. If Friday is used as a make-up day, a minimum of 8 hours will be scheduled. Any four day/ten-hour work schedule shall be a minimum of 2 weeks duration.

(d) In order to coordinate with other crafts, summer hours, customer requests, and the like, the starting time for each job shall be subject to variance of not more than 1 hour. Advanced notice to the Union will be required to approve any such variance greater than 1 hour. These alternate starting times must run for a minimum of 5 consecutive workdays, and all other times listed in this agreement will shift accordingly.

Section 4.02: All work performed outside of regularly scheduled hours will be paid at one and one-half times the regular straight-time rate, provided the employee works all of the regular scheduled hours made available, as defined in Art. IV Sec. 4.0l(a) and Sec. 4.0l(c).  In the event the employee does not work all of the regularly scheduled hours available he will receive no premium rate until after he has worked 40 hours.  Work on Sundays shall be paid at double the straight-time rate.  The following holidays:  New Year's Day, Memorial Day, Fourth of July, Labor Day, Veteran's Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas Day, shall be paid at double the straight-time rate. The following holidays shall be paid holidays starting June 2, 2025, Thanksgiving Day and Friday following, January 4, 2027, Christmas Day, January 3, 2028, New Year's Day. Eligible employees must have been employed for two weeks and worked the available workday before and the available workday after the holiday. Holidays shall be recognized only on the day on which they fall.

<u>Section 4.03:</u> The minimum regular straight-time rate of wages for Journeyman Inside Wireman (JIW) shall be as follows:

Effective June 2, 2025: $36.50
Effective January 5, 2026: $38.50
Effective January 4, 2027: $40.50
Effective January 3, 2028: $42.50

| APPENDIX A - MINIMUM BENEFITS | | | | | |
|---|---|---|---|---|---|
| **Multiplier** | **Classification** | **NEBF** | **Annuity** | **Medical** | **JATC** |
| 130% of JIW wage rate | General Foreman (area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | General Foreman (no area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | Area Foreman | 3% | 8% | $5.45 | 1%*** |
| 110% of JIW wage rate | Foreman | 3% | 8% | $5.45 | 1%*** |
| 100% | Journeyman Inside Wireman | 3% | 8%* | $5.45 | 1%*** |
| **Apprentice Wireman** | | | | | |
| 50% of JIW wage rate | 1st Year - Period 1 | 3% | ** | $3.70 | 1%*** |
| 55% of JIW wage rate | 1st Year - Period 2 | 3% | 3% | $3.70 | 1%*** |
| 60% of JIW wage rate | 2nd Year- Period 3 | 3% | 3% | $3.70 | 1%*** |
| 70% of JIW wage rate | 3rd Year - Period 4 | 3% | 5% | $3.70 | 1%*** |
| 75% of JIW wage rate | 4th Year- Period 5 | 3% | 5% | $3.70 | 1%*** |
| 80% of JIW wage rate | 5th Year - Period 6 | 3% | 8% | $3.70 | 1%*** |
| | Unindentured Apprentice | 3% | | $3.70 | 1%*** |

* 9% effective January 6th 2025
** 1% effective January 6th 2025
*** 1% of Journeyman Straight-Time Rate

<u>Section 4.04:</u> The Employer shall pay all wages in cash or check weekly, not later than quitting time on Friday. The Employer may pay wages by direct deposit, through debit card by cash or by

check. Employees may be required to execute authorization forms for direct electronic deposit of wages on a weekly basis to the bank or credit union of the employee's choice. This manner of payment, once adopted, may not be changed by the Employer except upon 14-day advance written notification to the employee with notification to the Union. In the event that employees are not paid by the above-stated time, waiting time at the regular straight time rate (not to exceed eight (8) hours in any one twenty-four (24) hour period) shall be charged until payment is made. The previous sentence only applies in the event that there has been a previous instance within the preceding twelve (12) months of the Employer failing to timely pay wages. Otherwise, paid waiting time only begins if payment has not been received by quitting time on Friday.

Section 4.05: Should the Employer issue a paycheck that does not clear the bank for payment, provided the employee does not hold said check for more than thirty (30) days before making attempt to cash said check, then said Employer, while in the jurisdiction of the Local Union, thereafter shall pay in cash.

Section 4.06: When Friday is a recognized holiday, wages shall be paid Thursday for all work during that week. An itemized statement shall be furnished each workman, showing total hours worked, total wages earned, and any deductions from such wages.

Section 4.07: Any man reporting for work and being laid off, not having been notified the day previous of such layoff shall receive not less than two (2) hours wages in order to gather his tools and personal belongings and shall be paid off in full immediately. In the event the employee is not paid off, waiting time at the regular rate (not to exceed eight [8] hours in any one twenty-four [24] hour period) shall be charged until payment is made. Two (2) hours wages for gathering tools and personal belongings will not be paid if the employee has not notified the Employer of a previous day's absence. An employee who voluntarily quits shall receive the employee's final paycheck on the next contractually scheduled pay day.

Section 4.08(a):   When men are directed to report to a job or shop and do not start to work due to causes other than weather conditions, they shall receive two (2) hours pay.

(b) When men receive two (2) hours pay as show-up time, they shall remain available for work for a full two (2) hour period.

(c) If requested by the Employer, during inclement weather conditions, men shall remain on the job available for work and shall receive two (2) hours pay.

(d) When men are directed to report to a job and are instructed to go to work by the Employer or his representative, weather conditions permitting, and they refuse, they shall not receive the two (2) hours show-up time.

(e) When men are called out on trouble or emergency calls outside of regularly scheduled working hours, they shall be paid from the time they leave home until they return at the overtime rate, with a minimum of one (1) hour's work.

Section 4.09: The Employer shall pay for traveling time and provide for at least one of the following provisions:

(i)    Furnish transportation from shop to job and job to job and job to shop during the regular working hours; or

(ii)    Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service for actual mileage from shop to job and job to job and job to shop during all the regular working hours to be reimbursed.

On work outside the jurisdiction of the Union, the Employer shall provide one of the following:

(i)    Furnish transportation, board and all other necessary expenses;

(ii)    Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service and furnish board and all other necessary expenses.

Section 4.10: No traveling time shall be paid before or after working hours to workmen for traveling to or from any job when workmen are ordered to report to the job, provided his day ends at such job.

Section 4.11: The Employer shall furnish a monthly payroll report to Local Union 520 postmarked no later than 15th day of the following month, giving workman's name, classification, wage rate, straight-time hours worked, overtime hours and gross wages paid to all workmen. This report shall identify the exact date of all employees who have quit or been discharged during the working period covered by this report.

A monthly payroll report to the Local Union and to all Trust Funds shall be completed and mailed each month, whether the Contractor has workmen employed or not.

Section 4.12: Workmen being laid off or discharged by an Employer or workmen severing their employment shall be given a termination slip stating the reason for termination and signed by their immediate supervisor or their Employer, and a copy shall be sent to Local Union 520. Additionally, employers shall provide a termination slip to the JATC Training Director in the case of an apprentice.

Section 4.13: When so elected by the contractor, multiple shifts of eight (8) hours for at least five (5) days' duration may be worked. When two (2) or three (3) shifts are worked:

The first shift (day shift) shall consist of eight (8) consecutive hours worked between the hours of 8:00 A.M. and 4:30 P.M. Workmen on the "day shift" shall be paid at the regular hourly rate of pay for all hours worked.

The second shift (swing shift) shall consist of eight (8) consecutive hours worked between the hours of 4:30 P.M. and 1:00 A.M. Workmen on the "swing shift" shall be paid at the regular hourly rate of pay plus **10%** for all hours worked.

The third shift (graveyard shift) shall consist of eight (8) consecutive hours worked between the hours of 1:00 A.M. and 9:00 A.M. Workmen on the "graveyard shift" shall be paid at the regular hourly rate of pay plus **15%** for all hours worked.

The Employer shall be permitted to adjust the starting hours of the shift by up to two (2) hours in order to meet the needs of the customer.

If the parties to the Agreement mutually agree, the shift week may commence with the third shift (graveyard shift) at 12:30 A.M. Monday to coordinate the work with the customer's work schedule. However, any such adjustment shall last for at least five (5) consecutive days duration unless mutually changed by the parties to this Agreement.

An unpaid lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required before the established start time and after the completion of eight (8) hours of any shift shall be paid at one and one-half times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight time rate shall be the maximum compensation for any hour worked. There shall be no requirement for a day shift when either the second or third shift is worked.

## UNION DUES DEDUCTION

Section 4.14: Upon receipt of a voluntary written authorization the Employer agrees to deduct and forward to the Financial Secretary of the Local Union - the additional working dues from the pay of each employee. The amount to be deducted shall be the amount specified in the approved Local Union Bylaws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

## ARTICLE V
## General Rules

Section 5:01: In order to comply with existing laws, nothing in this Agreement shall be construed as limiting the right of Employers to move, transfer, or assign employees from his shop to any specific job or from any job to any other job upon which said Employer bolds a contract for the performance of the electrical work. An employee, once on the Employer's payroll, may be worked by him at any location at the discretion of the Employer.

Section 5.02: When the Employer has no shop located in the jurisdiction of this Union, then under such circumstances the job site shall be considered the city in which the shop is located with one job site designated as the permanent shop.

Section 5.03: On all jobs requiring five (5) or more Journeymen, at least every fifth Journeyman, if available, shall be fifty (50) years of age or older.

Section 5.04(a): Journeyman shall provide themselves with the following tools:

| | |
|---|---|
| One tester not over 1000 volts or one Multi Volt Tester | Combination square-Tri-square |
| Knife | Adjustable 12" blade |
| Crescent Wrench 8" to 12" | Hacksaw frame |
| Screw drivers | Two pair channel lock type pliers |
| Hammer | One pair long nose pliers |
| Small level | One pair Dyke pliers |

Def. MSJ Appx.000092

| | |
|---|---|
| Plumb bob | One chalk line |
| Awl or Center punch | Keyhole saw |
| Pencil | One steel measuring tape at least 16' long |
| One pair side cutting pliers 7" or larger | Pipe wrench 12" to 14" or small |
| Wire stripper | Chain tong |

(b) Journeyman may furnish other similar tools but shall not be required to do so.

(c) A Journeyman may carry or store in his toolbox small tools furnished by and belonging to his Employer (power tools excluded). Such tools must be the property of the Employer, to be returned to him upon request or termination of the employee but are not to be replaced by the employee if broken or stolen.

(d) Apprentices shall provide themselves with the following tools only, except that first-year Apprentice may provide himself with a small toolbox and a third- or fourth-year Apprentice may have a toolbox on the job and start building up his tool list towards that of a Journeyman.

| | |
|---|---|
| 2 pair channel lock type pliers | Pencil |
| 1 pair side cutters pliers – 7" or larger | Hammer |
| One steel measuring tape at least 16' long | One voltage tester not over 1000 or Multi Volt Tester |
| Screw drivers | Small level |
| Knife | Hacksaw frame |
| Awl | Wire stripper |

He may furnish one pair of long-nose and one pair of Dyke pliers if he desires.

(e) The Employer shall furnish necessary locked storage to reasonably protect tools from the weather and vandalism on large jobs where it is necessary to leave tools on the job.

Section 5:05: The Employer shall furnish all other necessary tools or equipment. Workmen will be held responsible for the tools or equipment issued to them providing the Employer furnishes the necessary lockers, toolboxes, or other safe place of storage. Tools must be taken out and put away during working hours.

Section 5.06: Workmen shall install all electrical work in a safe and workman like manner in accordance with applicable code and contract specifications.

Section 5.07: The representatives of the Union shall be allowed access to any building at any reasonable time where members of the Union are employed.

Section 5.08: In all shops or on all jobs where four (4) or more Journeymen are employed, one Journeyman shall be designated as a Foreman.

On all jobs, the first working crew may consist of a maximum of eleven (11) men, that is, ten (10) Journeyman and one (1) working Foreman.

When a second crew is established, it may consist of a maximum of eleven (11) men, that is, ten

(10) Journeymen and one (1) working General Foreman.

When a third or subsequent crew is established, it may consist of a maximum of eleven (11) men, that is, ten (10) Journeymen and one (1) working Foreman. Each crew shall be supervised by a Foreman and the Foremen shall be supervised by the General Foreman.

No General Foremen shall supervise more than fifty-five (55) men, including Journeymen and Foremen. For each additional fifty-five (55) men, the above procedures shall repeat except that the sixth and subsequent Foremen shall be supervised by an Area Foreman.

Section 5.09: Foremen, Area Foremen, and General Foremen shall be permitted to use tools. This shall not mean that they cannot handle material. Foremen may be required to attend and complete Foremen courses when provided.

Section 5.10: On jobs requiring a Foreman, workmen are not to take directions, orders or accept the layout from anyone other than their Foreman. Foremen are to take directions, orders, or layout from their Area Foreman only, when Area Foremen are required. When Area Foremen are not required, Foremen shall take directions, orders or layouts from the General Foreman only. Area Foremen shall take directions, orders or layout from the General Foreman only.

Section 5.11: No workman on one job shall replace a workman on another for any overtime work. All overtime work on any job shall be distributed fair and equal to all workmen. Exceptions to the two conditions above shall include the need for special skills or when workmen have not worked the available straight time hours during the "work week" as defined in Article IV, Section 1.

Section 5.12: The Employer shall see that cold water (in warm weather) and first-aid kits are available on all jobs and/or trucks.

Section 5.13: The Employer shall furnish protective equipment for workmen on energized circuits or equipment carrying 300 volts or more. On all energized circuits or equipment carrying 440 volts or over, as a safety measure, two (2) or more Journeymen must work together.

Section 5.14: All conduit shall be cut and threaded by workmen covered by this Agreement.

Section 5.15: Where pipe cutting and threading machines, electric drills, electric benders, electric chipping hammers, sanders, similar portable tools and all other power-driven equipment are used, such shall be operated by workmen covered by this agreement in the jurisdiction of the IBEW.

Section 5.16: All pulling of wire or cable shall be done by workmen covered by this Agreement.

Section 5.17: Journeyman cable splicers shall furnish only hand tools. On all work of joining, splicing and insulating and the placing of flame-proof covering where wiped lead joints are necessary, it shall be performed by cable splicers. Journeymen only shall be used in assisting cable splicers, except that one de-energized enclosures, an Apprentice may be used. Cable splicers shall not be required to work on wires or cables when the difference in potential is over 200 volts between any two conductors or between any conductor and ground, unless assisted by one Journeyman. In no case shall cable splicers be required to work on energized cables carrying in excess of 480-volt circuit.

Section 5.18: Welders gloves, sleeves, hoods and all hard hats shall be furnished by the Employer. Workmen may be required to sign a payroll deduction form to authorize the deduction from their final paycheck to cover reimbursement of unreturned hard hats. Charges shall not exceed actual cost paid by the Contractor.

Section 5.19: The installation of all electrical raceways whether metal, wood, fiber, plastic clay or of any other conceivable composition, when used to contain electrical or grounding system conductors, and the installation, preparation and connection of all electrical and/or grounding or bonding conductors shall be performed by workmen employed under the terms of this Agreement and paid the hourly applicable negotiated wage rate contained herein unless it is an integral part of the building structure.

Section 5.20: No work shall be performed on Labor Day except in case of emergency.

Section 5.21: On any job of five (5) or more days duration on the main campus of the University of Texas, the Employer will either provide for employee parking within three blocks of the job or arrange for covered transportation from a parking area within two miles of the job.

## ARTICLE VI
## Standard Inside Apprenticeship Language

Section 6.01: There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of 6 or 8 members who shall also serve as Trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (un-indentured, intermediate journeymen, etc.).

Section 6.02: All JATC member appointments, reappointments, and acceptance of appointments shall be in writing. Each member shall be appointed for a 3-year term, unless being appointed for a lesser period of time to complete an expired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent, or they voluntarily resign. All vacancies shall be filled immediately

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

Section 6.03: Any issue concerning an apprentice, or an apprenticeship matter shall be referred to the JATC for its review, evaluation, and resolve, as per standards and policies. If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article One of this Agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

Section 6.04: There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunications apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

Section 6.05: The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties, and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

Section 6.06: To help ensure diversity of training, provide reasonable continuous employment opportunities, and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprenticeships with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

Section 6.07: All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selections procedures.
An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

Section 6.08: The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture the number of apprentices necessary to meet the jobsite ratio as per section 6.12.

Section 6.09: Though the JATC cannot guarantee any number of apprentices, if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request. If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants. An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

Section 6.10: To accommodate short-term needs when apprentices are unavailable, the JATC shall assign un-indentured workers who meet the basic qualifications for apprenticeship. Un- indentured workers shall not remain employed if apprentices become available for OJT assignment. Un-indentured workers shall be used to meet job site ratios except on wage-and-hour (prevailing wage) job sites.

Before being employed, the un-indentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an un-indentured, that they are subject to replacement by indentured apprentices, and that they are not to work on wage-and-hour (prevailing wage) job sites.

Should an un-indentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked as an un-indentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to un-indentured; such as Math Review, English, Safety, Orientation/Awareness, introduction to OSHA, First-Aid and CPR. Participation shall be voluntary.

Section 6.11: The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and un-indentured. Contributions to other benefit plans may be addressed in other sections of this agreement. (See Article IV Section 4.03).

Section 6.12: Each job site shall be allowed a ratio of one (1) apprentice(s) for everyone (1) Journeyman Wireman.

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 1 to 3 |
| 4 to 6 | 4 to 6 |
| Etc. | Etc. |

The first person assigned to any job shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

Section 6.13: An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in-sight-of a Journeyman Wireman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

Section 6.14: Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

Section 6.15: The parties to this Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor- Management Relations Act of 1947 as amended, ERISA, and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials, or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

Section 6.16: All employers subject to the terms of this Agreement shall contribute the amount of funds specified by the party's signatory to the local apprenticeship and training trust agreement. The current rate of contribution is: 1% of the Journeyman straight-time rate per hour for each hour worked. This sum shall be due the Trust Fund by the same date as is their payment to the NEBF under the terms of the Restated Employers Benefit Agreement and Trust.

**ARTICLE VII**
**Vacation**

Section 7.01: Upon written authorization from the employee, the Employer shall make a weekly payroll deduction of six percent (6%) from the gross pay of each employee. The employee shall request the payroll deduction at the beginning of employment with an employer. The employee shall notify the employer, in writing of any modifications to their participation status for the voluntary payroll deduction in the month of January or July. Payroll deduction revisions will be made effective on the first payroll of the following month. The Employer monthly shall forward the amount of individual deductions from each employee as shown on the monthly payroll to Velocity Credit Union, ATTN: Teller Operations, P.O. Box 1089, Austin, TX, 78767, for deposit to that employee's Velocity Credit Union vacation account, and simultaneously shall provide the Local Union with a written report which sets forth, for each employee, the number of hours worked, the employee's classification and pay rate, the employee's gross pay, and the amounts deducted.

Section 7.02: The payment and payroll report shall be mailed to reach the Velocity Credit Union no later than the 15th day of the month following the end of each benefit period.

Section 7.03: Each employee shall be allowed to take two (2) weeks of annual vacation between February 1st and January 31st.

Section 7.04: An Employer's failure to timely remit the payroll deductions or payroll report to the

Velocity Credit Union, or the payroll report to the Local Union, as required above shall be treated as a delinquent contribution under the terms of the applicable Inside Construction Agreement.

## ARTICLE VIII
### Annuity Plan

It is mutually agreed between the parties hereto and in accordance with the IBEW Local Union 520 Annuity Plan entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, the Employer will forward to the Annuity Plan an amount equal to the percentage levels per Appendix A (See Article IV Section 4.03) of the gross wages of all classifications of employees for all hours worked within the geographical limits of the Union's jurisdiction when work is performed for any Employer operating under this Agreement. The payment shall be made monthly, together with the payroll report forms specified in Article IV.

## ARTICLE IX
### 401(k) Savings Plan

All employers signatory to this Agreement and/or employing workmen under the terms of this Agreement, shall deduct from each employee's Gross Weekly Payroll of employees who wish to participate, a voluntary deductible amount to be deposited into a 401(k) savings plan, upon the written request of each employee. Employees may enroll at the beginning of the employment with an Employer and enroll or change withholding each year during the month of January or July. Withholding will be made effective on the first payroll of the following month.

## ARTICLE X
### Health and Welfare

It is hereby mutually agreed between the parties hereto and in accordance with the Benefit contract governing the electrical benefit fund entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, that the Employer will forward to the Central Texas Health and Benefit Plan the following contributions as per Appendix A (See Article IV Section 4.03) for all hours actually worked by each employee (both straight time and overtime) within the geographical limits of the Union's jurisdiction when work is performed for any Employers operating under the terms of the basic Agreement for all Employers. Payments shall be made monthly together with a monthly payroll report on a form that will be furnished for that purpose by the Trustees of the Electrical Benefit Plan.

It is agreed that employers shall contribute solely up to $5.45 per hour of increases declared by the Trustees of the Plan. Any increases above $5.45 shall be split equally between the employer -and employee through a wage reduction of the JIW rate of pay, all other classifications shall adjust accordingly.

## ARTICLE XI
## National Labor Management Cooperative Committee

Section 11.01: The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C. §186(c)(9). The purposes of this Fund include the following:

(1)    to improve communication between representatives of labor and management;

(2)    to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

(3)    to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

(4)    to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

(5)    to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

(6)    to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

(7)    to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

(8)    to engage in public education and other programs to expand the economic development of the electrical construction industry;

(9)    to enhance the involvement of workers in making decisions that affect their working lives; and

(10)    to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

Section 11.02: The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

Section 11.03: Each employer shall contribute one cent ($.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. The Central Texas Chapter, NECA, or its designee, shall be the collection agent for this Fund.

Section 11.04: If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.

Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE XII
## P.A.C. Fund

The Employer agrees to deduct and transmit to the Local Union 520, IBEW, Committee on Political Education (IBEW-COPE) .05 cents for each clock hour worked from the wages of those employees who voluntarily authorize such contributions on the forms provided for that purpose by IBEW-COPE. The deductions will be made monthly and reported and remitted in accordance with Article IV, Section 11 of this Agreement.

Any Employee may revoke the voluntary authorization at any time by notifying the Company and IBEW-COPE in writing of a desire to do so.

The Union will indemnify and save the Company harmless from any claims, suits, or any other form of liability as a result of making payroll deductions described above.

## ARTICLE XIII

This Agreement set forth the entire contract between the Chapter and the Union and supersedes all previous understandings and Agreements between them and amendments thereto.

## ARTICLE XIV
## Substance Abuse Language

The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state, and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

## ARTICLE XV
## Code of Excellence

The parties to this Agreement recognize that to meet the needs of our customers, both employer and employee must meet the highest levels of performance, professionalism, and productivity. The Code of Excellence has proven to be a vital element in meeting the customers' expectations.

Therefore, each IBEW local union and NECA chapter shall implement a Code of Excellence Program. The program shall include minimum standards as designed by the IBEW and NECA.

### Separability Clause

Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provision shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

## 1ˢᵗ YEAR APPRENTICE WAGE
## MEMORANDUM OF UNDERSTANDING

## BETWEEN

## A.S.H. ELECTRICAL SERVICES LLC

## AND

## IBEW LOCAL UNION 520

It is mutually agreed upon between IBEW Local 520 and A.S.H. Electrical Services LLC, effective May 27, 2019, that the minimum wage for a first-year apprentice shall be $15.00 per hour. This MOU shall remain in effect until such time as 50% of the JIW wage rate is greater than $15.00 per hour.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000103

# CE ADVANCEMENT
# MEMORANDUM OF UNDERSTANDING

## BETWEEN

## A.S.H. ELECTRICAL SERVICES

## LLC

## AND

## IBEW LOCAL UNION 520

A CE shall obtain a Texas State Journeyman's License before being upgraded to JIW status.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000104

## 2022 Residential MOU

**Scope:** This MOU shall apply to all dwelling units including single family dwellings, apartments, and condominiums four stories and below. This MOU shall not apply to the commercial portion of mixed-use developments.

1. A CW/CE, having attained a Residential Journeyman's License, shall be awarded 2000 SBCs/ OJT hours. This CW/CE shall be allowed to work unsupervised on residential construction/service work.
2. A worker holding a Residential or Unrestricted Journeyman's License shall be the first person assigned to any residential project.
3. On all residential projects with four or more workers, a worker holding a Residential Journeyman's License shall be designated Residential foreman. This Residential foreman shall be allowed to supervise a crew of up to 10 workers of his classification or below, including first- and second-year apprentices. This Residential foreman shall receive a 10% pay premium above his/her classification.
4. On all residential projects requiring more than 11 workers, one shall be designated Residential General Foreman. The Residential General Foreman shall receive a 20% pay premium above his/her classification.
5. There shall be one foreman per 10 workers.
6. A CW/CE with a Residential Journeyman's License shall continue to accrue SBCs/OJT hours and be advanced in the CW/CE program accordingly.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

## SHORT CALL EXTENSION

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## A.S.H. ELECTRICAL SERVICES
## LLC
## AND
## IBEW LOCAL UNION 520

In order to accommodate short term employment needs of the employer signed to this agreement, and the needs of our customers, the union and employer agree to the following:

Article III, Section 3.12 of the Inside Agreement between A.S.H. Electrical Services LLC and Local Union 520, of the International Brotherhood of Electrical Workers, shall have the following language added to the existing language contained in Article III, Section 3.12:

A forty (40) hour call may be extended an additional forty (40) hours by the employer is job conditions warrant such extension. An applicant is not required to stay for the second forty (40) hour period unless told in advance the job as for eighty (80) hours. For the purposes of calculating hours worked under this Memorandum, only the straight time hours worked will be used. Any overtime worked during the one (1) or two (2) week period covered by this Memorandum will not affect the applicant's position on the Out-of-Work List.

This Memorandum shall continue in effect from year to year hereafter unless changed or terminated in the same manner as prescribed for the Inside Agreement.

SIGNED FOR THE UNION:                        SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International       A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

_____              _____
Ben Brenneman
Business Manager/Financial Secretary          A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

## SMALL WORKS
## MEMORANDUM OF UNDERSTANDING

### BETWEEN

### A.S.H. ELECTRICAL SERVICES LLC

### AND

### IBEW LOCAL UNION 520

IBEW Local Union 520 and EMPLOYER have repeatedly discussed possible solutions to gaining market share within the small works arena. In an effort to assist all signatory contractors in this arena, Local 520 offers the following:

**Four Person Crew**

Effective June 6, 2022, the Union agrees on any/all jobs throughout the Local 520 jurisdiction, with four (4) or less employees, the signatory contractor may utilize the services of a Construction Electrician (CE) and/or a 6th period apprentice. This CE or apprentice must be in possession of a State of Texas Journeyman License and may work alone, if necessary.

Additionally, the licensed CE may supervise up to three (3) additional equal or lower classified workers (CE's and/or CW's). This crew mix would not include Apprentice Wiremen. As long as the jobsite requires 4 or less employees, there will be no need for a Journeyman Inside Wireman (JIW) nor a Foreman (F). Should the four-person crew increase to five (5) or more, a licensed JIW or a licensed Foreman must be utilized.

Due to the market conditions, the parties recognize this agreement to be a variance to Article VI Section 6.12 of the inside agreement that necessitates the JIW being the first person on the job. The parties recognize Apprentices and CW/CEs operate under a formal training program where OJT under direct and indirect supervision by a JIW is still an important component to their development. Therefore, employers must be diligent to ensure CW/CE employees receive OJT training supervised by a JIW outside of these qualifying projects.

Signatory Contractors are not limited to any number of Four Person Crew jobsites. Pay rates and applicable benefits for the above classified workers shall be the ones listed in the Local 520 Inside Collective Bargaining Agreement between IBEW Local Union 520 and A.S.H. Electrical Services LLC.

This Memorandum of Understanding will expire on June 4, 2028, unless both Parties agree to extend it for an additional timeframe.

SIGNED FOR THE UNION:                                    SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International     Def. MSJ Appx.000107 Electrical Services LLC
Brotherhood of Electrical Workers

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000108

## Memorandum of Understanding
## Summer Worker Program

1.  Must be by informal understanding between the local Union, the Employer and the JATC, with written guidelines.

2.  The guidelines should specify the following conditions:

    a.  The maximum number to be employed.

    b.  Effective only when placement will not displace an Apprentice or Intermediate Journeyman.

    c.  Qualifications:
        1.  At least 16 years old
        2.  A bona fide student (evidence required)
        3.  Summer worker and employer signatures on statement of understanding (sample attached)

    d.  Placement for a specific period of time, not to exceed 90 days. (Ending with the first pay period in September).

    e.  Placed as a <u>Summer Worker.</u> NOT as an apprentice. (Cannot be referred or worked on jobs requiring registered apprentices).

    f.  Rate of pay shall be equal to that of a first period indentured apprentice.

    g.  Work performed as a Summer Worker is not counted towards apprenticeship.

    h.  Wages paid to Summer Workers are included in gross labor payroll, and the 3% of gross labor payroll payment to NEBF must include Summer Workers wages.

    i.  Limited electrical work (same as unindentured apprentice).

<u>SIGNED FOR THE UNION:</u>
Local Union No. 520 of the International
Brotherhood of Electrical Workers

<u>SIGNED FOR THE EMPLOYER:</u>
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

# Memorandum
# of Understanding

## Between IBEW Local
## Union 520
## and
## A.S.H. ELECTRICAL SERVICES LLC

Effective June 2, 2025 through June 4, 2028.

On jobs of five (5) or more days duration on the main campus* of the University of Texas, if parking is not provided, the employer will reimburse $6.00 per day for parking to each employee who reports to work on time and works all regular hours available to him. The employer is not responsible to provide transportation to and from parking areas.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

*from I-35 to Guadalupe Street, from East & West Dean Keeton Street to East & West Martin Luther King, Jr. Blvd.



## Construction Wireman/Construction Electrician
## Memorandum of Understanding

### PURPOSE:

This agreement has two goals; one is to recruit an adequate number of personnel to meet the demands of the electrical construction industry in the jurisdiction covered by the inside construction and maintenance agreement. The second objective is to establish a standard by which those recruited will be properly placed for continuing skills based training.

