**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 520, Plaintiff,** | § § § | |
| **v.** | § § | **CIVIL ACTION NO. 1:25-cv-1643** |
| **A.S.H. ELECTRICAL SERVICES, LLC, Defendant.** | § § § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

Comes now Plaintiff, International Brotherhood of Electrical Workers ("IBEW"), Local 520, and files this response in opposition to Defendant's Motion for Summary Judgment.

## I. ARGUMENT SUMMARY

The Prior CBA did not expire until June 1, 2025, as the parties' own correspondence and conduct confirm, notwithstanding a typographical error in Section 1.01. Local 520 gave timely notice of its desire to modify the Agreement and satisfied every contractual prerequisite to invoking interest arbitration. Defendant's unpleaded defenses of fraud, mutual mistake, misrepresentation, and lack of a meeting of the minds were waived by its failure to plead them and, in any event, fail on the merits. The CIR's award draws its essence from the Prior CBA, which expressly authorized CIR to set the terms of a successor agreement, including the wage scale Defendant now disputes. Finally, Local 520's contemporaneous answer to Defendant's Counterclaim, addressed in Section II below, moots any concern about default.

## II. LOCAL 520'S ANSWER TO DEFENDANT'S COUNTERCLAIM DOES NOT BAR THIS RESPONSE

Defendant notes in a footnote that Local 520 has not filed a separate answer to Defendant's Counterclaim. *Def's MSJ*, at 1 n.1. No entry of default has been made by the Clerk under Rule 55(a). Default is not automatic when a pleading deadline is missed; it requires the Clerk's entry, which has not occurred here. *See* FED. R. CIV. P. 55(a); *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996).

Moreover, Defendant's Counterclaim to Invalidate Arbitration Award under LMRA Section 301 raises the same issue already before the Court in Local 520's Complaint: whether the May 13, 2025 interest arbitration award is valid and enforceable. Local 520's Complaint, its discovery responses, its own Motion for Summary Judgment, and this Response set out Local 520's position on every issue raised by the Counterclaim. Defendant has therefore had full notice of, and a full opportunity to respond to, Local 520's positions throughout this litigation, and it identifies no prejudice arising from the timing of a formal answer. *See Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 563 (5th Cir. 2003) (noting that default judgments are disfavored and doubts are resolved in favor of resolving disputes on the merits). Local 520 is filing its Answer to Defendant's Counterclaim contemporaneously with this Response, denying the Counterclaim's allegations and incorporating the arguments set forth in this Response. The Court should proceed to resolve the merits of both parties' motions together.

## III. ARGUMENTS & AUTHORITIES

### A. Legal principles on which the parties agree.

Defendant begins its motion by correctly noting that the Court decides arbitrability and that "[w]hether a CBA has terminated or remains in effect is a question of contract interpretation that is for the courts to decide, not an arbitrator." *Def's MSJ*, at 9. Local 520 also agrees that under

Fifth Circuit precedent, "CIR arbitration awards are not enforceable where the agreement expired before the union submitted unresolved negotiation issues to arbitration." *Def's MSJ*, at 10.

**B. The Prior CBA did not expire until June 1, 2025.**

In its Motion, Defendant finally reveals the source of its claim that the bargaining relationship was terminated in 2024: Defendant relies wholly on a typo in the Prior CBA (Exhibit 2 to Defendant's Motion). Article I of the Prior CBA mistakenly provides that "This Agreement shall take effect on June 2, 2019 and shall remain in effect through June 1, 2022, unless otherwise specifically provided for herein." *Def's MSJ*, Exhibit 2, at Section 1.01. This language was presumably carried over from the 2019–2022 CBA inadvertently.

Despite this typo, the Prior CBA is clear that its term was from 2022–2025, and Defendant has repeatedly expressed the same understanding. Courts interpret collective bargaining agreements according to "ordinary principles of contract law," at least where those principles are not inconsistent with federal labor policy, and "in this endeavor, as with any other contract, the parties' intentions control." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). An obvious typographical error does not control when the parties' intent is clear. *NLRB v. Cook Cnty. Sch. Bus, Inc.*, 283 F.3d 888, 895–96 (7th Cir. 2002).

