**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 520** | § § § § | |
| **v.** | § | **CIVIL ACTION NO. 1:25-cv-1643** |
| **A.S.H. ELECTRICAL SERVICES, LLC** | § § § | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE DAVID A. EZRA:

**SUMMARY OF THE ARGUMENT**

They key issue in this case is about the arbitrability of the dispute, not the meaning of an interest arbitration clause. There is a genuine issue of fact as to whether the termination date of the CBA was June 1, 2024, as contended by Defendant or June 1, 2025, as contended by Plaintiff. The parties have submitted competing CBA agreements with different language in section 1.01 that set out the term of the agreement.

The first submitted by Defendant with its Motion for Summary Judgment on its Counterclaim states, in clear and unambiguous language that it took effect on June 2, 2019, and would remain in effect until June 1, 2022, at which time it would convert to annual renewals unless changed or terminated as provided in the agreement. Defendant contends that notice of termination was provided as required by the contract and the contract terminated June 1, 2024.

The second submitted by IBEW contends that the CBA provided that it took effect on June 2, 2022, and terminated on June 1, 2025. Because there is a legitimate issue as to what language controls, Plaintiff's Motion for Summary Judgment should be denied. Alternatively,

even if the Court accepts that the CBA did not terminate until June, 1, 2025, the agreement is void ab initio because it was procured by fraud, mistake or because there was no meeting of the minds, the CIR award does not take its essence from the substance of the prior CBA, and because IBEW did not negotiate in good faith as required by the CBA before submitting any alleged dispute to CIR.

## INTRODUCTION AND FACTS

Defendant provided a detailed factual summary in its Motion for Summary Judgment on its Counterclaim. (ECF 33). To avoid duplication and redundancy, Defendant hereby incorporates the facts and the evidence from Defendant/Counter-Plaintiff's Motion for Summary Judgment on its Counterclaim. (ECF 33) and its Appendix to Defendant/Counter-Plaintiff's Motion for Summary Judgment on its Counterclaim (Appx. 34) for all purposes.

The facts and evidence set out in this response and the Appendix in support shall be set out in the body of this motion. When citing to the summary judgment record, Defendant shall identify references to the Appendix in support of its Motion for Summary Judgment on the Counterclaim as "(Appx.)." References to evidence included win the Appendix in support of Defendant's Response to Plaintiff's Motion for Summary Judgment shall be referenced as "(Resp. Appx.)".

## ARGUMENT AND AUTHORITIES

### STANDARDS FOR ARBITRABILITY

Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which it has not agreed to submit. *AT&T Technologies, Inc. v. Communication Workers of America*, 475 U.S. 643, 648 (1986). Arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to

arbitration. *Id*., at 649 (citing *Gateway Coal Co. v. Mine Workers*, 414, U.S. 368, 374 (1974)). Whether a CBA creates a duty for parties to arbitrate is an issue for judicial determination. *Id*. Unless the parties clearly and unmistakably provide otherwise, the question of whether parties agreed to arbitrate is decided by the court, not the arbitrator. *Id*., (citations omitted); see also, *Granite Rock Co. v. Int'ld Bhd of Teamsters*, 561 U.S. 287, 297 (2010). Whether a CBA has terminated or remains in effect is a question of contract interpretation that is for the courts to decide, not an arbitrator. *Litton Fin Printing Div. v. NLRB*, 501 U.S. 190, 209 (1991). The object of an arbitration clause is to implement a contract, not to transcend it. *Id*., at 205.

**A GENUINE ISSUE OF FACT EXISTS ON WHEN THE CBA TERMINATED**

In this case, the parties have submitted two nearly identical CBAs which each contain different language regarding the term of the agreement in section 1.01. In its Motion for Summary Judgment IBEW attached as an exhibit a different version of the CBA from the one Defendant included in its Appendix to its summary judgment motion on its counterclaim. (Cf. ECF 32.2, p. 1 to Appx. 4). The reason there is a discrepancy is demonstrated from the parties submissions to the NLRB in Case Ash Electrical Services LLC Case 16-RM-362398.

