Speaker 1: Shannon Carpenter (co-owner A.S.H Electrical)

Speaker 2: Diarmid Campbell (IBEW Representative)

Speaker 3: Adam Johnke (co-owner A.S.H. Electrical

# Audio File Transcript[1]

April 08 Negotiation.m4a

## Transcript

00:00:45 Shannon: Hello, how are you?

00:00:46 Diarmid: Good, good, how about you?

00:00:48 Shannon: Good, hi, how are you?

00:00:49 Unidentified: Good, thank you.

00:00:56 Shannon: You got your recorder ready.

00:00:59 Diarmid: Oh, no, no.

00:01:01 Shannon: No.

00:01:01 Diarmid: Do I need to?

00:01:03 Shannon: Yeah, probably.

00:01:07 Shannon: Don't you always?

00:01:17 Shannon: No, we got a drink before we came, but thank you.

00:01:21 Adam: Let me turn this one on.

[1] Transcribed by MS Word Copilot. Cleaned up from recording by Jon Mark Hogg

00:01:26 Shannon: I got the cat's chair.

00:01:29 Diarmid: Yeah. I don’t know what it is.

00:01:29 Shannon: Boy, he's doing damage, isn't he?

00:01:31 Diarmid: All the new ones, these old ones we don't mess with. So.

00:01:34 Shannon: Oh, really?

00:01:35 Shannon; Yeah, it was just.So.

00:01:38 Shannon: Are you going to see Don Huffines tonight?

00:01:46 Diarmid: Uh No.

00:01:46 Shannon: He's running for state comptroller.

00:01:49 Diarmid: No.

00:01:50 Shannon: He's going to be here speaking tonight.

00:01:52 Diarmid: Okay.

00:01:53 Shannon: It's going to be good.

00:01:54 Diarmid: Where's he speaking at?

00:01:56 Shannon: At the Clarion.

00:01:57 Diarmid: Oh, okay.

00:01:59 Shannon: Yeah. The tea party invited him.

00:02:00 Diarmid: Okay.

00:02:01 Diarmid: Is he going to be at the Arc Light? Isn't that that restaurant?

00:02:08 Shannon: It's the, it's some ballroom they got or something.

00:02:15 Diarmid: Oh, thank you.

00:02:16 Adam: And this is yours.

00:02:18 Shannon: Oh, I already got that.

00:02:22 Adam: Oh. Okay. So what I thought we would do is kind of more or less start over on number one. Because I can't really write what we're proposing until I have a good understanding of what you guys are proposing. Make sense?

00:02:43 Diarmid: Yes.

00:02:45 Adam: So I would like to start all over again, because I don't even think we got to number two or three last time. So number one.

00:02:57 Shannon: Wait, stop, for a second, because y'all understand this a lot more than I do, because I'm the dumb one here. When we go through these, say we made like an agreement or we come to an agreement, are you authorized to make that agreement today or do you got to go take it back to Austin and then we come back or how does that work?

00:03:21 Adam: Yes, so everything that would be proposed today, we would, I would then run by Austin. Because I know Thursday, they're actually meeting.

00:03:30 Shannon: So you can't sign for anything today. All we can do is talk about it, correct?

00:03:35 Diarmid: Yes, yeah, no, I don't believe anything could be signed just because of the process that we're in. So I would have to, we would have to run it by the attorney, everything like that to make sure that what we're signing off isn't going against the NECA. So that's the big thing with what we're negotiating here. It can't be better than the NECA, what they're negotiating.

00:04:00 Shannon: So they're authorized to do it, not you.

00:04:03 Diarmid: It's both. I mean, I have the authority being the assistant BA, but because we're having to go with the CBA, I would run it through our proper channels. because I can't authorize something better than what NECA's getting. It would be against this.

00:04:22 Shannon: Well, isn't that what this proposal is though? Why would you, if we agreed to this?

00:04:28 Diarmid: Well, so this, what we put in.

00:04:30 Shannon: I'm sorry, I'm just ignorant to this.

00:04:32 Diarmid: No, no, what was proposed here is yes, what was originally proposed to NECA up there. So like if all.

00:04:39 Shannon: So you could agree to this. If we agreed to all this, then we can make an agreement today.

00:04:45 Diarmid: I would still run it through the attorney.

00:04:48 Shannon: Oh, okay. So the attorney didn't have nothing to do with this?

00:04:52 Diarmid: No, I took what was proposed and put it, but just with how everything is, I would-.

00:05:00 Shannon: Who came up with these proposals?

00:05:02 Diarmid: This is what was proposed to NECA in Austin.

00:05:05 Shannon: Oh, okay. You wrote these proposals to NECA.

00:05:10 Diarmid: This is what Austin proposed. So I took that proposal.

00:05:14 Shannon: Oh, Austin did.

00:05:14 Diarmid: And put him here because that's what was given to NECA since it's the CBA.

00:05:19 Adam: Can I get edgewise in here somewhere?

00:05:23 Shannon: Yeah, I guess.

00:05:24 Adam: So Austin has proposed that San Angelo not be recognized as Zone 3 to NECA as well.

00:05:34 Diarmid: No, that is in there because we're doing modified. Because you're, so our proposal has the NECA, but then we propose because you're wanting to terminate the CBA. So we are proposing then to make modifications to it.

00:05:52 Shannon: Okay, and you may understand this, but I don't. So my question is, if we don't come to an agreement by the time our contract's up, what happens then?

00:06:07 Diarmid: Then it goes to CIR.

00:06:09 Shannon: CIR which stands for?

00:06:10 Diarmid: Council on Industrial Resolutions.

00:06:16 Shannon: Okay, it goes to CIR. So, but when our agreement is up, if it goes to CIR. we no longer have to pay benefits after our contract is up, right?

00:06:28 Diarmid: No, so CIR is the council, contractors, and union members, and they come together and.