### OBJECTIVES:

A. Provide a uniform means by which individuals can be brought into the organized industry.
B. Provide employment opportunities for those individuals who may not meet the entrance requirements of the local AETA
C. Establish a fair wage scale based on a skill standard that provides a clear and formal path to becoming a Journeyman Inside Wireman while maintaining a productive workforce.
D. Provide electrical employees with experience and potential, an avenue to becoming a Journeyman Inside Wireman.
E. To provide a second chance program for those indentured apprentices who discover that they do not fit into the AETA program.
F. To provide A.S.H. Electrical Services LLC and IBEW Local Union 520 the autonomous means of developing training programs to meet the needs of changing local markets.

### DEFINITIONS:

A. CW/CE – Construction Wireman/Construction Electrician
B. SBC – Skill Based Credits
C. AETA – Austin Electrical Training Alliance (formerly called Joint Apprenticeship Training Center)
D. JATC – Joint Apprenticeship Training Committee
E. LU 520 – International Brotherhood of Electrical Workers Local Union 520
F. Employer – A.S.H. Electrical Services LLC
G. TDLR – Texas Department of Licensing and Regulation
H. OJT – On the Job Training

### SECTION 1 – ADMINISTRATION

A. The AETA and LU 520 shall be responsible for:

1) Administering skill-based evaluations (supervised by Local Union staff)
2) Monitoring progress of the CW/CE for wage advancement
3) Develop and deliver skill-based training courses
4) Notifying LU 520 of the number of apprentices available for work assignments
5) Recruiting, processing and dispatching applicants to employers for assignment.



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

B. Either party (EMPLOYER, LU 520 or AETA) may review all skill-based evaluations and evaluation procedures.

## SECTION 2 – WAGES, BENEFITS AND ADVANCEMENT

Upon successful accumulation of 16,000 Skill Based Credits (SBC) and successful completion of a Texas State Journeyman's License the Construction Electrician shall be upgraded to Journeyman Inside Wireman.

### A. Wages Appendices A1 and A2

1. Accumulated SBC's shall determine the individuals initial pay rate. Individuals shall advance upon meeting the requirements shown in Appendix D.
   or

2. Experienced Applicants with verifiable industry wage -or- AETA Transferees (Ref: SECTION 5): wages shall remain frozen until accumulated SBC's warrant pay advancement.

### a. BENEFITS – REFERENCE APPENDICES A1 and A2:

1. Accumulated SBC's shall determine what level of benefits shall apply.
2. All benefits shall be paid in accordance with the various trust fund qualifications.

### b. SKILLS BASED CREDITS (SBC'S) shall accrue by the following methods:

1. One SBC per each OJT hour worked for a signatory contractor.
2. One SBC for every two (2) OJT hours worked for a non-signatory contractor (wage documentation required; no credit (SBC's) for hours worked prior to program enrollment).
3. SBC's from skill based evaluation.
4. SBC's credited by successful completion of skills based courses. SBC's achieved in this manner shall not exceed 4,000 for the life of the program.
   (see APPENDIX C)

   Note: In no case shall SBC's be earned above the stated maximums through the evaluation process and/or the optional course work within each skill discipline (see APPENDIX B).

Def. MSJ Appx.000112



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## c. EXPERIENCED APPLICANTS SHALL:

1) Provide verifiable electrical industry wage documentation to establish their wage rate. (wage documents for public works projects where a wage determination is established shall not be eligible for verification)

   OR

2) Take the next available skills based evaluation to determine how many SBC's shall be credited and establish initial wage rate.

   SEE APPENDICES A1 AND A2 FOR EVALUATION, CLASS SBC'S AND WAGE SCHEDULE.

## SECTION 3 – IMPLEMENTATION:

The LU 520 shall be primarily responsible for the recruitment, processing and dispatching of applicants to employers. The LU 520 shall provide all processing information to the AETA for the purpose of tracking the CW/CE's progress in the program.

The JATC shall be responsible for the training of participants in accordance with Article VI, section 6.01 of the inside agreement.

The Employer shall be responsible for providing a termination slip to the LU 520 and the AETA when a CW/CE becomes unemployed.

CW/CE shall be employed on a conditional basis for 90 days from their first assignment. During the conditional employment period the LU 520 and A.S.H. Electrical Services LLC shall determine the individuals continued status in the program.

No employer is guaranteed a specific number of CW/CE.

Each job shall follow a ratio of one or more (1 or more) CW/CE(s) to one (1) JIW.

An employer who fails or refuses to hire available apprentices, in accordance with the agreed upon ratio of apprentices to journeymen, shall not be entitled to hire CW/CE.

CW/CE may be transferred from one qualifying project to another by the employer.

CW/CE shall not be included in the calculation of the apprentice to journeyman ratio.

Referral records may be inspected at LU 520 by a representative of the Employer.



## Construction Wireman/Construction Electrician
## Memorandum of Understanding

Effective January 1, 2020, all Construction Wiremen and Construction Electricians are required to provide proof of completion, by originally issued card or certificate, of an OSHA 10 safety training course.

## SECTION 4 – SUPERVISION:

The CW/CE who has less than 8,000 SBC's shall be under the supervision of a Journeyman Inside Wireman. It shall be the responsibility of the supervisor to lay out the work required and to permit the CW/CE to perform the work on his/her own. A CW/CE who has 8,000 SBC's shall be allowed to work with no supervision but shall not supervise any apprentices or Journeyman Wireman.

## SECTION 5 – TRANSFERS:

A. All transfers shall be approved by the JATC.
B. Individuals are limited to a maximum of (2) transfers.
C. Transferees shall not experience a Wage Rate or Benefit Reduction.
D. AETA to CW/CE program:
   Local Apprentices from AETA apprenticeship program may transfer to the CW/CE program at an equal pay rate providing the apprentice has:
   1) A satisfactory work history (hours worked, absenteeism, and tardiness); and
   2) Established in writing the basis for the transfer.
   3) Apprentice transferees shall be credited one (1) SBC for each OJT Hour + (500) SBC's per completed academic year of apprenticeship. In no instance shall this transfer result in the apprentice being granted more than the maximum SBC's as shown below:

### AETA to CW/CE Credit Table

| AETA Completed | Credited SBC's | AETA Completed | Credited SBC's |
|---|---|---|---|
| Less than 1 year | 2000 | Completed 3rd year | 8000 |
| Complete 1st year | 4000 | Completed 4th year | 10000 |
| Complete 2nd year | 6000 | Completed 5th year | 12000 |

E. CW/CE to AETA Program:

   CW/CE meeting the requirements for entrance into the AETA program may transfer to the AETA program as outlined by the JATC standards. The transferring CW/CE will complete the IBEW/NECA ETA Proficiency Exam to determine placement in the academic portion of the training and will receive OJT Hour credits based on JATC guidelines. Transferees shall not experience a reduction in their wage rate.



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## SECTION 6 – TERM OF AGREEMENT:

This Agreement shall take effect on June 2, 2019. The terms and conditions of this Agreement shall continue on jobs bid under said terms until such jobs are completed.

**Disputes:** All allegations of infractions of this agreement shall be referred to the Labor Management Committee as defined in the current inside/maintenance collective bargaining agreement. In the event of a deadlock the matter shall be referred to the IBEW Seventh District Vice-president and the NECA Southern Region Director for final and binding adjudication. This agreement is a Memorandum of Understanding to the area inside construction and maintenance collective bargaining agreement and may continue with or without requirement of separate notice.

**Commitment:** The two parties, by signature below, hereby commit and promise to use their best efforts to see that this Memorandum is used to its highest level for the maximum benefit of employers and employees alike.

The parties further promise and agree that if changes are needed to this Memorandum; those changes will be addressed in an atmosphere of mutual trust and cooperation for the equal benefit of employers and employees alike. **Furthermore, any changes to this agreement or program shall be subject to review by the IBEW Seventh District Vice-President and the NECA Southern Region Director.**

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC


Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000115



# Construction Wireman/Construction Electrician Memorandum of Understanding

## APPENDIX A1 (CW1-CW6)

| Benefits | CE 1 | CE 2 | CE 3 | CE 4 | CE 5 | CE 6 |
|---|---|---|---|---|---|---|
| Range SBC'S | 0-2K | 2.01K-4K | 4.01K-6K | 6.01K-8K | 8.01K-10K | 10.01K-12K |
| JIW Rate | 44% | 44% | 49% | 54% | 59% | 64% |
| A.E.T.A. | NA | NA | NA | 1% of JIW | 1% of JIW | 1% of JIW |
| NLMCC | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| H&B | Plan C | Plan B | Plan B | Plan B | Plan B | Plan B |
| NEBF (3%) | 3% | 3% | 3% | 3% | 3% | 3% |
| Annuity | NA | NA | NA | 3% | 3% | 3% |
| AMF | .10 | .10 | .10 | .10 | .10 | .10 |

## APPENDIX A2 (CE1- CE 4)

| Benefits | CE 7 | CE 8 | CE 9 | CE 10 |
|---|---|---|---|---|
| Range SBC's | 12.01K-13K | 13.01K-14K | 14.01K-15K | 15.01K- more |
| JIW Rate | 68% | 73% | 78% | 85% |
| A.E.T.A. | 1% of JIW | 1% of JIW | 1% of JIW | 1% of JIW |
| NLMCC | $0.01 | $0.01 | $0.01 | $0.01 |
| H&B | Plan B | Plan B | Plan B | Plan B |
| NEBF (3%) | 3% | 3% | 3% | 3% |
| Annuity | 5% | 5% | 5% | 5% |
| AMF | .10 | .10 | .10 | .10 |

| |
|---|
| Low |
| Middle |
| High |

NOTE:  Benefit Schedule shown reflects current rates.  Rates shall be adjusted as per the Current Inside Agreement.

-Health and Welfare provides the employee with the option to select employee single coverage (for Levels 2, 3 & 4 only) or employee/dependent coverage (for Levels 2-8). Employees may change this election once each calendar year or more often as the trust fund rules provide.

-Only SBCs earned from participating employers qualify for benefits eligibility.



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## APPENDIX B

| SKILL DISCIPLINE | MAX SBC's |
|---|---|
| Branch Wiring | 6,400 |
| Feeder Wiring | 1,600 |
| Panels & Transformers | 1,600 |
| Switchgear & Motor Control Center | 1,120 |
| Motors & Motor Controls | 800 |
| Lighting & Lighting Controls | 2,400 |
| Grounding | 160 |
| Devices | 320 |
| Electrical Codes & Ordinances | 160 |
| Blueprints & Specifications | 160 |
| Meters & Tools | 160 |
| OSHA & Job Safety | 160 |
| Agreements | 160 |
| Service & Troubleshooting | 800 |

Def. MSJ Appx.000117



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## APPENDIX C

### Optional Coursework SBC Curriculum Allocation

| Skills Course | SBC's Credit | Course Hours |
|---|---|---|
| Branch Wiring | 920 | 72 |
| Electrical Codes & Ordinances | 320 | 30 |
| Service/Troubleshooting | 280 | 24 |
| Panels & Transformers | 280 | 24 |
| OSHA & Job Safety | 280 | 24 |
| Meters & Tools | 280 | 24 |
| Feeder Wiring | 280 | 24 |
| Blueprints & Specifications | 280 | 24 |
| Agreements | 240 | 24 |
| Switchgear & Motor Control Centers | 200 | 18 |
| Motors & Motor Controls | 200 | 18 |
| Lighting & Lighting Controls | 200 | 18 |
| Grounding | 120 | 12 |
| Devices | 120 | 12 |
| **TOTAL** | **4000** | **180** |



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

APPENDIX D

| Classification | SBC's | Training | Awarded |
|---|---|---|---|
| CW2 | 2000 | Conduit Bending 1 | 230 |
| CW3 | 4000 | Blueprint Reading | 280 |
| CW4 | 6000 | Conduit Bending 2 | 230 |
| CW5 | 8000 | Codeology | 120 |
| CW6 | 10000 | Basic Code | 120 |
| CE1 | 12000 | Conduit Bending 3 | 230 |
| CE2 | 13000 | Grounding/Transformers | 320 (120+200) |
| CE3 | 14000 | Services | 200 |
| CE4 | 15000 | Motor Control | 280 |
| JIW | 16000 | | |

Def. MSJ Appx.000119

 

**Memorandum of Understanding**
**Four Year Apprenticeship Program Conversion**

Made and entered into April 10, 2023, between IBEW Local Union 520, hereafter referred to as the Union, and the EMPLOYER, hereafter referred to as the Employer. This Agreement shall remain in effect from year to year throughout the current collective bargaining agreement and will expire at that time on June 1, 2025.

1. The parties hereby agree that Article IV, Section 4.03 Appendix A (Wages) of the Inside Agreement between the parties shall be modified with an additional schedule to meet the needs of the apprenticeship wage and benefit schedule for those starting the (4) Four Year Program.

| Apprentice Wireman | | | | | |
|---|---|---|---|---|---|
| Multiplier | Class | NEBF | Annuity | Medical | JATC |
| 50% of JIW 0-999 Hrs | 1st Period | 3% | ** | $3.70 | 1%*** |
| 55% of JIW 1000-1999 Hrs | 2nd Period | 3% | 3% | $3.70 | 1%*** |
| 60% of JIW 2000-3499 Hrs | 3rd Period 180 Hrs Instruction | 3% | 3% | $3.70 | 1%*** |
| 65% of JIW 3500-4999 Hrs | 4th Period 360 Hrs Instruction | 3% | 5% | $3.70 | 1%*** |
| 70% of JIW 5000-6499 Hrs | 5th Period 540 Hrs Instruction | 3% | 5% | $3.70 | 1%*** |
| 75% of JIW 6500-8000 Hrs | 6th Period 720 Hrs Instruction | 3% | 8% | $3.70 | 1%*** |
| 50% of JIW Max Hrs2000 | Unindentured Apprentice | 3% | ------------- | $2.65 | 1%*** |
| Journeyman 8000, completed 900 hours of related instruction and obtained State of Texas Journeyman license. Classroom instruction hours are cumulative. **1% effective January 6 2025 ***1% of Journeyman Straight -Time Rate | | | | | |

Def. MSJ Appx.000120

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000121

# EMPLOYER BRIEF

to

## The Council on Industrial Relations

for the

Electrical Contracting Industry

regarding the unresolved issues

between

## A.S.H. Electrical Services LLC

and

## Local Union 520, San Angelo Division

of the

## International Brotherhood of Electrical Workers

Case Reference 2659

May 2025

Def. MSJ Appx.000122

# Table of Contents

Executive Summary

Management Position on Issues in Dispute

I. Exhibits
- Exhibit I  –  Email Correspondence
- Exhibit II  – Tentative Agreement Zone III MOU

2

# Executive Summary

Members of the Council on Industrial Relations,

To begin, it is with an abundance of discontent, A.S.H. Electrical Services, LLC finds itself presented with current circumstance. We maintain the belief(s) that in order for a "dispute" or instance of "unresolved issues" to exist true negotiations must have occurred and a position of impasse declared. To date, representatives of A.S.H. Electrical Services, LLC, and one lone representative of IBEW LU 520, Mr. Diarmid Campbell, have met a total of 3 times to negotiate a successor agreement, all three occasions totaling no more than 2 hours collectively. Initial proposal received by A.S.H. was reviewed and discussed briefly March 18, 2025. Second meeting was held April 08, 2025. At that time A.S.H. gained a full understanding of changes proposed by LU 520. At each meeting numerous references have been made regarding NECA and IBEW LU 520 affiliation.

A.S.H. Electrical has made numerous attempts to clarify bargaining authority exists not with NECA but with representatives of A.S.H. to no avail. Mr. Campbell has consistently referenced NECA, LU 520 proposal to NECA, and has failed to recognize A.S.H. Electrical Services, LLC as an independent body. Mr. Campbell has also stated he is unable to agree to, make concessions, nor amend proposals as offered by LU 520 or received by A.S.H. Electrical Services. One would be hard pressed to define our three meetings as a bargaining session as Mr. Campbell, presiding as the representative for LU 520 has at all times maintained an intransigent position to any discussion or proposal verbally made by A.S.H. representatives. Rather, upon multiple occasions, he has suggested impasse and for this issue to be brought before the Council of Industrial Relations for adjudication.

Agreement was made and sent via letter/email by A.S.H. Electrical Services to remove the Favored Nations Clause April 16, 2025. A.S.H. Electrical Services, LLC desire was to be certain of each party's assent to this particular issue in that a relevant counter proposal could be formulated. For over a week Mr. Campbell refused to answer this letter, to date we have yet to receive confirmation. Mr. Campbell made request April 16 to file jointly to the Council of Industrial Relations. His request was denied and letter/email sent. Once again, April 17 request was received from Mr. Campbell requesting joint filing which was again denied. **Contrary to requirements clearly specified upon the CIR website within numerous sections, timely, written communication, (Notice of Intent) whether by email or letter was NEVER received stating IBEW 520 intent to file unilaterally to the Council. Regardless, on the date of April 17, Mr. Campbell, having only met twice prior, made unilateral request to the Council of Industrial Relations, a position he was predisposed to beginning upon first meeting March 18. A.S.H. Electrical Services Representatives were notified of this occurrence by receipt of email from the Secretary of the Council, April 18, 2025, 7:08 AM CST.**

A counter proposal was presented April 28, 2025 to LU 520 outlining A.S.H. position to initial proposal received by LU 520. Needless to say, Mr. Campbells uncompromising attitude continued yet again, thus the meeting was very brief in nature. The underlying question which must be answered is: **Has I.B.E.W. LU 520 or its representatives, at any time presented itself as open to serious negotiations, in which it has recognized the independent nature of A.S.H. Electrical Services, LLC and made serious efforts to**

3

**discuss contract terms, more especially wages, fringe benefits, contract duration and the like?**

It is our belief with little effort the Council will find the answer to be a resounding NO. Rather, a list of 10 non-negotiable items have been presented by I.B.E.W. LU 520 at each meeting with any response to attempted discussion being that of "You have made intent to terminate the CBA, we are negotiating against the CBA, this is what we have presented to NECA." How can any reasonable outcome be expected with a refusal on one party's behalf to be open to any type of discussion?

As a result, A.S.H. Electrical Services, LLC has been left with no choice but to file an Unfair Labor Practice against I.B.E.W. LU 520 regarding this matter. The obligation to peaceably meet and hold reasonable discussions in attempts to negotiate a successor agreement is one of joint commitment, not solely the responsibility of A.S.H. Electrical Services. Unfortunately, we hold that due to the desire to negotiate successor agreements for the Local 520 jurisdictional areas of both Austin, and San Angelo, intent to negotiate a successor agreement for A.S.H. Electrical has been neglected and viewed as secondary.

A brief history is necessary to fully grasp the current situation. Representatives of I.B.E.W. first engaged A.S.H. Electrical after a meeting at the local junior college early 2021. Through that meeting a minor relationship was formed and the request made to become a signatory contractor. On May 13, 2021 a meeting was held in which A.S.H. Electrical representatives were adamant that we would only be in agreement to a 1-year term of contract. Mr. Mike Grant, Assistant Business Manager, Local Union 520 assured both owners that would be the case. What transpired thereafter would be in most forums regarded as unconscionable. Representatives of A.S.H. Electrical were given a Letter of Assent "A" to sign establishing a 9A relationship. At that particular time, A.S.H. Electrical Services, LLC comprised 0 employees except for one owner. The current contract expired June 01, 2023, however the Letter of Assent provided bound A.S.H. Electrical Services indefinitely. The one-year term was correct only in reference to the CBA, NOT the letter of Assent. Since that time, NLRB Regional District 16 has ruled that the relationship between A.S.H. Electrical Services, LLC and I.B.E.W. LU 520 is an 8F relationship. Had the correct Letter of Assent been signed establishing the relationship as that of an 8F as ruled by the NLRB, we would not be presenting this brief to the Council. The matter before us would have long ago been resolved. **The lingering question remains: How has the relationship between A.S.H. Electrical Services and I.B.E.W. LU 520 been of benefit to A.S.H. Electrical?** To date, I.B.E.W. LU 520 does not maintain a majority within A.S.H. Electrical, nor do they make such claim. The bargaining unit within A.S.H. Electrical Services, LLC consists of 1- Journeyman Inside Wireman, and 1- CE Level 08. Both individuals have ceased union membership and exercised their rights under the right to work statutes within the State of Texas to refuse working dues deductions from respective payroll.

Additionally, representatives of A.S.H. Electrical Services, LLC furthermore contend the refusal to bargain in good faith by Local Union 520 is evident based on documents recently received. Initial counter-proposal given to Mr. Campbell contained provisions exceeding that which has been tentatively agreed upon by I.B.E.W. LU 520 and Chapter for the San Angelo- Zone III MOU. At the April 28, 2025 meeting Mr. Campbell refused to speak to wages, fringes, or to any proposal while in possession of knowledge to the tentative agreement reached between signatory contractors other than A.S.H.

4

       **For the specified reasons, A.S.H. Electrical Services, LLC does hereby request the Council honor A.S.H. Electrical Services, LLC request to terminate the relationship between parties. Reasoning why LU 520 has not claimed disinterest evades A.S.H. Electrical. Had IBEW LU 520 been transparent and an 8F Agreement been initially signed, relationship would have ceased 3 years ago.  Unfortunately, A.S.H. Electrical Services, LLC has been bound to a disadvantageous contract for 3 years longer than necessary. Should this request be denied, A.S.H. Electrical Services, LLC requests the Council to make recommendation to I.B.E.W. LU 520 that it engage in meaningful negotiations, providing representatives with authority to bargain, jointly with A.S.H. Electrical Services, LLC to negotiate a successor agreement.  Upon due process, if and only then, at that time, should discord exist, would a decision by the Council become necessary.**

**Timeline of Events:**

- May 30, 2023:  Initial letters sent of intent to terminate CBA as well as termination of bargaining authority sent to Central Texas Chapter, NECA

- December 27, 2023: Confirmation Letters sent to I.B.E.W. LU 520 of intent to terminate CBA as well as termination of bargaining authority sent to Central Texas Chapter, NECA

- January 20, 2025: Confirmation Letters sent to I.B.E.W. LU 520 of intent to terminate CBA as well as termination of bargaining authority sent to Central Texas Chapter, NECA

- February 03, 2025: Letter received by Mr. Ben Brenneman, I.B.E.W. LU 520 confirming desire to change and/or modify Collective Bargaining Agreement

- March 18, 2025:  First meeting held with Mr. Diarmid Campbell regarding IBEW 520 proposed CBA changes.

- April 08, 2025: Second meeting held with Mr. Diarmid Campbell regarding IBEW 520 proposed CBA changes.

- April 16, 2025: Email received by Mr. Campbell requesting joint submission to CIR

- April 16, 2025: Letter sent, email sent with A.S.H. Electrical Services, response to request

- April 17, 2025:  Email received by Mr. Campbell again requesting joint submission to CIR

- April 17, 2025:  Email response sent to Mr. Campbell again denying joint submission to CIR

- April 17, 2025: Mr. Campbell files unilaterally to CIR

5

- April 18, 2025: Confirmation received by A.S.H. Electrical of unilateral filing by Mr. Campbell

- April 18, 2025: ULP filed with NLRB, Region 16 by A.S.H. Electrical Services, LLC- failure to bargain in good faith cited against IBEW LU 520, **Case# 16-CB-364062**

# Management Position on the Issues in Dispute

**I.B.E.W. Local Union # 520 has provided no reference of items which claim is made to impasse. Without knowledge of claimed impasse items it is impossible for A.S.H. Electrical Services, LLC to provide rebuttal. Should Council move to construct contract between parties, A.S.H. Electrical Services, LLC humbly requests the following.**

## Issue 1 – Term (Article I)

A.S.H. Electrical Services, LLC maintains an 8F relationship with IBEW 520.  At a minimum citing previous reasoning:

### We respectfully request the Council to grant:

**A maximum of 12-month (1 year) contract to commence June 06, 2025 and expire June 05, 2026.**

**Modified CIR Language to be included within contract.**

## Issue 2 –Wages

MOU ZONE III- San Angelo: Agreement has been tentatively reached regarding the San Angelo, Zone II MOU.

### We respectfully request the Council to render the following decision:

A.S.H. Electrical Services, LLC agrees to abide by the terms of the Zone III MOU for the period of time specified in Issue 1.

6

# EXHIBIT I, IA

Email Communication between A.S.H. Electrical Services and Mr. Diarmid Campbell

# EXHIBIT II

SAN ANGELO, TX- ZONE III TENATIVE AGREEMENT MOU

7

Def. MSJ Appx.000128

**From:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Sent:** Wednesday, April 16, 2025 8:29 AM
**To:** adam@ashelectricalservices.com
**Subject:** Negotiations

Good morning, I'm emailing regarding negotiations and our lack to reach common ground. If we cannot come to an agreement by April 20th, I would like to ask that we file jointly for CIR. Please let me know and we can proceed accordingly. Thank you

Get Outlook for iOS

## Diarmid Campbell response to letter sent April 16, 2025

**From:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Sent:** Thursday, April 17, 2025 8:06 AM
**To:** adam@ashelectricalservices.com
**Cc:** Shannon@ashelectricalservices.com
**Subject:** Re: Response to Email 04/16/2025

Good morning I understand your concern, but I am just needing to know if you are willing to file jointly or if I need to file unilaterally for CIR. We will still be able to negotiate, and I want to continue to negotiate. Thank you

Get Outlook for iOS

Def. MSJ Appx.000129



**325-716-6696**

April 16, 2025                                                     **VIA EMAIL AND CMRR**

Mr. Diarmid Campbell
Organizer/Assistant Business Agent
IBEW Local 520
909 Caddo St
San Angelo, TX 7901

Mr. Campbell,

This letter is to recap the party's bargaining history, our (A.S.H. Electrical Services, LLC) position with regard to accepting language presented by the Local, and response to an email I received from you today.

As you are aware, you represented I.B.E.W. Local Union # 520, along with Ms. Shannon Carpenter, and myself during 2 collective bargaining sessions, specifically on:
- March 18, 2025, and
- April 8, 2025.

During the March 18, 2025, session you presented us with a comprehensive proposal (Attachment 1).

During the April 8, 2025, session the parties walked through and discussed the Union's proposal in great detail. We are willing to accept and tentatively agree to your Item #2 from the proposal. However, your statements from that meeting are quoted below and are followed by our response:
> "....... everything that is proposed today, I would run by Austin because I know Thursday they're actually meeting."
> "......no, I don't believe anything could be signed just because that is the process we are in."

Our acceptance of the Union's proposal #2 was your language! I would be surprised if you were not aware that it is unlawful under the National Labor Relations Act to send representatives to the bargaining table without actual table authority to bargain. Therefore, we expect that in keeping with the Act, you formally tentatively agree to language that we accepted from your proposal on April 8, 2025.
> "......we would have to run it by the attorney and everything like that to make sure that what were signing off isn't going against NECA. It can't be better than NECA.

To be clear, we also clarified for you during the April 8, 2025, meeting that A.S.H. Electrical Services, LLC, withdrew from NECA and asked you who drafted the Union's original proposal. You responded, "This is what Austin proposed, so I took their proposal and put them here because that's what was given to NECA, since it's the CBA".

Def. MSJ Appx.000130



Finally, I am in receipt of your Wednesday, April 16, 2025, email (Attachment 2). I am very confused as Article 1.02, (d) of the current CBA states:

> (d) Unresolved issues of disputes arising of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations for the Electrical Contracting Industry (CIR) may be submitted jointly or unilaterally to the Council for adjudication. Such unresolved issues of disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date. The Council's decisions shall be final and binding.

We are currently in contract until June 1, 2025. We have yet to formally propose non-economic/economic proposals to you. We have not claimed impasse, in fact as mentioned previously, have agreed to your #2 proposal. Furthermore, it is of the opinion of A.S.H. Electrical Services, LLC representatives' that to make request to submit negotiations to the Council of Industrial Relations (CIR) at this time is predominately a tactic of "bad faith negotiating" as on its face this constitutes an attempt to suspend the duty to bargain. This "threat" has been mentioned at each negotiation meeting. The CIR does not exist as a "safety net" to exclaim IMPASSE! Each party has a lawful obligation to have engaged in serious negotiations and make a reasonable effort to reach some basis of agreement. Secondly, in our opinion, to request submittal to CIR is in direct violation of the CBA of which both parties, I.B.E.W. Local Union 520 and A.S.H. Electrical Services, LLC are currently bound. Therefore, I reject your proposal to file jointly requesting arbitration on behalf of the Council of Industrial Relations as it is both premature and unlawful at the current time.

I look forward to your response.

Sincerely,

Adam Johnke

Def. MSJ Appx.000131

**adam@ashelectricalservices.com**

| | |
|---|---|
| **From:** | adam@ashelectricalservices.com |
| **Sent:** | Thursday, April 17, 2025 1:50 PM |
| **To:** | 'Diarmid Campbell' |
| **Cc:** | 'Shannon@ashelectricalservices.com' |
| **Subject:** | Response to Email- 04/17/2025 |

**Importance:**     High

Diarmid,

While the informal nature of communication you have chosen does not go unnoticed, I will resign myself to make A.S.H. Electrical, LLC position clear.  On four separate occasions it has been your desire to file with the CIR requesting mediation between A.S.H. Electrical Services, LLC and I.B.E.W. Local 520.  As stated yesterday  in my letter to you (attachment 1) this cannot be viewed in any way except the blatant attempt to subvert your duty to collectively bargain.  Acceptance of stipulation # 2 was made yesterday, which, by your own language, should allow for a more productive bargaining session. We have yet to receive confirmation that Local Union # 520 has agreed to remove the Favored Nations Clause. Furthermore, as stated yesterday, it is of my opinion neither party has exhausted every possible avenue to resolve any disputes which have or could potentially arise through peaceful negotiations regarding a successor agreement.  For these reasons the answer is a resounding NO. A.S.H. Electrical Services, LLC declines to file jointly with I.B.E.W. Local Union 520 to the CIR.  The Council of Industrial Relations (CIR) does not exist as a stop gap.  A.S.H. Electrical Services, LLC sent a letter yesterday which we are awaiting a response.  In the interim we will continue to draft a counter-proposal to discuss at a future date.  Please respond with the Local Unions position as to acceptance or denial of our agreement to the removal of the Favored Nations Clause. Also, as discussed at our April 08, 2025 negotiations meeting, you have yet to send further information as it relates to the proposed NEIB.  Language regarding NEIB, NEBF, and NEAP is proposed with no concrete explanation of how the various pension and annuity plans co-mingle. Until such time as a more informative explanation of what these plans, their structure, and how funds are transferred from one to the other, it is impossible for any discussions to be held regarding proposal # 5.  Upon receipt of information requested we expect to propose our response in a timely manner.