The cover page of the Prior CBA makes clear that it is a "June 2, 2022 – June 1, 2025 AGREEMENT," as does the heading on the first page, on which Section 1.01 appears. *Def's MSJ*, Exhibit 2. Section 4.03 specifies wage rates to be "Effective June 6, 2022," "January 2, 2023," "January 1, 2024," and "January 6, 2025," and it provides for several benefit changes to be "effective January 6th 2025." *Def's MSJ*, Exhibit 2, at Section 4.03. Article XVI establishes an administrative fund "Effective June 6, 2022." *Def's MSJ*, Exhibit 2, at Article XVI. The CBA was

signed by both parties on June 1, 2022. *Def's MSJ*, Exhibit 2. The Zone III Memorandum of Understanding addendum to the contract sets certain pay rates as of "June 6, 2022," "January 1, 2023," "January 2, 2024," and "January 6, 2025." *Def's MSJ*, Exhibit 2, at Zone III MOU. That addendum was signed by both parties on June 7, 2022. *Def's MSJ*, Exhibit 2, at Zone III MOU. The Small Works Memorandum of Understanding addendum to the contract sets out a staffing option for contractors on small jobs that is "Effective June 6, 2022." *Def's MSJ*, Exhibit 2, at Small Works MOU. That addendum was signed by both parties on June 1, 2022. *Def's MSJ*, Exhibit 2, at Small Works MOU.

Defendant shared the same understanding. In January 2025, before negotiations for a successor agreement began, Defendant reminded Local 520 that "notice of our intent to terminate current Collective Bargaining Agreement upon expiration, June 01, 2025 was sent and received by your office" and stated its intention that "this company will not be bound by the Collective Bargaining Agreement between Central Texas Chapter, NECA and Local Union No. 520 of the International Brotherhood of Electrical Workers after June 01, 2025, nor will this company be bound thereafter by any negotiations, renegotiations, amendment, extension or renewal of said Collective Bargaining Agreement." *Def's MSJ*, Exhibit 16. Then, Defendant wrote during bargaining in April 2025, "We are currently in contract until June 1, 2025." *Plaintiff's MSJ*, Exhibit 14. In May 2025, Defendant expressed to the CIR its view that "A.S.H. Electrical Services, LLC has been bound to a disadvantageous contract for 3 years longer than necessary." *Def's MSJ*, Exhibit 22, at 4.

As the Court can see, despite the typo, the Prior CBA was clear that its term was from 2022–2025, and the parties had a meeting of the minds on the duration. The Court should thus reject Defendant's argument that the contractual relationship ended in 2024. Defendant argues in

the alternative that, if Section 1.01 is ambiguous, the duration of the Prior CBA becomes a formation dispute falling outside the CBA altogether. *Def's MSJ*, at 13–14. Even if that were so, a formation or duration dispute is still one the Court decides, and on this record the Court should decide it for Local 520 for the reasons set out above.

**C. Local 520 gave timely notice of proposed changes.**

Defendant next argues that Local 520 failed to properly invoke interest arbitration because "IBEW failed to provide timely notice of the changes as required by the CBA before negotiations." *Def's MSJ*, at 14. This argument lacks merit.

Section 1.02 of the Prior CBA provides,

> (a): Either party desiring to change or terminate this Agreement must provide written notification at least 90 days prior to the expiration date of the Agreement or any anniversary date occurring thereafter.
>
> (b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice, or no later than the first negotiating meeting unless mutually agreed otherwise.

*Def's MSJ*, Exhibit 2.

It is undisputed that Local 520 provided written notification of its desire to change the Agreement more than 90 days prior to June 1, 2025; it did so on February 3, 2025. *Def's MSJ*, Exhibit 17; *Def's MSJ*, at 7. It is also undisputed that Local 520 provided notice of the changes desired at the first negotiating meeting. *Compare Def's MSJ*, at 7 (identifying March 18, 2025 as the first negotiating meeting), *with Def's MSJ*, at 14 (noting that Local 520 "did not provide written notice of the changes desired until March 18, 2025."). As the Court can see, there is no factual dispute on whether Local 520 complied with the plain language of Section 1.02(a)–(b).

Defendant nevertheless asks the Court to rewrite the Prior CBA, urging that if its plain language were enforced, "then the 90-day notice provision means nothing." *Def's MSJ*, at 14. Of

course, that provision means exactly what it says: any party desiring to change or terminate the agreement must communicate that desire 90 days or more before the scheduled expiration date of the CBA. This provision simply adds 30 days to the statutory requirement to provide such notice 60 days before expiration under 29 U.S.C. § 158(d). The date by which the actual proposed changes must be communicated, which is governed by Section 1.02(b) of the Prior CBA, does not change the meaning of Section 1.02(a).