After negotiations between IBEW and ASH began on March 18, 2025, Defendant submitted a petition for an election to the National Labor Relations Board (NLRB) contesting what it believed to be IBEW's unlawful attempt to turn an NLRA 8(f) agreement into section 9(a) representation. (Resp. Appx. 1-2). [1] In its response to that election petition, IBEW included a copy of the 2022-2025 agreement. (Resp. Appx. 10). That agreement provided in section 1.01

[1] ASH also filed an Unfair Labor Practice charge with the NLRB asserting that IBEW 520 failed to negotiate in good faith on April 18, 2025, the day after IBEW submitted this case to the CIR. (Resp. Appx ) This charge, Case 16-CB-364062 is being investigated by the NLRB and remains pending.

that the term of the agreement was from June 1, 2019, until June 1, 2022, renewing annually thereafter. (Resp. Appx. 12 ). That election petition was dismissed on April 3, 2025. (Resp. Appx 92).

An employee of ASH later filed his own election petition with the NLRB on September 30, 2025. (Resp. Appx 96) In its response to this petition, IBEW submitted a CBA with different language for section 1.01. (Resp. Appx 107) That document appears to be is identical (even the signature pages appear to be identical) to the previously filed CBA, except that Section 1.01 in this second submission says that the agreement is effective from June 2, 2022, through June 2, 2025. (Resp. Appx 107). The only conclusion that can be drawn from this discrepancy is that sometime between its two submissions to the NLRB on March 30, 2025[2], and November 5, 2025, IBEW changed the language in Section 1.01 while leaving the rest of the document the same.

At the time of the negotiations and IBEW's submission to CIR in April of 2025, the CBA provided that it terminated on June 1, 2022, and was renewed annually from that point. Later IBEW changed the language in section 1.01 to match the IBEW's previously asserted position that it did not terminate until June 1, 2025. No explanation has been proffered by the IBEW for this discrepancy.

This evidence establishes that the term of the agreement at the time of this dispute was an annual agreement. As set out in Defendant/Counter-Plaintiff's Motion for Summary Judgment, the plain language of the 2022-2025 CBA in effect at the time this dispute arose specifically

[2] The document has the incorrect date of March 30, 2024, but based on the context of the NLRB petition and orders this is in error and should be March 30, 2025.

states that after the June 1, 2022, the CBA would renew on an annual basis unless it was changed or terminated as otherwise provided in the agreement. ASH timely withdrew its assent to this agreement as provided for in Section 8(f) of the National Labor Relations Act. 29 U.S.C. § 158(f) (2026). It gave timely notice of its intent to terminate the CBA on both May 30, 2023, and December 27, 2023. Therefore, the termination date of the CBA as it related to ASH was June 1, 2024. IBEW never sought modification or renewal of the CBA under the interest arbitration clause in Section 1.02 of the CBA until after the termination of the agreement on June 1, 2024.

The CBA in this case provided that only unresolved issues may be submitted to the CIR no later than the next regular meeting of the Council following the expiration date of the agreement or any subsequent anniversary date. This means that after June 1, 2024, IBEW had until the next regular meeting of the CIR to submit any dispute for arbitration after negotiations had been attempted and no agreement could be reached. The next session after the termination on June 1, 2024, was in August of 2024.

The Council for Industrial Relations Council Policy III Council Meeting Schedule provides:

> "Meetings of the Council are scheduled quarterly, in the months of February, May, August and November. The Council may vary this schedule when necessary. If no cases are filed, the Secretary shall notify the Council members of the cancellation of that particular meeting." [3]

IBEW 520 failed to begin negotiations, or even tell ASH what the subjects it wanted to negotiate were, until March 18, 2025. It failed to submit any dispute related to the CBA to CIR until April 17, 2025, long after the CBA expired and long after the deadline to submit any

---

[3] Council for Industrial Relations, Council Policy, http://www.thecir.org/Policy.htm (accessed July 30, 2026.)

dispute it had to CIR. Therefore, there was no contract in effect under which IBEW was able to submit any dispute to the CIR, and the CIR had no authority or jurisdiction to enter the award on May 13, 2025.