00:06:36 Shannon: But what I'm saying is we don't have to pay anything because that's the date that the contract's up. So why would we continue to pay benefits after the contract's up? That's why do a contract if the contract date means nothing.

00:06:51 Diarmid: So yeah, that I'm not going to speak on. It's just because I don't know the legal and I don't want to say one way or the other.

But through the process, well, I know that's why we have a certain date. So all this will go through before that, my understanding, before that deadline.

00:07:11 Shannon: Well, I'm just asking because when we signed, y'all, I mean, there was always an understanding that when the contract is up, we can get out. And so I don't understand why we would continue to pay anything after the contract's up. And you may know the answer to

this, but I don't. So that's why I'm asking. You see what I'm saying? Like, how is there a never-ending contract if we can't get out? Why is there a contract date?

00:07:38 Diarmid: Well, so I believe all this will be once it goes, because we have to submit everything by a certain date to make sure it can get in front of everyone before that end date.

00:07:49 Shannon: Before the end date.

00:07:50 Diarmid: That is my understanding.

00:07:51 Shannon: So if we don't, okay, that's where I need clarification. So if we do not come to a resolution or an agreement, I don't know what y'all call it, a bargain, whatever, prior to that date, how long prior to that date will you send it to wherever?

00:08:10 Adam: The goal to this is so we can try to get some kind of. I understand what you're saying.

00:08:17 Shannon: But what I'm saying is, if we don't, we still have a contract date that says we can, the contract's over. So why would we still have to pay?

00:08:29 Diarmid: Well, but there's also contract language in that, certain steps have to be met. And it then it falls into the.

00:08:37 Shannon: So y'all try to keep us in a never-ending hamster wheel. Is that what you're telling me?

00:08:42 Diarmid: No.

00:08:43 Shannon: So we can get out.

00:08:46 Diarmid: I would suggest reading what the letter A states.

00:08:50 Shannon: Well, I think there's some misinterpretations of it. That's why I'm asking.

00:08:54 Diarmid: What I would say, because it's a legal document, then an attorney could probably interpret that.

00:08:59 Shannon: Okay, well, we got one, but let's, we can continue now. Yeah, let's just go to the questions, because none of that makes sense to me. Okay, number one.

00:09:09 Adam: So. This is a combination. I want to make sure I understand. This is a combination of what was presented to NECA by Austin with additions or exclusions specifically to ASH Electrical.

00:09:34 Diarmid: No, not specifically to ASH, with any contractor because you're wanting to step away and not bargain with NECA. So we have to then ratify the MOU to allow us. So this isn't just specific to you.

00:09:51 Shannon: I thought we were a part of NECA.

00:09:53 Adam: So, well, we're not.

00:09:55 Shannon: Okay.

00:09:55 Diarmid: It's the our contract, though.

00:09:57Adam: This is what my question is. Zone 3, because this is following into #2. Zone 3, you're requesting that it be removed from the CBA. So let's take.

00:10:13 Shannon: In the CBA is the bargaining.

00:10:16 Adam: Collective bargaining agreement. So let's take that knowledge. You want to remove zone 3. Is zone 3 being proposed to be removed from contractors, I'm trying to think how I can phrase this, contractors actively engaged or potentially may be engaged in this geographical region. Is that being proposed for them as well? Or is that why #2 follows up that you want to remove the favored nations clause? The reason I ask that, it would seem to reason if you're going to give me a worse deal than what other contractors are getting, you see where I'm

going with it? Unless, I'll just be specific, unless A&M, what is it, Sigma and Royal, you're going to remove it from their deal, then in effect, the reasoning for the removal, the proposed removal of the favored nations clause is so that I sign a harsher contract, which is more damaging to our company than what the other ones have. Is that correct or incorrect?

00:11:37 Diarmid: I would say incorrect. We put this in there.

00:11:41 Shannon: So is theirs like ours?

00:11:43 Diarmid: They didn't ask to terminate the CPA.

00:11:45 Shannon: So you're going to punish us by making it harder?

00:11:48 Diarmid: We're not punishing you.

00:11:50 Shannon: That's what it looks like.

00:11:51 Diarmid: It may look like that.

00:11:53 Adam: If zone 3, if zone 3.

00:11:55 Diarmid: We are following the law and the statute that we have to follow. We're not punishing everything that's in here.

00:12:02 Adam: I just want to be clear. If you, I'm not saying that, Diarmid. I'm trying to open up dialogue.

00:12:06 Shannon: Wait. Let's talk one at a time:

00:12:08 Adam: I'm trying to open up dialogue. The removal of zone 3 would increase the wages by a substantial amount. And we both realize that. So the fact that you propose to remove Zone 3, that's a big whammy right there off the bat. And that's, so what is the justification in removing Zone 3 for ASH Electric? Because we predominantly perform work in this geographical jurisdiction. What is the purpose in removal of Zone 3?

00:12:50 Diarmid: Because you asked to terminate the CBA. So we are.

00:12:53 Shannon: What does that have to do with it?

00:12:55 Diarmid: Because we are then negotiating against the CBA. So the CBA and the whole. So therefore we've asked since you want to negotiate against the CBA?

00:13:04 Shannon: So what electricians here get paid 250% more? Then what? I mean, so basically what you are saying, because I want to understand this, is because y'all want to leave and we're mad about it, we want you to pay your electricians 250% more than any other electrician here. Is that what I'm understanding?

00:13:26 Adam: Shannon?

00:13:27 Diarmid: No.

00:13:28 Adam: We'll get to, if I could, we'll get down to #10.

00:13:32 Shannon: Okay.

00:13:32 Adam: I mean that. Zone 3, we all know why it exists. We all know why it exists.

00:13:40 Shannon: Why? I don't.

00:13:42 Adam: Zone 3 exists because the prevailing rate of pay for the San Angelo area is not the same as Austin.