Thank you,


Adam C. Johnke
A.S.H. Electrical Services LLC
P.O. Box 61905
San Angelo, Texas 76906
Office: 325-716-6696
TECL #34111


In the interest of a healthy professional/personal life balance, our team has been instructed to step away from our devices and will not be reading or responding to professional emails or texts between the hours of 6pm and 7am.  As our business operates on a 24/7 basis for emergencies, please call 1-325-716-6696, and leave a detailed message for any matter that qualifies as such.  We appreciate your patience and understanding that we all need to unplug to keep our minds healthy and happy! Thank you

www.ashelectricalservices.com

1

Def. MSJ Appx.000132

**adam@ashelectricalservices.com**

| | |
|---|---|
| **From:** | Diarmid Campbell <diarmid_campbell@ibew520.org> |
| **Sent:** | Wednesday, April 23, 2025 2:50 PM |
| **To:** | adam@ashelectricalservices.com |
| **Subject:** | Re: IBEW LU# 520 Response/ Continued Negotiations |

I have been out of town since last week and will be in the office Friday.

Get Outlook for iOS

**From:** adam@ashelectricalservices.com <adam@ashelectricalservices.com>
**Sent:** Wednesday, April 23, 2025 1:38:14 PM
**To:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Subject:** IBEW LU# 520 Response/ Continued Negotiations

Diarmid,

Last week a letter was sent to you via email in which A.S.H. Electrical Services, LLC proposed acceptance of removal of Favored Nations Clause. Subsequent email sent Thursday, April 17, 2025 our request made at the April 08, 2025 negotiations meeting regarding proposed NEIB language was made once again. This email shall serve as the second notification of request for IBEW LU 520 position of acceptance or denial of removal of Favored Nations clause, this will be the third request for information regarding proposal # 5 regarding NEIB. Previous email received by you expressed your desire to continue negotiations, however, it would seem as our requests for the above mentioned items are going unanswered. Diarmid, is Local Union # 520 of the I.B.E.W. truly interested in negotiation of a successor agreement or are you engaged upon "surface bargaining" with no intent whatsoever except the intent to push negotiations to the Council of Industrial Relations? We continue to await your response.

Sincerely,

Adam C. Johnke
A.S.H. Electrical Services LLC
P.O. Box 61905
San Angelo, Texas 76906
Office: 325-716-6696
TECL #34111

In the interest of a healthy professional/personal life balance, our team has been instructed to step away from our devices and will not be reading or responding to professional emails or texts between the hours of 6pm and 7am. As our business operates on a 24/7 basis for emergencies, please call 1-325-716-6696, and leave a detailed message for any matter that qualifies as such. We appreciate your patience and understanding that we all need to unplug to keep our minds healthy and happy! Thank you

www.ashelectricalservices.com

1

Def. MSJ Appx.000133

**adam@ashelectricalservices.com**

| | |
|---|---|
| **From:** | Diarmid Campbell <diarmid_campbell@ibew520.org> |
| **Sent:** | Friday, April 25, 2025 1:35 PM |
| **To:** | adam@ashelectricalservices.com |
| **Subject:** | Re: IBEW LU# 520 Response / Continued Negotiations |

Good afternoon if you are available to meet Monday the 28th for negotiations my day is more than open so whatever time works best for you, and I will have the answers to the questions you had asked. Please let me know at your earliest convenience if this day will work for you. Thank you

Get Outlook for iOS

**From:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Sent:** Friday, April 25, 2025 12:10:11 PM
**To:** adam@ashelectricalservices.com <adam@ashelectricalservices.com>
**Subject:** Re: IBEW LU# 520 Response / Continued Negotiations

And as I stated in my last email I was out of town and would be back in the office today. It is not 5oclock so I believe I still have time to respond.

Get Outlook for iOS

**From:** adam@ashelectricalservices.com <adam@ashelectricalservices.com>
**Sent:** Friday, April 25, 2025 12:08:30 PM
**To:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Subject:** RE: IBEW LU# 520 Response / Continued Negotiations

Diarmid,

Following up on these requests yet again. Communication was sent Wednesday, April 23 to which you replied you had been out of town and would address these requests upon your return. As of this writing, no further communication has been received from you or IBEW LU # 520 regarding request(s).

Last week a letter was sent to you via email in which A.S.H. Electrical Services, LLC proposed acceptance of removal of Favored Nations Clause. Subsequent email sent Thursday, April 17, 2025 our request made at the April 08, 2025 negotiations meeting regarding proposed NEIB language was made once again. This email shall serve as the second notification of request for IBEW LU 520 position of acceptance or denial of removal of Favored Nations clause, this will be the third request for information regarding proposal # 5 regarding NEIB. Previous email received by you expressed your desire to continue negotiations, however, it would seem as our requests for the above mentioned items are going unanswered. Diarmid, is Local Union # 520 of the I.B.E.W. truly interested in negotiation of a successor agreement or are you engaged upon "surface bargaining" with no intent whatsoever except the intent to push negotiations to the Council of Industrial Relations? We continue to await your response.

Sincerely,

Adam C. Johnke
A.S.H. Electrical Services LLC
P.O. Box 61905

1

Def. MSJ Appx.000134

**adam@ashelectricalservices.com**

| | |
|---|---|
| **From:** | Diarmid Campbell <diarmid_campbell@ibew520.org> |
| **Sent:** | Friday, April 25, 2025 5:03 PM |
| **To:** | adam@ashelectricalservices.com |
| **Cc:** | Shannon@ashelectricalservices.com |
| **Subject:** | Re: IBEW LU# 520 Response / Continued Negotiations |

I am confused as ASH electric has not given the IBEW any form of counter proposal, so we are not sure were ASH electric stands on any issue. All that ASH electric has done in both meetings is act hostile towards the IBEW and forced the meeting to be cut short. You stated in the last meeting that ASH electric would send a counter proposal over so the IBEW could look at it and we could discuss when we met for or next meeting, and as of date the IBEW still has not received that. Is the IBEW supposed to take this as ASH electric just "surface bargaining" with no hopes of honestly coming to an agreement. We have gone out of our way to set up meeting's , offer a proposal, and as stated in the previous email get the answers to the questions you ASH electric asked and as stated in the previous email we are willing to provide those answers and give an updated proposal in a meeting Monday the 28th. We are trying in good faith to bargain with ASH electric so please let me know if Monday the 28th works for you and what time would be best for ASH electric.

Get Outlook for iOS

**From:** adam@ashelectricalservices.com <adam@ashelectricalservices.com>
**Sent:** Friday, April 25, 2025 4:44:16 PM
**To:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Cc:** Shannon@ashelectricalservices.com <Shannon@ashelectricalservices.com>
**Subject:** RE: IBEW LU# 520 Response / Continued Negotiations

Diarmid,

Has the local changed or modified the proposal which we discussed April 08, 2025? If not, I am confused. A response has been requested to the position of IBEW LU 520 as to the removal of the Favored Nations Clause (Item # 2 of the original proposal). Having went through the proposal line by line item, April 8, two items were left which necessitated a response. Quite frankly, neither requires a formal meeting. We require acceptance or denial by IBEW 520 of our proposal or rather agreement to the Removal of the Favored Nations Clause, Secondly additional information has been requested regarding NEIB (proposal item # 5). Before we are able to move forward it remains paramount to receive a response regarding Favored Nations Clause, without agreement to that particular issue no further bargaining is relevant. Please provide answers/requested documentation so that we may proceed as planned. At the current time request to meet April 28 is denied as a special meeting is not necessary for these two items alone.

Thank you,

Adam C. Johnke
A.S.H. Electrical Services LLC
P.O. Box 61905
San Angelo, Texas 76906
Office: 325-716-6696

1

Def. MSJ Appx.000135

**adam@ashelectricalservices.com**

| | |
|---|---|
| **From:** | Diarmid Campbell <diarmid_campbell@ibew520.org> |
| **Sent:** | Friday, April 25, 2025 6:41 PM |
| **To:** | adam@ashelectricalservices.com |
| **Cc:** | Shannon@ashelectricalservices.com |
| **Subject:** | Re: IBEW LU# 520 Response / Continued Negotiations |

I'm sorry if you feel that me asking for a time that you can pick to sit down and do proper negotiations and so you can get the answers to the two questions you have asked for is hostile or in any way disrespectful. Was it disrespectful for ASH electric to act hostile towards me or was it disrespectful on how yall ASH electric attacked my religion and faith in the previous meetings, I have been more than accommodating to ASH electric on setting dates and times that would work best for ASH electric to meet regardless if it conflicted with my schedule. Why is it my job to prep your negotiations? ASH electric has provided no counter offers, asked for no time or place for a meeting or done any research on their own to try and answer any questions they may have for their behalf in negotiations. Now I have done everything you ASH electric has asked, we are asking for a time that would work so we may have proper negotiations and move forward on this agreement. If ASH electric is refusing to properly negotiate then that is on ASH electric. I am in no way being hostile or disrespectful in any manner. I am trying to set a meeting date as you requested, thank you and I look forward to a time we can meet and discuss in person.

Get Outlook for iOS

**From:** adam@ashelectricalservices.com <adam@ashelectricalservices.com>
**Sent:** Friday, April 25, 2025 6:22:50 PM
**To:** Diarmid Campbell <diarmid_campbell@ibew520.org>
**Cc:** Shannon@ashelectricalservices.com <Shannon@ashelectricalservices.com>
**Subject:** RE: IBEW LU# 520 Response / Continued Negotiations

Diarmid,

A.S.H. Electrical Services, LLC is baffled that ANY confusion could exist on your behalf. We have asked two very simple questions of which you have refused to answer. Why are you refusing to answer two questions? Also evident is your hostility and total lack of respect towards both myself and the entity which I represent. We ask that the two items be addressed prior to additional sit down meetings and would greatly appreciate your cooperation.

Thank you,


Adam C. Johnke
A.S.H. Electrical Services LLC
P.O. Box 61905
San Angelo, Texas 76906
Office: 325-716-6696
TECL #34111


In the interest of a healthy professional/personal life balance, our team has been instructed to step away from our devices and will not be reading or responding to professional emails or texts between the hours of 6pm and

1

Def. MSJ Appx.000136

## ZONE III MEMORANDUM OF UNDERSTANDING
## CONTINGENT ON AUSTIN

It is mutually agreed between IBEW Local Union 520 and Central Texas Chapter, NECA, effective June 6, 2025, that the following counties shall be designated as "Zone III":

> Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason, and Kimble

It is further agreed that, within Zone III, the following holidays (Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas Day) shall be paid holidays, furthermore, it is agreed that the Contractor will cover the cost of pay at straight time hourly rates excluding fringe benefits unless holiday day is worked then refer to CBA (section 4.02). The day before and after the holiday must be worked if applicable for the employee/member to qualify for holiday pay unless a two-week notice is given requesting the day before and/or after a holiday is needed off. It is further agreed that the number of holidays an employee/member will qualify for is tiered as follows: CE1- CE2, 0 Holidays Paid; CE3- CE6, 1 Holiday Paid; CE7- CE10, 2 Holidays Paid; JIW-Gen. Foreman 3 Holidays Paid; Apprentices 1-3 period 1 Holiday Paid; Apprentices 4-5 period 2 Holidays Paid. It is further agreed that Holiday Pay benefits will start 90 days from the employee/member's hire date for that contractor and will be tiered to the employee/member's classification. It is further agreed that Christmas Day will be the only paid holiday for 2025. Black Friday (the day after Thanksgiving) paid holiday will commence in 2026. Thanksgiving paid holiday will commence in 2027. Paid holidays stated in the MOU will be paid according to employee/member classification.

It is further agreed that the contractors will contribute .5% into the Annuity, 9.5% total starting on January 5th, 2026.

It is further agreed that, within Zone III, the CE program shall be governed by the local Union San Angelo representative, who will maintain Austin's CE program standards as the minimum guidelines. If no local Union San Angelo representative is employed, Austin, TX, shall govern the CE program.

It is further agreed that, within Zone III, the San Angelo Employee Handbook will set the minimum guidelines and governance for administrative office staff in the San Angelo office. *Unless the staff member is under a CBA, or the Austin Business Manager overrules.*

It is further agreed that, within Zone III, the JIW rate of pay shall be as follows:

| | |
|---|---|
| June 2, 2025: | $29.00 |
| June 1, 2026: | $29.12 |
| January 4, 2027: | $29.24 |
| June 7, 2027: | $29.34 |

Wage rates for CEs shall be set per the following table for the period of June 6, 2025 - June 2, 2028:

| CE 1 | CE2 | CE3 | CE4 | CE5 | CE6 | CE7 | CE8 | CE9 | CE 10 |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| 45%  | 45% | 50% | 55% | 60% | 65% | 70% | 75% | 80% | 90%   |

All other terms and conditions of employment will be those set forth in the AGREEMENT Between The CENTRAL TEXAS CHAPTER of the NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC. and LOCAL UNION NO. 520 of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS.

**HALL REPRESENTITIVES:**          **CONTRACTOR REPRESENITIVES:**

Def. MSJ Appx.000138

PARTIES IN DISPUTE:
    A.S.H. Electric
    Local Union No. 520

Austin, Texas
May 13, 2025
Inside

PRESENTATION:
    By brief only for A.S.H. Electric
    By brief and oral argument for Local Union No. 520

APPEARANCES:
    For Local Union No. 520:  B. Brenneman, D. Campbell

MATTERS IN DISPUTE:
1. Article I, Section 1.01 – Length of Agreement
2. Article II, Section 2.01 – Favored Nations
3. Article IV, Section 4.02 – Paid Holidays
4. Article IV, Section 4.03 – Wages
5. Article V – General Rules
6. Article V – Walk Time
7. Article VI, Section 6.16 – Apprenticeship Contribution
8. Article VIII – Annuity Plan

MEMBERS OF COUNCIL SITTING:

| FOR THE EMPLOYER | FOR THE UNION |
|---|---|
| D. Laffoon | M. Hager |
| S. Krieg | C. Bergfeld |
| J. Brunia | A. Warwick |
| T. Maloney | D. McInerney |
| F. Piatt | R. Wolf |
| L. Bell | D. Robinson |

DECISION:

After careful consideration of the evidence submitted, the Council rules as follows:

In the instant case, the parties are directed to sign and immediately implement the Collective Bargaining Agreement which is attached hereto and hereby made a part of this decision. The Council retains jurisdiction over disputes pertaining to this Agreement including any wage/fringe opener(s) contained therein and such disputes are to be returned to Council through the normal procedures if the parties are unable to reach agreement.

Def. MSJ Appx.000139

Def00047

UNANIMOUSLY ADOPTED:
Washington, DC
May 13, 2025


_____                _____
Acting Co-Chairman                                    Acting Co-Chairman



_____
Secretary


Def00048



June 2, 2025 -  June 4, 2028

## AGREEMENT
Between

## A.S.H. Electrical Services LLC

and

## LOCAL UNION NO. 520 of the
## INTERNATIONAL BROTHERHOOD OF
## ELECTRICAL WORKERS

Austin, Texas

Def. MSJ Appx.000141

Def00049

**June 2, 2022 - June 1, 2025**
**AGREEMENT**

**Between**

**A.S.H. Electrical Services LLC**

**and**

**LOCAL UNION NO. 520 of the**
**INTERNATIONAL BROTHERHOOD OF**
**ELECTRICAL WORKERS**
**Austin, Texas**

## PARTIES CLAUSE

Agreement by and between the A.S.H. Electrical Services LLC and LOCAL UNION 520, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS. As used hereinafter in this Agreement, the term "Employer" shall mean A.S.H. Electrical Services LLC, and the term "Union" shall mean LOCAL UNION NO. 520, IBEW.

## BASIC PRINCIPLES

The Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union, and the Public. Progress in Industry demands a mutuality of confidence between the Employer and the Union. All will benefit by continuous peace, and by adjusting any differences by rational, common sense methods. Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

Def00050

## ARTICLE I
## EFFECTIVE DATE/CHANGES/GRIEVANCES/DISPUTES

Section 1.01: This Agreement shall take effect on June 2, 2025 and shall remain in effect through June 4, 2028, unless otherwise specifically provided for herein. It shall continue in effect from year to year thereafter, from the start of the first full pay period in June through the last pay period starting in May of each year, unless changed or terminated in the way later provided herein.

Section 1.02(a): Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of this Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) In the event that either party, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, has given a timely notice of proposed changes and an agreement has not been reached by the expiration date or by any subsequent anniversary date to renew, modify, or extend this Agreement, or to submit the unresolved issues to the Council on Industrial Relations for the Electrical Contracting Industry (CIR), either party or such an Employer, may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e) By mutual agreement only, the Chapter, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, may jointly, with the Union, submit the unresolved issues to the Council on Industrial Relations for adjudication. Such unresolved issues shall be submitted no later than the next regular meeting of the Council following the expiration date of this Agreement or any subsequent anniversary dates. The Council's decisions shall be final and binding.

(f) When a case has been submitted to the Council, it shall be the responsibility of the negotiating committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of Council.

(g) Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

Section 1.03: This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

Def00051

Section 1.04: During the term of this Agreement, there shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

### GRIEVANCES/DISPUTES

Section 1.05: There shall be a Labor-Management Committee of trustees representing the Union and three representing the Employers. It shall meet regularly at such stated times as it may decide. However, it shall also meet within 48 hours when notice is given by either party. It shall select its own Chairman and Secretary. The Local Union shall select the Union representatives and the Employer shall select the management representatives.

Section 1.06: All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.

Section 1.07: All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

Section 1.08: Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding.

Section 1.09: When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

Section 1.10: The Labor-Management Committee shall not recognize any grievance or dispute unless written notice of the charge is given within thirty (30) days after the representatives of the parties to this Agreement first became aware, or reasonably should have been aware, of a violation of this Agreement. This shall not apply to any Section which requires money to be deposited to any Trust Fund.

### ARTICLE II
### Employers Rights - Union Rights

Section 2.01: The Employer recognizes the Union as the exclusive representative of all its employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment.

Section 2.02(a): Certain qualifications, knowledge, experience, and financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm, or corporation, having these qualifications and maintaining a place of business and suitable financial status to meet payroll requirements and

Def00052

employing at least one Journeyman Wireman.

(b) All Employers subject to the terms of this Agreement shall carry an Indemnity Bond, issued by a company authorized to do business in the State of Texas, the minimum for all employers shall be $5,000.00 as evidence of financial responsibility, and to insure proper payments to the Electrical Joint Apprenticeship and Training Trust Fund, the National Employees Benefit Board, the Austin Vacation Trust Fund, IBEW Local Union 520 Annuity Plan and Health and Welfare Plan, 401(k), and P.A.C. deductions, to Local Union 520, for any union dues or assessments withheld on behalf of employees, and wages required under this Agreement be paid directly to the affected employee(s). Bond amounts greater than $5000 shall be required based on the following formula outlined below:

(c) Each employer signatory to the collective bargaining agreement shall be required to secure a welfare bond of at least $5000. Employers shall be required to secure larger bonds based on the following formula: Employers shall provide a welfare bond based on the average monthly hours worked utilizing the previous three years to calculate the average. This number shall be multiplied by the aggregate amount of the benefit package and rounded up to the next one thousandth. If an employer has been delinquent in the payment of benefits more than twice, they shall be required to pay benefits timely on a weekly basis for a period of six months and secure the required bond. After a period of six months of timely benefit payments the employer may return to the monthly schedule. If an employer has no previous experience in the jurisdiction the bond shall be based on the estimated monthly hours of the project to be worked. The maximum bond for any employer shall be $50,000.

The aforesaid Bond shall be executed for a period of time to conform to the time limitations set forth in this Agreement and shall be renewed as provided for in subsequent Agreements.

The Bond shall provide that it may not be canceled by either the Employer or the insurance carrier without thirty (30) days written notice in advance to the Union by Certified, Registered, or Insured mail from the Surety. Proof of the execution of the Bond, in the form of an affidavit executed by the insurance carrier, shall be furnished the Union for each Employer. Such affidavit shall show on its face that it may not be canceled by either the insurance carrier of the Employer without prior notification to the Union. The Local Union shall furnish a copy of the affidavit of Bond to each Fund.

The Obligee (Local Union 520, IBEW) shall notify the Surety within thirty (30) days after having knowledge of a breach of this Agreement by the principal hereof.

(d) Fringe benefits provided for under this Agreement are due and payable on or before the 15th day of the month following the month, covering the hours worked by each employee. Each Employer shall file a monthly report for each fringe benefit, in the form established, therefore, each report shall be filed, regardless of whether or not the Employer has employed any employee in the month covered by said report.

Any Employer who fails to file a report and pay contributions for any of the fringe benefits by the 15th day following the month in which such report or payment is due shall be considered delinquent and is in violation of this Agreement. If payments are not mailed in time to reach the

Def00053

Benefit Fund by the prescribed time, interest at the rate of 1½% monthly will be due and payable. Each Employer shall make available applicable books and records for the purpose of auditing same to determine the amount of his liability and shall pay the expense of audit if delinquencies are found, under guidelines of the Funds. Action to collect contributions may be brought in the name of the respective Fund involved, its Trustees and any assignee or agent designated by said Trustees. Employer hereby accepts and agrees to the terms of each trust agreement and plan for such fringe Benefit Fund.

A delinquent Employer shall be liable to any employee affected by such delinquency for all benefits lost by such employee by virtue of such delinquency, and such delinquent Employer shall also be liable for reasonable attorneys' fees for any action brought to recover the amount of said benefits.

"This section does not waive or deny any remedies of collection in other sections of this Agreement, Trust or a remedy at law".

Section 2.03: For all employees covered by this Agreement the Employer shall carry Workman's Compensation Insurance with a Company authorized to do business in this State, Social Security, and such other protective insurance as may be required by the laws of this State and shall furnish satisfactory proof of such to the Union. He shall also make contributions to the State Unemployment Compensation Commission.

Section 2.04(a): It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to three percent (3 %) of the gross monthly labor payroll, paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by the suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

(b) An individual Employer who fails to remit as provided above shall be additionally subject to having his Agreement terminated upon seventy-two (72) hours' notice in writing being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this Agreement.

Section 2.05: The Union reserves the right to discipline its members for violations of its laws,

Def00054

rules, and agreements.

Section 2.06: The Local Union is part of the International Brotherhood of Electrical Workers and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this Section, will be sufficient cause for the cancellation of his Agreement by the Local Union after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual Employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its Local Unions as the collective bargaining representative of his employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

Notwithstanding anything in this Agreement, the Employer may sublet, assign, or transfer the installation of wiring and devices for fire alarm or security systems if those systems are low voltage system, the installation of lightning protection system, trenching and backfilling excavation to a specialty contractor.

The Employer may also sublet, assign, or transfer any work requiring employees to place themselves in any trench that is greater than a depth of five feet.

The following work, systems and/or functions shall not be covered by the terms of this agreement: field instrumentation and installation, process control instrumentation and installation, instrument and control loop testing and certification, instrument calibration, instrument certification, PLC equipment, PLC programming, distributed control and SCADA systems, control system SCADA & HMI software development and programming, radio telemetry systems, and manufacture of control panels.

Nothing in this Agreement should be construed to require the Employer to purchase manufactured products from employer's signatory to a collective bargaining agreement.

All charges of violation of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

Section 2.07: No member of Local Union 520, while he remains a member of such Local Union and subject to employment by the Employers operating under this Agreement shall himself become a contractor for the performance of any electrical work.

Section 2.08: Only two individuals connected with an employing concern as owner, manager, superintendent, partner, or member of a Board of Directors shall perform any manual electrical work where it displaces the service of a Journeyman; and then only when he has at least one Journeyman, working under the terms of this Agreement, employed and working the same hours including overtime, with the exception of emergency repairs not to last over two (2) hours.

Def00055

Section 2.09(a): The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the collective bargaining agreement, in planning, directing, and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying off employees, in transferring employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

(b) The employer shall have the right to call a Foreman by name provided:

A)    The employer shall notify the business manager in writing of the name of the individual who is to be requested for employment as a Foreman. Upon such request, the business manager shall refer said Foreman provided the name appears on the highest priority group.

B)    When an employee is called as a Foreman, he must remain as a Foreman for 500 hours or must receive a reduction in force.

## Portability

Section 2.10: The Employer, if signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, may bring an unlimited amount of Supervisory bargaining unit employees employed in that Local Union's jurisdiction into Local Union 520's jurisdiction to perform supervisory work. Supervisory bargaining unit employees are defined as those that direct bargaining unit employees. The Employer may also bring one (1) bargaining unit employee employed in that Local Union's jurisdiction into Local Union 520's after the Employer employs one (1) Local Union 520's bargaining unit employee; if necessary this process will continue to alternate. The Employer shall maintain a minimum of a one (1) to one (1) ratio of Local Union 520's bargaining unit employees to those that are brought in through this Portability provision. The employees brought in through portability may remain on the specific job until the job is complete. All employees brought in through this portability provision must check in with the Business Manager of IBEW Local Union 520 and all working assessments shall be paid to Local Union 520. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of the Agreement for the handling of grievances with the exception that any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

Section 2.11: The Union has the right to appoint a Steward at any shop and/or job where workmen are employed under the terms of this Agreement. The Employer shall be notified in writing of who the Steward is. No Steward shall be discriminated against by the Employer because of the faithful performance of his duties as Steward.

Def00056

## ARTICLE III
## Standard Inside Referral

Section 3.01:  In the interest of maintaining an efficient system of production in the Industry, providing for an orderly procedure of referral of applicants for employment preserving the legitimate interests of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

Section 3.02:  The Union shall be the sole and exclusive source of referral of applicants for employment.

Section 3.03:  The Employer shall have the right to reject any applicant for employment.

Section 3.04:  The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements.  All such selection and referral shall be in accord with the following procedure.

Section 3.05:  The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below.  Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

### Journeyman Wireman - Journeyman Technician

**GROUP I** All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or has been certified as a Journeyman Wireman by any inside Joint Apprenticeship and Training Committee, and, who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement.

Group I status shall be limited to one Local Union at one time. An applicant who qualifies for Group I in a local union shall be so registered electronically and remain on Group I in that local union unless and until the applicant designates another local union as his or her Group I local union. If an applicant qualifies for Group I status in a local union other than his or her home local union and designates that local as his or her Group I local union, the business manager of the new Group I status local union shall by electronic means notify the business manager of the applicant's former Group I status local union.

Def00057

**GROUP II**  All applicants for employment who have four or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the IBEW or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

**GROUP III**  All applicants for employment who have two or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, and who have been employed for at least six months in the last three years in the geographical area covered by the collective bargaining agreement.

**GROUP IV**  All applicants for employment who have worked at the trade for more than one year.

Section 3.06: If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within 48 hours from the time of receiving the Employer's request, Saturdays, Sundays and holidays excepted, the Employer shall be free to secure applicants without using the Referral Procedure. But such applicants, if hired, shall have the status of "temporary employees".

Section 3.07: The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "temporary employees" and shall replace such "temporary employees" as soon as registered applicants for employment are available under the Referral Procedure.

Section 3.08: "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent thereto which includes the area from which the normal labor supply is secured: Travis, Bastrop, Hays, Blanco, Burnet, Williamson, Lee, Llano, San Saba, Burleson, Caldwell, Fayette, Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason, Kimble and parts of Coryell and Bell Counties to include that part of Fort Hood in Coryell County south of Cowhouse Creek, and not to extend more than two (2) miles into Bell County from the Southeast boundary line of Coryell County, Gray Field, and the City of Killeen, and parts of Lampasas, Bell and Milam Counties, which are nearer to Austin than Waco, in the State of Texas.

The above geographical area is agreed upon by the parties to include the area defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which the Agreement applies.

Section 3.09: "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

Section 3.10: "Examinations" - An "Examination" shall include experience rating tests if such examination shall have been given prior to the date of this procedure, but from and after the date

Def00058

of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the IBEW. Reasonable intervals of time for examinations are specified as ninety (90) days. An applicant shall be eligible for examination if he has four years' experience in the trade.

Section 3.11: The Union shall maintain an "Available for Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

Section 3.12(a): An applicant who is hired and who receives, through no fault of his own, work of forty hours or less shall, upon re-registration, be restored to his appropriate place within his Group.

(b) An applicant who has registered on the "Available for Work List" must renew his application every thirty (30) days or his name will be removed from the "List."

Section 3.13: Employers shall advise the Business Manager of the Local Union of the number of applicants needed. The Business Manager shall refer applicants to the Employer by first referring applicants in GROUP I in the order of their place on the "Available for Work List" and then referring applicants in the same manner successively from the "Available for Work List" in GROUP II, then GROUP III, and then GROUP IV. Any applicant who is rejected by the Employer shall be returned to his appropriate place within this GROUP and shall be referred to other employment in accordance with the position of his GROUP and his place within his GROUP.

Section 3.13(a): An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral. The neutral member of the Appeals Committee shall, within three business days, review the qualifications of the applicant and the reasons for the discharges. The neutral member of the Appeals Committee may, in his or her sole discretion: (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks, or longer, depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list.

Section 3.14: The only exceptions which shall be allowed in this order of referral are as follows:

(a) When the employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

(b) The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age. Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

Def00059

Section 3.15:  An Appeals Committee is hereby established, composed of one member appointed by the Union, one member appointed by the Employer or by the Association, as the case may be, and a Public Member appointed by both these members.

Section 3.16:  It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the administration by the Local Union of Sections 4 through 14 of this Agreement.  The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union.  The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions to this Agreement and its decisions shall be in accord with this Agreement.

Section 3.17:  A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

Section 3.18:  A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

Section 3.19:  Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the parties.