Defendant then posits that if the plain language were enforced, "notice of the changes could be provided just a month or even weeks or days before the termination of the agreement, which completely does away with the 90-day notice requirement." *Def's MSJ*, at 15. Of course, that is not what happened in this case, and any party to the agreement could avoid that outcome by scheduling the first negotiating meeting quickly after receiving the 90-day notice.

Defendant's conclusion—that "Under the terms of the CBA, there was no agreement to arbitrate changes to the CBA until the party seeking changes had provided a minimum of 90 days' notice of those changes in writing"—is unsupported by the plain language of the contract and should be rejected by the Court.

**D. Local 520 fulfilled all prerequisites to invoking interest arbitration.**

Defendant's motion next argues that Local 520 did not properly invoke the interest arbitration clause because Local 520 did not negotiate in good faith leading up to invoking interest arbitration. *Def's MSJ*, at 15–17. Defendant claims, "The interest arbitration clause does provide for arbitration with CIR, but only after formal notice has been given and after the parties have had a meaningful chance to engage in good faith negotiations. That did not happen here." *Def's MSJ*, at 17.

Local 520 did provide proper notice, as set out in Section III.C, above. All that is required to invoke interest arbitration, in addition to providing proper notice, is the existence of "Unresolved issues or disputes arising out of the failure to negotiate a renewal or modification of this agreement that remain on the 20th of the month preceding the next regular meeting of the Council on Industrial Relations for the Electrical Contracting Industry (CIR)." *Def's MSJ*, Exhibit 2, at Section 1.02(d). It is undisputed that there were such unresolved issues or disputes as of April 20, 2025. *Def's MSJ*, at 7–8.

***1. Whether the parties bargained in good faith is not a question presented in this litigation.***

Judicial review of a labor arbitration award is confined to three questions: whether there is an agreement to arbitrate covering the parties, whether the award draws its essence from the agreement and stays within the issues submitted, and whether the award is repugnant to the Act. *General Warehousemen & Helpers Local 767 v. Standard Brands, Inc.*, 579 F.2d 1282, 1292 (5th Cir. 1978) (en banc). The quality of a party's bargaining is not among them.

Defendant conflates two distinct inquiries. Whether the parties agreed to arbitrate, and whether the Agreement containing that promise remained in effect, are substantive questions for the Court, and Local 520 addresses them in Section III.B above. But whether a party satisfied conditions precedent to invoking a clause that applies, including the adequacy of notice and the sufficiency of negotiations, is a question of procedural arbitrability presumptively committed to the arbitrator. "Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964); *accord BG Group plc v. Republic of Argentina*, 572 U.S. 25, 34–35 (2014); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84–85 (2002).

This distinction is important because Defendant already made these arguments to the arbitration panel. In its brief to the CIR, Defendant argued that no impasse existed, that negotiations were ongoing, that Local 520 had presented a take-it-or-leave-it position, and that Local 520 had not bargained in good faith. *Def's MSJ*, Exhibit 22. The Council considered Defendant's submission and directed the parties to execute the New CBA. The parties agreed that the Council's decisions "shall be final and binding." *Def's MSJ*, Exhibit 2, at Section 1.02(d). Defendant now asks this Court to reweigh the arguments it lost before the CIR, which is review that Section 301 does not permit. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987).

Finally, the standard Defendant invokes is not in the parties' contract. The phrase "a meaningful chance to engage in good faith negotiations," *Def's MSJ*, at 17, appears nowhere in Section 1.02. Section 1.02(d) conditions submission on a single circumstance: unresolved issues or disputes remaining as of the 20th of the month preceding the Council's next regular meeting. Defendant asks the Court to write an additional precondition into the Agreement that the parties did not adopt. The Court should decline.

***2. In any event, Local 520 bargained in good faith.***

Even if the Court were to review the quality of bargaining, Defendant's eight arguments that Local 520 failed to bargain in good faith should be rejected.

First, Defendant claims that "IBEW filed a disciplinary action against Adam Johnke, a 25-year member of the IBEW, because he sought to terminate the CBA as being in the best interests of his company." *Def's MSJ*, at 15. Defendant does not explain how disciplinary charges filed in January 2024, more than a year before bargaining began, could constitute a failure to bargain in good faith in March and April 2025. *Def's MSJ*, Exhibit 10.

Second, Defendant urges that "IBEW ignored ASH's efforts to discuss termination of the agreement and its view that the language of the contract provided for termination on June 1, 2024." *Def's MSJ*, at 15. This is simply not accurate: as set out above, Defendant's position during bargaining in April 2025 was, "We are currently in contract until June 1, 2025." *Plaintiff's MSJ*, Exhibit 14.