Even if the Court believes that the evidence does not establish that the CBA terminated on June 1, 2024, as a matter of law. The evidence of two different clauses establishes a genuine issue of material fact as to why and when section 1.01 was changed, who changed it, and when the CBA expired, on June 1, 2024, or June 1, 2025.

Plaintiff claims that Defendant admitted in its answer that the effective dates of the agreement were June of 2022 through June of 2025. This is a misreading of the answer. Defendant never admitted in its answer that the termination date of the CBA was June 1, 2025. The agreement states on the cover page and the title that it is for 2022-2025. But that does not constitute an admission as to when the agreement terminated in light of ASH's timely notice of termination and the plain language of section 1.01.

It is ironic that IBEW seeks to prohibit ASH from asserting that the CBA expired on June 1, 2024, by misconstruing the pleadings. In that same pleading, ASH asserted a counterclaim against IBEW in which it asserted that the contract terminated prior to IBEW's submission to CIR, and the CIR exceeded its authority by imposing a CBA after termination of the bargaining relationship. (ECF 6 ¶ 11). IBEW never answered this counterclaim. By failing to do so, IBEW has admitted this allegation and is prohibited from contesting this allegation under Fed. R. Civ. P. 8(b)(6). To the extent the court deems Defendant to have admitted the effective termination date of the agreement was June 1, 2025, Defendant requests the Court allow Defendant to withdraw that admission as it is incorrect and contradicts the plain language of the CBA.

Plaintiff also claims that Defendant acknowledged during negotiation that the contract was in effect until June 1, 2025. This is disingenuous and ignores the fact that ASH's position in this case has been that the CBA expired June 1, 2024. (Appx. 53). Out of an abundance of caution, and trying to avoid litigation, Defendant showed good faith and attempted to negotiate a successor agreement based on IBEW's insistence that the CBA did not terminate until June 1, 2025. As this case has matured and the evidence has been closely evaluated by counsel it has become clear that ASH was correct all along. The termination date was June 1, 2024, based on the plain language of the CBA. Defendant had no legal or contractual obligation to enter into any negotiations with IBEW. That fact that it attempted to do so to avoid litigation should not be held against it in this case.

Plaintiff relies on *Sheet Metal Workers Local 54 v. E.F. Etie Sheet Metal Co*., 1 F.3d 1464 (5th Cir. 1993), overruled in party on other grounds *Kansa Reinsurance Co. v. Congressional Mortgage Corp*.,20 F.3d 1362, 1373-74 (5th Cir. 1994); and *IBEW Local Union No. 666 v. Stokes Electrical Service, Inc.*, 225 F.3d 415 (4th Cir. 2000) as well as other similar authorities for the proposition that a notice of termination does not necessarily defeat an interest-arbitration obligation. While that is a correct statement of the law, it does not help IBEW in this case. Here we are dealing with a claim that the agreement had terminated before IBEW invoked interest arbitration.

In the Fifth Circuit, CIR arbitration awards are not enforceable where the agreement expired before the union submitted unresolved negotiation issues to arbitration. *Local Union No. 898 of the I.B.E.W v. XL Electric Inc*., 380 F. 3d. 868 (5th Cir. 2004). XL had signed a Section 8(f) pre-hire agreement. *Id*., at 869. The letter of assent provided that it would remain in effect until termination by written notice to Red River 150 days prior to the current anniversary date of

the Agreement, which was May 31, 2000. *Id*. The agreement contained an interest arbitration clause which provided:

> "Unresolved issues in negotiations that remain on the 20th of the month preceding the next regular meeting for the Council on Industrial Relations, may be submitted jointly or unilaterally by the parties to this Agreement to the Council for adjudication prior to the anniversary date of the agreement." *Id.*

XL sent a letter to the NECA Chapter and the union on November 12, 1999, stating that it was withdrawing from the NECA agreement and would negotiate its own agreement. *Id*. The letter included proposals and terms XL wanted to negotiate. *Id*. The parties never reached agreement and on July 10, 2000, XL sent a letter informing the union that their relationship had ended on June 1, 2000, when the letter of assent expired. *Id*. In August of 2000, the union submitted the unresolved issues between itself and XL Electric to the CIR. Id. The CIR found that XL had properly terminated the letter of assent, but it had not followed the proper procedure for terminating the Agreement. *Id*. CIR held XL was bound by a new Inside Agreement effective June 1, 2000, to May 31, 2003. Id.