00:13:53 Shannon: Right. Well, it's not supposed to be.

00:13:54 Adam: Exactly.

00:13:55 Shannon: Yeah.

00:13:55 Adam: Because the cost of living index and so forth and so on is substantially lower here.

00:14:01 Shannon: So we'd be paying more than Austin then by doing that?

00:14:06 Adam: Well the removal of zone 3 does that effectively. It says you will pay at a rate unless we can come to some other, which we got to get down to number 10.

00:14:22 Shannon: Okay.

00:14:26 Adam: Because the way I'm reading this, the removal of the favored nations clause, if we can negotiate a better deal than contractors, we've removed the favored nations clause.

00:14:42 Diarmid: And that's why we're asking to bring it out in this go round so when we sit we can then talk about that and not have to go with what's being proposed to NECA. So that's why these two are in this so then we can take out the fact that NECA is the bargaining partner.

00:15:00 Adam: And even something such as A differing length of contract is the purpose in #2.Correct or incorrect?

00:15:14 Diarmid: Well, all that falls in there with the favored nations. Yeah, you can't give one contract or something and not the others. So that's why we would propose to take it out so then we can actually bargain separately. So this first one here, it still falls under NECA. That's why we're asking for that language. So then next bargaining session can actually...

00:15:37 Shannon: But we can keep it in, right?

00:15:40 Adam: We can propose it.

00:15:42 Shannon: Okay.

00:15:44 Adam: I mean, it's a...

00:15:45 Shannon: Wouldn't that be more beneficial to us?

00:15:48 Adam: No, because from my perspective, it could be worse. You don't know. It's 50-50.

00:15:54 Shannon: Okay.

00:15:54 Adam: Quite frankly.

00:15:56 Shannon: You can explain that later.

00:15:57 Adam: Either we could get a worse deal than the current NECA contractors if we agree to that, or we could get a better deal.

00:16:08 Shannon: Okay.

00:16:11 Adam: Number 3, I believe, is self-explanatory.

00:16:18 Shannon: That's a hard no.

00:16:21 Adam: Let's see here. What is our current apprenticeship contribution? Because I don't see anything.

00:16:51 Diarmid: So the JTC rate going in.

00:16:57Adam: I don't see that.

00:16:59 Diarmid: Yeah, it depends.

00:17:00 Adam: I don't see.

00:17:01 Diarmid: It looks like 36 cents as it tops what the journeyman contributes.

00:17:09 Shannon: All right.

00:17:10 Adam: And how is that computed? Because you give a percentage here, not a fixed rate.

00:17:19 Diarmid: Yeah, I believe they're trying to, because on this, they're trying to move it to a percentage from the fixed rate.

00:17:27 Adam: I need a calculator.

00:17:40 Shannon: You're getting old, you're blind.

00:17:42 Adam: Is the, no, it's got to look at my face. Is the percentage based on wages?

00:17:50 Diarmid: How they came to that percentage there, I'm not 100% on it.

00:17:54 Adam: So I'm not trying to trap you, but annuities, $2.61, didn't they say that that's 9%? So let's just see. 29.09 equals 261. Okay, so it's based on a wage. So you're at 1.2%

currently so you'd want a half a little over a half a percent increase is what I'm calculating because right now we're at 1.241 and they want to go to 1.75 yep we're at 1.241 1.75 minus 1.241 equals a point, yeah, a half a percent, just a little over. Yeah, .051% increase. Number 5, an annuity increase across the board by 1%. So you would go to 10% and then the NEBF and add 3% to the NEBF.

00:19:40 Diarmid: No, it's the NEIB.

00:19:43 Adam: NEIB. Okay.

00:19:44 Diarmid: It's a new pension format.

00:19:47 Adam: Oh, so that would just be in addition to everything that's already currently here. And then the NEIB. NEIB. And I'm going to put that.

00:20:02 Shannon: It's a new pension format.

00:20:03 Adam: That's a new pension. So I'm going to ask, is that already in or this is being proposed?

00:20:15 Shannon: Separate.

00:20:17 Adam: Ah. So you are trying to institute a local pension plan because there's not one in existence. Is that correct?

00:20:23 Diarmid: Yeah, no, they're trying to bring this on. So it's along the same lines as any VF, except it's just the other.

00:20:29 Adam: It would be like a kind of like a 401k kind of sort of.

00:20:30 Diarmid: Yes.

00:20:33 Adam: Not exactly. I'm not trying to.

00:20:35 Diarmid: No, yeah, I'm not…

00:20:35 Adam: Trying to trap you in the scene. That's what that is.

00:20:38 Diarmid: But yeah, it falls within those lines. But it is something that is being brought. The members have to vote all this and that. So no, it is a new thing that is being put on the table for retirement.

00:20:57 Adam: So currently, that'd be 87 cents an hour at current wages. And as an adder. Just so we're on the same page here. Okay. And that was on attachment one. Well, this is NEBF is attachment one.

00:21:35 Diarmid: I believe there should be some language. Everything in there is what they had given the contractors in Austin. I don't have the attachments with me.

00:21:44 Adam: Here, she's got one and I got a spare one. There you go. So I am not seeing any reference to the NEIB.

00:22:01 Shannon: It's all NEBC. NEIB.

00:22:04 Diarmid: So the below languages is...

00:22:07 Adam: Where is that at?

00:22:08 Shannon: Section 6.01.

00:22:11 Diarmid: Electrical benefit fund.

00:22:12 Adam: Hold on, where'd you get that?

00:22:14 Shannon: Right here. NEIB.

00:22:16 Adam: How come I don't get that?

00:22:18 Shannon: 6.01. Oh, you don't have this?

00:22:22 Adam: No.

00:22:22 Shannon: Oh, well, I'm sorry. Here.

00:22:25 Adam: Hold on. Let me look. No.

00:22:26 Shannon: It might not be in order.