Section 3.20:  When making reductions in the number of employees due to lack of work, Employers shall use the following procedure:

(a) Temporary employees, if any are employed, shall be laid off first. Then employees in Group IV shall be laid off next, if any are employed in this Group. Next to be laid off are employees in Group III, if any are employed in this Group, then those in Group IV, and then those in Group I.

(b) Paragraph (a) will not apply as long as the special skills requirement as provided for in Section 14(a) is required.

(c) Supervisory employees covered by the terms of this Agreement will be excluded from layoff as long as they remain in the supervisory capacity.  When they are reduced to the status of Journeyman, they will be slotted in the appropriate group in Paragraph (a) above.

Section 3.21:  All Journeymen and Apprentices are required to provide proof of completion, by originally issued card or certificate, of an OSHA 10 safety training course.

Def00060

## ARTICLE IV
## Hours - Wage Payment

<u>Section 4.0l(a):</u>   Eight hours work between the hours of 6:00 A.M. and 6:30 P.M. with thirty (30) minutes for a lunch period, shall constitute a workday.  Forty (40) hours within (5) days, Monday through Friday, inclusive, shall constitute the work week. Saturday may be used for a make-up day due to inclement weather.  If Saturday is used as a make up day, a minimum of eight (8) hours will be scheduled.  The payroll week shall end on Sunday midnight of each week. Any workman required to punch a time clock that requires more than five (5) minutes to check out shall be paid for any additional time used in checking out.  Workmen reporting to the shop or job shall not report earlier than 15 minutes prior the starting time.  If practical, workmen directed to report to the job shall be at their place of work at the starting time and shall remain at their place of work until quitting time unless otherwise instructed by the Employer.

(b) Any change from the regular working hours must be five (5) or more day's duration. When any change in the starting time is made, lunch period, overtime, and shifts may be changed accordingly.

(c) The Employer with 24-hour notice to the Union may elect to work 4-10 hour days to be scheduled. The first 10 hours of work per day shall be paid at the hourly straight time rate of pay. When working 4-10s, the Employer can schedule the work week for Monday through Thursday, 10 hours per day. A second work week can be scheduled from Tuesday through Friday, 10 hours per day. The 4 day work week will be Monday through Thursday. Friday can be used as a make-up day due to inclement weather. If Friday is used as a make-up day, a minimum of 8 hours will be scheduled. Any four day/ten-hour work schedule shall be a minimum of 2 weeks duration.

(d) In order to coordinate with other crafts, summer hours, customer requests, and the like, the starting time for each job shall be subject to variance of not more than 1 hour. Advanced notice to the Union will be required to approve any such variance greater than 1 hour. These alternate starting times must run for a minimum of 5 consecutive workdays, and all other times listed in this agreement will shift accordingly.

<u>Section 4.02:</u> All work performed outside of regularly scheduled hours will be paid at one and one-half times the regular straight-time rate, provided the employee works all of the regular scheduled hours made available, as defined in Art. IV Sec. 4.0l(a) and Sec. 4.0l(c).  In the event the employee does not work all of the regularly scheduled hours available he will receive no premium rate until after he has worked 40 hours.  Work on Sundays shall be paid at double the straight-time rate.  The following holidays:  New Year's Day, Memorial Day, Fourth of July, Labor Day, Veteran's Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas Day, shall be paid at double the straight-time rate. The following holidays shall be paid holidays starting June 2, 2025, Thanksgiving Day and Friday following, January 4, 2027, Christmas Day, January 3, 2028, New Year's Day. Eligible employees must have been employed for two weeks and worked the available workday before and the available workday after the holiday.  Holidays shall be recognized only on the day on which they fall.

Def00061

Section 4.03: The minimum regular straight-time rate of wages for Journeyman Inside Wireman (JIW) shall be as follows:

Effective June 2, 2025:  $36.50
Effective January 5, 2026:  $38.50
Effective January 4, 2027:  $40.50
Effective January 3, 2028:  $42.50

| APPENDIX A - MINIMUM BENEFITS | | | | | |
|---|---|---|---|---|---|
| **Multiplier** | **Classification** | **NEBF** | **Annuity** | **Medical** | **JATC** |
| 130% of JIW wage rate | General Foreman (area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | General Foreman (no area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | Area Foreman | 3% | 8% | $5.45 | 1%*** |
| 110% of JIW wage rate | Foreman | 3% | 8% | $5.45 | 1%*** |
| 100% | Journeyman Inside Wireman | 3% | 8%* | $5.45 | 1%*** |
| **Apprentice Wireman** | | | | | |
| 50% of JIW wage rate | 1st Year - Period 1 | 3% | ** | $3.70 | 1%*** |
| 55% of JIW wage rate | 1st Year - Period 2 | 3% | 3% | $3.70 | 1%*** |
| 60% of JIW wage rate | 2nd Year- Period 3 | 3% | 3% | $3.70 | 1%*** |
| 70% of JIW wage rate | 3rd Year - Period 4 | 3% | 5% | $3.70 | 1%*** |
| 75% of JIW wage rate | 4th Year- Period 5 | 3% | 5% | $3.70 | 1%*** |
| 80% of JIW wage rate | 5th Year - Period 6 | 3% | 8% | $3.70 | 1%*** |
| | Unindentured Apprentice | 3% | | $3.70 | 1%*** |

   * 9% effective January 6th 2025
  ** 1% effective January 6th 2025
*** 1% of Journeyman Straight-Time Rate

Section 4.04: The Employer shall pay all wages in cash or check weekly, not later than quitting time on Friday. The Employer may pay wages by direct deposit, through debit card by cash or by

Def00062

check. Employees may be required to execute authorization forms for direct electronic deposit of wages on a weekly basis to the bank or credit union of the employee's choice. This manner of payment, once adopted, may not be changed by the Employer except upon 14-day advance written notification to the employee with notification to the Union. In the event that employees are not paid by the above-stated time, waiting time at the regular straight time rate (not to exceed eight (8) hours in any one twenty-four (24) hour period) shall be charged until payment is made. The previous sentence only applies in the event that there has been a previous instance within the preceding twelve (12) months of the Employer failing to timely pay wages. Otherwise, paid waiting time only begins if payment has not been received by quitting time on Friday.

Section 4.05: Should the Employer issue a paycheck that does not clear the bank for payment, provided the employee does not hold said check for more than thirty (30) days before making attempt to cash said check, then said Employer, while in the jurisdiction of the Local Union, thereafter shall pay in cash.

Section 4.06: When Friday is a recognized holiday, wages shall be paid Thursday for all work during that week. An itemized statement shall be furnished each workman, showing total hours worked, total wages earned, and any deductions from such wages.

Section 4.07: Any man reporting for work and being laid off, not having been notified the day previous of such layoff shall receive not less than two (2) hours wages in order to gather his tools and personal belongings and shall be paid off in full immediately. In the event the employee is not paid off, waiting time at the regular rate (not to exceed eight [8] hours in any one twenty-four [24] hour period) shall be charged until payment is made. Two (2) hours wages for gathering tools and personal belongings will not be paid if the employee has not notified the Employer of a previous day's absence. An employee who voluntarily quits shall receive the employee's final paycheck on the next contractually scheduled pay day.

Section 4.08(a): When men are directed to report to a job or shop and do not start to work due to causes other than weather conditions, they shall receive two (2) hours pay.

(b) When men receive two (2) hours pay as show-up time, they shall remain available for work for a full two (2) hour period.

(c) If requested by the Employer, during inclement weather conditions, men shall remain on the job available for work and shall receive two (2) hours pay.

(d) When men are directed to report to a job and are instructed to go to work by the Employer or his representative, weather conditions permitting, and they refuse, they shall not receive the two (2) hours show-up time.

(e) When men are called out on trouble or emergency calls outside of regularly scheduled working hours, they shall be paid from the time they leave home until they return at the overtime rate, with a minimum of one (1) hour's work.

Section 4.09: The Employer shall pay for traveling time and provide for at least one of the following provisions:

Def00063

(i)    Furnish transportation from shop to job and job to job and job to shop during the regular working hours; or

(ii)    Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service for actual mileage from shop to job and job to job and job to shop during all the regular working hours to be reimbursed.

On work outside the jurisdiction of the Union, the Employer shall provide one of the following:

(i)    Furnish transportation, board and all other necessary expenses;

(ii)    Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service and furnish board and all other necessary expenses.

Section 4.10:  No traveling time shall be paid before or after working hours to workmen for traveling to or from any job when workmen are ordered to report to the job, provided his day ends at such job.

Section 4.11: The Employer shall furnish a monthly payroll report to Local Union 520 postmarked no later than 15th day of the following month, giving workman's name, classification, wage rate, straight-time hours worked, overtime hours and gross wages paid to all workmen. This report shall identify the exact date of all employees who have quit or been discharged during the working period covered by this report.

A monthly payroll report to the Local Union and to all Trust Funds shall be completed and mailed each month, whether the Contractor has workmen employed or not.

Section 4.12:  Workmen being laid off or discharged by an Employer or workmen severing their employment shall be given a termination slip stating the reason for termination and signed by their immediate supervisor or their Employer, and a copy shall be sent to Local Union 520. Additionally, employers shall provide a termination slip to the JATC Training Director in the case of an apprentice.

Section 4.13:  When so elected by the contractor, multiple shifts of eight (8) hours for at least five (5) days' duration may be worked. When two (2) or three (3) shifts are worked:

The first shift (day shift) shall consist of eight (8) consecutive hours worked between the hours of 8:00 A.M. and 4:30 P.M. Workmen on the "day shift" shall be paid at the regular hourly rate of pay for all hours worked.

The second shift (swing shift) shall consist of eight (8) consecutive hours worked between the hours of 4:30 P.M. and 1:00 A.M. Workmen on the "swing shift" shall be paid at the regular hourly rate of pay plus **10%** for all hours worked.

The third shift (graveyard shift) shall consist of eight (8) consecutive hours worked between the hours of 1:00 A.M. and 9:00 A.M. Workmen on the "graveyard shift" shall be paid at the regular hourly rate of pay plus **15%** for all hours worked.

Def00064

The Employer shall be permitted to adjust the starting hours of the shift by up to two (2) hours in order to meet the needs of the customer.

If the parties to the Agreement mutually agree, the shift week may commence with the third shift (graveyard shift) at 12:30 A.M. Monday to coordinate the work with the customer's work schedule. However, any such adjustment shall last for at least five (5) consecutive days duration unless mutually changed by the parties to this Agreement.

An unpaid lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required before the established start time and after the completion of eight (8) hours of any shift shall be paid at one and one-half times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight time rate shall be the maximum compensation for any hour worked. There shall be no requirement for a day shift when either the second or third shift is worked.

## UNION DUES DEDUCTION

Section 4.14:  Upon receipt of a voluntary written authorization the Employer agrees to deduct and forward to the Financial Secretary of the Local Union - the additional working dues from the pay of each employee. The amount to be deducted shall be the amount specified in the approved Local Union Bylaws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

## ARTICLE V
## General Rules

Section 5:01: In order to comply with existing laws, nothing in this Agreement shall be construed as limiting the right of Employers to move, transfer, or assign employees from his shop to any specific job or from any job to any other job upon which said Employer bolds a contract for the performance of the electrical work. An employee, once on the Employer's payroll, may be worked by him at any location at the discretion of the Employer.

Section 5.02: When the Employer has no shop located in the jurisdiction of this Union, then under such circumstances the job site shall be considered the city in which the shop is located with one job site designated as the permanent shop.

Section 5.03: On all jobs requiring five (5) or more Journeymen, at least every fifth Journeyman, if available, shall be fifty (50) years of age or older.

Section 5.04(a): Journeyman shall provide themselves with the following tools:

| | |
|---|---|
| One tester not over 1000 volts or one Multi Volt Tester | Combination square-Tri-square |
| Knife | Adjustable 12" blade |
| Crescent Wrench 8" to 12" | Hacksaw frame |
| Screw drivers | Two pair channel lock type pliers |
| Hammer | One pair long nose pliers |
| Small level | One pair Dyke pliers |

Def00065

| | |
|---|---|
| Plumb bob | One chalk line |
| Awl or Center punch | Keyhole saw |
| Pencil | One steel measuring tape at least 16' long |
| One pair side cutting pliers 7" or larger | Pipe wrench 12" to 14" or small |
| Wire stripper | Chain tong |

(b) Journeyman may furnish other similar tools but shall not be required to do so.

(c) A Journeyman may carry or store in his toolbox small tools furnished by and belonging to his Employer (power tools excluded). Such tools must be the property of the Employer, to be returned to him upon request or termination of the employee but are not to be replaced by the employee if broken or stolen.

(d) Apprentices shall provide themselves with the following tools only, except that first-year Apprentice may provide himself with a small toolbox and a third- or fourth-year Apprentice may have a toolbox on the job and start building up his tool list towards that of a Journeyman.

| | |
|---|---|
| 2 pair channel lock type pliers | Pencil |
| 1 pair side cutters pliers – 7" or larger | Hammer |
| One steel measuring tape at least 16' long | One voltage tester not over 1000 or Multi Volt Tester |
| Screw drivers | Small level |
| Knife | Hacksaw frame |
| Awl | Wire stripper |

He may furnish one pair of long-nose and one pair of Dyke pliers if he desires.

(e) The Employer shall furnish necessary locked storage to reasonably protect tools from the weather and vandalism on large jobs where it is necessary to leave tools on the job.

Section 5:05: The Employer shall furnish all other necessary tools or equipment. Workmen will be held responsible for the tools or equipment issued to them providing the Employer furnishes the necessary lockers, toolboxes, or other safe place of storage. Tools must be taken out and put away during working hours.

Section 5.06: Workmen shall install all electrical work in a safe and workman like manner in accordance with applicable code and contract specifications.

Section 5.07: The representatives of the Union shall be allowed access to any building at any reasonable time where members of the Union are employed.

Section 5.08: In all shops or on all jobs where four (4) or more Journeymen are employed, one Journeyman shall be designated as a Foreman.

On all jobs, the first working crew may consist of a maximum of eleven (11) men, that is, ten (10) Journeyman and one (1) working Foreman.

When a second crew is established, it may consist of a maximum of eleven (11) men, that is, ten

Def00066

(10) Journeymen and one (1) working General Foreman.

When a third or subsequent crew is established, it may consist of a maximum of eleven (11) men, that is, ten (10) Journeymen and one (1) working Foreman. Each crew shall be supervised by a Foreman and the Foremen shall be supervised by the General Foreman.

No General Foremen shall supervise more than fifty-five (55) men, including Journeymen and Foremen. For each additional fifty-five (55) men, the above procedures shall repeat except that the sixth and subsequent Foremen shall be supervised by an Area Foreman.

Section 5.09: Foremen, Area Foremen, and General Foremen shall be permitted to use tools. This shall not mean that they cannot handle material. Foremen may be required to attend and complete Foremen courses when provided.

Section 5.10: On jobs requiring a Foreman, workmen are not to take directions, orders or accept the layout from anyone other than their Foreman. Foremen are to take directions, orders, or layout from their Area Foreman only, when Area Foremen are required. When Area Foremen are not required, Foremen shall take directions, orders or layouts from the General Foreman only. Area Foremen shall take directions, orders or layout from the General Foreman only.

Section 5.11: No workman on one job shall replace a workman on another for any overtime work. All overtime work on any job shall be distributed fair and equal to all workmen. Exceptions to the two conditions above shall include the need for special skills or when workmen have not worked the available straight time hours during the "work week" as defined in Article IV, Section 1.

Section 5.12: The Employer shall see that cold water (in warm weather) and first-aid kits are available on all jobs and/or trucks.

Section 5.13: The Employer shall furnish protective equipment for workmen on energized circuits or equipment carrying 300 volts or more. On all energized circuits or equipment carrying 440 volts or over, as a safety measure, two (2) or more Journeymen must work together.

Section 5.14: All conduit shall be cut and threaded by workmen covered by this Agreement.

Section 5.15: Where pipe cutting and threading machines, electric drills, electric benders, electric chipping hammers, sanders, similar portable tools and all other power-driven equipment are used, such shall be operated by workmen covered by this agreement in the jurisdiction of the IBEW.

Section 5.16: All pulling of wire or cable shall be done by workmen covered by this Agreement.

Section 5.17: Journeyman cable splicers shall furnish only hand tools. On all work of joining, splicing and insulating and the placing of flame-proof covering where wiped lead joints are necessary, it shall be performed by cable splicers. Journeymen only shall be used in assisting cable splicers, except that one de-energized enclosures, an Apprentice may be used. Cable splicers shall not be required to work on wires or cables when the difference in potential is over 200 volts between any two conductors or between any conductor and ground, unless assisted by one Journeyman. In no case shall cable splicers be required to work on energized cables carrying in excess of 480-volt circuit.

Def00067

Section 5.18: Welders gloves, sleeves, hoods and all hard hats shall be furnished by the Employer. Workmen may be required to sign a payroll deduction form to authorize the deduction from their final paycheck to cover reimbursement of unreturned hard hats. Charges shall not exceed actual cost paid by the Contractor.

Section 5.19: The installation of all electrical raceways whether metal, wood, fiber, plastic clay or of any other conceivable composition, when used to contain electrical or grounding system conductors, and the installation, preparation and connection of all electrical and/or grounding or bonding conductors shall be performed by workmen employed under the terms of this Agreement and paid the hourly applicable negotiated wage rate contained herein unless it is an integral part of the building structure.

Section 5.20: No work shall be performed on Labor Day except in case of emergency.

Section 5.21: On any job of five (5) or more days duration on the main campus of the University of Texas, the Employer will either provide for employee parking within three blocks of the job or arrange for covered transportation from a parking area within two miles of the job.

## ARTICLE VI
## Standard Inside Apprenticeship Language

Section 6.01: There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of 6 or 8 members who shall also serve as Trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (un-indentured, intermediate journeymen, etc.).

Section 6.02: All JATC member appointments, reappointments, and acceptance of appointments shall be in writing. Each member shall be appointed for a 3-year term, unless being appointed for a lesser period of time to complete an expired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent, or they voluntarily resign. All vacancies shall be filled immediately

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

Def00068

Section 6.03:  Any issue concerning an apprentice, or an apprenticeship matter shall be referred to the JATC for its review, evaluation, and resolve, as per standards and policies.  If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article One of this Agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

Section 6.04:  There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunications apprenticeship.  The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

Section 6.05:  The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties, and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC.  All employees of the JATC shall serve at the pleasure and discretion of the JATC.

Section 6.06:  To help ensure diversity of training, provide reasonable continuous employment opportunities, and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprenticeships with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

Section 6.07:  All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selections procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship.  Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

Section 6.08:  The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs.  The JATC is authorized to indenture the number of apprentices necessary to meet the jobsite ratio as per section 6.12.

Section 6.09:  Though the JATC cannot guarantee any number of apprentices, if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request.  If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants.  An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

Def00069

Section 6.10: To accommodate short-term needs when apprentices are unavailable, the JATC shall assign un-indentured workers who meet the basic qualifications for apprenticeship. Un- indentured workers shall not remain employed if apprentices become available for OJT assignment.  Un-indentured workers shall be used to meet job site ratios except on wage-and-hour (prevailing wage) job sites.

Before being employed, the un-indentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an un-indentured, that they are subject to replacement by indentured apprentices, and that they are not to work on wage-and-hour (prevailing wage) job sites.

Should an un-indentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked as an un-indentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to un-indentured; such as Math Review, English, Safety, Orientation/Awareness, introduction to OSHA, First-Aid and CPR.  Participation shall be voluntary.

Section 6.11: The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and un-indentured. Contributions to other benefit plans may be addressed in other sections of this agreement. (See Article IV Section 4.03).

Section 6.12: Each job site shall be allowed a ratio of one (1) apprentice(s) for everyone (1) Journeyman Wireman.

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 1 to 3 |
| 4 to 6 | 4 to 6 |
| Etc. | Etc. |

The first person assigned to any job shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments.  The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

Section 6.13: An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in-sight-of a Journeyman Wireman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies.  Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Def00070

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

Section 6.14:  Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

Section 6.15:  The parties to this Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor- Management Relations Act of 1947 as amended, ERISA, and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials, or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

Section 6.16:  All employers subject to the terms of this Agreement shall contribute the amount of funds specified by the party's signatory to the local apprenticeship and training trust agreement. The current rate of contribution is: 1% of the Journeyman straight-time rate per hour for each hour worked. This sum shall be due the Trust Fund by the same date as is their payment to the NEBF under the terms of the Restated Employers Benefit Agreement and Trust.

## ARTICLE VII
### Vacation

Section 7.01:  Upon written authorization from the employee, the Employer shall make a weekly payroll deduction of six percent (6%) from the gross pay of each employee. The employee shall request the payroll deduction at the beginning of employment with an employer. The employee shall notify the employer, in writing of any modifications to their participation status for the voluntary payroll deduction in the month of January or July. Payroll deduction revisions will be made effective on the first payroll of the following month. The Employer monthly shall forward the amount of individual deductions from each employee as shown on the monthly payroll to Velocity Credit Union, ATTN: Teller Operations, P.O. Box 1089, Austin, TX, 78767, for deposit to that employee's Velocity Credit Union vacation account, and simultaneously shall provide the Local Union with a written report which sets forth, for each employee, the number of hours worked, the employee's classification and pay rate, the employee's gross pay, and the amounts deducted.

Section 7.02:  The payment and payroll report shall be mailed to reach the Velocity Credit Union no later than the 15th day of the month following the end of each benefit period.

Section 7.03:  Each employee shall be allowed to take two (2) weeks of annual vacation between February 1st and January 31st.

Section 7.04:  An Employer's failure to timely remit the payroll deductions or payroll report to the

Def00071

Velocity Credit Union, or the payroll report to the Local Union, as required above shall be treated as a delinquent contribution under the terms of the applicable Inside Construction Agreement.

## ARTICLE VIII
## Annuity Plan

It is mutually agreed between the parties hereto and in accordance with the IBEW Local Union 520 Annuity Plan entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, the Employer will forward to the Annuity Plan an amount equal to the percentage levels per Appendix A (See Article IV Section 4.03) of the gross wages of all classifications of employees for all hours worked within the geographical limits of the Union's jurisdiction when work is performed for any Employer operating under this Agreement. The payment shall be made monthly, together with the payroll report forms specified in Article IV.

## ARTICLE IX
## 401(k) Savings Plan

All employers signatory to this Agreement and/or employing workmen under the terms of this Agreement, shall deduct from each employee's Gross Weekly Payroll of employees who wish to participate, a voluntary deductible amount to be deposited into a 401(k) savings plan, upon the written request of each employee. Employees may enroll at the beginning of the employment with an Employer and enroll or change withholding each year during the month of January or July. Withholding will be made effective on the first payroll of the following month.

## ARTICLE X
## Health and Welfare

It is hereby mutually agreed between the parties hereto and in accordance with the Benefit contract governing the electrical benefit fund entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, that the Employer will forward to the Central Texas Health and Benefit Plan the following contributions as per Appendix A (See Article IV Section 4.03) for all hours actually worked by each employee (both straight time and overtime) within the geographical limits of the Union's jurisdiction when work is performed for any Employers operating under the terms of the basic Agreement for all Employers. Payments shall be made monthly together with a monthly payroll report on a form that will be furnished for that purpose by the Trustees of the Electrical Benefit Plan.

It is agreed that employers shall contribute solely up to $5.45 per hour of increases declared by the Trustees of the Plan. Any increases above $5.45 shall be split equally between the employer -and employee through a wage reduction of the JIW rate of pay, all other classifications shall adjust accordingly.

Def00072

## ARTICLE XI
## National Labor Management Cooperative Committee

Section 11.01: The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C. §186(c)(9). The purposes of this Fund include the following:

(1)     to improve communication between representatives of labor and management;

(2)     to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

(3)     to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

(4)     to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

(5)     to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

(6)     to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

(7)     to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

(8)     to engage in public education and other programs to expand the economic development of the electrical construction industry;

(9)     to enhance the involvement of workers in making decisions that affect their working lives; and

(10)     to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

Section 11.02: The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

Section 11.03: Each employer shall contribute one cent ($.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. The Central Texas Chapter, NECA, or its designee, shall be the collection agent for this Fund.

Section 11.04: If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.

Def00073

Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE XII
## P.A.C. Fund

The Employer agrees to deduct and transmit to the Local Union 520, IBEW, Committee on Political Education (IBEW-COPE) .05 cents for each clock hour worked from the wages of those employees who voluntarily authorize such contributions on the forms provided for that purpose by IBEW-COPE. The deductions will be made monthly and reported and remitted in accordance with Article IV, Section 11 of this Agreement.

Any Employee may revoke the voluntary authorization at any time by notifying the Company and IBEW-COPE in writing of a desire to do so.

The Union will indemnify and save the Company harmless from any claims, suits, or any other form of liability as a result of making payroll deductions described above.

## ARTICLE XIII

This Agreement set forth the entire contract between the Chapter and the Union and supersedes all previous understandings and Agreements between them and amendments thereto.

## ARTICLE XIV
## Substance Abuse Language

The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state, and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

## ARTICLE XV
## Code of Excellence

The parties to this Agreement recognize that to meet the needs of our customers, both employer and employee must meet the highest levels of performance, professionalism, and productivity. The Code of Excellence has proven to be a vital element in meeting the customers' expectations.

Def00074

Therefore, each IBEW local union and NECA chapter shall implement a Code of Excellence Program. The program shall include minimum standards as designed by the IBEW and NECA.

### Separability Clause

Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provision shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

SIGNED FOR THE UNION:                          SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International        A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

_____                _____
Ben Brenneman
Business Manager/Financial Secretary           A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

Def00075

# 1st YEAR APPRENTICE WAGE
## MEMORANDUM OF UNDERSTANDING

### BETWEEN

### A.S.H. ELECTRICAL SERVICES LLC

### AND

### IBEW LOCAL UNION 520

It is mutually agreed upon between IBEW Local 520 and A.S.H. Electrical Services LLC, effective May 27, 2019, that the minimum wage for a first-year apprentice shall be $15.00 per hour. This MOU shall remain in effect until such time as 50% of the JIW wage rate is greater than $15.00 per hour.

SIGNED FOR THE UNION:                          SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International        A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

Ben Brenneman
Business Manager/Financial Secretary           A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

Def00076

**CE ADVANCEMENT**
**MEMORANDUM OF UNDERSTANDING**

**BETWEEN**

**A.S.H. ELECTRICAL SERVICES**

**LLC**

**AND**

**IBEW LOCAL UNION 520**

A CE shall obtain a Texas State Journeyman's License before being upgraded to JIW status.

SIGNED FOR THE UNION:                          SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International        A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

Ben Brenneman
Business Manager/Financial Secretary          A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

Def00077

Def. MSJ Appx.000169

## 2022 Residential MOU

**Scope:** This MOU shall apply to all dwelling units including single family dwellings, apartments, and condominiums four stories and below. This MOU shall not apply to the commercial portion of mixed-use developments.

1. A CW/CE, having attained a Residential Journeyman's License, shall be awarded 2000 SBCs/ OJT hours. This CW/CE shall be allowed to work unsupervised on residential construction/service work.
2. A worker holding a Residential or Unrestricted Journeyman's License shall be the first person assigned to any residential project.
3. On all residential projects with four or more workers, a worker holding a Residential Journeyman's License shall be designated Residential foreman. This Residential foreman shall be allowed to supervise a crew of up to 10 workers of his classification or below, including first- and second-year apprentices. This Residential foreman shall receive a 10% pay premium above his/her classification.
4. On all residential projects requiring more than 11 workers, one shall be designated Residential General Foreman. The Residential General Foreman shall receive a 20% pay premium above his/her classification.
5. There shall be one foreman per 10 workers.
6. A CW/CE with a Residential Journeyman's License shall continue to accrue SBCs/OJT hours and be advanced in the CW/CE program accordingly.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000170

Def00078

## SHORT CALL EXTENSION

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## A.S.H. ELECTRICAL SERVICES
## LLC
## AND
## IBEW LOCAL UNION 520

In order to accommodate short term employment needs of the employer signed to this agreement, and the needs of our customers, the union and employer agree to the following:

Article III, Section 3.12 of the Inside Agreement between A.S.H. Electrical Services LLC and Local Union 520, of the International Brotherhood of Electrical Workers, shall have the following language added to the existing language contained in Article III, Section 3.12:

> A forty (40) hour call may be extended an additional forty (40) hours by the employer is job conditions warrant such extension. An applicant is not required to stay for the second forty (40) hour period unless told in advance the job as for eighty (80) hours. For the purposes of calculating hours worked under this Memorandum, only the straight time hours worked will be used. Any overtime worked during the one (1) or two (2) week period covered by this Memorandum will not affect the applicant's position on the Out-of-Work List.

This Memorandum shall continue in effect from year to year hereafter unless changed or terminated in the same manner as prescribed for the Inside Agreement.

SIGNED FOR THE UNION:                          SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International        A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

_____

Ben Brenneman
Business Manager/Financial Secretary           A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

Def00079

# SMALL WORKS
## MEMORANDUM OF UNDERSTANDING

### BETWEEN

### A.S.H. ELECTRICAL SERVICES LLC

### AND

### IBEW LOCAL UNION 520

IBEW Local Union 520 and EMPLOYER have repeatedly discussed possible solutions to gaining market share within the small works arena. In an effort to assist all signatory contractors in this arena, Local 520 offers the following:

**Four Person Crew**

Effective June 6, 2022, the Union agrees on any/all jobs throughout the Local 520 jurisdiction, with four (4) or less employees, the signatory contractor may utilize the services of a Construction Electrician (CE) and/or a 6th period apprentice. This CE or apprentice must be in possession of a State of Texas Journeyman License and may work alone, if necessary.

Additionally, the licensed CE may supervise up to three (3) additional equal or lower classified workers (CE's and/or CW's). This crew mix would not include Apprentice Wiremen. As long as the jobsite requires 4 or less employees, there will be no need for a Journeyman Inside Wireman (JIW) nor a Foreman (F). Should the four-person crew increase to five (5) or more, a licensed JIW or a licensed Foreman must be utilized.