Third, Defendant argues, "When IBEW finally did seek to enter negotiations it was only interested in discussing renewal of the agreement and imposing onerous conditions and terms on ASH that were not in the current agreement." *Def's MSJ*, at 15. It is true that Local 520 only discussed renewal of the agreement, but there was nothing else to discuss. Defendant never made a proposal for termination of the agreement. *Def's MSJ*, Exhibit 26. If it had, Local 520 would have discussed it. Under Section 1.02(f) of the Prior CBA, a party's desire to terminate the Agreement "shall be handled in the same manner as a proposed change." *Def's MSJ*, Exhibit 2, at Section 1.02(f). Folding Defendant's desire to terminate into the successor negotiations, and then into the CIR submission when no agreement was reached, is precisely what the Agreement required. In addition, adding terms and conditions not in the current agreement is the essence of changing the agreement, as Local 520 notified Defendant it desired on February 3, 2025. *Def's MSJ*, Exhibit 17.

Fourth, Defendant argues that "IBEW only took one position during negotiations." *Def's MSJ*, at 16. Defendant fails to mention that Defendant did not make any counter-offer until negotiations had been going on for six weeks and the dispute had already been submitted to CIR. *Def's MSJ*, Exhibit 26, at 5–8.

Fifth, Defendant argues that Local 520 "provided no justification" for its proposed wage increases "related to the market in which ASH works." *Def's MSJ*, at 16. Defendant goes on to

claim that "No evidence was submitted to CIR about wage conditions relevant to San Angelo, Tom Green County or West Texas." *Def's MSJ*, at 16. This is not accurate. As Defendant's evidence shows, Local 520 relied on and submitted to CIR the following:

Supporting Facts regarding proposed wage increase:

- Solar Farm and Data Center work is being done in Abilene, TX., at $45 an hour.
- Solar Farm project in Tennyson, TX., being bid at $45 an hour minimum.
- The Solar Farm project planned in Brownwood, TX., is being bid at around $40-$45 an hour.
- ASH Electric has bid and gotten work at Austin Scale, plus a 30% added in the scale, showing they can support a $40-$45 wage scale.

*Def's MSJ*, Exhibit 21.

Sixth, Defendant urges that "ASH objected to submission to CIR because he believed there was no impasse." *Def's MSJ*, at 17. However, as discussed above, the Prior CBA's interest arbitration clause does not require an "impasse"; it only requires that there were unresolved issues or disputes between the parties as of April 20, 2025. It is undisputed that such issues and disputes existed.

Seventh, Defendant claims that "IBEW also failed to continue to negotiate while the CIR matter was pending contrary to the agreement." *Def's MSJ*, at 17. Again, this assertion is disproved by Defendant's evidence. The affidavit of its co-owner makes clear that Local 520 submitted the dispute to CIR on April 17, 2025, and continued to negotiate with Defendant, including on April 28, 2025, and April 30, 2025. *Def's MSJ*, Exhibit 26, at 6–8. Defendant does not claim that it unsuccessfully sought any additional negotiations with Local 520. Section 1.02(e) directs the negotiating committee to "continue to meet weekly in an effort to reach a settlement," *Def's MSJ*, Exhibit 2, at Section 1.02(e), but nothing in the Agreement makes weekly meetings a condition

precedent to the CIR's jurisdiction, and Defendant does not identify any meeting it requested and was denied.

Eighth, Defendant suggests that Local 520 improperly submitted "the permissive bargaining issue of the most favored nations clause" to CIR. *Def's MSJ*, at 17. This argument fails for two independent reasons. First, the Most Favored Nations clause was already part of the Prior CBA that governed the parties' relationship; Local 520 was not introducing a new permissive term into negotiations, but addressing a provision the parties were already bound by. Second, and regardless, Defendant itself acknowledges that "the parties had agreed on removing the Most Favored Nation's clause" before the matter went to CIR, *Def's MSJ*, at 17 n.6, and the New CBA does not contain a Most Favored Nations provision. Defendant cannot simultaneously claim that a term was agreed upon and removed, and that submitting it to CIR was improper.

As the Court can see, Local 520 met all the contractual requirements to invoke interest arbitration. The Court should reject Defendant's arguments on this issue.