The union filed suit against XL to enforce the terms of the arbitration award. *Id*., at 870. After a bench trial, the district court denied enforcement and concluded that XL was not bound by the interest arbitration clause after the agreement expired on May 31, 2000, and the CIR award was not enforceable. Id. The union appealed and the Fifth Circuit affirmed the decision of the district court to not enforce the CIR award. Id., at 871.

The Fifth Circuit opinion notes at the very beginning that this dispute was a threshold question of whether there is a valid agreement in place under which the union's claims could be arbitrated. Id. at 870. That is the same question the Court is faced with here. "Was there or wasn't there an agreement in effect for which a dispute could be submitted to arbitration." Id. In *XL* the Fifth Circuit agreed with the district court that questions of arbitrability were questions

for the court, thus the district court did not err in analyzing whether the dispute between XL and the Union was subject to the Agreement. Id., 870-871 (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 208–09 (1991), and *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 651, (1986)). The Fifth Circuit went on to conclude that the arbitration clause only provided for issues to be submitted to arbitration while the agreement was effective. *Id*., at 871. "Accordingly, the question of whether there is an agreement to arbitrate depends on whether the Agreement was terminated." Id.

Similarly, in *Local Union No. 637, Int'l Bhd. of Elec. Workers v. Davis H. Elliot Co.*, 13 F.3d 129 (4th Cir. 1993) the Fourth Circuit also concluded that a dispute about arbitrability was for the court to decide, not the arbitrator. In that case, Elliot signed a letter of assent to be represented by the National Electrical Contractors Association (NECA) and was subject to a CBA negotiated by NECA. *Id*. The CBA was set to expire on August 30, 1992. *Id*., at 130. Elliot revoked its letter of assent and notified IBEW that it was terminating the collective bargaining agreement's expiration date on August 30, 1992. *Id.* On May 27, 1992, the union invited Elliot to negotiate for a new agreement which would succeed the multi-employer agreement. *Id*. Elliot did not respond to the request and IBEW unilaterally submitted the dispute to the Council for Industrial Relations (CIR). Elliot advised the CIR that it did not possess the power to set an agreement because the agreement had expired. *Id*. CIR rendered an award for a new agreement, Elliot refused to sign it and IBEW sued to enforce the arbitration award. *Id*. The district court refused to enforce the award and IBEW appealed. *Id*., at 131. The Fourth Circuit affirmed the district court holding that "…whether the parties have agreed to submit a case to arbitration is one of contract interpretation, resolution of the question is a judicial matter of the court." *Id*. at 132. It reasoned that the interest arbitration clause but only those changes proposed 90 days

before the expiration date, and on which no agreement through negotiation had been reached. Id. at 134. Disputes about formation, existence or duration of the CBA itself are threshold questions a court must resolve. *Granite Rock*, 561 U.S. at 304 [formation date question required judicial resolution.]

Plaintiff's reliance on *Stokes* and *Etie* and their relations is misguided. In *Etie*, there was no dispute that the union invoked interest arbitration while the CBA was still in effect, and that Etie only expressed a desire to terminate the CBA, "at the earliest possible time." *Etie*, 1 F.3d at 1472. Here, IBEW's April 17, 2025, submission came nearly ten months after the Prior CBA had already terminated by its own terms on June 1, 2024. Alternatively, there is at the very least a factual dispute regarding the term of the CBA that prohibits summary judgment under these facts.