00:22:28 Adam: No, I do not have that page.

00:22:33 Shannon: There.

00:22:33 Adam: You got a copier?

00:22:35 Diarmid: Yeah.

00:22:35 Adam: Can you make...

00:22:36 Diarmid: I didn't say I thought I had included.

00:22:38 Shannon: Do you have that one in there?

00:22:41 Diarmid: No, I didn't see that in there, but yeah, no, I can make another copy.

00:22:44 Adam: Please. Thank you.

00:22:46 Shannon: Thank you. Don't yawn, you'll make me yawn. These campaign days, I'm ready for this to be over. I'm ready to go fish, to be honest with you. That's where I find my peace, the lake.

00:23:25 Unidentified: The lake?

00:23:26 Shannon: Yeah.

00:23:33 Unidentified: There's one for him, one for you.

00:23:34 Shannon: Here you go. Now you have one. You feel better?

00:23:40 Adam: Yeah.

00:23:43 Shannon: I was special. So this is the first time I see in this one.

00:24:09 Adam: What is NEAP?

00:24:10 Diarmid: The NEAP that I have not.

00:24:17 Adam: Because it says, see the note? Upon mutual agreement, it may be inserted at the end of this section and allows for contributions which exceed the limits of NEAP to be paid

into the NEIB. And I have a question where that's concerning because without knowing what NEAP, we got a, we got a, I think it's prudent for us to clarify what some of these.

00:24:52 Diarmid: The National Electrical Annuity Plan is the NEAP.

00:24:55 Adam: Okay.

00:24:57 Shannon: Yeah, it's right here. See.

00:24:59 Adam: I'm not trying to be hard here, but it says, it allows for contribution which exceed the limits of NEAP to be paid into the NEIB. But this is asking for a 3%. Just a flat rate of 3%. So I'm not, I don't understand how a payment, what payments are being contributed to NEAP.

00:25:38 Diarmid: So that I would have to get with, that may be just another plan that maybe we don't have and it's just stating that if you contribute to that anything over may fall then into the NEIB.

00:25:50 Shannon: Can we just clarify that? You know what I'm saying? Like get clarification on that.

00:25:54 Adam: Just let me know what the NEAP is because, can you see my quandary here?

00:26:00 Diarmid: Yeah, yeah.

00:26:01 Adam: So it says. It says that if contribution exceed the limits of NEAP, then they'll go into the NEIB. But number 5 is proposing that just a straight flat across the board contribution of 3% go to the NEAP.

00:26:23 Shannon: And how would we know what the excess of the 415 limit for such a year is?

00:26:33 Diarmid: Yeah, no, I can.

00:26:34 Adam: That's a little confusing there.

00:26:41 Shannon: They contradict.

00:26:44 Adam: And is that like a monthly payment as we've set up now or is that a, because it goes on to say that the employer shall contribute an amount equal to the required NEAP contributions in excess of the 415 limit for such year for each such individual to the NEBF. So if it goes over, then it reverts back to the NEBF.

00:27:11 Diarmid: Uh. So yeah, that's something I would have to get with.

00:27:14 Adam: I think #5, we need a substantial amount of clarification on what that is.

00:27:20 Shannon: An explanation.

00:27:22 Adam: Just so we're all on the same page.

00:27:25 Diarmid: No, yeah. And that'd be easy enough.

00:27:27 Adam: Okay. Yeah. Number 6. I'm not understanding the purpose of number six. And I do not have a, current CBA with me. I'm not understanding what the purpose of number six is, other than the fact that breaks are not currently within the contract and they are at the sole discretion of us. Is there concern that that's being abused or there are contractors that don't recognize a break period?

00:28:18 Diarmid: I'm sure that's what it is.

00:28:19 Shannon: Because doesn't Texas state laws say you don't have to give one?

00:28:23 Adam: No, but we've always given our guys a break. On the construction sites, they've gotten breaks, not on a service truck, because that brings up a good point. What if you're on a service that you're not stationed at?

00:28:41 Diarmid: Well, and that's why they've put it in here, because we've had issues. And so...

00:28:46 Shannon: But not with us.

00:28:47 Diarmid: Well, no, just in general. And so we're trying to bring language then in that states they'll be given.

00:28:53 Adam: So what exclusion would there be for a service truck? Because I'm already paying a guy, and now you can see where I'm going at it, is I'm already paying a guy, and if he goes, if he said, let's say he's on the base or Chadbourne. And the next call is in Buffalo Heights. He's going to sit in that truck for 25 minutes to get from Chadbourne.

00:29:18 Shannon: Talking on the phone…

00:29:20 Adam: So how do we work around that without some kind of additional language? Because this is all good and well for a job site that the men report to at a specific start time, and they are there for the duration of the day. But for someone that engages in service work and things of that nature, that's...

00:29:49 Diarmid: And that would be something that, yeah, we would have to go back and forth on. And I'll tell you this.

00:29:55 Adam: Well, what's your feeling on it?

00:29:57 Diarmid: We do it as a blanket, because…

00:29:59 Adam: But then that traps me into where y'all can come back and say, you're in violation of our agreement and I'm going to, you know what's going to happen. I'm going to say, Jesus Christ, I paid a guy for 30 minutes to drive his freaking truck from here to here. What do you want me to do? He gets there and he gets to sit down for another 15 minutes. You can see that's already.

00:30:19 Shannon: Would that be reasonable?

00:30:21 Adam: That's already a potential issue.

00:30:24 Diarmid: And like I said, I know why it's blanket because then the same comes in as we get a contractor saying, they got that 15 minute break. They had to drive to the supply house. Why do I need to give them a break then? Yeah, they're on a site, but they had to drive to the supply. So that's why it's because it can go both ways. Y'all got yours and then we got ours. They're both valid arguments.

00:30:46 Shannon: But y'all are always right, right?

00:30:49 Diarmid: If you'd like to say it like that.