Due to the market conditions, the parties recognize this agreement to be a variance to Article VI Section 6.12 of the inside agreement that necessitates the JIW being the first person on the job. The parties recognize Apprentices and CW/CEs operate under a formal training program where OJT under direct and indirect supervision by a JIW is still an important component to their development. Therefore, employers must be diligent to ensure CW/CE employees receive OJT training supervised by a JIW outside of these qualifying projects.

Signatory Contractors are not limited to any number of Four Person Crew jobsites. Pay rates and applicable benefits for the above classified workers shall be the ones listed in the Local 520 Inside Collective Bargaining Agreement between IBEW Local Union 520 and A.S.H. Electrical Services LLC.

This Memorandum of Understanding will expire on June 4, 2028, unless both Parties agree to extend it for an additional timeframe.

SIGNED FOR THE UNION:                    SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International    A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

Def00080

Ben Brenneman
Business Manager/Financial Secretary         A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

Def. MSJ Appx.000173

Def00081

**Memorandum of Understanding**
**Summer Worker Program**

1.    Must be by informal understanding between the local Union, the Employer and the JATC, with written guidelines.

2.    The guidelines should specify the following conditions:

   a.    The maximum number to be employed.

   b.    Effective only when placement will not displace an Apprentice or Intermediate Journeyman.

   c.    Qualifications:
      1.   At least 16 years old
      2.   A bona fide student (evidence required)
      3.   Summer worker and employer signatures on statement of understanding (sample attached)

   d.    Placement for a specific period of time, not to exceed 90 days. (Ending with the first pay period in September).

   e.    Placed as a <u>Summer Worker.</u>   NOT as an apprentice. (Cannot be referred or worked on jobs requiring registered apprentices).

   f.    Rate of pay shall be equal to that of a first period indentured apprentice.

   g.    Work performed as a Summer Worker is not counted towards apprenticeship.

   h.    Wages paid to Summer Workers are included in gross labor payroll, and the 3% of gross labor payroll payment to NEBF must include Summer Workers wages.

   i.    Limited electrical work (same as unindentured apprentice).

<u>SIGNED FOR THE UNION:</u>                    <u>SIGNED FOR THE EMPLOYER:</u>
Local Union No. 520 of the International          A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

Ben Brenneman
Business Manager/Financial Secretary             A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

Def00082

**Memorandum**
**of Understanding**

**Between IBEW Local**
**Union 520**
**and**
**A.S.H. ELECTRICAL SERVICES LLC**

Effective June 2, 2025 through June 4, 2028.

On jobs of five (5) or more days duration on the main campus* of the University of Texas, if parking is not provided, the employer will reimburse $6.00 per day for parking to each employee who reports to work on time and works all regular hours available to him. The employer is not responsible to provide transportation to and from parking areas.

SIGNED FOR THE UNION:                          SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International        A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

Ben Brenneman
Business Manager/Financial Secretary           A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

*from I-35 to Guadalupe Street, from East & West Dean Keeton Street to East & West Martin Luther King, Jr. Blvd.

Def00083



## Construction Wireman/Construction Electrician
## Memorandum of Understanding

### PURPOSE:

This agreement has two goals; one is to recruit an adequate number of personnel to meet the demands of the electrical construction industry in the jurisdiction covered by the inside construction and maintenance agreement.  The second objective is to establish a standard by which those recruited will be properly placed for continuing skills based training.

### OBJECTIVES:

A.  Provide a uniform means by which individuals can be brought into the organized industry.
B.  Provide employment opportunities for those individuals who may not meet the entrance requirements of the local AETA
C.  Establish a fair wage scale based on a skill standard that provides a clear and formal path to becoming a Journeyman Inside Wireman while maintaining a productive workforce.
D.  Provide electrical employees with experience and potential, an avenue to becoming a Journeyman Inside Wireman.
E.  To provide a second chance program for those indentured apprentices who discover that they do not fit into the AETA program.
F.  To provide A.S.H. Electrical Services LLC and IBEW Local Union 520 the autonomous means of developing training programs to meet the needs of changing local markets.

### DEFINITIONS:

A.  CW/CE – Construction Wireman/Construction Electrician
B.  SBC – Skill Based Credits
C.  AETA – Austin Electrical Training Alliance (formerly called Joint Apprenticeship Training Center)
D.  JATC – Joint Apprenticeship Training Committee
E.  LU 520 – International Brotherhood of Electrical Workers Local Union 520
F.  Employer – A.S.H. Electrical Services LLC
G.  TDLR – Texas Department of Licensing and Regulation
H.  OJT – On the Job Training

### SECTION 1 – ADMINISTRATION

A.  The AETA and LU 520 shall be responsible for:

1) Administering skill-based evaluations (supervised by Local Union staff)
2) Monitoring progress of the CW/CE for wage advancement
3) Develop and deliver skill-based training courses
4) Notifying LU 520 of the number of apprentices available for work assignments
5) Recruiting, processing and dispatching applicants to employers for assignment.

Def00084

 **Construction Wireman/Construction Electrician
Memorandum of Understanding**

B. Either party (EMPLOYER, LU 520 or AETA) may review all skill-based evaluations and evaluation procedures.

## SECTION 2 – WAGES, BENEFITS AND ADVANCEMENT

Upon successful accumulation of 16,000 Skill Based Credits (SBC) and successful completion of a Texas State Journeyman's License the Construction Electrician shall be upgraded to Journeyman Inside Wireman.

### A. Wages Appendices A1 and A2

1. Accumulated SBC's shall determine the individuals initial pay rate. Individuals shall advance upon meeting the requirements shown in Appendix D.
   or

2. Experienced Applicants with verifiable industry wage -or- AETA Transferees (Ref: SECTION 5): wages shall remain frozen until accumulated SBC's warrant pay advancement.

### a. BENEFITS – REFERENCE APPENDICES A1 and A2:

1. Accumulated SBC's shall determine what level of benefits shall apply.
2. All benefits shall be paid in accordance with the various trust fund qualifications.

### b. SKILLS BASED CREDITS (SBC'S) shall accrue by the following methods:

1. One SBC per each OJT hour worked for a signatory contractor.
2. One SBC for every two (2) OJT hours worked for a non-signatory contractor (wage documentation required; no credit (SBC's) for hours worked prior to program enrollment).
3. SBC's from skill based evaluation.
4. SBC's credited by successful completion of skills based courses. SBC's achieved in this manner shall not exceed 4,000 for the life of the program.
   (see APPENDIX C)

   Note: In no case shall SBC's be earned above the stated maximums through the evaluation process and/or the optional course work within each skill discipline (see APPENDIX B).

Def00085



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

### c. EXPERIENCED APPLICANTS SHALL:

1) Provide verifiable electrical industry wage documentation to establish their wage rate. (wage documents for public works projects where a wage determination is established shall not be eligible for verification)

OR

2) Take the next available skills based evaluation to determine how many SBC's shall be credited and establish initial wage rate.

SEE APPENDICES A1 AND A2 FOR EVALUATION, CLASS SBC'S AND WAGE SCHEDULE.

### SECTION 3 – IMPLEMENTATION:

The LU 520 shall be primarily responsible for the recruitment, processing and dispatching of applicants to employers. The LU 520 shall provide all processing information to the AETA for the purpose of tracking the CW/CE's progress in the program.

The JATC shall be responsible for the training of participants in accordance with Article VI, section 6.01 of the inside agreement.

The Employer shall be responsible for providing a termination slip to the LU 520 and the AETA when a CW/CE becomes unemployed.

CW/CE shall be employed on a conditional basis for 90 days from their first assignment. During the conditional employment period the LU 520 and A.S.H. Electrical Services LLC shall determine the individuals continued status in the program.

No employer is guaranteed a specific number of CW/CE.

Each job shall follow a ratio of one or more (1 or more) CW/CE(s) to one (1) JIW.

An employer who fails or refuses to hire available apprentices, in accordance with the agreed upon ratio of apprentices to journeymen, shall not be entitled to hire CW/CE.

CW/CE may be transferred from one qualifying project to another by the employer.

CW/CE shall not be included in the calculation of the apprentice to journeyman ratio.

Referral records may be inspected at LU 520 by a representative of the Employer.

Def. MSJ Appx.000178

Def00086



# Construction Wireman/Construction Electrician
## Memorandum of Understanding

Effective January 1, 2020, all Construction Wiremen and Construction Electricians are required to provide proof of completion, by originally issued card or certificate, of an OSHA 10 safety training course.

## SECTION 4 – SUPERVISION:

The CW/CE who has less than 8,000 SBC's shall be under the supervision of a Journeyman Inside Wireman.  It shall be the responsibility of the supervisor to lay out the work required and to permit the CW/CE to perform the work on his/her own.  A CW/CE who has 8,000 SBC's shall be allowed to work with no supervision but shall not supervise any apprentices or Journeyman Wireman.

## SECTION 5 – TRANSFERS:

A. All transfers shall be approved by the JATC.
B. Individuals are limited to a maximum of (2) transfers.
C. Transferees shall not experience a Wage Rate or Benefit Reduction.
D. AETA to CW/CE program:
   Local Apprentices from AETA apprenticeship program may transfer to the CW/CE program at an equal pay rate providing the apprentice has:
   1) A satisfactory work history (hours worked, absenteeism, and tardiness); and
   2) Established in writing the basis for the transfer.
   3) Apprentice transferees shall be credited one (1) SBC for each OJT Hour + (500) SBC's per completed academic year of apprenticeship.  In no instance shall this transfer result in the apprentice being granted more than the maximum SBC's as shown below:

### AETA to CW/CE Credit Table

| AETA Completed | Credited SBC's | AETA Completed | Credited SBC's |
|---|---|---|---|
| Less than 1 year | 2000 | Completed 3rd year | 8000 |
| Complete 1st year | 4000 | Completed 4th year | 10000 |
| Complete 2nd year | 6000 | Completed 5th year | 12000 |

E. CW/CE to AETA Program:

   CW/CE meeting the requirements for entrance into the AETA program may transfer to the AETA program as outlined by the JATC standards.  The transferring CW/CE will complete the IBEW/NECA ETA Proficiency Exam to determine placement in the academic portion of the training and will receive OJT Hour credits based on JATC guidelines.  Transferees shall not experience a reduction in their wage rate.

Def00087



## Construction Wireman/Construction Electrician
## Memorandum of Understanding

### SECTION 6 – TERM OF AGREEMENT:

This Agreement shall take effect on June 2, 2019. The terms and conditions of this Agreement shall continue on jobs bid under said terms until such jobs are completed.

**Disputes:** All allegations of infractions of this agreement shall be referred to the Labor Management Committee as defined in the current inside/maintenance collective bargaining agreement. In the event of a deadlock the matter shall be referred to the IBEW Seventh District Vice-president and the NECA Southern Region Director for final and binding adjudication. This agreement is a Memorandum of Understanding to the area inside construction and maintenance collective bargaining agreement and may continue with or without requirement of separate notice.

**Commitment:** The two parties, by signature below, hereby commit and promise to use their best efforts to see that this Memorandum is used to its highest level for the maximum benefit of employers and employees alike.

The parties further promise and agree that if changes are needed to this Memorandum; those changes will be addressed in an atmosphere of mutual trust and cooperation for the equal benefit of employers and employees alike. **Furthermore, any changes to this agreement or program shall be subject to review by the IBEW Seventh District Vice-President and the NECA Southern Region Director.**

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

A.S.H. Electrical Services LLC Representative

Def00088



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## APPENDIX A1 (CW1-CW6)

| Benefits | CE 1 | CE 2 | CE 3 | CE 4 | CE 5 | CE 6 |
|---|---|---|---|---|---|---|
| Range SBC'S | 0-2K | 2.01K-4K | 4.01K-6K | 6.01K-8K | 8.01K-10K | 10.01K-12K |
| JIW Rate | 44% | 44% | 49% | 54% | 59% | 64% |
| A.E.T.A. | NA | NA | NA | 1% of JIW | 1% of JIW | 1% of JIW |
| NLMCC | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| H&B | Plan C | Plan B | Plan B | Plan B | Plan B | Plan B |
| NEBF (3%) | 3% | 3% | 3% | 3% | 3% | 3% |
| Annuity | NA | NA | NA | 3% | 3% | 3% |
| AMF | .10 | .10 | .10 | .10 | .10 | .10 |

## APPENDIX A2 (CE1- CE 4)

| Benefits | CE 7 | CE 8 | CE 9 | CE 10 |
|---|---|---|---|---|
| Range SBC's | 12.01K-13K | 13.01K-14K | 14.01K-15K | 15.01K- more |
| JIW Rate | 68% | 73% | 78% | 85% |
| A.E.T.A. | 1% of JIW | 1% of JIW | 1% of JIW | 1% of JIW |
| NLMCC | $0.01 | $0.01 | $0.01 | $0.01 |
| H&B | Plan B | Plan B | Plan B | Plan B |
| NEBF (3%) | 3% | 3% | 3% | 3% |
| Annuity | 5% | 5% | 5% | 5% |
| AMF | .10 | .10 | .10 | .10 |

| |
|---|
| Low |
| Middle |
| High |

NOTE:  Benefit Schedule shown reflects current rates.  Rates shall be adjusted as per the Current Inside Agreement.

-Health and Welfare provides the employee with the option to select employee single coverage (for Levels 2, 3 & 4 only) or employee/dependent coverage (for Levels 2-8). Employees may change this election once each calendar year or more often as the trust fund rules provide.

-Only SBCs earned from participating employers qualify for benefits eligibility.

Def00089



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## APPENDIX B

| SKILL DISCIPLINE | MAX SBC's |
|---|---|
| Branch Wiring | 6,400 |
| Feeder Wiring | 1,600 |
| Panels & Transformers | 1,600 |
| Switchgear & Motor Control Center | 1,120 |
| Motors & Motor Controls | 800 |
| Lighting & Lighting Controls | 2,400 |
| Grounding | 160 |
| Devices | 320 |
| Electrical Codes & Ordinances | 160 |
| Blueprints & Specifications | 160 |
| Meters & Tools | 160 |
| OSHA & Job Safety | 160 |
| Agreements | 160 |
| Service & Troubleshooting | 800 |

Def00090



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## APPENDIX C

**Optional Coursework SBC Curriculum Allocation**

| Skills Course | SBC's Credit | Course Hours |
|---|---|---|
| Branch Wiring | 920 | 72 |
| Electrical Codes & Ordinances | 320 | 30 |
| Service/Troubleshooting | 280 | 24 |
| Panels & Transformers | 280 | 24 |
| OSHA & Job Safety | 280 | 24 |
| Meters & Tools | 280 | 24 |
| Feeder Wiring | 280 | 24 |
| Blueprints & Specifications | 280 | 24 |
| Agreements | 240 | 24 |
| Switchgear & Motor Control Centers | 200 | 18 |
| Motors & Motor Controls | 200 | 18 |
| Lighting & Lighting Controls | 200 | 18 |
| Grounding | 120 | 12 |
| Devices | 120 | 12 |
| **TOTAL** | **4000** | **180** |

Def. MSJ Appx.000183

Def00091

 **Construction Wireman/Construction Electrician**
**Memorandum of Understanding**

## APPENDIX D

| Classification | SBC's | Training | Awarded |
|---|---|---|---|
| CW2 | 2000 | Conduit Bending 1 | 230 |
| CW3 | 4000 | Blueprint Reading | 280 |
| CW4 | 6000 | Conduit Bending 2 | 230 |
| CW5 | 8000 | Codeology | 120 |
| CW6 | 10000 | Basic Code | 120 |
| CE1 | 12000 | Conduit Bending 3 | 230 |
| CE2 | 13000 | Grounding/Transformers | 320 (120+200) |
| CE3 | 14000 | Services | 200 |
| CE4 | 15000 | Motor Control | 280 |
| JIW | 16000 | | |

Def00092



**Memorandum of Understanding**
**Four Year Apprenticeship Program Conversion**



Made and entered into April 10, 2023, between IBEW Local Union 520, hereafter referred to as the Union, and the EMPLOYER, hereafter referred to as the Employer. This Agreement shall remain in effect from year to year throughout the current collective bargaining agreement and will expire at that time on June 1, 2025.

1.  The parties hereby agree that Article IV, Section 4.03 Appendix A (Wages) of the Inside Agreement between the parties shall be modified with an additional schedule to meet the needs of the apprenticeship wage and benefit schedule for those starting the (4) Four Year Program.

| Apprentice Wireman | | | | | |
|---|---|---|---|---|---|
| Multiplier | Class | NEBF | Annuity | Medical | JATC |
| 50% of JIW 0-999 Hrs | 1st Period | 3% | ** | $3.70 | 1%*** |
| 55% of JIW 1000-1999 Hrs | 2nd Period | 3% | 3% | $3.70 | 1%*** |
| 60% of JIW 2000-3499 Hrs | 3rd Period **180 Hrs Instruction** | 3% | 3% | $3.70 | 1%*** |
| 65% of JIW 3500-4999 Hrs | 4th Period **360 Hrs Instruction** | 3% | 5% | $3.70 | 1%*** |
| 70% of JIW 5000-6499 Hrs | 5th Period **540 Hrs Instruction** | 3% | 5% | $3.70 | 1%*** |
| 75% of JIW 6500-8000 Hrs | 6th Period **720 Hrs Instruction** | 3% | 8% | $3.70 | 1%*** |
| 50% of JIW **Max Hrs2000** | Unindentured Apprentice | 3% | ---------------- | $2.65 | 1%*** |
| **Journeyman 8000, completed 900 hours of related instruction and obtained State of Texas Journeyman license. Classroom instruction hours are cumulative.** ** I% effective January 6 2025 ***1% of Journeyman Straight -Time Rate | | | | | |

Def00093

SIGNED FOR THE UNION:                          SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International        A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers


_____                _____
Ben Brenneman
Business Manager/Financial Secretary           A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

Def00094

# Council on Industrial Relations
## for the
# Electrical Contracting Industry



**DECISION NO.**    8883

<u>PARTIES IN DISPUTE</u>:
    A.S.H. Electric
    Local Union No. 520

Austin, Texas
May 13, 2025
Inside

<u>PRESENTATION</u>:
    By brief only for A.S.H. Electric
    By brief and oral argument for Local Union No. 520

<u>APPEARANCES</u>:
    For Local Union No. 520:  B. Brenneman, D. Campbell

<u>MATTERS IN DISPUTE</u>:
1. Article I, Section 1.01 – Length of Agreement
2. Article II, Section 2.01 – Favored Nations
3. Article IV, Section 4.02 – Paid Holidays
4. Article IV, Section 4.03 – Wages
5. Article V – General Rules
6. Article V – Walk Time
7. Article VI, Section 6.16 – Apprenticeship Contribution
8. Article VIII – Annuity Plan

<u>MEMBERS OF COUNCIL SITTING</u>:

| FOR THE EMPLOYER | FOR THE UNION |
| --- | --- |
| D. Laffoon | M. Hager |
| S. Krieg | C. Bergfeld |
| J. Brunia | A. Warwick |
| T. Maloney | D. McInerney |
| F. Piatt | R. Wolf |
| L. Bell | D. Robinson |

<u>DECISION</u>:

After careful consideration of the evidence submitted, the Council rules as follows:

In the instant case, the parties are directed to sign and immediately implement the Collective Bargaining Agreement which is attached hereto and hereby made a part of this decision. The Council retains jurisdiction over disputes pertaining to this Agreement including any wage/fringe opener(s) contained therein and such disputes are to be returned to Council through the normal procedures if the parties are unable to reach agreement.

Sponsored by the National Electrical Contractors Association • International Brotherhood of Electrical Workers®



Office of the Secretary • 900 7th Street, NW • Washington, DC 20001
Phone (202) 728-6165 • Fax (202) 728-6168 • Website: www.thecir.org

Def. MSJ Appx 000187



**COUNCIL ON INDUSTRIAL RELATIONS**
      **FOR THE ELECTRICAL CONTRACTING INDUSTRY**            **DECISION NO.**   8883

UNANIMOUSLY ADOPTED:
Washington, DC
May 13, 2025

_____
     Acting Co-Chairman

_____
     Acting Co-Chairman

_____
     Secretary

Def. MSJ Appx. 000188



June 2, 2025 - June 4, 2028

# AGREEMENT
Between

## A.S.H. Electrical Services LLC

and

## LOCAL UNION NO. 520 of the
## INTERNATIONAL BROTHERHOOD OF
## ELECTRICAL WORKERS

Austin, Texas

Def. MSJ Appx.000189

**June 2, 2022 - June 1, 2025**
**AGREEMENT**

**Between**

**A.S.H. Electrical Services LLC**

**and**

**LOCAL UNION NO. 520 of the**
**INTERNATIONAL BROTHERHOOD OF**
**ELECTRICAL WORKERS**
**Austin, Texas**

## PARTIES CLAUSE

Agreement by and between the A.S.H. Electrical Services LLC and LOCAL UNION 520, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS. As used hereinafter in this Agreement, the term "Employer" shall mean A.S.H. Electrical Services LLC, and the term "Union" shall mean LOCAL UNION NO. 520, IBEW.

## BASIC PRINCIPLES

The Employer and the Union have a common and sympathetic interest in the Electrical Industry. Therefore, a working system and harmonious relations are necessary to improve the relationship between the Employer, the Union, and the Public. Progress in Industry demands a mutuality of confidence between the Employer and the Union. All will benefit by continuous peace, and by adjusting any differences by rational, common sense methods. Now, therefore, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

Def. MSJ Appx.000190

# ARTICLE I
## EFFECTIVE DATE/CHANGES/GRIEVANCES/DISPUTES

Section 1.01: This Agreement shall take effect on June 2, 2025 and shall remain in effect through June 4, 2028, unless otherwise specifically provided for herein. It shall continue in effect from year to year thereafter, from the start of the first full pay period in June through the last pay period starting in May of each year, unless changed or terminated in the way later provided herein.

Section 1.02(a): Either party or an Employer withdrawing representation from the Chapter or not represented by the Chapter, desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of this Agreement or any anniversary date occurring thereafter.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

(c) The existing provisions of the Agreement, including this Article, shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d) In the event that either party, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, has given a timely notice of proposed changes and an agreement has not been reached by the expiration date or by any subsequent anniversary date to renew, modify, or extend this Agreement, or to submit the unresolved issues to the Council on Industrial Relations for the Electrical Contracting Industry (CIR), either party or such an Employer, may serve the other a ten (10) day written notice terminating this Agreement. The terms and conditions of this Agreement shall remain in full force and effect until the expiration of the ten (10) day period.

(e) By mutual agreement only, the Chapter, or an Employer withdrawing representation from the Chapter or not represented by the Chapter, may jointly, with the Union, submit the unresolved issues to the Council on Industrial Relations for adjudication. Such unresolved issues shall be submitted no later than the next regular meeting of the Council following the expiration date of this Agreement or any subsequent anniversary dates. The Council's decisions shall be final and binding.

(f) When a case has been submitted to the Council, it shall be the responsibility of the negotiating committee to continue to meet weekly in an effort to reach a settlement on the local level prior to the meeting of Council.

(g) Notice of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

Section 1.03: This Agreement shall be subject to change or supplement at any time by mutual consent of the parties hereto. Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

Section 1.04: During the term of this Agreement, there shall be no stoppage of work either by strike or lockout because of any proposed changes in this Agreement or dispute over matters relating to this Agreement. All such matters must be handled as stated herein.

## GRIEVANCES/DISPUTES

Section 1.05: There shall be a Labor-Management Committee of trustees representing the Union and three representing the Employers. It shall meet regularly at such stated times as it may decide. However, it shall also meet within 48 hours when notice is given by either party. It shall select its own Chairman and Secretary. The Local Union shall select the Union representatives and the Employer shall select the management representatives.

Section 1.06: All grievances or questions in dispute shall be adjusted by the duly authorized representative of each of the parties to this Agreement. In the event that these two are unable to adjust any matter within 48 hours, they shall refer the same to the Labor-Management Committee.

Section 1.07: All matters coming before the Labor-Management Committee shall be decided by a majority vote. Four members of the Committee, two from each of the parties hereto, shall be a quorum for the transaction of business, but each party shall have the right to cast the full vote of its membership and it shall be counted as though all were present and voting.

Section 1.08: Should the Labor-Management Committee fail to agree or to adjust any matter, such shall then be referred to the Council on Industrial Relations for the Electrical Contracting Industry for adjudication. The Council's decisions shall be final and binding.

Section 1.09: When any matter in dispute has been referred to conciliation or arbitration for adjustment, the provisions and conditions prevailing prior to the time such matters arose shall not be changed or abrogated until agreement has been reached or a ruling has been made.

Section 1.10: The Labor-Management Committee shall not recognize any grievance or dispute unless written notice of the charge is given within thirty (30) days after the representatives of the parties to this Agreement first became aware, or reasonably should have been aware, of a violation of this Agreement. This shall not apply to any Section which requires money to be deposited to any Trust Fund.

## ARTICLE II
## Employers Rights - Union Rights

Section 2.01: The Employer recognizes the Union as the exclusive representative of all its employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment and other conditions of employment.

Section 2.02(a): Certain qualifications, knowledge, experience, and financial responsibility are required of everyone desiring to be an Employer in the Electrical Industry. Therefore, an Employer who contracts for electrical work is a person, firm, or corporation, having these qualifications and maintaining a place of business and suitable financial status to meet payroll requirements and

employing at least one Journeyman Wireman.

(b) All Employers subject to the terms of this Agreement shall carry an Indemnity Bond, issued by a company authorized to do business in the State of Texas, the minimum for all employers shall be $5,000.00 as evidence of financial responsibility, and to insure proper payments to the Electrical Joint Apprenticeship and Training Trust Fund, the National Employees Benefit Board, the Austin Vacation Trust Fund, IBEW Local Union 520 Annuity Plan and Health and Welfare Plan, 401(k), and P.A.C. deductions, to Local Union 520, for any union dues or assessments withheld on behalf of employees, and wages required under this Agreement be paid directly to the affected employee(s). Bond amounts greater than $5000 shall be required based on the following formula outlined below:

(c) Each employer signatory to the collective bargaining agreement shall be required to secure a welfare bond of at least $5000. Employers shall be required to secure larger bonds based on the following formula: Employers shall provide a welfare bond based on the average monthly hours worked utilizing the previous three years to calculate the average. This number shall be multiplied by the aggregate amount of the benefit package and rounded up to the next one thousandth. If an employer has been delinquent in the payment of benefits more than twice, they shall be required to pay benefits timely on a weekly basis for a period of six months and secure the required bond. After a period of six months of timely benefit payments the employer may return to the monthly schedule. If an employer has no previous experience in the jurisdiction the bond shall be based on the estimated monthly hours of the project to be worked. The maximum bond for any employer shall be $50,000.

The aforesaid Bond shall be executed for a period of time to conform to the time limitations set forth in this Agreement and shall be renewed as provided for in subsequent Agreements.

The Bond shall provide that it may not be canceled by either the Employer or the insurance carrier without thirty (30) days written notice in advance to the Union by Certified, Registered, or Insured mail from the Surety. Proof of the execution of the Bond, in the form of an affidavit executed by the insurance carrier, shall be furnished the Union for each Employer. Such affidavit shall show on its face that it may not be canceled by either the insurance carrier of the Employer without prior notification to the Union. The Local Union shall furnish a copy of the affidavit of Bond to each Fund.

The Obligee (Local Union 520, IBEW) shall notify the Surety within thirty (30) days after having knowledge of a breach of this Agreement by the principal hereof.

(d) Fringe benefits provided for under this Agreement are due and payable on or before the 15th day of the month following the month, covering the hours worked by each employee. Each Employer shall file a monthly report for each fringe benefit, in the form established, therefore, each report shall be filed, regardless of whether or not the Employer has employed any employee in the month covered by said report.

Any Employer who fails to file a report and pay contributions for any of the fringe benefits by the 15th day following the month in which such report or payment is due shall be considered delinquent and is in violation of this Agreement. If payments are not mailed in time to reach the

Benefit Fund by the prescribed time, interest at the rate of 1½% monthly will be due and payable. Each Employer shall make available applicable books and records for the purpose of auditing same to determine the amount of his liability and shall pay the expense of audit if delinquencies are found, under guidelines of the Funds. Action to collect contributions may be brought in the name of the respective Fund involved, its Trustees and any assignee or agent designated by said Trustees. Employer hereby accepts and agrees to the terms of each trust agreement and plan for such fringe Benefit Fund.

A delinquent Employer shall be liable to any employee affected by such delinquency for all benefits lost by such employee by virtue of such delinquency, and such delinquent Employer shall also be liable for reasonable attorneys' fees for any action brought to recover the amount of said benefits.

"This section does not waive or deny any remedies of collection in other sections of this Agreement, Trust or a remedy at law".

Section 2.03: For all employees covered by this Agreement the Employer shall carry Workman's Compensation Insurance with a Company authorized to do business in this State, Social Security, and such other protective insurance as may be required by the laws of this State and shall furnish satisfactory proof of such to the Union. He shall also make contributions to the State Unemployment Compensation Commission.

Section 2.04(a): It is agreed that in accord with the Employees Benefit Agreement of the National Electrical Benefit Fund ("NEBF"), as entered into between the National Electrical Contractors Association and the International Brotherhood of Electrical Workers on September 3, 1946, as amended, and now delineated as the Restated Employees Benefit Agreement and Trust, that unless authorized otherwise by the NEBF the individual Employer will forward monthly to the NEBF's designated local collection agent an amount equal to three percent (3 %) of the gross monthly labor payroll, paid to, or accrued by, the employees in this bargaining unit, and a completed payroll report prescribed by the NEBF. The payment shall be made by check or draft and shall constitute a debt due and owing to the NEBF on the last day of each calendar month, which may be recovered by the suit initiated by the NEBF or its assignee. The payment and the payroll report shall be mailed to reach the office of the appropriate local collection agent not later than fifteen (15) calendar days following the end of each calendar month.

The individual Employer hereby accepts, and agrees to be bound by, the Restated Employees Benefit Agreement and Trust.

(b) An individual Employer who fails to remit as provided above shall be additionally subject to having his Agreement terminated upon seventy-two (72) hours' notice in writing being served by the Union, provided the individual Employer fails to show satisfactory proof that the required payments have been paid to the appropriate local collection agent.