**E. Defendant has not raised the affirmative defenses of fraud, misrepresentation, mutual mistake, or lack of a meeting of the minds in this litigation.**

In its next set of arguments, Defendant claims—for the first time since signing the Letter of Assent in May 2021—that the Letter of Assent "was obtained by fraud, mutual mistake, misrepresentation or there was no meeting of the minds." *Def's MSJ*, at 17–18. Defendant's live pleading (Document 6) does not even hint at any of these theories. None of them are included in the 25(!) affirmative defenses raised in Defendant's answer.

The lone reference to arbitrator misconduct in Defendant's live pleading—"The CIR's members engaged in fraud and/or corruption"—does not save these theories either. That allegation is directed at the CIR's conduct in issuing the award, not at the formation of the Letter of Assent, and it gave Local 520 no notice of the contract-formation defenses of fraud, mutual mistake,

misrepresentation, or lack of a meeting of the minds that Defendant raises for the first time in this Motion.

FED. R. CIV. P. 8(c) expressly lists fraud among the affirmative defenses that a party "must affirmatively state" in responding to a pleading. FED. R. CIV. P. 9(b) requires, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Courts have applied Rule 9(b)'s particularity requirement to fraud raised as an affirmative defense, not only as a claim. As one district court put it, "Pleading fraud without more as an affirmative defense does not meet the particularity requirements of Rule 9(b)." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 841 (S.D.N.Y. 1988). Courts have interpreted the particularity standard to require the pleader to detail the allegedly fraudulent statements or omissions, identify the speaker, state where and when the statements were made, and explain why they were fraudulent. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).

Mutual mistake is also subject to Rule 9(b)'s particularity requirement because it is a species of "mistake" expressly covered by the rule. Lack of a meeting of the minds is a contract-formation defense that overlaps substantially with the other theories and would similarly need to be pleaded with enough specificity to give the opposing party fair notice. In this case, Defendant did not plead any contract-formation defenses and said nothing in its live pleading that would give Local 520 notice of any of these theories. Defendant did not even disclose these theories in its amended discovery responses served a few weeks ago. *Plaintiff's MSJ*, Exhibit 13.

Unpleaded affirmative defenses can only be raised on summary judgment when doing so "does not result in unfair surprise." *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008). "The concern is that '[a] defendant should not be permitted to "lie behind a log" and ambush a plaintiff

with an unexpected defense.'" *Id.* (quoting *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987)). The critical question is whether the plaintiff had "'fair notice' of the defense that is being advanced." *Id.* (quoting *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999)). Here, as set out above, Local 520 had no notice whatsoever that Defendant intended to raise anything resembling these theories until Defendant filed its Motion for Summary Judgment. Considering that the discovery deadline has long since passed, Local 520 has been prejudiced in its ability to respond to the motion. In these circumstances, the Court should follow the default rule "that failure to abide by Rule 8(c) leads to waiver." *Id.*

Even if the Court could consider these unpleaded theories, they should be rejected. Although the Fifth Circuit does not appear to have reached the issue, the NLRB and various courts have consistently held that a party's failure to read a contract it had a reasonable opportunity to review does not constitute excusable ignorance, even if the other party made representations about the contract's contents.

The NLRB has repeatedly reaffirmed that failing to read and fully understand a contract before signing it is not a recognized defense. *Horizon Grp. of New England & S. New Jersey Laborers Dist. Council & Laborers Loc. Union No. 1153*, 347 NLRB 795, 798 (2006); *Positive Elec. Enters., Inc. & IBEW Local 43*, 345 NLRB 915, 921–22 (2005).

In *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386 (3d Cir. 2020), the Third Circuit articulated the standard most comprehensively. The court held that a party's failure to read a contract is not by itself sufficient to avoid the legal effects of its signature. However, the court recognized that fraud in the execution by reason of excusable ignorance can be established where the other party engaged in misconduct or imposition that effectively cut off the signer's opportunity to read the contract—such as significant time pressure

combined with an erroneous assurance that the written agreement accurately reflected the parties' oral understanding. The court emphasized that failing to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading. *Id.* at 404. In *MZM*, the employer stated a viable claim because the union representative allegedly assured the employer that the short-form agreement was a single-project agreement (when it actually incorporated statewide, self-renewing CBAs with an arbitration provision) and simultaneously threatened to pull workers from the job site if the employer did not sign immediately, creating urgency that foreclosed a reasonable opportunity to review the incorporated agreements. *Id.*

In contrast, in this case, although Defendant claims that it was "never provided a copy of either the 2019-2022 CBA when the [sic] signed the letter of assent or the new 2022-2025 Inside Agreement CBA when it was signed," *Def's MSJ*, at 18, Defendant does not claim that it even asked to review the CBA, much less that Local 520 refused to provide it or engaged in some other misconduct or imposition that effectively cut off Defendant's ability to obtain and read the CBA. As such, this set of arguments should be rejected.