The issue in *Stokes* was over an 8(f) employer that had obtained 9(a) status. Stokes, 225 F. 3d at 419. The employer later disputed whether the union still enjoyed majority support under section 9(a) and expressed its desire to terminate. Id., at 420. The union gave notice of its desire to negotiate a new agreement and employer refused to enter into negotiations. Id. The Court held that even though there was no obligation to negotiate under section 8(f) it was still contractual bound to negotiate under the interest arbitration clause and that a good faith belief that the union did not enjoy majority status did not change that obligation. *Id*. at 424-25.

For all these reasons, the Court should deny Plaintiff's Motion for Summary Judgment.

**FACT ISSUE ON FRAUD, MISREPRESENTATION, MUTUAL MISTAKE OR LACK OF A MEETING OF THE MINDS**

There is also a legitimate issue of material fact as to whether Defendant's assent to the CBA was obtained by fraud, mutual mistake, misrepresentation, or that there was no meeting of

the minds. There is no dispute in this case that neither of the owners of ASH had any prior experience in dealing with Inside Agreements or Section 8(f) of the NLRA. (Appx. 236-237). They relied on the representations made to them by IBEW representatives that their agreement to participate in the NECA Inside Agreement would only be a one-year commitment and they could get out after a year if they wished. (Appx. 237, 246).

What they were not informed of was that a new agreement would be entered into at the end of that year that would then bind them to another three-year agreement through June of 2025, and they could not get out of it until then. They also were never informed of the interest arbitration clause which meant that IBEW could keep them in a captive bargaining relationship for years. They were never provided a copy of either the 2019-2022 CBA when the signed the letter of assent or the new 2022-2025 Inside Agreement CBA when it was signed. These raise genuine factual disputes as to the enforceability of the agreement and whether the agreement is void ab initio.

**A Fact Issue Exists As to Whether IBEW Negotiated in Good Faith**

Even if the CBA was effective through June 1, 2025, IBEW's conduct in the weeks before submitting to the CIR raises a genuine fact issue as to whether it engaged in the good-faith bargaining the CBA and CIR's own submission policy require before a dispute can be submitted to the CIR. Section 1.02(a) required written notice of a desire to change the Agreement at least 90 days before its expiration or anniversary date — March 3, 2025, measured against June 1, 2025. IBEW's pre-March 3 letter satisfied that formal notice date, but it identified no specific issue, term, or proposal. Section 1.02(b) permits the substance of proposed changes to be withheld until the first negotiating meeting, and IBEW did not disclose the nature of any of its

proposed changes until March 18, 2025 — the first session, less than one month before it submitted the dispute to the CIR.

The result was that Defendant had no meaningful opportunity to prepare, evaluate, or formulate a considered response to IBEW's actual demands before negotiations began, despite IBEW's formal compliance with the notice date. IBEW then submitted the dispute to the CIR on April 17, 2025. This sequence — technical compliance with a notice deadline paired with total silence on substance until the eleventh hour, followed by a rush to arbitration less than thirty days later — is evidence a fact-finder can weigh in determining whether IBEW's participation in the CIR submission process reflected the bona fide effort to reach a local settlement that both the CBA and CIR Standing Policy VIII require, or was nothing other than a predetermined path to arbitration disguised as negotiation.

Additionally, throughout this process IBEW retaliated against ASH for asserting its right to terminate its agreement to the CBA. The most obvious evidence of this is that the same day IBEW finally acknowledged receipt of notice of termination, IBEW filed a disciplinary action against Adam Johnke, a 25-year member of the IBEW, because he sought to terminate the CBA as being in the best interests of his company. They withdrew those charges only after Adam resigned his membership with IBEW because they had no jurisdiction over a non-member.

IBEW ignored ASH's efforts to discuss termination of the agreement and its view that the language of the contract provided for termination on June 1, 2024. IBEW simply responded that the agreement did not expire until June 1, 2025, contrary to the express language of the agreement, and took no action to provide any basis that the agreement terminated in 2025. It never discussed or informed ASH that it had changed the language in the CBA from 2022 to 2025.