00:30:51 Shannon: I'm sure you would. I'm sure you would. That's kind of where I'm.

00:30:57 Adam: I'm making you aware of.

00:30:59 Diramid: No, and I get it.

00:31:00 Adam: That's going to be.

00:31:01 Shannon: So you're trapping us with that one is pretty much.

00:31:04 Diarmid: I would not say that would be a trap.

00:31:07 Adam: And also, it could be a trap.

00:31:11 Diarmid: And a contractor could take advantage of it.

00:31:13 Shannon: When you're taken, have we ever?

00:31:15 Diarmid: But see, you're trying to make it about you, and I'm saying this.

00:31:18 Shannon: Well, it is about us.

00:31:19 Diarmid: No, it's not.

00:31:20 Shannon: It's about our company.

00:31:21 Adam: Well, actually, actually, hold on, hold on, let me clarify. This is actually about us, Diarmid, because it says this proposal is specifically for us.

00:31:33 Diarmid: And what I've put in here is what's been offered. To you as well.

00:31:39 Adam: So, well, we will,

00:31:I guess we can agree to disagree.

00:31:42 Adam: You already know.

00:31:44 Shannon: It's about us.

00:31:45 Adam: Number 6. Number 6 is, I mean.

00:31:51 Shannon: Ridiculous.

00:31:52 Adam: Every morning, Jerry gets in his truck and goes to the job site and he's in that van because we don't congregate, we don't operate in a typical job site format. So we already have travel to the job per the contract and travel back from the job per the contract that we're paying these men.

00:32:17 Shannon: When he was driving our truck and getting his drugs, I mean, was that his break?

00:32:21 Adam: No.

00:32:22 Shannon: I'm just wondering. Because it works the other way too, Diarmid.

00:32:26 Diarmid: Well, and that's why I'm saying.

00:32:28 Shannon: Can we? In fact, we're the ones that have been used by employees.

00:32:33 Diarmid: You can't get mad at me for.

00:32:36 Shannon: No, I'm not, but.

00:32:37 Adam: With all due respect.

00:32:39 Shannon: You also have to have understand our side too, because it has happened to us. We've never done that to employees, but your employees have done that to us.

00:32:51 Adam: So.

00:32:53 Diarmid: If they're my employee, then why is he still working for you?

00:32:56 Adam: So for, hold on, we're not going to get off track here. We're not going to get off track. That's not what this is about. Now, I want to ask a question.

00:33:06 Diarmid: Yes, sir.

00:33:06 Adam: For us to have any type of successful negotiations, you've got to be able to say, I disagree or I agree. Now, you've been well aware of what our standard format is, that I don't believe I've ever had an employee report to the job. I do not believe that's ever happened. So we have to either start agreeing. I don't think that's something that you need to discuss with Ben. There's a lot of time ASH Electric has paid employees that we just have, to institute a mandatory 30 minutes possible, 45 minutes additionally of company paid, but I mean, you might as well be putting in another lunch break.

00:34:09 Shannon: They know that already. This isn't serious.

00:34:10 Adam: We've had employees drive to Abilene. That's 90 minutes. That's an hour and a half. We can, we can, I think, in order, you got to start putting a good foot forward, and I'm just telling you.

00:34:25 Shannon: You really think this is serious?

00:34:27 Adam: You got to know…

00:34:28 Shannon: In good faith.

00:34:29 Diarmid: But we, this is what I don't think y'all are understanding. We're negotiating the CBA. The CBA falls under the NECA, which falls under Austin

00:34:36 Adam: But you're negotiating. You can't, we're not recognized by NECA Diarmid. I have revoked their authority a year ago.

00:34:45 Diarmid: So that's why then we put this in. But what is being offered here for (unintelligible) the paid breaks.

00:34:52 Adam: Let me get, let me get to a question here, and I'm just I'm just trying to keep the peace. Until we agree to #2, we really can't. Is that a fair statement? We really can't do anything because there's going to be you're going. I hypothesize that anytime I say something like, we both know that that's ridiculous, that you're going to reply, your reply will be, this is what we're offering to the Austin contractors through NECA. So until we either agree or disagree to take out #2 or agree that that's until some traction is made on #2, none of the rest of this really makes any difference. Is that fair or unfair to say, in your opinion?

00:35:45 Diarmid: No, I would say yes. My hands are tied with what we can offer because I have to offer what's being offered to NECA.

00:35:51 Adam: Okay.

00:35:51 Diarmid: So this Thursday when they meet, something may change because they may have come to this or that. But my hands got tied when y'all said you wanted to terminate the CBA. The CBA succeeds our MOU.

00:36:04 Shannon: No, we will terminate.

00:36:06 Diarmid: So therefore that is what we have to negotiate.

00:36:07 Adam: Just so we're all clear, just so we're all clear, not only have we made intent to terminate the CBA, we have also revoked NECA's authority to bargain upon our behalf. That was done multiple years ago. So both of those are legal and binding. NECA does not bargain for ASH Electric. That's why we're here. If they had authority to bargain for us, then I wouldn't be here. Does that make sense? I'm just trying to clarify some things in your mind because NECA does not have authority. I'm not a member of NECA. Their authority to bargain on my behalf has been revoked. And yes, you are correct Ash Electrical has made due notice multiple times that we seek to terminate the CBA and the agreement at its term. So that is all correct. But you are, and I

don't know if it's on purpose. I'm not accusing you. I don't know if it's purposefully done, but NECA is not authorized to bargain for us in any shape, form, or fashion.

00:37:14 Shannon: So why are we talking about NECA?

00:37:16 Diarmid: Because per our CBA, we bar, but you can, I'll give you a copy of it. That's how we're tied.

00:37:22 Adam: I'm just,

00:37:23 Shannon: He knows.

00:37:24 Adam: Well, I'm telling you, it's been recognized legally.