The failure of an individual Employer to comply with the applicable provisions of the Restated Employees Benefit Agreement and Trust shall also constitute a breach of this Agreement.

Section 2.05: The Union reserves the right to discipline its members for violations of its laws,

rules, and agreements.

Section 2.06: The Local Union is part of the International Brotherhood of Electrical Workers and any violation or annulment by an individual Employer of the approved Agreement of this or any other Local Union of the IBEW, other than violations of Paragraph 2 of this Section, will be sufficient cause for the cancellation of his Agreement by the Local Union after a finding has been made by the International President of the Union that such a violation or annulment has occurred.

The subletting, assigning, or transfer by an individual Employer of any work in connection with electrical work to any person, firm or corporation not recognizing the IBEW or one of its Local Unions as the collective bargaining representative of his employees on any electrical work in the jurisdiction of this or any other Local Union to be performed at the site of the construction, alteration, painting or repair of a building, structure or other work, will be deemed a material breach of this Agreement.

Notwithstanding anything in this Agreement, the Employer may sublet, assign, or transfer the installation of wiring and devices for fire alarm or security systems if those systems are low voltage system, the installation of lightning protection system, trenching and backfilling excavation to a specialty contractor.

The Employer may also sublet, assign, or transfer any work requiring employees to place themselves in any trench that is greater than a depth of five feet.

The following work, systems and/or functions shall not be covered by the terms of this agreement: field instrumentation and installation, process control instrumentation and installation, instrument and control loop testing and certification, instrument calibration, instrument certification, PLC equipment, PLC programming, distributed control and SCADA systems, control system SCADA & HMI software development and programming, radio telemetry systems, and manufacture of control panels.

Nothing in this Agreement should be construed to require the Employer to purchase manufactured products from employer's signatory to a collective bargaining agreement.

All charges of violation of Paragraph 2 of this Section shall be considered as a dispute and shall be processed in accordance with the provisions of this Agreement covering the procedure for the handling of grievances and the final and binding resolution of disputes.

Section 2.07: No member of Local Union 520, while he remains a member of such Local Union and subject to employment by the Employers operating under this Agreement shall himself become a contractor for the performance of any electrical work.

Section 2.08: Only two individuals connected with an employing concern as owner, manager, superintendent, partner, or member of a Board of Directors shall perform any manual electrical work where it displaces the service of a Journeyman; and then only when he has at least one Journeyman, working under the terms of this Agreement, employed and working the same hours including overtime, with the exception of emergency repairs not to last over two (2) hours.

Section 2.09(a): The Union understands the Employer is responsible to perform the work required by the owner. The Employer shall, therefore, have no restrictions except those specifically provided for in the collective bargaining agreement, in planning, directing, and controlling the operation of all his work, in deciding the number and kind of employees to properly perform the work, in hiring and laying off employees, in transferring employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all employees to observe all safety regulations, and in discharging employees for proper cause.

(b) The employer shall have the right to call a Foreman by name provided:

A)    The employer shall notify the business manager in writing of the name of the individual who is to be requested for employment as a Foreman. Upon such request, the business manager shall refer said Foreman provided the name appears on the highest priority group.

B)    When an employee is called as a Foreman, he must remain as a Foreman for 500 hours or must receive a reduction in force.

## Portability

Section 2.10: The Employer, if signatory to a collective bargaining agreement or to a letter of assent to an agreement with another IBEW Local Union, may bring an unlimited amount of Supervisory bargaining unit employees employed in that Local Union's jurisdiction into Local Union 520's jurisdiction to perform supervisory work. Supervisory bargaining unit employees are defined as those that direct bargaining unit employees. The Employer may also bring one (1) bargaining unit employee employed in that Local Union's jurisdiction into Local Union 520's after the Employer employs one (1) Local Union 520's bargaining unit employee; if necessary this process will continue to alternate. The Employer shall maintain a minimum of a one (1) to one (1) ratio of Local Union 520's bargaining unit employees to those that are brought in through this Portability provision. The employees brought in through portability may remain on the specific job until the job is complete. All employees brought in through this portability provision must check in with the Business Manager of IBEW Local Union 520 and all working assessments shall be paid to Local Union 520. All charges of violations of this section shall be considered as a dispute and shall be processed in accordance with the provisions of the Agreement for the handling of grievances with the exception that any decision of a local labor-management committee that may be contrary to the intent of the parties to the National Agreement on employee Portability, upon recommendation of either or both the appropriate IBEW International Vice President or NECA Regional Executive Director, is subject to review, modification, or rescission by the Council on Industrial Relations.

Section 2.11: The Union has the right to appoint a Steward at any shop and/or job where workmen are employed under the terms of this Agreement. The Employer shall be notified in writing of who the Steward is. No Steward shall be discriminated against by the Employer because of the faithful performance of his duties as Steward.

## ARTICLE III
## Standard Inside Referral

Section 3.01: In the interest of maintaining an efficient system of production in the Industry, providing for an orderly procedure of referral of applicants for employment preserving the legitimate interests of the employees in their employment status within the area and of eliminating discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment.

Section 3.02: The Union shall be the sole and exclusive source of referral of applicants for employment.

Section 3.03: The Employer shall have the right to reject any applicant for employment.

Section 3.04: The Union shall select and refer applicants for employment without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other aspect or obligation of Union membership policies or requirements. All such selection and referral shall be in accord with the following procedure.

Section 3.05: The Union shall maintain a register of applicants for employment established on the basis of the Groups listed below. Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

### Journeyman Wireman - Journeyman Technician

**GROUP I** All applicants for employment who have four or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted Inside Construction Local Union of the I.B.E.W. or has been certified as a Journeyman Wireman by any inside Joint Apprenticeship and Training Committee, and, who have been employed in the trade for a period of at least one year in the last four years in the geographical area covered by the collective bargaining agreement.

Group I status shall be limited to one Local Union at one time. An applicant who qualifies for Group I in a local union shall be so registered electronically and remain on Group I in that local union unless and until the applicant designates another local union as his or her Group I local union. If an applicant qualifies for Group I status in a local union other than his or her home local union and designates that local as his or her Group I local union, the business manager of the new Group I status local union shall by electronic means notify the business manager of the applicant's former Group I status local union.

**GROUP II** All applicants for employment who have four or more years' experience in the trade and who have passed a Journeyman Wireman's examination given by a duly constituted Inside Construction Local Union of the IBEW or have been certified as a Journeyman Wireman by any Inside Joint Apprenticeship and Training Committee.

**GROUP III** All applicants for employment who have two or more years' experience in the trade, are residents of the geographical area constituting the normal construction labor market, and who have been employed for at least six months in the last three years in the geographical area covered by the collective bargaining agreement.

**GROUP IV** All applicants for employment who have worked at the trade for more than one year.

Section 3.06: If the registration list is exhausted and the Local Union is unable to refer applicants for employment to the Employer within 48 hours from the time of receiving the Employer's request, Saturdays, Sundays and holidays excepted, the Employer shall be free to secure applicants without using the Referral Procedure. But such applicants, if hired, shall have the status of "temporary employees".

Section 3.07: The Employer shall notify the Business Manager promptly of the names and Social Security numbers of such "temporary employees" and shall replace such "temporary employees" as soon as registered applicants for employment are available under the Referral Procedure.

Section 3.08: "Normal construction labor market" is defined to mean the following geographical area plus the commuting distance adjacent thereto which includes the area from which the normal labor supply is secured: Travis, Bastrop, Hays, Blanco, Burnet, Williamson, Lee, Llano, San Saba, Burleson, Caldwell, Fayette, Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason, Kimble and parts of Coryell and Bell Counties to include that part of Fort Hood in Coryell County south of Cowhouse Creek, and not to extend more than two (2) miles into Bell County from the Southeast boundary line of Coryell County, Gray Field, and the City of Killeen, and parts of Lampasas, Bell and Milam Counties, which are nearer to Austin than Waco, in the State of Texas.

The above geographical area is agreed upon by the parties to include the area defined by the Secretary of Labor to be the appropriate prevailing wage areas under the Davis-Bacon Act to which the Agreement applies.

Section 3.09: "Resident" means a person who has maintained his permanent home in the above defined geographical area for a period of not less than one year or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area as his permanent home.

Section 3.10: "Examinations" - An "Examination" shall include experience rating tests if such examination shall have been given prior to the date of this procedure, but from and after the date

of this procedure, shall include only written and/or practical examinations given by a duly constituted Inside Construction Local Union of the IBEW. Reasonable intervals of time for examinations are specified as ninety (90) days. An applicant shall be eligible for examination if he has four years' experience in the trade.

Section 3.11: The Union shall maintain an "Available for Work List" which shall list the applicants within each Group in chronological order of the dates they register their availability for employment.

Section 3.12(a):   An applicant who is hired and who receives, through no fault of his own, work of forty hours or less shall, upon re-registration, be restored to his appropriate place within his Group.

(b) An applicant who has registered on the "Available for Work List" must renew his application every thirty (30) days or his name will be removed from the "List."

Section 3.13:   Employers shall advise the Business Manager of the Local Union of the number of applicants needed. The Business Manager shall refer applicants to the Employer by first referring applicants in GROUP I in the order of their place on the "Available for Work List" and then referring applicants in the same manner successively from the "Available for Work List" in GROUP II, then GROUP III, and then GROUP IV. Any applicant who is rejected by the Employer shall be returned to his appropriate place within this GROUP and shall be referred to other employment in accordance with the position of his GROUP and his place within his GROUP.

Section 3.13(a):   An applicant who is discharged for cause two times within a 12-month period shall be referred to the neutral member of the Appeals Committee for a determination as to the applicant's continued eligibility for referral. The neutral member of the Appeals Committee shall, within three business days, review the qualifications of the applicant and the reasons for the discharges. The neutral member of the Appeals Committee may, in his or her sole discretion: (1) require the applicant to obtain further training from the JATC before again being eligible for referral; (2) disqualify the applicant for referral for a period of four weeks, or longer, depending on the seriousness of the conduct and/or repetitive nature of the conduct; (3) refer the applicant to an employee assistance program, if available, for evaluation and recommended action; or (4) restore the applicant to his/her appropriate place on the referral list.

Section 3.14:   The only exceptions which shall be allowed in this order of referral are as follows:

(a) When the employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

(b) The age ratio clause in the Agreement calls for the employment of an additional employee or employees on the basis of age. Therefore, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements provided, however, that all names in higher priority Groups, if any, shall first be exhausted before such overage reference can be made.

Section 3.15:  An Appeals Committee is hereby established, composed of one member appointed by the Union, one member appointed by the Employer or by the Association, as the case may be, and a Public Member appointed by both these members.

Section 3.16:  It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the administration by the Local Union of Sections 4 through 14 of this Agreement.  The Appeals Committee shall have the power to make a final and binding decision on any such complaint which shall be complied with by the Local Union.  The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the provisions to this Agreement and its decisions shall be in accord with this Agreement.

Section 3.17:  A representative of the Employer or of the Association, as the case may be, designated to the Union in writing, shall be permitted to inspect the Referral Procedure records at any time during normal business hours.

Section 3.18:  A copy of the Referral Procedure set forth in this Agreement shall be posted on the Bulletin Board in the offices of the Local Union and in the offices of the Employers who are parties to this Agreement.

Section 3.19:  Apprentices shall be hired and transferred in accordance with the apprenticeship provisions of the Agreement between the parties.

Section 3.20:  When making reductions in the number of employees due to lack of work, Employers shall use the following procedure:

(a) Temporary employees, if any are employed, shall be laid off first. Then employees in Group IV shall be laid off next, if any are employed in this Group. Next to be laid off are employees in Group III, if any are employed in this Group, then those in Group IV, and then those in Group I.

(b) Paragraph (a) will not apply as long as the special skills requirement as provided for in Section 14(a) is required.

(c) Supervisory employees covered by the terms of this Agreement will be excluded from layoff as long as they remain in the supervisory capacity.  When they are reduced to the status of Journeyman, they will be slotted in the appropriate group in Paragraph (a) above.

Section 3.21:  All Journeymen and Apprentices are required to provide proof of completion, by originally issued card or certificate, of an OSHA 10 safety training course.

## ARTICLE IV
## Hours - Wage Payment

Section 4.0l(a):   Eight hours work between the hours of 6:00 A.M. and 6:30 P.M. with thirty (30) minutes for a lunch period, shall constitute a workday.  Forty (40) hours within (5) days, Monday through Friday, inclusive, shall constitute the work week. Saturday may be used for a make-up day due to inclement weather.  If Saturday is used as a make up day, a minimum of eight (8) hours will be scheduled.  The payroll week shall end on Sunday midnight of each week. Any workman required to punch a time clock that requires more than five (5) minutes to check out shall be paid for any additional time used in checking out.  Workmen reporting to the shop or job shall not report earlier than 15 minutes prior the starting time.  If practical, workmen directed to report to the job shall be at their place of work at the starting time and shall remain at their place of work until quitting time unless otherwise instructed by the Employer.

(b) Any change from the regular working hours must be five (5) or more day's duration. When any change in the starting time is made, lunch period, overtime, and shifts may be changed accordingly.

(c) The Employer with 24-hour notice to the Union may elect to work 4-10 hour days to be scheduled. The first 10 hours of work per day shall be paid at the hourly straight time rate of pay. When working 4-10s, the Employer can schedule the work week for Monday through Thursday, 10 hours per day. A second work week can be scheduled from Tuesday through Friday, 10 hours per day. The 4 day work week will be Monday through Thursday. Friday can be used as a make-up day due to inclement weather. If Friday is used as a make-up day, a minimum of 8 hours will be scheduled. Any four day/ten-hour work schedule shall be a minimum of 2 weeks duration.

(d) In order to coordinate with other crafts, summer hours, customer requests, and the like, the starting time for each job shall be subject to variance of not more than 1 hour. Advanced notice to the Union will be required to approve any such variance greater than 1 hour. These alternate starting times must run for a minimum of 5 consecutive workdays, and all other times listed in this agreement will shift accordingly.

Section 4.02:  All work performed outside of regularly scheduled hours will be paid at one and one-half times the regular straight-time rate, provided the employee works all of the regular scheduled hours made available, as defined in Art. IV Sec. 4.0l(a) and Sec. 4.0l(c).  In the event the employee does not work all of the regularly scheduled hours available he will receive no premium rate until after he has worked 40 hours.  Work on Sundays shall be paid at double the straight-time rate.  The following holidays:  New Year's Day, Memorial Day, Fourth of July, Labor Day, Veteran's Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas Day, shall be paid at double the straight-time rate. The following holidays shall be paid holidays starting June 2, 2025, Thanksgiving Day and Friday following, January 4, 2027, Christmas Day, January 3, 2028, New Year's Day. Eligible employees must have been employed for two weeks and worked the available workday before and the available workday after the holiday.  Holidays shall be recognized only on the day on which they fall.

<u>Section 4.03:</u> The minimum regular straight-time rate of wages for Journeyman Inside Wireman (JIW) shall be as follows:

Effective June 2, 2025: $36.50
Effective January 5, 2026: $38.50
Effective January 4, 2027: $40.50
Effective January 3, 2028: $42.50

| APPENDIX A - MINIMUM BENEFITS | | | | | |
|---|---|---|---|---|---|
| **Multiplier** | **Classification** | **NEBF** | **Annuity** | **Medical** | **JATC** |
| 130% of JIW wage rate | General Foreman (area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | General Foreman (no area foreman required) | 3% | 8% | $5.45 | 1%*** |
| 120% of JIW wage rate | Area Foreman | 3% | 8% | $5.45 | 1%*** |
| 110% of JIW wage rate | Foreman | 3% | 8% | $5.45 | 1%*** |
| 100% | Journeyman Inside Wireman | 3% | 8%* | $5.45 | 1%*** |
| **Apprentice Wireman** | | | | | |
| 50% of JIW wage rate | 1st Year - Period 1 | 3% | ** | $3.70 | 1%*** |
| 55% of JIW wage rate | 1st Year - Period 2 | 3% | 3% | $3.70 | 1%*** |
| 60% of JIW wage rate | 2nd Year- Period 3 | 3% | 3% | $3.70 | 1%*** |
| 70% of JIW wage rate | 3rd Year - Period 4 | 3% | 5% | $3.70 | 1%*** |
| 75% of JIW wage rate | 4th Year- Period 5 | 3% | 5% | $3.70 | 1%*** |
| 80% of JIW wage rate | 5th Year - Period 6 | 3% | 8% | $3.70 | 1%*** |
| | Unindentured Apprentice | 3% | | $3.70 | 1%*** |

\* 9% effective January 6th 2025
\*\* 1% effective January 6th 2025
\*\*\* 1% of Journeyman Straight-Time Rate

<u>Section 4.04:</u> The Employer shall pay all wages in cash or check weekly, not later than quitting time on Friday. The Employer may pay wages by direct deposit, through debit card by cash or by

check. Employees may be required to execute authorization forms for direct electronic deposit of wages on a weekly basis to the bank or credit union of the employee's choice. This manner of payment, once adopted, may not be changed by the Employer except upon 14-day advance written notification to the employee with notification to the Union. In the event that employees are not paid by the above-stated time, waiting time at the regular straight time rate (not to exceed eight (8) hours in any one twenty-four (24) hour period) shall be charged until payment is made. The previous sentence only applies in the event that there has been a previous instance within the preceding twelve (12) months of the Employer failing to timely pay wages. Otherwise, paid waiting time only begins if payment has not been received by quitting time on Friday.

Section 4.05: Should the Employer issue a paycheck that does not clear the bank for payment, provided the employee does not hold said check for more than thirty (30) days before making attempt to cash said check, then said Employer, while in the jurisdiction of the Local Union, thereafter shall pay in cash.

Section 4.06: When Friday is a recognized holiday, wages shall be paid Thursday for all work during that week. An itemized statement shall be furnished each workman, showing total hours worked, total wages earned, and any deductions from such wages.

Section 4.07: Any man reporting for work and being laid off, not having been notified the day previous of such layoff shall receive not less than two (2) hours wages in order to gather his tools and personal belongings and shall be paid off in full immediately. In the event the employee is not paid off, waiting time at the regular rate (not to exceed eight [8] hours in any one twenty-four [24] hour period) shall be charged until payment is made. Two (2) hours wages for gathering tools and personal belongings will not be paid if the employee has not notified the Employer of a previous day's absence. An employee who voluntarily quits shall receive the employee's final paycheck on the next contractually scheduled pay day.

Section 4.08(a):  When men are directed to report to a job or shop and do not start to work due to causes other than weather conditions, they shall receive two (2) hours pay.

(b) When men receive two (2) hours pay as show-up time, they shall remain available for work for a full two (2) hour period.

(c) If requested by the Employer, during inclement weather conditions, men shall remain on the job available for work and shall receive two (2) hours pay.

(d) When men are directed to report to a job and are instructed to go to work by the Employer or his representative, weather conditions permitting, and they refuse, they shall not receive the two (2) hours show-up time.

(e) When men are called out on trouble or emergency calls outside of regularly scheduled working hours, they shall be paid from the time they leave home until they return at the overtime rate, with a minimum of one (1) hour's work.

Section 4.09: The Employer shall pay for traveling time and provide for at least one of the following provisions:

(i)     Furnish transportation from shop to job and job to job and job to shop during the regular working hours; or

(ii)    Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service for actual mileage from shop to job and job to job and job to shop during all the regular working hours to be reimbursed.

On work outside the jurisdiction of the Union, the Employer shall provide one of the following:

(i)     Furnish transportation, board and all other necessary expenses;

(ii)    Reimburse the employee for mileage at the standard mileage rate determined by the Internal Revenue Service and furnish board and all other necessary expenses.

Section 4.10: No traveling time shall be paid before or after working hours to workmen for traveling to or from any job when workmen are ordered to report to the job, provided his day ends at such job.

Section 4.11: The Employer shall furnish a monthly payroll report to Local Union 520 postmarked no later than 15th day of the following month, giving workman's name, classification, wage rate, straight-time hours worked, overtime hours and gross wages paid to all workmen. This report shall identify the exact date of all employees who have quit or been discharged during the working period covered by this report.

A monthly payroll report to the Local Union and to all Trust Funds shall be completed and mailed each month, whether the Contractor has workmen employed or not.

Section 4.12: Workmen being laid off or discharged by an Employer or workmen severing their employment shall be given a termination slip stating the reason for termination and signed by their immediate supervisor or their Employer, and a copy shall be sent to Local Union 520. Additionally, employers shall provide a termination slip to the JATC Training Director in the case of an apprentice.

Section 4.13: When so elected by the contractor, multiple shifts of eight (8) hours for at least five (5) days' duration may be worked. When two (2) or three (3) shifts are worked:

The first shift (day shift) shall consist of eight (8) consecutive hours worked between the hours of 8:00 A.M. and 4:30 P.M. Workmen on the "day shift" shall be paid at the regular hourly rate of pay for all hours worked.

The second shift (swing shift) shall consist of eight (8) consecutive hours worked between the hours of 4:30 P.M. and 1:00 A.M. Workmen on the "swing shift" shall be paid at the regular hourly rate of pay plus **10%** for all hours worked.

The third shift (graveyard shift) shall consist of eight (8) consecutive hours worked between the hours of 1:00 A.M. and 9:00 A.M. Workmen on the "graveyard shift" shall be paid at the regular hourly rate of pay plus **15%** for all hours worked.

The Employer shall be permitted to adjust the starting hours of the shift by up to two (2) hours in order to meet the needs of the customer.

If the parties to the Agreement mutually agree, the shift week may commence with the third shift (graveyard shift) at 12:30 A.M. Monday to coordinate the work with the customer's work schedule. However, any such adjustment shall last for at least five (5) consecutive days duration unless mutually changed by the parties to this Agreement.

An unpaid lunch period of thirty (30) minutes shall be allowed on each shift. All overtime work required before the established start time and after the completion of eight (8) hours of any shift shall be paid at one and one-half times the "shift" hourly rate.

There shall be no pyramiding of overtime rates and double the straight time rate shall be the maximum compensation for any hour worked. There shall be no requirement for a day shift when either the second or third shift is worked.

## UNION DUES DEDUCTION

Section 4.14: Upon receipt of a voluntary written authorization the Employer agrees to deduct and forward to the Financial Secretary of the Local Union - the additional working dues from the pay of each employee. The amount to be deducted shall be the amount specified in the approved Local Union Bylaws. Such amount shall be certified to the Employer by the Local Union upon request by the Employer.

## ARTICLE V
## General Rules

Section 5:01: In order to comply with existing laws, nothing in this Agreement shall be construed as limiting the right of Employers to move, transfer, or assign employees from his shop to any specific job or from any job to any other job upon which said Employer bolds a contract for the performance of the electrical work. An employee, once on the Employer's payroll, may be worked by him at any location at the discretion of the Employer.

Section 5.02: When the Employer has no shop located in the jurisdiction of this Union, then under such circumstances the job site shall be considered the city in which the shop is located with one job site designated as the permanent shop.

Section 5.03: On all jobs requiring five (5) or more Journeymen, at least every fifth Journeyman, if available, shall be fifty (50) years of age or older.

Section 5.04(a): Journeyman shall provide themselves with the following tools:

| | |
|---|---|
| One tester not over 1000 volts or one Multi Volt Tester | Combination square-Tri-square |
| Knife | Adjustable 12" blade |
| Crescent Wrench 8" to 12" | Hacksaw frame |
| Screw drivers | Two pair channel lock type pliers |
| Hammer | One pair long nose pliers |
| Small level | One pair Dyke pliers |

| | |
|---|---|
| Plumb bob | One chalk line |
| Awl or Center punch | Keyhole saw |
| Pencil | One steel measuring tape at least 16' long |
| One pair side cutting pliers 7" or larger | Pipe wrench 12" to 14" or small |
| Wire stripper | Chain tong |

(b) Journeyman may furnish other similar tools but shall not be required to do so.

(c) A Journeyman may carry or store in his toolbox small tools furnished by and belonging to his Employer (power tools excluded). Such tools must be the property of the Employer, to be returned to him upon request or termination of the employee but are not to be replaced by the employee if broken or stolen.

(d) Apprentices shall provide themselves with the following tools only, except that first-year Apprentice may provide himself with a small toolbox and a third- or fourth-year Apprentice may have a toolbox on the job and start building up his tool list towards that of a Journeyman.

| | |
|---|---|
| 2 pair channel lock type pliers | Pencil |
| 1 pair side cutters pliers – 7" or larger | Hammer |
| One steel measuring tape at least 16' long | One voltage tester not over 1000 or Multi Volt Tester |
| Screw drivers | Small level |
| Knife | Hacksaw frame |
| Awl | Wire stripper |

He may furnish one pair of long-nose and one pair of Dyke pliers if he desires.

(e) The Employer shall furnish necessary locked storage to reasonably protect tools from the weather and vandalism on large jobs where it is necessary to leave tools on the job.

Section 5:05: The Employer shall furnish all other necessary tools or equipment. Workmen will be held responsible for the tools or equipment issued to them providing the Employer furnishes the necessary lockers, toolboxes, or other safe place of storage. Tools must be taken out and put away during working hours.

Section 5.06: Workmen shall install all electrical work in a safe and workman like manner in accordance with applicable code and contract specifications.

Section 5.07: The representatives of the Union shall be allowed access to any building at any reasonable time where members of the Union are employed.

Section 5.08: In all shops or on all jobs where four (4) or more Journeymen are employed, one Journeyman shall be designated as a Foreman.

On all jobs, the first working crew may consist of a maximum of eleven (11) men, that is, ten (10) Journeyman and one (1) working Foreman.

When a second crew is established, it may consist of a maximum of eleven (11) men, that is, ten

(10) Journeymen and one (1) working General Foreman.

When a third or subsequent crew is established, it may consist of a maximum of eleven (11) men, that is, ten (10) Journeymen and one (1) working Foreman. Each crew shall be supervised by a Foreman and the Foremen shall be supervised by the General Foreman.

No General Foremen shall supervise more than fifty-five (55) men, including Journeymen and Foremen. For each additional fifty-five (55) men, the above procedures shall repeat except that the sixth and subsequent Foremen shall be supervised by an Area Foreman.

Section 5.09: Foremen, Area Foremen, and General Foremen shall be permitted to use tools. This shall not mean that they cannot handle material. Foremen may be required to attend and complete Foremen courses when provided.

Section 5.10: On jobs requiring a Foreman, workmen are not to take directions, orders or accept the layout from anyone other than their Foreman. Foremen are to take directions, orders, or layout from their Area Foreman only, when Area Foremen are required. When Area Foremen are not required, Foremen shall take directions, orders or layouts from the General Foreman only. Area Foremen shall take directions, orders or layout from the General Foreman only.

Section 5.11: No workman on one job shall replace a workman on another for any overtime work. All overtime work on any job shall be distributed fair and equal to all workmen. Exceptions to the two conditions above shall include the need for special skills or when workmen have not worked the available straight time hours during the "work week" as defined in Article IV, Section 1.

Section 5.12: The Employer shall see that cold water (in warm weather) and first-aid kits are available on all jobs and/or trucks.

Section 5.13: The Employer shall furnish protective equipment for workmen on energized circuits or equipment carrying 300 volts or more. On all energized circuits or equipment carrying 440 volts or over, as a safety measure, two (2) or more Journeymen must work together.

Section 5.14: All conduit shall be cut and threaded by workmen covered by this Agreement.

Section 5.15: Where pipe cutting and threading machines, electric drills, electric benders, electric chipping hammers, sanders, similar portable tools and all other power-driven equipment are used, such shall be operated by workmen covered by this agreement in the jurisdiction of the IBEW.

Section 5.16: All pulling of wire or cable shall be done by workmen covered by this Agreement.

Section 5.17: Journeyman cable splicers shall furnish only hand tools. On all work of joining, splicing and insulating and the placing of flame-proof covering where wiped lead joints are necessary, it shall be performed by cable splicers. Journeymen only shall be used in assisting cable splicers, except that one de-energized enclosures, an Apprentice may be used. Cable splicers shall not be required to work on wires or cables when the difference in potential is over 200 volts between any two conductors or between any conductor and ground, unless assisted by one Journeyman. In no case shall cable splicers be required to work on energized cables carrying in excess of 480-volt circuit.

Section 5.18: Welders gloves, sleeves, hoods and all hard hats shall be furnished by the Employer. Workmen may be required to sign a payroll deduction form to authorize the deduction from their final paycheck to cover reimbursement of unreturned hard hats. Charges shall not exceed actual cost paid by the Contractor.

Section 5.19: The installation of all electrical raceways whether metal, wood, fiber, plastic clay or of any other conceivable composition, when used to contain electrical or grounding system conductors, and the installation, preparation and connection of all electrical and/or grounding or bonding conductors shall be performed by workmen employed under the terms of this Agreement and paid the hourly applicable negotiated wage rate contained herein unless it is an integral part of the building structure.

Section 5.20: No work shall be performed on Labor Day except in case of emergency.

Section 5.21: On any job of five (5) or more days duration on the main campus of the University of Texas, the Employer will either provide for employee parking within three blocks of the job or arrange for covered transportation from a parking area within two miles of the job.

## ARTICLE VI
## Standard Inside Apprenticeship Language

Section 6.01: There shall be a local Joint Apprenticeship and Training Committee (JATC) consisting of a total of 6 or 8 members who shall also serve as Trustees to the local apprenticeship and training trust. An equal number of members (either 3 or 4) shall be appointed, in writing, by the local chapter of the National Electrical Contractors Association (NECA) and the local union of the International Brotherhood of Electrical Workers (IBEW).

The local apprenticeship standards shall be in conformance with national guideline standards and industry policies to ensure that each apprentice has satisfactorily completed the NJATC required hours and course of study. All apprenticeship standards shall be registered with the NJATC before being submitted to the appropriate registration agency.

The JATC shall be responsible for the training of apprentices, journeymen, installers, technicians, and all others (un-indentured, intermediate journeymen, etc.).