**F. The interest arbitration award draws its essence from the Prior CBA.**

The final contention in Defendant's Motion urges that the CIR's award "does not draw its essence from the underlying agreement." *Def's MSJ*, at 18–21. Defendant raises three arguments on this issue.

First, Defendant claims that "the award conflicts with the express terms of the agreement because the agreement between Plaintiff and Defendant terminated on June 1, 2024." *Def's MSJ*, at 19. Local 520 has addressed this issue in Section III.B, above, in which it set out the evidence that both parties agreed that the Prior CBA did not terminate until June 1, 2025.

Second, Defendant argues that "the award imposed additional requirements that are not expressly provided in the agreement" because the New CBA imposed by the CIR "was not a termination, change, renewal or modification of the agreement, but an entirely new agreement." *Def's MSJ*, at 19. Defendant does not explain what it believes the difference is between a changed agreement, a modified agreement, and a new agreement, but it identifies four complaints about the award: the New CBA "removed the Zone III Memorandum of understanding," it added two MOUs, it increased the wage scale, and it "included Steward language and imposed break requirements that were not contained in the prior agreement." *Def's MSJ*, at 19–20.

Defendant correctly identifies the factors for analyzing whether an arbitration award draws its essence from a CBA, but does little to connect any of those factors to any of its arguments. At its core, Defendant's argument is that the CIR "imposed additional requirements that are not expressly provided in the agreement" by imposing the New CBA, which is not identical to the Prior CBA. If that argument were to prevail, then virtually every interest arbitration award would be subject to attack, because it is extremely uncommon for an interest arbitration panel to impose a CBA that is identical to the prior CBA. In contrast, the Sixth Circuit has held that for the CIR to run afoul of this principle, it would need to "convert the collective bargaining agreement between the parties into something else." *Local 58, IBEW v. SE Mich. Chapter, Nat. Elec. Contractors Ass'n, Inc.*, 43 F.3d 1026, 1031 (6th Cir. 1995). The CIR did not convert a CBA into something else in this case.

The Sixth Circuit in *Local 58* found it important that "Neither party objected to the CIR's first decision." *Id.* Similarly, in this case, Defendant's request for reconsideration to CIR objected only to the wage scale in the New CBA; it never raised the addition of the Construction Wireman/Construction Electrician and Four-Year Apprenticeship MOUs, or the Steward and

break-requirement language, the complaints it now presses for the first time in this Motion. *Plaintiff's MSJ*, Exhibit 11. The Prior CBA plainly gave the CIR authority to set the wage scale in the New CBA, and Defendant's complaints about the wage scale are complaints about the merits of the decision—which the Court is not permitted to review, *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)—rather than whether the award draws its essence from the Prior CBA.

Even setting the merits-review prohibition aside, the wage differential is not the arbitrary result Defendant suggests. The Zone III Memorandum reflects rates negotiated for a specific multi-county sub-market as part of the broader 2025–2028 multi-employer agreement between IBEW and NECA, an agreement to which Defendant was not a party. By contrast, the record before CIR included Local 520's submission documenting $40–$45 per hour solar and data-center work being bid in Abilene, Tennyson, and Brownwood, and evidence that ASH itself had obtained work at rates supporting a $40–$45 wage scale. *Def's MSJ*, Exhibit 21. CIR was entitled to weigh that market-specific evidence submitted by the parties in setting the wage scale for Defendant's New CBA. That the result differs from the Zone III multi-employer rate does not show irrationality; it reflects that CIR had before it evidence specific to Defendant's own bidding activity that was not necessarily before the negotiators of the broader Zone III agreement. This set of arguments should be rejected.

## IV. CONCLUSION

For these reasons, along with the reasons argued in Local 520's Motion for Summary Judgment, Local 520 respectfully requests the Court to grant summary judgment in its favor on all issues.

*Respectfully submitted,*

DEATS DURST & OWEN, PLLC

*/s/ Matt Bachop*
Matt Bachop
TBN: 24055127
mbachop@ddollaw.com
2901 Bee Caves Rd., Ste. L
Austin, Texas 78746
(512) 474-6200
FAX (512) 474-7896

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing document has been served on all counsel of record by the Court's CM/ECF system on this 18th day of August, 2026.

*/s/ Matt Bachop*
Matt Bachop