When IBEW finally did seek to enter negotiations, it was only interested in discussing renewal of the agreement and imposing onerous conditions and terms on ASH that were not in the current agreement. (Appx. 239-241). IBEW refused to enter into any substantive negotiations claiming its hands were tied because ASH sought termination. (Appx. 240). No explanation for this position was ever provided. IBEW's representative also said he did not have authority to enter into an agreement or change any of the proposals made. (Appx. 240).

IBEW only took one position during negotiations. It refused to discuss ASH's desire to end the relationship and insisted only on forcing an onerous agreement on ASH for an additional three years. It also refused to consider discussing any reasonable increase in wages and insisted on raising wages from $29/hr to $36.50 staring June 1, 2025, and continuing large increases up to $42.50 by 2028. (Appx. 202) This is an immediate increase in wages of 25.86% and additional increases of wages of 46.55% in three years.

Plaintiff provided no justification for these increases related to the market in which ASH works. No evidence was submitted to CIR about wage conditions relevant to San Angelo, Tom Green County or West Texas. In its response brief, at CIR Defendant submitted the Zone III memorandum that was negotiated and included as part of the 2025-2028 that IBEW negotiated with NECA. (Appx. 137). This was the same Zone III and wages that IBEW insisted could not be applied to any renewal agreement with ASH. It showed the Zone III wage rates went from $29.00 to $29.34, only a 1.14 %. (Id.) It would go up to only $29.37 a total increase of only 1.28% over the life of the agreement, frozen thereafter through 2028. Plaintiff had already communicated these Zone III terms to Defendant on April 30, 2025 — nearly two weeks before the CIR's May 13, 2025, decision — and the MOU was formally executed July 25, 2025,

confirming Plaintiff cannot credibly claim the comparator rate was unknown or unsettled at the time of the CIR's decision.

The obvious intent was not to create uniformity among its agreements as IBEW stated to the CIR, but to punish and impose conditions on ASH so onerous that it would force him out of business. During the negotiation session on April 8, 2025, ASH when asked directly why Zone III protection was being removed. IBEW's negotiation representative Diarmid Campbell stated "Because you asked to terminate the CBA, so we are going... Because we are then negotiating against the CBA... therefore we've asked since you want to negotiate against the CBA." (Resp. Appx. 277-78). When asked by co-owner Shannon Carpetner, "So you're gonna punish us by making it harder?" Campbell did not deny the causal connection. He denied only Shannon's characterization. "We're not punishing you... It may look like that..." (Resp. Appx. 277) Campbell's own written meeting notes from April 8, 2025, independently confirm the same rationale. He wrote, "since ASH Electric asked to terminate the CBA, then that is what we are negotiating against, and everything they were offered is what NECA was offered." (Resp. Appx 303-304).

ASH objected to submission to CIR because there was no impasse. ASH had agreed to some of the terms, including dropping the most favored nation clause and discussions were on going on other issues at the time the union filed with CIR. Nevertheless, IBEW submitted the permissive bargaining issue of the most favored nations clause to the CIR along with its other

demands on which it offered no real compromise.[4] In fact, the CIR submission was made after only two initial negotiating sessions and before ASH could even respond to IBEW's proposals. IBEW also failed to continue to negotiate while the CIR matter was pending contrary to the agreement.

The day after Plaintiff unilaterally submitted the dispute to the CIR, Defendant filed an unfair labor practice charge with the NLRB (Case No. 16-CB-364062) alleging the same pattern of conduct at issue here. Defendant's objection was contemporaneous, not an after-the-fact litigation position. (Resp. Appx. 268). That charge is still pending before the NLRB. Defendant has consistently complained about the lack of good faith bargaining before, during and after IBEW's submission to CIR.

ASH raised all these issues and others in its brief to the CIR. (Appx. 122). Yet, the CIR did not even consider them and in a few short lines without any reasoning imposed on ASH an entirely new agreement setting out onerous and unfair terms. The interest arbitration clause does provide for arbitration with CIR, but only after formal notice has been given and after the parties have had a meaningful chance to engage in good faith negotiations. That did not happen here. Therefore, the issues raised were not arbitrable by CIR at the time of IBEW's submission.