00:37:29 Shannon: Case law.

00:37:32 Adam: That NECA cannot bargain for us. That's why I am bound to bargain with you guys and see if we can hammer something out and that's fine. But like I said, at some point you got to keep, I feel like I'm trying to bargain with a silent partner that's not here. And I don't think you're a bad guy and I don't think you have ill intention, but you got to know that when I've paid men to travel to Menard, when I've paid men to travel to Abilene, El Dorado, Sonora, Ozona, you got to know that number six, we've never abused our employees. And that's just, you got to know that that's an issue. So #7, I don't really know. That's more of a Austin deal. I mean, we're not badging in through gates and everything here.

00:38:32 Diarmid: Yeah, just future, kind of stuff.

00:38:38 Adam: We propose a minute. We got to get through this. We got to. I mean, I'm just, I'm laying it down. Whether you want to or not, we got to get through #10 so that I can have something to come back and say, this is our proposal.

00:38:56 Shannon: No impasse this time.

00:38:58 Adam: Yeah, we have got to, this ain't personal, Diarmid. It’s business.

00:39:01 Diarmid: Oh, no. Believe me, I grew up in a business household. I know you don't combine.

00:39:06 Adam: So #8. We propose amending section 2.12, see attachment 3. Okay. I've read this.

00:39:18 Diarmid: It's Steward language.

00:39:20 Adam: Okay, that's pretty self-explanatory. I mean, personally, I think that there should, there's no time limit here. It's like, and I think that you should be conversant with that, you cannot interfere.The steward being allowed sufficient time without loss of pay or reprimand, so forth and so on.Man, what's this really, that's, what's to really stop a steward from not doing a damn thing all day and saying, I'm in the, I'm carrying out my duties as a steward, hands off. We don't want that. I don't think you guys do either, so that needs to get cleaned up. I'm just going to say that. needs to get cleaned up. That's my input. And I don't know about, steward shall be given a complete list of workers to be paid showing the amount of money earned and hours worked by each worker. That might be infringing upon some kind of state law. I'm reading through this and just giving you my opinion. That's kind of confidential information or confidential information listed on an employee's paycheck. I don't think that's legal.

00:41:20 Shannon: Do you know?

00:41:22 Diarmid: More than likely, if we have something there, it's been ran by attorneys. So,

00:41:30 Shannon: Of course.

00:41:31 Adam: The steward will be given a list where it could be terminated at least two hours prior to the termination of these workers. Now, there we go again with that on #2. I don't know if that's lawful or legal.

00:41:49 Shannon: Idn't there case law with the company, you already did this to them in San Angelo and took it all the way to the appellate court and he won.

00:41:57 Adam: Okay.

00:41:57 Diarmid: I'm sure it's public, right?

00:41:59 Shannon: There it is.

00:42:00 Adam: Okay. So let's see here.

00:42:03 Diarmid: I think it's the same one that I picked for 25,000 in stolen wages.

00:42:07 Shannon: What?

00:42:07 Adam: Yeah.

00:42:08 Diarmid: It's the same contractor that we've gotten in stolen wages from one prevailing wage work.

00:42:13 Adam: Okay. Number 9. For paid holidays, Thanksgiving, day after Christmas, as well as PTO, what would be the business justification, except for y'all just want that? What is the justification for that?

00:42:38 Diarmid: Well, a lot of the open shops pay the holidays. We have them off. They pay them. And so we're just trying to be competitive.

00:42:50 Adam: I don't know if a lot of open shops are paying their men $29 an hour either, plus nearly $10 an hour in benefits already. So taking that in consideration with a total JIW rate of $38.40, that's current, not what's proposed. Um. We can take out, I'm trying to be reasonable here. We could take out the medical, which that's kind of overpriced actually, because we all know why.

00:43:38 Diarmid: I will stop you there.

00:43:39 Adam: I won't go any further.

00:43:40 Diarmid: We will not pull out anything that is already established.

00:43:43 Adam: I understand that. Okay. I'm making clear what I'm saying is the medical is already, is already overpriced. I'm trying to punch in a damn code. Because what happens is in a multi-employer health plan such as the union has is I pay the same amount for every employee regardless of age, regardless of health history, things of that nature, because we got, there are people being covered that are in extremely poor health and elderly. So the same amount is paid to cover that anyway.

00:44:30 Shannon: Someone's leaving a voicemail.

00:44:31 Adam: Yeah, I sent that on mute. So let's, notwithstanding, I just want to, we're going to get some things clear how someone that works with money and business, because your job is to get the most freaking money, the most time off, the most vacation, the most benefits that you can possibly secure. My job is to tell you that is not economically viable or it is economically viable. And that's going to be the pivot point on a lot of these conversations because it can't be a scale like this. I think that's understandable. And if it's the position of IBEW 520, I'm not saying you, I'm saying IBEW 520 is hell no, the skills will be like this and you're going to suck it up and eat it and we're going to cram it down your throat, we're not going to have a successful bargaining ever. So, and I'm saying currently, I know what number 10 says, I know what number 10 says, but we're working on #9. And #9, so we'll just not even include the medical, but currently, I don't know if anyone's ever presented it to you in this way. Currently, $38.40. Currently, there are $3.95 worth of benefits hourly that we pay to these guys, and that is not including the medical. That's from annuity down, okay? That's $3.95 an hour. Let's base a standard work year of 2,000 hours times $3.95 an hour, that's $7,900 for a JIW. And that's what the whole contract is based on, is JIW wage, correct or incorrect?

00:47:05 Diarmid:Well, yes, how our other wages are set.