Section 6.02: All JATC member appointments, reappointments, and acceptance of appointments shall be in writing. Each member shall be appointed for a 3-year term, unless being appointed for a lesser period of time to complete an expired term. The terms shall be staggered, with one (1) term from each side expiring each year. JATC members shall complete their appointed term unless removed for cause by the party they represent, or they voluntarily resign. All vacancies shall be filled immediately

The JATC shall select from its membership, but not both from the same party, a Chairman and a Secretary who shall retain voting privileges. The JATC will maintain one (1) set of minutes for JATC committee meetings and a separate set of minutes for trust meetings.

The JATC should meet on a monthly basis, and also upon the call of the Chairman.

Section 6.03:  Any issue concerning an apprentice, or an apprenticeship matter shall be referred to the JATC for its review, evaluation, and resolve, as per standards and policies.  If the JATC deadlocks on any issue, the matter shall be referred to the Labor-Management Committee for resolution as outlined in Article One of this Agreement; except for trust fund matters, which shall be resolved as stipulated in the local trust instrument.

Section 6.04:  There shall be only one (1) JATC and one (1) local apprenticeship and training trust. The JATC may, however, establish joint subcommittees to meet specific needs, such as residential or telecommunications apprenticeship. The JATC may also establish a subcommittee to oversee an apprenticeship program within a specified area of the jurisdiction covered by this agreement.

All subcommittee members shall be appointed, in writing, by the party they represent. A subcommittee member may or may not be a member of the JATC.

Section 6.05:  The JATC may select and employ a part-time or a full-time Training Director and other support staff, as it deems necessary. In considering the qualifications, duties, and responsibilities of the Training Director, the JATC should review the Training Director's Job Description provided by the NJATC. All employees of the JATC shall serve at the pleasure and discretion of the JATC.

Section 6.06:  To help ensure diversity of training, provide reasonable continuous employment opportunities, and comply with apprenticeship rules and regulations, the JATC, as the program sponsor, shall have full authority for issuing all job training assignments and for transferring apprentices from one employer to another. The employer shall cooperate in providing apprenticeships with needed work experiences. The local union referral office shall be notified, in writing, of all job training assignments. If the employer is unable to provide reasonable continuous employment for apprentices, the JATC is to be so notified.

Section 6.07:  All apprentices shall enter the program through the JATC as provided for in the registered apprenticeship standards and selections procedures.

An apprentice may have their indenture canceled by the JATC at any time prior to completion as stipulated in the registered standards. Time worked and accumulated in apprenticeship shall not be considered for local union referral purposes until the apprentice has satisfied all conditions of apprenticeship. Individuals terminated from apprenticeship shall not be assigned to any job in any classification, or participate in any related training, unless they are reinstated in apprenticeship as per the standards, or they qualify through means other than apprenticeship, at sometime in the future, but no sooner than two years after their class has completed apprenticeship, and they have gained related knowledge and job skills to warrant such classification.

Section 6.08:  The JATC shall select and indenture a sufficient number of apprentices to meet local manpower needs. The JATC is authorized to indenture the number of apprentices necessary to meet the jobsite ratio as per section 6.12.

Section 6.09:  Though the JATC cannot guarantee any number of apprentices, if a qualified employer requests an apprentice, the JATC shall make every effort to honor the request. If unable to fill the request within ten (10) working days, the JATC shall select and indenture the next available person from the active list of qualified applicants. An active list of qualified applicants shall be maintained by the JATC as per the selection procedures.

Section 6.10: To accommodate short-term needs when apprentices are unavailable, the JATC shall assign un-indentured workers who meet the basic qualifications for apprenticeship. Un- indentured workers shall not remain employed if apprentices become available for OJT assignment. Un-indentured workers shall be used to meet job site ratios except on wage-and-hour (prevailing wage) job sites.

Before being employed, the un-indentured person must sign a letter of understanding with the JATC and the employer - agreeing that they are not to accumulate more than two thousand (2,000) hours as an un-indentured, that they are subject to replacement by indentured apprentices, and that they are not to work on wage-and-hour (prevailing wage) job sites.

Should an un-indentured worker be selected for apprenticeship, the JATC will determine, as provided for in the apprenticeship standards, if some credit for hours worked as an un-indentured will be applied toward the minimum OJT hours of apprenticeship.

The JATC may elect to offer voluntary related training to un-indentured; such as Math Review, English, Safety, Orientation/Awareness, introduction to OSHA, First-Aid and CPR. Participation shall be voluntary.

Section 6.11: The employer shall contribute to the local health and welfare plans and to the National Electrical Benefit Fund (NEBF) on behalf of all apprentices and un-indentured. Contributions to other benefit plans may be addressed in other sections of this agreement. (See Article IV Section 4.03).

Section 6.12: Each job site shall be allowed a ratio of one (1) apprentice(s) for everyone (1) Journeyman Wireman.

| Number of Journeymen | Maximum Number of Apprentices/Unindentured |
|---|---|
| 1 to 3 | 1 to 3 |
| 4 to 6 | 4 to 6 |
| Etc. | Etc. |

The first person assigned to any job shall be a Journeyman Wireman.

A job site is considered to be the physical location where employees report for their work assignments. The employer's shop (service center) is considered to be a separate, single job site. All other physical locations where workers report for work are each considered to be a single, separate job site.

Section 6.13: An apprentice is to be under the supervision of a Journeyman Wireman at all times. This does not imply that the apprentice must always be in-sight-of a Journeyman Wireman. Journeymen are not required to constantly watch the apprentice. Supervision will not be of a nature that prevents the development of responsibility and initiative. Work may be laid out by the employer's designated supervisor or journeyman based on their evaluation of the apprentice's skills and ability to perform the job tasks. Apprentices shall be permitted to perform job tasks in order to develop job skills and trade competencies. Journeymen are permitted to leave the immediate work area without being accompanied by the apprentice.

Apprentices who have satisfactorily completed the first four years of related classroom training using the NJATC curriculum and accumulated a minimum of 6,500 hours of OJT with satisfactory performance, shall be permitted to work alone on any job site and receive work assignments in the same manner as a Journeyman Wireman. An apprentice shall not be the first person assigned to a job site and apprentices shall not supervise the work of others.

Section 6.14: Upon satisfactory completion of apprenticeship, the JATC shall issue all graduating apprentices an appropriate diploma from the NJATC. The JATC shall encourage each graduating apprentice to apply for college credit through the NJATC. The JATC may also require each apprentice to acquire any electrical license required for journeymen to work in the jurisdiction covered by this agreement.

Section 6.15: The parties to this Agreement shall be bound by the Local Joint Apprenticeship and Training Trust Fund Agreement which shall conform to Section 302 of the Labor- Management Relations Act of 1947 as amended, ERISA, and other applicable regulations.

The Trustees authorized under this Trust Agreement are hereby empowered to determine the reasonable value of any facilities, materials, or services furnished by either party. All funds shall be handled and disbursed in accordance with the Trust Agreement.

Section 6.16: All employers subject to the terms of this Agreement shall contribute the amount of funds specified by the party's signatory to the local apprenticeship and training trust agreement. The current rate of contribution is: 1% of the Journeyman straight-time rate per hour for each hour worked. This sum shall be due the Trust Fund by the same date as is their payment to the NEBF under the terms of the Restated Employers Benefit Agreement and Trust.

## **ARTICLE VII**
### **Vacation**

Section 7.01: Upon written authorization from the employee, the Employer shall make a weekly payroll deduction of six percent (6%) from the gross pay of each employee. The employee shall request the payroll deduction at the beginning of employment with an employer. The employee shall notify the employer, in writing of any modifications to their participation status for the voluntary payroll deduction in the month of January or July. Payroll deduction revisions will be made effective on the first payroll of the following month. The Employer monthly shall forward the amount of individual deductions from each employee as shown on the monthly payroll to Velocity Credit Union, ATTN: Teller Operations, P.O. Box 1089, Austin, TX, 78767, for deposit to that employee's Velocity Credit Union vacation account, and simultaneously shall provide the Local Union with a written report which sets forth, for each employee, the number of hours worked, the employee's classification and pay rate, the employee's gross pay, and the amounts deducted.

Section 7.02: The payment and payroll report shall be mailed to reach the Velocity Credit Union no later than the 15th day of the month following the end of each benefit period.

Section 7.03: Each employee shall be allowed to take two (2) weeks of annual vacation between February 1st and January 31st.

Section 7.04: An Employer's failure to timely remit the payroll deductions or payroll report to the

Velocity Credit Union, or the payroll report to the Local Union, as required above shall be treated as a delinquent contribution under the terms of the applicable Inside Construction Agreement.

## ARTICLE VIII
### Annuity Plan

It is mutually agreed between the parties hereto and in accordance with the IBEW Local Union 520 Annuity Plan entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, the Employer will forward to the Annuity Plan an amount equal to the percentage levels per Appendix A (See Article IV Section 4.03) of the gross wages of all classifications of employees for all hours worked within the geographical limits of the Union's jurisdiction when work is performed for any Employer operating under this Agreement. The payment shall be made monthly, together with the payroll report forms specified in Article IV.

## ARTICLE IX
### 401(k) Savings Plan

All employers signatory to this Agreement and/or employing workmen under the terms of this Agreement, shall deduct from each employee's Gross Weekly Payroll of employees who wish to participate, a voluntary deductible amount to be deposited into a 401(k) savings plan, upon the written request of each employee. Employees may enroll at the beginning of the employment with an Employer and enroll or change withholding each year during the month of January or July. Withholding will be made effective on the first payroll of the following month.

## ARTICLE X
### Health and Welfare

It is hereby mutually agreed between the parties hereto and in accordance with the Benefit contract governing the electrical benefit fund entered into by and between the Central Texas Chapter, NECA, and Local Union 520, IBEW, that the Employer will forward to the Central Texas Health and Benefit Plan the following contributions as per Appendix A (See Article IV Section 4.03) for all hours actually worked by each employee (both straight time and overtime) within the geographical limits of the Union's jurisdiction when work is performed for any Employers operating under the terms of the basic Agreement for all Employers. Payments shall be made monthly together with a monthly payroll report on a form that will be furnished for that purpose by the Trustees of the Electrical Benefit Plan.

It is agreed that employers shall contribute solely up to $5.45 per hour of increases declared by the Trustees of the Plan. Any increases above $5.45 shall be split equally between the employer -and employee through a wage reduction of the JIW rate of pay, all other classifications shall adjust accordingly.

## ARTICLE XI
## National Labor Management Cooperative Committee

Section 11.01: The parties agree to participate in the NECA-IBEW National Labor-Management Cooperation Fund, under authority of Section 6(b) of the Labor-Management Cooperation Act of 1978, 29 U.S.C. §175(a) and Section 302(c)(9) of the Labor-Management Relations Act, 29 U.S.C. §186(c)(9). The purposes of this Fund include the following:

(1)     to improve communication between representatives of labor and management;

(2)     to provide workers and employers with opportunities to study and explore new and innovative joint approaches to achieving organizational effectiveness;

(3)     to assist workers and employers in solving problems of mutual concern not susceptible to resolution within the collective bargaining process;

(4)     to study and explore ways of eliminating potential problems which reduce the competitiveness and inhibit the economic development of the electrical construction industry;

(5)     to sponsor programs which improve job security, enhance economic and community development, and promote the general welfare of the community and the industry;

(6)     to encourage and support the initiation and operation of similarly constituted local labor-management cooperation committees;

(7)     to engage in research and development programs concerning various aspects of the industry, including, but not limited to, new technologies, occupational safety and health, labor relations, and new methods of improved production;

(8)     to engage in public education and other programs to expand the economic development of the electrical construction industry;

(9)     to enhance the involvement of workers in making decisions that affect their working lives; and

(10)     to engage in any other lawful activities incidental or related to the accomplishment of these purposes and goals.

Section 11.02: The Fund shall function in accordance with, and as provided in, its Agreement and Declaration of Trust, and any amendments thereto and any other of its governing documents. Each Employer hereby accepts, agrees to be bound by, and shall be entitled to participate in the NLMCC, as provided in said Agreement and Declaration of Trust.

Section 11.03: Each employer shall contribute one cent ($.01) per hour worked under this Agreement up to a maximum of 150,000 hours per year. Payment shall be forwarded monthly, in a form and manner prescribed by the Trustees, no later than fifteen (15) calendar days following the last day of the month in which the labor was performed. The Central Texas Chapter, NECA, or its designee, shall be the collection agent for this Fund.

Section 11.04: If an Employer fails to make the required contributions to the Fund, the Trustees shall have the right to take whatever steps are necessary to secure compliance. In the event the Employer is in default, the Employer shall be liable for a sum equal to 15% of the delinquent payment, but not less than the sum of twenty dollars ($20), for each month payment of contributions is delinquent to the Fund, such amount being liquidated damages, and not a penalty, reflecting the reasonable damages incurred by the Fund due to the delinquency of the payments.

Such amount shall be added to and become a part of the contributions due and payable, and the whole amount due shall bear interest at the rate of ten percent (10%) per annum until paid. The Employer shall also be liable for all costs of collecting the payment together with attorneys' fees.

## ARTICLE XII
## P.A.C. Fund

The Employer agrees to deduct and transmit to the Local Union 520, IBEW, Committee on Political Education (IBEW-COPE) .05 cents for each clock hour worked from the wages of those employees who voluntarily authorize such contributions on the forms provided for that purpose by IBEW-COPE. The deductions will be made monthly and reported and remitted in accordance with Article IV, Section 11 of this Agreement.

Any Employee may revoke the voluntary authorization at any time by notifying the Company and IBEW-COPE in writing of a desire to do so.

The Union will indemnify and save the Company harmless from any claims, suits, or any other form of liability as a result of making payroll deductions described above.

## ARTICLE XIII

This Agreement set forth the entire contract between the Chapter and the Union and supersedes all previous understandings and Agreements between them and amendments thereto.

## ARTICLE XIV
## Substance Abuse Language

The dangers and costs that alcohol and other chemical abuses can create in the electrical contracting industry in terms of safety and productivity are significant. The parties to this Agreement resolve to combat chemical abuse in any form and agree that, to be effective, programs to eliminate substance abuse and impairment should contain a strong rehabilitation component. The local parties recognize that the implementation of a drug and alcohol policy and program must be subject to all applicable federal, state, and local laws and regulations. Such policies and programs must also be administered in accordance with accepted scientific principles and must incorporate procedural safeguards to ensure fairness in application and protection of legitimate interests of privacy and confidentiality. To provide a drug-free workforce for the Electrical Construction Industry, each IBEW local union and NECA chapter shall implement an area-wide Substance Abuse Testing Policy. The policy shall include minimum standards as required by the IBEW and NECA. Should any of the required minimum standards fail to comply with federal, state, and/or local laws and regulations, they shall be modified by the local union and chapter to meet the requirements of those laws and regulations.

## ARTICLE XV
## Code of Excellence

The parties to this Agreement recognize that to meet the needs of our customers, both employer and employee must meet the highest levels of performance, professionalism, and productivity. The Code of Excellence has proven to be a vital element in meeting the customers' expectations.

Therefore, each IBEW local union and NECA chapter shall implement a Code of Excellence Program. The program shall include minimum standards as designed by the IBEW and NECA.

### Separability Clause

Should any provision of this Agreement be declared illegal by any court of competent jurisdiction, such provision shall immediately become null and void, leaving the remainder of the Agreement in full force and effect and the parties shall, thereupon, seek to negotiate substitute provisions which are in conformity with the applicable laws.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____
Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____
A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000215

# 1st YEAR APPRENTICE WAGE
# MEMORANDUM OF UNDERSTANDING

## BETWEEN

## A.S.H. ELECTRICAL SERVICES LLC

## AND

## IBEW LOCAL UNION 520

It is mutually agreed upon between IBEW Local 520 and A.S.H. Electrical Services LLC, effective May 27, 2019, that the minimum wage for a first-year apprentice shall be $15.00 per hour. This MOU shall remain in effect until such time as 50% of the JIW wage rate is greater than $15.00 per hour.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

A.S.H. Electrical Services LLC Representative

# CE ADVANCEMENT
## MEMORANDUM OF UNDERSTANDING

## BETWEEN

## A.S.H. ELECTRICAL SERVICES

## LLC

## AND

## IBEW LOCAL UNION 520

A CE shall obtain a Texas State Journeyman's License before being upgraded to JIW status.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000217

**2022 Residential MOU**

**Scope:** This MOU shall apply to all dwelling units including single family dwellings, apartments, and condominiums four stories and below. This MOU shall not apply to the commercial portion of mixed-use developments.

1. A CW/CE, having attained a Residential Journeyman's License, shall be awarded 2000 SBCs/ OJT hours. This CW/CE shall be allowed to work unsupervised on residential construction/service work.
2. A worker holding a Residential or Unrestricted Journeyman's License shall be the first person assigned to any residential project.
3. On all residential projects with four or more workers, a worker holding a Residential Journeyman's License shall be designated Residential foreman. This Residential foreman shall be allowed to supervise a crew of up to 10 workers of his classification or below, including first- and second-year apprentices. This Residential foreman shall receive a 10% pay premium above his/her classification.
4. On all residential projects requiring more than 11 workers, one shall be designated Residential General Foreman. The Residential General Foreman shall receive a 20% pay premium above his/her classification.
5. There shall be one foreman per 10 workers.
6. A CW/CE with a Residential Journeyman's License shall continue to accrue SBCs/OJT hours and be advanced in the CW/CE program accordingly.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

## SHORT CALL EXTENSION

## MEMORANDUM OF UNDERSTANDING
### BETWEEN
### A.S.H. ELECTRICAL SERVICES
### LLC
### AND
### IBEW LOCAL UNION 520

In order to accommodate short term employment needs of the employer signed to this agreement, and the needs of our customers, the union and employer agree to the following:

Article III, Section 3.12 of the Inside Agreement between A.S.H. Electrical Services LLC and Local Union 520, of the International Brotherhood of Electrical Workers, shall have the following language added to the existing language contained in Article III, Section 3.12:

A forty (40) hour call may be extended an additional forty (40) hours by the employer is job conditions warrant such extension. An applicant is not required to stay for the second forty (40) hour period unless told in advance the job as for eighty (80) hours. For the purposes of calculating hours worked under this Memorandum, only the straight time hours worked will be used. Any overtime worked during the one (1) or two (2) week period covered by this Memorandum will not affect the applicant's position on the Out-of-Work List.

This Memorandum shall continue in effect from year to year hereafter unless changed or terminated in the same manner as prescribed for the Inside Agreement.

SIGNED FOR THE UNION:                           SIGNED FOR THE EMPLOYER:
Local Union No. 520 of the International         A.S.H. Electrical Services LLC
Brotherhood of Electrical Workers

_____                _____
Ben Brenneman
Business Manager/Financial Secretary            A.S.H. Electrical Services LLC Representative
IBEW Local Union 520

## SMALL WORKS
## MEMORANDUM OF UNDERSTANDING

### BETWEEN

### A.S.H. ELECTRICAL SERVICES LLC

### AND

### IBEW LOCAL UNION 520

IBEW Local Union 520 and EMPLOYER have repeatedly discussed possible solutions to gaining market share within the small works arena. In an effort to assist all signatory contractors in this arena, Local 520 offers the following:

**Four Person Crew**

Effective June 6, 2022, the Union agrees on any/all jobs throughout the Local 520 jurisdiction, with four (4) or less employees, the signatory contractor may utilize the services of a Construction Electrician (CE) and/or a 6th period apprentice. This CE or apprentice must be in possession of a State of Texas Journeyman License and may work alone, if necessary.

Additionally, the licensed CE may supervise up to three (3) additional equal or lower classified workers (CE's and/or CW's). This crew mix would not include Apprentice Wiremen. As long as the jobsite requires 4 or less employees, there will be no need for a Journeyman Inside Wireman (JIW) nor a Foreman (F). Should the four-person crew increase to five (5) or more, a licensed JIW or a licensed Foreman must be utilized.

Due to the market conditions, the parties recognize this agreement to be a variance to Article VI Section 6.12 of the inside agreement that necessitates the JIW being the first person on the job. The parties recognize Apprentices and CW/CEs operate under a formal training program where OJT under direct and indirect supervision by a JIW is still an important component to their development. Therefore, employers must be diligent to ensure CW/CE employees receive OJT training supervised by a JIW outside of these qualifying projects.

Signatory Contractors are not limited to any number of Four Person Crew jobsites. Pay rates and applicable benefits for the above classified workers shall be the ones listed in the Local 520 Inside Collective Bargaining Agreement between IBEW Local Union 520 and A.S.H. Electrical Services LLC.

This Memorandum of Understanding will expire on June 4, 2028, unless both Parties agree to extend it for an additional timeframe.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

Def. MSJ Appx 000220

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

## Memorandum of Understanding
## Summer Worker Program

1.    Must be by informal understanding between the local Union, the Employer and the JATC, with written guidelines.

2.    The guidelines should specify the following conditions:

   a.    The maximum number to be employed.

   b.    Effective only when placement will not displace an Apprentice or Intermediate Journeyman.

   c.    Qualifications:
      1.  At least 16 years old
      2.  A bona fide student (evidence required)
      3.  Summer worker and employer signatures on statement of understanding (sample attached)

   d.    Placement for a specific period of time, not to exceed 90 days. (Ending with the first pay period in September).

   e.    Placed as a <u>Summer Worker.</u>  NOT as an apprentice. (Cannot be referred or worked on jobs requiring registered apprentices).

   f.    Rate of pay shall be equal to that of a first period indentured apprentice.

   g.    Work performed as a Summer Worker is not counted towards apprenticeship.

   h.    Wages paid to Summer Workers are included in gross labor payroll, and the 3% of gross labor payroll payment to NEBF must include Summer Workers wages.

   i.    Limited electrical work (same as unindentured apprentice).


SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC


_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

## Memorandum
## of Understanding

## Between IBEW Local
## Union 520
## and
## A.S.H. ELECTRICAL SERVICES LLC

Effective June 2, 2025 through June 4, 2028.

On jobs of five (5) or more days duration on the main campus* of the University of Texas, if parking is not provided, the employer will reimburse $6.00 per day for parking to each employee who reports to work on time and works all regular hours available to him. The employer is not responsible to provide transportation to and from parking areas.

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____
Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____
A.S.H. Electrical Services LLC Representative

*from I-35 to Guadalupe Street, from East & West Dean Keeton Street to East & West Martin Luther King, Jr. Blvd.



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

**PURPOSE:**

This agreement has two goals; one is to recruit an adequate number of personnel to meet the demands of the electrical construction industry in the jurisdiction covered by the inside construction and maintenance agreement. The second objective is to establish a standard by which those recruited will be properly placed for continuing skills based training.

**OBJECTIVES:**

A. Provide a uniform means by which individuals can be brought into the organized industry.
B. Provide employment opportunities for those individuals who may not meet the entrance requirements of the local AETA
C. Establish a fair wage scale based on a skill standard that provides a clear and formal path to becoming a Journeyman Inside Wireman while maintaining a productive workforce.
D. Provide electrical employees with experience and potential, an avenue to becoming a Journeyman Inside Wireman.
E. To provide a second chance program for those indentured apprentices who discover that they do not fit into the AETA program.
F. To provide A.S.H. Electrical Services LLC and IBEW Local Union 520 the autonomous means of developing training programs to meet the needs of changing local markets.

**DEFINITIONS:**

A. CW/CE – Construction Wireman/Construction Electrician
B. SBC – Skill Based Credits
C. AETA – Austin Electrical Training Alliance (formerly called Joint Apprenticeship Training Center)
D. JATC – Joint Apprenticeship Training Committee
E. LU 520 – International Brotherhood of Electrical Workers Local Union 520
F. Employer – A.S.H. Electrical Services LLC
G. TDLR – Texas Department of Licensing and Regulation
H. OJT – On the Job Training

**SECTION 1 – ADMINISTRATION**

A. The AETA and LU 520 shall be responsible for:

1) Administering skill-based evaluations (supervised by Local Union staff)
2) Monitoring progress of the CW/CE for wage advancement
3) Develop and deliver skill-based training courses
4) Notifying LU 520 of the number of apprentices available for work assignments
5) Recruiting, processing and dispatching applicants to employers for assignment.



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

B. Either party (EMPLOYER, LU 520 or AETA) may review all skill-based evaluations and evaluation procedures.

## SECTION 2 – WAGES, BENEFITS AND ADVANCEMENT

Upon successful accumulation of 16,000 Skill Based Credits (SBC) and successful completion of a Texas State Journeyman's License the Construction Electrician shall be upgraded to Journeyman Inside Wireman.

### A. Wages Appendices A1 and A2

1. Accumulated SBC's shall determine the individuals initial pay rate. Individuals shall advance upon meeting the requirements shown in Appendix D.
   or

2. Experienced Applicants with verifiable industry wage -or- AETA Transferees (Ref: SECTION 5): wages shall remain frozen until accumulated SBC's warrant pay advancement.

### a. BENEFITS – REFERENCE APPENDICES A1 and A2:

1. Accumulated SBC's shall determine what level of benefits shall apply.
2. All benefits shall be paid in accordance with the various trust fund qualifications.

### b. SKILLS BASED CREDITS (SBC'S) shall accrue by the following methods:

1. One SBC per each OJT hour worked for a signatory contractor.
2. One SBC for every two (2) OJT hours worked for a non-signatory contractor (wage documentation required; no credit (SBC's) for hours worked prior to program enrollment).
3. SBC's from skill based evaluation.
4. SBC's credited by successful completion of skills based courses. SBC's achieved in this manner shall not exceed 4,000 for the life of the program.
   (see APPENDIX C)

Note: In no case shall SBC's be earned above the stated maximums through the evaluation process and/or the optional course work within each skill discipline (see APPENDIX B).



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## c. EXPERIENCED APPLICANTS SHALL:

1) Provide verifiable electrical industry wage documentation to establish their wage rate. (wage documents for public works projects where a wage determination is established shall not be eligible for verification)

OR

2) Take the next available skills based evaluation to determine how many SBC's shall be credited and establish initial wage rate.

SEE APPENDICES A1 AND A2 FOR EVALUATION, CLASS SBC'S AND WAGE SCHEDULE.

## SECTION 3 – IMPLEMENTATION:

The LU 520 shall be primarily responsible for the recruitment, processing and dispatching of applicants to employers. The LU 520 shall provide all processing information to the AETA for the purpose of tracking the CW/CE's progress in the program.

The JATC shall be responsible for the training of participants in accordance with Article VI, section 6.01 of the inside agreement.

The Employer shall be responsible for providing a termination slip to the LU 520 and the AETA when a CW/CE becomes unemployed.

CW/CE shall be employed on a conditional basis for 90 days from their first assignment. During the conditional employment period the LU 520 and A.S.H. Electrical Services LLC shall determine the individuals continued status in the program.

No employer is guaranteed a specific number of CW/CE.

Each job shall follow a ratio of one or more (1 or more) CW/CE(s) to one (1) JIW.

An employer who fails or refuses to hire available apprentices, in accordance with the agreed upon ratio of apprentices to journeymen, shall not be entitled to hire CW/CE.

CW/CE may be transferred from one qualifying project to another by the employer.

CW/CE shall not be included in the calculation of the apprentice to journeyman ratio.

Referral records may be inspected at LU 520 by a representative of the Employer.



## Construction Wireman/Construction Electrician
## Memorandum of Understanding

Effective January 1, 2020, all Construction Wiremen and Construction Electricians are required to provide proof of completion, by originally issued card or certificate, of an OSHA 10 safety training course.

### SECTION 4 – SUPERVISION:

The CW/CE who has less than 8,000 SBC's shall be under the supervision of a Journeyman Inside Wireman. It shall be the responsibility of the supervisor to lay out the work required and to permit the CW/CE to perform the work on his/her own. A CW/CE who has 8,000 SBC's shall be allowed to work with no supervision but shall not supervise any apprentices or Journeyman Wireman.

### SECTION 5 – TRANSFERS:

A. All transfers shall be approved by the JATC.
B. Individuals are limited to a maximum of (2) transfers.
C. Transferees shall not experience a Wage Rate or Benefit Reduction.
D. AETA to CW/CE program:
   Local Apprentices from AETA apprenticeship program may transfer to the CW/CE program at an equal pay rate providing the apprentice has:
   1) A satisfactory work history (hours worked, absenteeism, and tardiness); and
   2) Established in writing the basis for the transfer.
   3) Apprentice transferees shall be credited one (1) SBC for each OJT Hour + (500) SBC's per completed academic year of apprenticeship. In no instance shall this transfer result in the apprentice being granted more than the maximum SBC's as shown below:

#### AETA to CW/CE Credit Table

| AETA Completed | Credited SBC's | AETA Completed | Credited SBC's |
|---|---|---|---|
| Less than 1 year | 2000 | Completed 3rd year | 8000 |
| Complete 1st year | 4000 | Completed 4th year | 10000 |
| Complete 2nd year | 6000 | Completed 5th year | 12000 |

E. CW/CE to AETA Program:

CW/CE meeting the requirements for entrance into the AETA program may transfer to the AETA program as outlined by the JATC standards. The transferring CW/CE will complete the IBEW/NECA ETA Proficiency Exam to determine placement in the academic portion of the training and will receive OJT Hour credits based on JATC guidelines. Transferees shall not experience a reduction in their wage rate.



## Construction Wireman/Construction Electrician
## Memorandum of Understanding

### SECTION 6 – TERM OF AGREEMENT:

This Agreement shall take effect on June 2, 2019. The terms and conditions of this Agreement shall continue on jobs bid under said terms until such jobs are completed.

**Disputes:** All allegations of infractions of this agreement shall be referred to the Labor Management Committee as defined in the current inside/maintenance collective bargaining agreement. In the event of a deadlock the matter shall be referred to the IBEW Seventh District Vice-president and the NECA Southern Region Director for final and binding adjudication. This agreement is a Memorandum of Understanding to the area inside construction and maintenance collective bargaining agreement and may continue with or without requirement of separate notice.

**Commitment:** The two parties, by signature below, hereby commit and promise to use their best efforts to see that this Memorandum is used to its highest level for the maximum benefit of employers and employees alike.