**FACT ISSUE EXISTS ON WHETHER AWARD DRAWS ESSENCE FROM UNDERLYING AGREEMENT**

There is a also fact issue as to whether the CIR award draws its essence from the underlying agreement. An arbitration award in a labor dispute fails to draw its essence from the underlying agreement when the arbitrator's decision is not an interpretation of application of the

---

[4] In fact, IBEW's representative had previously acknowledged in a Zoom conference that the parties had agreed on removing the Most Favored Nations's clause. (Appx. 242-243).

agreement but instead reflects the arbitrator's own notions of industrial justice. *United Steelworkers of America v. Enterprise Wheel & Car Corp*. 363 U.S. 593, 597 (1960) [Arbitrator is confined to interpretation and application of the collective bargaining agreement.]. The award must have a basis that is rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. *Executone Info. Sys. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994) (citing *Brotherhood of R.R. Trainmen v. Central of Ga. Ry*., 415 F.2d 403, 412 (5th Cir. 1969), cert. denied, 396 U.S. 1008 (1970).

The Fifth Circuit has established a four factor test for the failure to draw its essence standard: (1) The award conflicts with the express terms of the agreement; (2) the award imposed additional requirement that are not expressly provided in the agreement;(3) the award is without rational support or cannot be rationally derived from the terms of the agreement; or, (4) the award is based on general considerations of fairness and equity rather than the precise terms of the agreement. *Am. Eagle Airlines v. Air Line Pilots Ass'n*, 197 F. Supp. 2d 580, 585 (N.D. Tex. 2002) (citing *Airline Prof'ls Ass'n v. ABX Air, Inc*., 274 F.3d 1023, 1030 (6th Cir. 2001).

As already argued above, the award conflicts with the express terms of the agreement because the agreement between Plaintiff and Defendant terminated on June 1, 2024. The award imposes additional requirements that are not expressly provided in the agreement. What the CIR imposed was not a termination, change, renewal or modification of the agreement, but an entirely new agreement.

The new agreement removed the Zone III Memorandum of understanding which provided for different wages in the counties in which Defendant works, including Tom Green County and the surrounding areas. (Appx. 30). Instead, it added a long and complex Construction Wireman/Construction Electrician MOU, and a Four-Year Apprenticeship MOU. It

also imposed the wage scale for Zone I (Austin, Texas) which would make the wages Defendant paid go from $29/hr to $36.50 staring June 1, 2025, and would go up to $42.50 by 2028. (Appx. 202) This is an immediate increase of wages of 25.86% and additional increases of wages of 46.55% in three years.

This is directly in contrast to the Zone III Memorandum that IBEW negotiated and agreed to with NECA at the same time as it was refusing to give any consideration to local conditions in negotiations with ASH. The Zone III Memorandum adopted by IBEW for the 2025-2028 multi-employer agreement provided for wages in the counties of Runnels, Coleman, Brown, Tom Green, Concho, McCulloch, Menard, Mason and Kimble to go from $29.00 in 2025 to $29.34 in 2027. (Appx. 137). This is a 1.14% increase in wages during the same period when the award imposes a 46.55% increase on ASH.

No rationale or explanation was provided for the hyper-increase in wages. The award also included Steward language and imposed break requirements that were not contained in the prior agreement. Therefore, the imposed CBA does not draw its essence from the agreement in effect at the time of termination.

WHEREFORE, Defendant asks the Court to deny Plaintiff's Motion for Summary Judgment, and any other relief to which it is entitled.

Respectfully submitted,

By: /s/ *Jon Mark Hogg*
Jon Mark Hogg
State Bar No. 00784286

JON MARK HOGG PLLC
1 East Twohig Ave, 2nd Floor
San Angelo, Texas 76903
(325) 777-0455
jmh@jmhogglaw.com

ATTORNEY FOR DEFENDANT A.S.H. ELECTRICAL SERVICES

**CERTIFICATE OF SERVICE**

This is to certify that on August 18, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record on file.

*/s/ Jon Mark Hogg*
Jon Mark Hogg