00:47:07 Adam: Okay, so we're in agreement with at least something. So $7,900 a year in benefits. Now we're going to take that and divide it back by $29 an hour. That's 272 hours. Now we take that and divide that by a standard eight-hour workday. You're already getting 34 days, 34 calendar days a year when you compare it to the open shop. I don't know if anyone's ever broken it down that way to you. You're already getting 34 calendar days a year. Because the open shops, a lot of them pay an insurance plan. That's agreed. I got no argument. I think, anyway, I think a lot of them do have a medical plan, but they don't have all this. But based on the journeyman scale, 7,900 hours. I'll do that one more time. So $7,900, that's gross. Divided by, would I do that? 8 hours. That ain't how I did that. Now I'm getting mixed up again. It was $7,900. We could do that, divided by... No, you can't. $3 and ninety-five. Now I got you got me mixed up trying to explain this. Delete, delete, delete, delete. Okay, $3 and ninety-five cents an hour times 2,000. That's a standard work year. If you don't believe me, you can... So that's $7,900 a year, that's annually, in benefits that we incur that it's fair to say most open shops do not. That really would be the way to do it. Divide that by 8 hour workdays. But you can't really do that because it doesn't really work out that way. I'd have to get a, well, let's just say 7,900. You could take that and you want and there's several ways to work this. One, two, three, 4. Four days, you know, quite frankly, And that's where my mind's going. I'd have to figure out what the hell I had in my damn head here, but 7,900. Oh, I know what I did. 7,900 divided by 29. Now I'm back on track. 7,900 divided by $29 an hour is 272 hours. 272.413. Let's make sure that's right. 272.413 times $29 an hour is $7,899, close enough. So 272 hours divided by, I'm not asking you to agree with me because I already know you're not divided by 8-hour workdays is 34 days. That's 34 days that we basically pay our guys. If a banker was sitting here looking at you, pretend it's not even me, pretend it's a banker. That

contractor pays a journeyman wireman 34 days of wages in benefits that an open shop contractor does not incur.

00:52:03 Diarmid: I'm sorry if you feel that a worker isn't worth that.

00:52:06 Adam: Didn't say that.

00:52:07 Diarmid: Well, but that, that…

0052:08 Adam: But you're saying, you told me, hold on, hold on, we're not arguing, Diarmid.

00:52:15 Shannon: Well, apparently your order shops don't either, because they don't pay them that.

00:52:18 Adam: When I asked you, this ain't an argument. When I asked you, #9, what is your business justification for #9, you said, so that we come more into alignment with the non-union shops. That was your answer. So I'm telling you, this is my interpretation of why now when you sit and look at it, you damn right they can give their guys one, two, three, 4 days PTO. Jesus Christ.

00:52:57 Diarmid: Oh no, those are for holidays plus PTO. We would occur PTO as well.

00:53:02 Adam: Yeah.

00:53:03 Diarmid: For like every 30 hours they work, they get money.

00:53:05 Adam: Yeah, so let's just take the four days.

00:53:08 Diarmid: Comes out to like $0.15 an hour for the four days.

00:53:10 Adam: No, by my calculations. That's $2,000 a day. You can agree or you can not, but I'm guaranteeing you, and I'm just being, I'm being dead front honest with you. Take this to an accountant and see how they're going to run the numbers.

00:53:29 Shannon: They wouldn't think it was good faith.

00:53:31 Adam: Go get, go get, you can't get it, but you know what? You do have Intrepids. You probably do have payroll reports from them. Tell me how many guys they got making $29 an hour on their payroll. Then tell me how many are getting close to $10 an hour in benefits. And then tell me why, when that guy, see, I've already walked in your shoes. And that's going to be the problem you're always going to face is, Diarmid, I've been doing this a long time.

00:54:06 Shannon: He knows more.

00:54:07 Adam: Way, way longer. And that's fine. Way longer than you guys.

00:54:11 Shannon: So when you. When you-- I'm just saying. When you try-- No, I mean, holistically thinking about that. That'd be like a professor trying to argue with his student in his class.

00:54:23 Adam: We're going to have an issue. I'm just trying to tell you where this is going, Because you've got to go back and report to your people. Hell yes, intrepid. Hell yes, Advanced. Hell yes Accurate. Every one of them can, because that's pretty damn cheap. If I'm paying a guy, if I'm paying a guy 20, $24, I'll be gracious. I got a licensed electrician. I'm paying him 24.50. Let's just say that's what they're paying. I got no freaking idea. I would really be surprised if someone there's making that. And I know there's one guy. One lone wolf at Legacy that makes like 29. I know that. You've already disclosed that. That's one out of what, how many electricians we got here. He's the exception. Okay. All right. 24.50. Let's just use that as a base. And we're going to do gross because this was gross. So we got to do apples to apples. $24.50 an hour times one, two, three, four days. Four days. 2450 times 32. Oh, hold on. I fucked up again because my fingers, excuse my language, 2450 times 32 hours, which is 4 days. That's $784. $784. Do you see the uphill battle because employees don't think like that? They're like, Yeah, sucker, you ain't getting paid for Thanksgiving and the day after. There's probably very few members that are going to say,

yeah, but I get $8,000 a year that you don't. Because Intrepid and Advanced and Accurate, they're going to say, that son of a bitch gives me a truck. I get a truck to drive home. I got me a pickup truck that's wore out and beat to shit but I got one. And he pays me for Thanksgiving the day after Christmas and New Year's. Wow. So he's, you're going to take that truck and take your wife on vacation? Hell no, because it won't make it across town. And he's paying you $785 a year for your loyalty. All right, enough about #9. I've said my piece on that. Number 10. $45. Let's break this down. Is that $45 total package? Or is this $45 base wage?

00:57:30 Diarmid: Base wage.

00:57:31 Adam: So you are proposing for San Angelo that 29 is current?

00:57:42 Shannon: And you said NECA came up with that? 45.

00:57:45 Diarmid: That's what they're proposing.

00:57:47 Shannon: Do you pay your guys forty-five?

00:57:48 Diarmid: You are asking to terminate the CBA.

00:57:51 Shannon: Okay, I see. It's punishment. Okay, I got you.