The parties further promise and agree that if changes are needed to this Memorandum; those changes will be addressed in an atmosphere of mutual trust and cooperation for the equal benefit of employers and employees alike. **Furthermore, any changes to this agreement or program shall be subject to review by the IBEW Seventh District Vice-President and the NECA Southern Region Director.**

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000228



**Construction Wireman/Construction Electrician**
**Memorandum of Understanding**

## APPENDIX A1 (CW1-CW6)

| Benefits | CE 1 | CE 2 | CE 3 | CE 4 | CE 5 | CE 6 |
|---|---|---|---|---|---|---|
| Range SBC'S | 0-2K | 2.01K-4K | 4.01K-6K | 6.01K-8K | 8.01K-10K | 10.01K-12K |
| JIW Rate | 44% | 44% | 49% | 54% | 59% | 64% |
| A.E.T.A. | NA | NA | NA | 1% of JIW | 1% of JIW | 1% of JIW |
| NLMCC | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 |
| H&B | Plan C | Plan B | Plan B | Plan B | Plan B | Plan B |
| NEBF (3%) | 3% | 3% | 3% | 3% | 3% | 3% |
| Annuity | NA | NA | NA | 3% | 3% | 3% |
| AMF | .10 | .10 | .10 | .10 | .10 | .10 |

## APPENDIX A2 (CE1- CE 4)

| Benefits | CE 7 | CE 8 | CE 9 | CE 10 |
|---|---|---|---|---|
| Range SBC's | 12.01K-13K | 13.01K-14K | 14.01K-15K | 15.01K- more |
| JIW Rate | 68% | 73% | 78% | 85% |
| A.E.T.A. | 1% of JIW | 1% of JIW | 1% of JIW | 1% of JIW |
| NLMCC | $0.01 | $0.01 | $0.01 | $0.01 |
| H&B | Plan B | Plan B | Plan B | Plan B |
| NEBF (3%) | 3% | 3% | 3% | 3% |
| Annuity | 5% | 5% | 5% | 5% |
| AMF | .10 | .10 | .10 | .10 |

| |
|---|
| Low |
| Middle |
| High |

NOTE: Benefit Schedule shown reflects current rates. Rates shall be adjusted as per the Current Inside Agreement.

-Health and Welfare provides the employee with the option to select employee single coverage (for Levels 2, 3 & 4 only) or employee/dependent coverage (for Levels 2-8). Employees may change this election once each calendar year or more often as the trust fund rules provide.

-Only SBCs earned from participating employers qualify for benefits eligibility.

Def. MSJ Appx.000229



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

## APPENDIX B

| SKILL DISCIPLINE | MAX SBC's |
|---|---|
| Branch Wiring | 6,400 |
| Feeder Wiring | 1,600 |
| Panels & Transformers | 1,600 |
| Switchgear & Motor Control Center | 1,120 |
| Motors & Motor Controls | 800 |
| Lighting & Lighting Controls | 2,400 |
| Grounding | 160 |
| Devices | 320 |
| Electrical Codes & Ordinances | 160 |
| Blueprints & Specifications | 160 |
| Meters & Tools | 160 |
| OSHA & Job Safety | 160 |
| Agreements | 160 |
| Service & Troubleshooting | 800 |

Def. MSJ Appx.000230



**Construction Wireman/Construction Electrician Memorandum of Understanding**

## APPENDIX C

### Optional Coursework SBC Curriculum Allocation

| Skills Course | SBC's Credit | Course Hours |
|---|---|---|
| Branch Wiring | 920 | 72 |
| Electrical Codes & Ordinances | 320 | 30 |
| Service/Troubleshooting | 280 | 24 |
| Panels & Transformers | 280 | 24 |
| OSHA & Job Safety | 280 | 24 |
| Meters & Tools | 280 | 24 |
| Feeder Wiring | 280 | 24 |
| Blueprints & Specifications | 280 | 24 |
| Agreements | 240 | 24 |
| Switchgear & Motor Control Centers | 200 | 18 |
| Motors & Motor Controls | 200 | 18 |
| Lighting & Lighting Controls | 200 | 18 |
| Grounding | 120 | 12 |
| Devices | 120 | 12 |
| **TOTAL** | **4000** | **180** |



**Construction Wireman/Construction Electrician
Memorandum of Understanding**

APPENDIX D

| Classification | SBC's | Training | Awarded |
|---|---|---|---|
| CW2 | 2000 | Conduit Bending 1 | 230 |
| CW3 | 4000 | Blueprint Reading | 280 |
| CW4 | 6000 | Conduit Bending 2 | 230 |
| CW5 | 8000 | Codeology | 120 |
| CW6 | 10000 | Basic Code | 120 |
| CE1 | 12000 | Conduit Bending 3 | 230 |
| CE2 | 13000 | Grounding/Transformers | 320 (120+200) |
| CE3 | 14000 | Services | 200 |
| CE4 | 15000 | Motor Control | 280 |
| JIW | 16000 | | |

Def. MSJ Appx.000232



**Memorandum of Understanding**
**Four Year Apprenticeship Program Conversion**



Made and entered into April 10, 2023, between IBEW Local Union 520, hereafter referred to as the Union, and the EMPLOYER, hereafter referred to as the Employer. This Agreement shall remain in effect from year to year throughout the current collective bargaining agreement and will expire at that time on June 1, 2025.

1.  The parties hereby agree that Article IV, Section 4.03 Appendix A (Wages) of the Inside Agreement between the parties shall be modified with an additional schedule to meet the needs of the apprenticeship wage and benefit schedule for those starting the (4) Four Year Program.

| Apprentice Wireman | | | | | |
|---|---|---|---|---|---|
| Multiplier | Class | NEBF | Annuity | Medical | JATC |
| 50% of JIW 0-999 Hrs | 1st Period | 3% | ** | $3.70 | 1%*** |
| 55% of JIW 1000-1999 Hrs | 2nd Period | 3% | 3% | $3.70 | 1%*** |
| 60% of JIW 2000-3499 Hrs | 3rd Period 180 Hrs Instruction | 3% | 3% | $3.70 | 1%*** |
| 65% of JIW 3500-4999 Hrs | 4th Period 360 Hrs Instruction | 3% | 5% | $3.70 | 1%*** |
| 70% of JIW 5000-6499 Hrs | 5th Period 540 Hrs Instruction | 3% | 5% | $3.70 | 1%*** |
| 75% of JIW 6500-8000 Hrs | 6th Period 720 Hrs Instruction | 3% | 8% | $3.70 | 1%*** |
| 50% of JIW Max Hrs2000 | Unindentured Apprentice | 3% | --------------- | $2.65 | 1%*** |
| Journeyman 8000, completed 900 hours of related instruction and obtained State of Texas Journeyman license. Classroom instruction hours are cumulative. **1% effective January 6 2025 ***1% of Journeyman Straight -Time Rate | | | | | |

SIGNED FOR THE UNION:
Local Union No. 520 of the International
Brotherhood of Electrical Workers

SIGNED FOR THE EMPLOYER:
A.S.H. Electrical Services LLC

_____

Ben Brenneman
Business Manager/Financial Secretary
IBEW Local Union 520

_____

A.S.H. Electrical Services LLC Representative

Def. MSJ Appx.000234



# THE COUNCIL ON INDUSTRIAL RELATIONS
## FOR THE ELECTRICAL CONTRACTING INDUSTRY

OFFICE OF THE SECRETARY • 900 7th STREET, N.W. • WASHINGTON, D.C. 20001
PHONE (202) 728-6165 • FAX (202) 728-6168 • WEBSITE: WWW.THECIR.ORG

June 10, 2025

Mr. Adam C. Johnke                          Mr. Ben Brenneman
Co-Owner                                    Business Manager
A.S.H. Electrical Services, LLC             IBEW Local Union 520
P.O. Box 61905                              4818 East Ben White Blvd
San Angelo, Texas 76906                     Austin, TX 78741

RE: Reconsideration of Council on Industrial Relations Decision

Dear Mr. Johnke:

　　We have received your request that the Council on Industrial Relations ("CIR") reconsider its May 13, 2025, decision in which it directed A.S.H. Electrical Services, LLC and IBEW Local 520 "to sign and immediately implement the Collective Bargaining Agreement" attached to the CIR's decision.  The CIR fully considered the issues you have raised in your request for reconsideration. There is no basis for the CIR to reconsider its decision, which is final and binding on the parties.

Al D. Davis                                 Steve Krieg
Secretary, CIR                              Treasurer, CIR

SK/ADD:ek

Copy to:  Chris J. Wagner, International Vice President, IBEW Seventh District
　　　　　 Frank Piatt, Executive Director, Southern Region, NECA

Def00099

Case 1:25-cv-01643-DAE    Document 34-1    Filed 08/04/26    Page 236 of 249


**IN THE UNITED STATE DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 520 | § § § § § | |
| v. | § § | CIVIL ACTION NO. 1:25-CV-01643 |
| A.S.H. ELECTRICAL SERVICES, LLC | § § | |

## AFFIDAVIT OF ADAM JOHNKE

My name is Adam Johnke. I am over the age of 18 years, of sound mind and legally capable of submitting this Affidavit. I submit and sign this affidavit under penalty of perjury.

I am the co-founder and co-owner of A.S.H. Electrical Services, LLC. Shannon Carpenter is the joint co-founder and co-owner. We are a small electrical contracting company with our principal place of business located at 3214 Sunset Drive, San Angelo, Texas. We founded our company in 2019. We currently have two employees besides myself and my co-owner Shannon Carpenter. None of our employees are members of the International Brotherhood of Electrical Workers (IBEW) or its Local 520. All of our employees have expressed their preference not to be represented by IBEW 520.

I obtained my Master Electrician License in 2004 and have worked my entire career as an electrician. I am a working owner as is Shannon Carpenter. I bid for work, manage employees, assign them to jobs, supervise their work as well as inspect the finished project. I do invoicing, job walks, and electrical work myself as a working owner.

When we started our company in 2019, we had zero employees. I had been a member of the IBEW for close to 25 years at that time. Shannon and I first came into contact with IBEW representatives Mike Grant and Diarmid Campbell during the fall of 2020 at Howard Junior

College, where the local junior college was working to develop an electrical training curriculum for the community. It was during these meetings at Howard Junior College that the IBEW expressed interest in A.S.H. Electrical Services, LLC and expressed a desire that we become a signatory contractor. While hesitant, our company was growing, and due to the COVID-19 pandemic and a lack of qualified, skilled workmen available locally, we spoke briefly regarding a potential, mutually beneficial arrangement between the IBEW and A.S.H. Electrical Services, LLC. The IBEW consistently assured us that they maintained an ample roster of qualified workmen available for dispatch. Wage scale applicable to our geographic area, San Angelo, and benefits to be paid to employees were disclosed during this time. The differences between types of labor agreements, and the mechanics of how NECA operated, were not discussed.

On May 13, 2021 - the day we signed the Letter of Assent - we were at the Union Hall in San Angelo. From A.S.H. Electrical Services, LLC, Shannon and I were present. From the Union, Mike Grant (Business Development and Assistant Business Manager) and Diarmid Campbell (Field Organizer and Assistant Business Manager). Both Mike and Diarmid refer to themselves in different ways depending on the circumstances. Before we signed the Letter of Assent, Shannon asked, "If this doesn't work, how long do we have to do this?" She said, "I don't want to agree to anything over a year." She was adamant. Mike said the term was for one year. After a year, he said if we felt it wasn't of benefit we could part ways and not be stuck in it. All this was right before I signed the agreement. It is important to know that all we were presented with was the Letter of Assent. Despite multiple requests, a copy of the then- current contract was never received by A.S.H. Electrical Services, LLC from IBEW LU 520. This would have been the 2019-2022 Contract.

Def. MSJ Appx.000237

The primary reason I was interested in this arrangement was that we signed the Letter of Assent at the height of the COVID-19 pandemic. I was expecting the IBEW would be of benefit to our company, and that we would, by their assurances, be better enabled to secure qualified workmen through their hiring hall. This turned out not to be the case. The hiring hall had few qualified workers to refer to us and the few that were generally exhibited substance abuse problems, poor work ethics, as well as had experienced employment issues with other local contractors. Because of these problems that went on for more than a year, on May 30, 2023, I sent letters to both NECA (National Electrical Contractors Association) and the Union to terminate our relationship. No one from IBEW responded to that letter. I understand through discovery in this case that there is a letter from IBEW to me dated August 7, 2023, that confirms receipt of my May notice of termination. I never received that letter from IBEW.

Because I had never received a response from IBEW, on December 27, 2023, my attorney sent another letter to the Union to terminate our relationship. On January 3, 2024, Ben Brenneman (Business Manager) responded. My attorneys responded on January 9, 2024. On January 22, 2024, Ben responded. On January 30, 2024, I responded, and let Ben know to send all future communications regarding this matter to me and that, although I disagreed with his position about when the CBA terminated, I would agree to abide by the CBA until May 31, 2024. My letter also notified him that termination of the CBA would become effective June 1, 2024 and asked that IBEW accept or reject these terms by February 19, 2024. I did not get a response from Ben until May 30, 2024 claiming that the date of termination was not until June 1, 2025.

In this dispute, IBEW has asserted that on February 28, 2024, a meeting was requested with A.S.H. Electrical Services, LLC for March 28, 2024. The letter is actually dated February

29, 2024. This requested meeting had nothing to do with bargaining or negotiations. This request had to do with internal charges filed against me by Diarmid Campbell of IBEW. Because I was a long-standing IBEW member, Mr. Campbell sought to bring me before the disciplinary committee of IBEW because I expressed my intent to terminate the CBA. Because of the charges, I resigned my Union membership of 25 years. Because I resigned, they had to drop the charges. On March 20, 2024, I responded by certified mail and email to both Diarmid and Ben on the grounds that travel to Austin was impractical and requesting that it be rescheduled locally. The meeting was never rescheduled.

On January 20, 2025, I sent another letter to both NECA and the Union. It was to remind them of our previous termination. In the Union's CIR (Council on Industrial Relations) brief, they claimed that they sent a letter on January 17, 2025. No such letter was sent. On February 3, 2025, I received a letter via email from Ben. He did not directly respond to my letter. On February 25, 2025, I received another letter from Ben via mail. He proposed to meet on March 18, 2025. On March 10, 2025, I responded asking for proposed meeting location and time. On March 14, 2025, Diarmid informed me that Ben Brenneman, Business Manager, had directed him to be the Union's representative for negotiations. He wrote that the meeting should not take too much time.

Going into the March 18, 2025, meeting, it was my understanding that we were to discuss outstanding items pertaining to termination and the manner in which we would wrap this thing up and everyone move on. The Union did not tell me what the subjects of the negotiations would be. Under the Contract, the Union could have told us what they wanted to negotiate, but they refused to send us specific requests or proposals in the February 2025 letters.

AFFIDAVIT OF ADAM JOHNKE - PAGE 4

On March 18, 2025, we met at the Union Hall in San Angelo. Shannon, Diarmid, and I were present. The Union presented us with a list of ten proposals. These proposals were not specific to A.S.H. Electrical; rather they reflected a NECA pattern agreement, and many of the terms were not applicable to our specific business. The meeting lasted approximately 20 minutes. On March 21, 2025, Diarmid sent me an email to propose another meeting. We agreed to meet on April 8, 2025. On April 8, 2025, we again met at the Union Hall in San Angelo. Again, Shannon, Diarmid, and I were present. The meeting lasted approximately one hour.

During these sessions, Shannon asked Diarmid directly whether our signature or agreement to the proposals would end negotiations; he answered no, stating that he would still have to run it by Austin. I asked Diarmid directly during the sessions that the other nine proposals could be discussed indefinitely, but that there would be no real movement on anything until the parties agreed to remove the Most Favored Nations (MFN) Clause. Diarmid confirmed that, because A.S.H. had given notice of intent to terminate, he was conditioning bargaining on this single item. Diarmid specifically told me that, because of A.S.H.'s notice to terminate, terms specific to our company could not be discussed by the Union until we agreed to remove the Most Favored Nations Clause. He also repeatedly said, during this session, and throughout the negotiating sessions, that he was bargaining against the prior CBA.

After April 8, 2025, Shannon and I worked on a counter proposal to the list of ten proposals the Union presented in the March 18, 2025, and April 8, 2025, meetings. We were also waiting for responses to questions we had asked Diarmid during the April 8, 2025, meeting. We had a standing request for information regarding two items proposed by the Union. We were awaiting actual documentation regarding these two items as well as an answer from the Union that they had agreed to the MFN removal.

AFFIDAVIT OF ADAM JOHNKE - PAGE 5

On April 16 and 17, 2025, Diarmid and I exchanged emails after Diarmid requested to file jointly with the CIR. On April 16, 2025, Diarmid requested to file jointly with the CIR. I responded to Diarmid in writing that same day, April 16, 2025, objecting on the record to the CIR filing. In that email, I noted that this was the fourth separate occasion on which Diarmid had expressed his intent to file for CIR mediation, that A.S.H. had accepted bargaining stipulation number two the day before specifically to allow for a more productive bargaining session, and that the Union had still not responded to A.S.H.'s outstanding request regarding removal of the Favored Nations Clause as well as information requested regarding NEAP and proposal number 8. I stated directly that the filing could not be viewed as anything other than an attempt to subvert the Union's duty to bargain collectively. On April 17, 2025, Diarmid filed unilaterally with the CIR. At the time, I was not aware why the Union was filing with the CIR. There was never any communication stating that we had failed to resolve any specific issues that should be submitted to the CIR.

On April 24, 2025, Scott Hopkins (NECA Representative from Oklahoma City) and I spoke for the first time. During that conversation, Hopkins told me that part of his role as the assigned NECA representative was to ensure that the Council's own process was properly followed, and that he believed our case was not ripe for interest arbitration because no real, meaningful negotiations had occurred. Hopkins further stated that he intended to recommend to David Gonzales that Ben Brenneman withdraw the matter from the Council and return to the table. Hopkins also stated that, ultimately, Chris Wagner would either allow or disapprove of withdrawing the matter from the Council process. During this same April 24, 2025, conversation, Hopkins also told me that, in his estimation, the worst outcome we could likely expect from the CIR process was a one-year contract with the Zone III MOU. During this same conversation,

AFFIDAVIT OF ADAM JOHNKE - PAGE 6

Hopkins also told me not to secure counsel for CIR proceedings, as appearing with counsel would serve no purpose other than to "piss off" the arbitration panel.

On April 28, 2025, we had a third negotiating meeting. Diarmid and I were present. We were at the Union Hall in San Angelo. Diarmid had a new proposal ready before I had even presented our counterproposal. I thought this was strange since I had yet to present any formal counterproposal on behalf of A.S.H. Electrical Services, LLC. San Angelo, Texas is situated within Tom Green County, one of nine counties recognized under the Zone III MOU which stipulates wages in accordance with our specific geographical area. Throughout the relationship, A.S.H. Electrical had at all times adhered to and paid wages and benefits per the Zone III memorandum, as we do not perform work within the established boundaries of Zone I. Towards the end of the meeting, I asked if the Union and NECA had reached an agreement or MOU regarding Zone III contractors. Diarmid confirmed that an agreement had been reached. I asked specifically about wages. He refused to answer. Later, I found out that my counter proposal was actually better, as far as wages, than what the Union accepted for the other Zone III contractors in the new NECA agreement that was being negotiated at the same time. Despite this, Diarmid rejected my counterproposal.

On April 28, 2025, the same day, I followed up with Scott to discuss my meeting with Diarmid. We spoke on the phone.

While this was going on, NECA and the Union were attempting to negotiate the Zone I (Austin area) agreement. What Diarmid had consistently proposed to us was the NECA Zone I agreement with the addition of proposals Numbers 1 and 2.

On April 30, 2025, we had a Zoom meeting. Scott, David Gonzalez (IBEW International Representative), and I were present. Diarmid showed up maybe five minutes late. Ben

AFFIDAVIT OF ADAM JOHNKE - PAGE 7

Brenneman did not attend. I was in my office. Scott and David were in the Austin Union Hall. I recorded this meeting. During this meeting, I agreed, once again, to remove the Most Favored Nations Clause, and Diarmid agreed as well; however, Diarmid's CIR brief lists the Most Favored Nations Clause, a permissive item, as disputed.

After the April 30, 2025 meeting, David called Scott and told him they had agreed to provide the tentative agreement for MOU Zone III. Scott told me this. Diarmid sent me the MOU for Zone III that evening. This is how I found out that my counterproposal was better than what had been agreed to for Zone III.

Hopkins also informed me that the Union had agreed to send a list of items it still considered in dispute the following morning, so that I would know what to address in ASH's own brief to the CIR. That list was never received. I learned that the Union had filed its brief only through notification from the CIR via the case file/notification system, with roughly ninety minutes remaining before our own deadline. I mailed our brief, in compliance with CIR requirements, before ever seeing the Union's brief.

On May 23, 2025, we received the preliminary CIR decision via email. It is dated May 13, 2025, but that isn't when I received it. I called Scott that same day.

In A.S.H.'s own brief submitted to the CIR, A.S.H. specifically requested that, should the Council decline to honor A.S.H.'s request to terminate the relationship between the parties, the Council instead recommend to IBEW Local 520 that it engage in meaningful negotiations, with representatives possessing actual authority to bargain, jointly with A.S.H. to negotiate a successor agreement. A.S.H.'s brief stated that only upon due process, and only if discord still existed at that time, would a decision by the Council become necessary. That due process— meaningful negotiations with authorized representatives— never occurred before the Council

AFFIDAVIT OF ADAM JOHNKE - PAGE 8

rendered its decision. A.S.H. was denied the very due process it expressly requested in its own brief, and the Council's decision was rendered without it.

On May 23, 2025, I sent the CIR a request for reconsideration. On June 10, 2025, the CIR denied my request for reconsideration. At no point — whether in the preliminary decision issued May 23, 2025, or the final decision issued June 10, 2025 — did the CIR explain why it disregarded our request to terminate, the wage rates it imposed, or any other mandated term. Not one request made in our brief was acknowledged, and no reasoning was provided for any of it.

After the CIR decision, Joel Cochren (Representative, Central Texas Chapter of NECA) called me at the request of Scott. I spoke with Joel Cochren twice. Basically, Joel wanted to know if I would agree to the Zone III MOU. If so, he could talk to Ben about agreeing to the Zone III MOU terms for A.S.H. Electrical Services, LLC. As a result of the conversations, I did not agree to sign anything. Joel never came back to me with Ben's agreement to sign the MOU Zone III.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on August 03 , 2026

_____
Adam Johnke
Co-owner, A.S.H. Electrical Services, LLC

AFFIDAVIT OF ADAM JOHNKE - PAGE 9

IN THE UNITED STATE DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD<br>OF ELECTRICAL WORKERS,<br>LOCAL 520<br><br>v.<br><br>A.S.H. ELECTRICAL SERVICES,<br>LLC | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 1:25-CV-01643 |

## AFFIDAVIT OF SHANNON CARPENTER

My name is Shannon Carpenter. I am over the age of 18 years, of sound mind and legally capable of submitting this Affidavit. I submit and sign this affidavit under penalty of perjury.

I am the co-founder and co-owner of A.S.H. Electrical Services, LLC. Adam Johnke is the joint co-founder and co-owner. We are a small electrical contracting company with our principal place of business located at 3214 Sunset Drive, San Angelo, Texas. We founded our company in 2019. We currently have two employees besides myself and my co-owner Adam Johnke. None of our employees are members of the International Brotherhood of Electrical Workers (IBEW) or its Local 520. All of our employees have expressed their preference not to be represented by IBEW 520.

At the time we started the company, I had owned another business for about 15 years. Adam Johnke (co-founder and co-owner) had a master electrician license, but he had never started a company before. We used Adam's license and my business experience starting A.S.H. Electrical Services, LLC to start the company. Eventually, I got an apprentice electrician license from TDLR (Texas Department of Licensing and Registration), and I worked in the field with Adam for a while until we hired our first employee. As to my duties and responsibilities, every day is different. It depends on the business and on the jobs. I do billing. I do advertising. I do the

mail. I do the banking. I answer the phones when Adam is on the other phone and cannot answer or is not available for other reasons.

I have prior experience as a Law Enforcement Officer, and once Adam and I recognized that the Union had misled us, we made a deliberate decision to begin making it our practice to record conversations between ourselves and any Union representative. This does not mean every such conversation was successfully recorded — there were instances where we failed to record or believed the record function had been activated when it had not. This explains the origin and general consistency of A.S.H.'s recording practice referenced throughout this affidavit, without overstating it as a complete or unbroken record of every interaction.

On the day we signed the Letter of Assent, Mike Grant and Diarmid Campbell met with Adam and me at the Union Hall in San Angelo. Mike and Diarmid gave me business cards at various points. Both men referred to themselves by different titles depending on the situation. Going into it, I was not partial to the Union because I had an uncle and aunt who had been part of a union with General Motors. My uncle was laid off right before he retired. However, I also knew that Adam had more experience with unions than I did. I trusted Adam, but the only way I would agree to sign the Letter of Assent is if we could get out at the end of one year. I asked multiple times if we could get out after a year if the agreement wasn't working for us. I was adamant and repeated myself multiple times. Mike assured us that at the end of the first year, if we were not happy, we could go our way, and they would go theirs. I believe now that Mike buttered me up and told me what I wanted to hear because he knew this was a sticking point for me. Diarmid actively confirmed, by nodding his head yes and verbally agreeing, that the one-year term understanding described by Mike would be the case. Mike assured both Adam and me that signing the Letter of Assent committed us to a one-year term only, and that if we decided to

Def. MSJ Appx.000246

remain after the one-year trial period, then at each successive annual anniversary the relationship would be evaluated and could be terminated if we chose not to continue.

On January 27, 2022, I answered the business phone when it rang. Adam was out. All I could hear was a conversation in the background, though I could hear the primary speaker clearly. I knew it was an Austin number because of the 512 area code. I heard two people, but I did not know who it was at the time. Shortly after receiving the calls, Adam confirmed the voice was Mike Grant's. It must have been a butt dial. The comments I overheard were explicit, homophobic, derogatory, and sexual remarks mocking gay people in Austin, Texas, regarding contracts. At the time of these calls, my son — who is gay — was living in Austin, Texas, and his occupation at that time involved contracts. Hearing two unidentified men discussing "obtaining contracts" in Austin while making explicit, homophobic, derogatory, and sexual remarks mocking gay people in Austin, Texas, caused me genuine, immediate fear that the conversation could concern or threaten my son specifically. As a conservative mother, and a chaplain at that time, I was fearful due to my son's choice of lifestyle. I also made the point that I was a chaplain at the meeting and did not like what I heard. This was not about anything other than a mother's instinct to protect her son. My reaction was a mother's fear for her son's safety, not offense taken on my own behalf. I hung up, but then received multiple calls. I began recording at some point during one of the calls received, remaining recording continuously until the individual I could hear clearly, who I now know to be Mike, terminated the call. Shortly following these calls, Mike called again, and the first words were, "Shannon, are we ok?" I advised him to place a passcode on his phone.

At a meeting occurring after this incident, I brought up the phone calls. Chris Wagner (Union International Representative), Mike, and Diarmid were present for the Union. Chris

Def. MSJ Appx.000247

Wagner's home local is IBEW Local 520, and he is a former Business Manager of Local 520. I confronted Mike directly about the calls. Mike responded as though he did not know what I was talking about, which I understood as questioning my integrity. I then placed my phone on the table, stated the recording was there, and invited those present to listen to the recording. All Union representatives present, including Chris Wagner, declined to do so. During this meeting, I made it clear to those present that I did not want to be affiliated with an organization that held these views. At the conclusion of the meeting, privately, Mike approached me and apologized in what appeared to be an attempt to reconcile. According to Scott Hopkins, Chris Wagner ultimately had the authority to decide whether A.S.H.'s case would proceed before the CIR.

On March 18, 2025, Adam, Diarmid, and I met at the Union Hall in San Angelo. There was a Union secretary nearby. It is my belief only that she could hear what was being discussed from the separate room in which she was seated, but I cannot be certain. I recorded that meeting. I was present the entire time. I don't know whether I told Diarmid I was recording, but it wasn't a secret. The phone used to record this meeting was placed on the table directly in front of Diarmid. During this meeting, when I asked Diarmid about Mike Grant's earlier statement that we could revisit the Letter of Assent after one year, Diarmid did not disagree; rather, he responded, "That is a legal issue." I am also not certain whether it was this meeting or the April 8, 2025, meeting at which I specifically told Diarmid I was recording.

On April 8, 2025, Adam, Diarmid, and I again met at the Union Hall in San Angelo. Again, there was a Union secretary nearby. It is my belief only that she could hear portions of the meeting from the separate room. She was not a participant, and I cannot be certain whether she could hear. I recorded the meeting. I was present the entire time. This time we specifically discussed recording. Again, my phone was out, and it was not a secret.

AFFIDAVIT OF SHANNON CARPENTER - PAGE 4

Def. MSJ Appx.000248

During either the March 18, 2025, or April 8, 2025, meeting — I don't recall which — Diarmid left briefly to make copies. The recording was not paused or stopped at any point. There is simply a segment with no dialogue during this portion because Diarmid was out of the room making copies and no one else was speaking, not because the recording was interrupted.

A.S.H. made requests to Diarmid during both the March 18, 2025, and April 8, 2025, meetings for information, which the Union never provided. It was my understanding at the time, as related to me by Adam, that these meetings were intended to discuss terms for finalizing A.S.H.'s termination of and affiliation with the Union, not to negotiate a new successor agreement.

Scott Hopkins (NECA Representative from Oklahoma City) advised that, should we elect to attend CIR proceedings and present an oral brief or argument, we should refrain from being represented by legal counsel, as doing so would do nothing but "piss off" the Council.

On April 24, 2025, prior to the CIR's preliminary decision, I distinctly recall Hopkins telling us that, at worst, we could expect the Zone III MOU, modified CIR language, and a one-year contract.

On May 23, 2025, after we received the CIR's decision, I was on a call with Scott Hopkins during which he stated he felt we might need to secure legal counsel, since the Council's decision was typically final and binding. This was a marked shift from his earlier advice against attending CIR proceedings with legal counsel.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on August 3, 2026

Shannon Carpenter
Co-owner, A.S.H. Electrical Services, LLC

AFFIDAVIT OF SHANNON CARPENTER - PAGE 5