00:57:55 Diarmid: It's not punishment.

00:57:56 Shannon: No, actually it is. Maybe not from your perspective. You get paid to say that. I don't.

00:58:02 Adam: Twenty-nine.

00:58:03 Shannon: I don't make 90,000 a year.

00:58:05 Adam: I want to get clear. So you're asking for a $16 an hour increase in wages.

00:58:19 Diarmid: Because we are not negotiating the MOU.

00:58:21 Adam: I'm not asking. I'm just, this is a yes or no.

00:58:26 Adam: Yes or no?

00:58:26 Diarmid: But I mean, we keep going back to it and I'm telling you why I'm coming with this, because you've asked to terminate the CBA.

00:58:32 Shannon: Are you coming with this or is Austin coming with this?

00:58:35 Diarmid: We are one in the same. This is what has been proposed to me.

00:58:38 Adam: Okay.

00:58:38 Shannon: Well, then you should be able to agree.

00:58:40 Diarmid: You're trying to see.

00:58:43 Shannon: Anyway, let's move on.

00:58:44 Diarmid: Yeah. You know.

00:58:46 Shannon: So we're on #10 now.

00:58:48 Diarmid: If you want to negotiate something more three years of this. Withdraw your term of wanting to get out, we can negotiate the MOU.

00:58:58 Adam: Oh, no, sir, that's not going to happen.

00:59:01 Diarmid: Well, so then this is what we're negotiating.

00:59:02 Shannon: I mean, we already know you're going to sue us, so we're prepared.

00:59:19 Adam: I think I had it there. Yeah, so that's some decimals out, but pretty much a 55% increase from current. Did you guys not pay attention to what happened to the dock workers? I'm just going to ask that in all fairness. When they said we're making this much and you're going to do this or we're going to shut down the docks.

00:59:50 Diarmid: I'm not a dock worker. Their union's politics don't concern me or the IPEW.

00:59:56 Adam: Okay. Organized labor is organized labor. I'm just making a point. 55% increase. And I'm just. I think we've made it.

1:00:10 Diarmid: The Austin contractors and the Austin local have put that $45. That's where it came from.

1:00: 18 I'm going to ask you, okay, I'm going to ask you one question.

01:00:18 Shannon: You get paid to say that.

01:00:20 Adam: I'm going to ask you a question and I want, this is just a yes or no, because you know I'm going to ask you what the business justification for that, knowing where we're at, you're asking for a 55% increase. I'm not going to waste your time any longer because I feel like you may think I'm wasting your time. I'm trying to give you some where my mind's at. We're on the last one, number 10, asking for a 55% increase. My question to you is, taking into consideration the amount that we are currently paying, what, and I'm being serious, in your mind thinks that starting the negotiations out at a 55% increase, we're so far apart. How is that? Hold on, I'm not done. How is that negotiating and bargaining in good faith? How does that even come? Because this is, we made it through all this, and I'll reserve my opinion on all of this, but when we get down to number 10, this is not, maybe in Austin, but you knew who was walking in this door, Diarmid. You knew who was coming in. ASH Electrical. And you know that at JIW is making $29 here in San Angelo. How is that even beginning to cross the threshold of bargaining?

01:02:14: Shannon: I mean how do you sleep at night?

01:02:16 Diarmid: I sleep just fine because we are not negotiating this. Y'all ask the CBA. We're going off Austin. So forget these. This is MOU Zone 3.

01:02:25 Adam: You know what we're paying. You know what we're paying?

01:02:29 Diarmid: So that's where it came. It's simple. We're not negotiating the MOU because you've asked to terminate the CBA. So these numbers, you can't pull from them. We have to go on the CBA.

01:02:44 Shannon: Come on now. Come on now. Come on now. I hope you believe in God?

01:02:45 Diarmid: Do you think, do you think?

01:02:46 Shannon: I really do. I really do.

01:02:50 Diarmid: Why would you bring that up?

01:02:51 Shannon: Give me a second. No, you can. And I hope he sleeps good at night. I really hope he does

01:02:58 Adam: If we win.

01:03:01 Shannon: Wow.

01:03:01 Diarmid: If this thing has nothing to do with these conversations. And I don't know.

01:03:06 Shannon: Oh. Trust me, at the end of the day, it does.

01:03:08 Diarmid: We're done here because of that.

01:03:11 Shannon: Oh. Whatever. No, at the end of the day, it does.

01:03:15 Shannon: So this is twice you’ve called for an impasse.

01:03:18 Diarmid: We are done because you're trying to bring up stuff that has nothing to do with the negotiations.

01:03:21 Shannon: No, I don't know how you sleep at night.

01:03:24 Diarmid: My faith doesn't. So we are done here.

01:03:27 Shannon: We were already done. We were already done. We were already on 10, so we were already done, Diarmid. Give me a break. I hope you sleep well.

01:03:38 Adam: We will uh I think I've got a little bit better understanding of what you guys are doing and what you're asking for. So now we will, with that information, I congratulate.

01:03:56 Shannon: Bye, sister.

01:03:57 Adam: And we can continue.

01:03:58 Shannon: Have a good day.

01:03:59 Adam: Agree or disagree? Okay, have a good one.

01:04:04 Shannon: All right, thank you.

01:04:07 Shannon: Diarmid. I may have upset you but you and I both know what's going on here you know it ain't right and I'll be honest with you I don't know how any moral person could do what you're doing.

01:04:23 Diarmid: Show me how I'm breaking morals

01:04:24 Shannon: Look what we're doing you know what you know what hey hey you get paid to say that you get paid to say that Diarmid. I'm sorry.

01:04:46 Adam: You got to stop. You got to stop.

01:04:48 Shannon: I'm sorry.

01:04:49 Adam: Sorry don't get it because...

01:04:51 Shannon: We were already done. We were already done.

01:04:54 Adam: You cannot continue.