**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 520** | § § § § | |
| **v.** | § | **CIVIL ACTION NO. 1:25-cv-1643** |
| **A.S.H. ELECTRICAL SERVICES, LLC** | § § § | |

**DEFENDANT/COUNTER-PLAINTIFF'S REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE DAVID A. EZRA:

**PLAINTIFF'S REQUEST FOR REFORMATION SHOULD BE DENIED**

At the summary judgment stage, the parties argue over two, apparently different versions of the same CBA. The earliest version of the agreement provided that the term ended on June 1, 2022, and from that point forward was renewable on an annual basis. IBEW filed this first version of the CBA with the NLRB when it opposed ASH's petition for election. (Def. Resp. Appx. 6-13, 38).

Plaintiff now argues that the 2019-2022 language in section 1.01 is a typo, and that the agreement did not end until June 1, 2025. In support of this position, they rely on the same CBA, but their version has different terms in Section 1.01. As already argued in Defendant's Response to Plaintiff's Motion for Summary Judgment, IBEW first presented this version of the CBA to the NLRB long after June 1, 2025. It has not and cannot explain this discrepancy other than by admitting that IBEW unilaterally changed the text of Section 1.101 and substituted this change without the knowledge or consent of all parties to the agreement, and without it being committed to writing and signed by all parties.

This is not a typographical error. A typographical error is a mistake, such as a misspelled word, in typed or printed text.[1] An entire clause of a contract that sets out the term of the contract is not a typographical error. There is no case law counsel could find that permits a party to unilaterally correct an error in a CBA, or any other type of agreement for that matter. Changing a contract requires the unanimous consent of the other parties to the agreement. The CBA itself specifically provides in Section 1.03 that it could only be changed by the mutual consent of the parties, and any change or supplement had to be reduced to writing and signed by both parties. (Def. Appx. 5). Plaintiff has offered no summary judgment evidence to establish this was ever done while the CBA was in effect.

As noted by Plaintiff, collective bargaining agreements are interpreted according to ordinary principles of contract law, so long as they are not inconsistent with federal labor policy *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). When the written language of an agreement is clear and unambiguous, its meaning must generally be ascertained from its plainly expressed intent. *Id*. The plain language of Section 1.01 of the first version of the agreement is clear and unambiguous and provides that the termination date was June 1, 2022, and the agreement was to be renewed annually thereafter. This created and vested in Defendant the right to terminate the agreement annually by providing 90 days' notice prior to the termination of the agreement. There is no dispute that Defendant in fact did so.

IBEW wants to avoid the entire issue by claiming that the first Section 1.01 did not reflect the parties' intent. This is not a claim of a misspelling or typo. It is a claim of a mutual

---

[1] https://www.merriam-webster.com/dictionary/typographical%20error (accessed August 23, 2026).

mistake and sort of an implied request for the Court to reform the agreement and enforce their second version of section 1.01 instead.

To obtain reformation of a CBA, a party cannot simply change the agreement and substitute new pages by itself. Without written agreement of the other parties, only a court can reform a CBA. To reform the agreement IBEW must bring forward clear and convincing evidence that a mutual mistake was made. *Meza v. General Battery Corp*, 908 F. 2d 1262, 1275 (5th Cir. 1990).

Specifically, the party seeking reformation must plead and prove by clear and convincing evidence the following:

1. Clear proof of the original, antecedent agreement reached by the parties.
2. A mutual mistake was made after the original agreement in reducing that agreement to writing.

*Illinois C. G. R.R. Co. v. R.R. Land, Inc*., 988 F. 2d 1397, 1402 (5th Cir. 1993).

A claim of mutual mistake challenges whether the written contract represents the actual bargain made. The court's task is not to interpret the language of the contract itself, but to determine whether the contract is valid and reflects the true intent of the parties. *Wallerstein v. Spirt*, 8 S.W. 3d 774, 780-81 (Tex. App.–Austin 1999, no pet.). The existence of a mutual mistake is determined not by the self-serving, subjective statements of the party's intent, but solely by the objective circumstances surrounding the execution of the contract. *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys*., 177, S.W. 3d 605, 618 (Tex. App.–Houston [1st] 2005, no pet.). A party seeking to avoid the contract on the grounds of mutual mistake must show (1) a mistake of fact, (2) held mutually by the parties, and (3) which materially affects the agreed upon exchange. *Wallerstein*, at 780.

Plaintiff argues that Defendant admitted the contract did not expire until June 1, 2025, in paragraph six of its Original Answer and Counterclaim. This is incorrect as already pointed out in Defendant's Response to Plaintiff's Motion for Summary Judgment. (ECF 37, 6)[2]

Plaintiff also argues that Defendant admitted in correspondence during the negotiations that the term of the CBA did not end until June 1, 2025. Any such statements made in any correspondence are inadmissible under Fed. R. Evid. 408 and Defendant objects to their being considered by the Court.

Even if such statements are admissible to prove some sort of admission, Plaintiff is cherry-picking one statement and ignoring the entire context of the letter. The letter also stated,

**"We do believe that A.S.H. Electrical Services, LLC is not party to an independent agreement binding this company to the obligation of any collective bargaining agreement with your organization. However, out of an abundance of caution, this letter, once again, constitutes notice that A.S.H. Electrical Services, LLC desires to terminate any such independent collective bargaining agreement." (**Def. Appx. 59) [emphasis in original]

IBEW also argues that the language on the cover page and title proves the intent of the agreement was for it to continue until June 1, 2025. But specific contract provisions control over general ones like titles and recitals. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling*, 574 S.W. 3d 882, 889 (Tex. 2019.) IBEW also argues that the agreement provides wage and benefit increases after June 1, 2022. But there is nothing inconsistent with these provisions with the term set out in Section 1.01. The agreement specifically provides that after June 1, 2022, the agreement continues and is renewed on an annual basis. Wages and benefits and other provisions of the

---

[2] Defendant has also moved for leave of court to file an Amended Answer and Counterclaim to clarify this point.

agreement would continue beyond June 1, 2022, so long as the CBA had not been terminated as provided in the CBA.

Additionally, Section 1.01 states, "this Agreement shall take effect on June 2, 2019, and shall remain in effect through June 1, 2022, **unless otherwise specifically provided for herein**." [emphasis added]. This effect of this language is that other clauses in the agreement, such as wages, pension or other benefits, still apply even if they fall outside the 2022 termination date. The primary objective in construing contracts is to give written expression to the parties' intent. *Id*. A contract's plain language controls, not what one side or the other alleges they intended to say but did not. *Id*. Just because IBEW does not like the language it put in the agreement does not mean that it gets to unilaterally ignore it or rewrite it.

Other than the existence of the alleged mistake in the two purported versions of the agreement, no summary judgment evidence has been offered that establishes a genuine fact issue on any of the three elements for reformation of a mutual mistake. There is no proof that the CBA contained a mistake of fact, that such mistake was held mutually by the parties, and that such mistake materially affected the agreed upon exchange. Plaintiff cannot establish a mutual mistake and is not entitled to reformation of the agreement as a matter of law.

**GOOD FAITH NEGOTIATION IS AN ESSENTIAL PRECONDITION TO INVOKING CIR**

Plaintiff argues that adequate notice and good faith negotiations are procedural issues that fall within the jurisdiction of the arbitrator and are not a basis for the court to deny enforcement of the award. But other than citing cases for the general proposition that procedural questions belong to the arbitrator, IBEW cites no authority to support this claim. There is a pending ULP charge with the NLRB related to ASH's claim that IBEW did not negotiate in good faith. ASH

alleges that IBEW engaged in only surface bargaining to move the case to CIR without engaging in any real, substantive discussions about issues with ASH.

The CBA requires notice of the issues IBEW wanted to change. The IBEW already had notice that ASH wanted to terminate the agreement and that it wanted to discuss that issue. IBEW chose not to provide a list of the changes it wanted to make until the first negotiation meeting on March 18, 2025. IBEW filed for CIR 30 days later.

The CBA provided that the parties could submit "unresolved issues" to CIR that remained on the 20th of the month preceding the next regular meeting of the CIR. But the CBA remained in full force and effect until a conclusion is reached on proposed changes. The deadline for submitting the "unresolved issues or disputes" was not the 20th days of the preceding the next regular meeting of the CIR as IBEW seems to imply. Section 1.02 (d) provides that the "unresolved issues or disputes shall be submitted no later than the next regular meeting of the Council following the expiration date of this agreement or any subsequent anniversary date." (Def. Appx. 5). This was not until August, so there was plenty of time for good faith negotiations to take place.

Whether a party may lawfully invoke an interest arbitration clause requires a finding of good faith bargaining. *Hope Electrical Corporation*, 34 NLRB AMR 58, 34 NLRB Advice Mem. Rep. 58, 1999 WL 35112500 (Nov. 18, 1999). "The presence of an interest arbitration provision in a contract does not, however, relieve employers and unions of their responsibilities to engage in good-faith collective bargaining." *Electrical Workers IBEW Local 113*, 296 NLRB No 144 (October 4, 1989).

IBEW tries to split hairs by arguing that they were not required to negotiate changes with ASH until impasse, but only until issues were "unresolved". In essence they are claiming that

under the interest arbitration clause they are entitled to demand an entirely new CBA for three more years, increasing wages by almost 50% and benefits and when the employer rejects that proposal simply declares the issue unresolved. This is a ridiculous argument. An issue or dispute is unresolved only if the parties reach impasse after good faith negotiations.

The course of the negotiations, the short and perfunctory nature of the negotiations and the submission to CIR after only an hour and twenty minutes of negotiation, and while further negotiations were expected, is bad faith negotiating. It was not ASH who cut off discussions, it was IBEW because they were rushing to move past negotiations to CIR. Only issues that are unresolved are permitted to be submitted for arbitration. You cannot have an unresolved issue when negotiations are ongoing. Whether good faith negotiations occurred before submission to CIR is an inherent precondition before that issue may be submitted. It is only unresolved issues that can be submitted, not an entirely new and different CBA as in this case. It is not a question for the arbitrator because it fundamentally about whether there is something the parties agreed to arbitrate.

Only a court can decide whether the contract allowed the alleged unresolved dispute to be submitted to interest arbitration at the CIR under these facts. It is a fundamental arbitrability question not a procedural question for the arbitrator. As the Supreme Court has stated, "whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance ... is undeniably an issue for judicial determination." *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 649 (1986).

Good faith bargaining is a necessary precondition to a finding of impasse. *Carey Salt Co. v. NLRB*, 736 F.3d 405, 411 (5th Cir 2013). Good faith negotiations must continue until all avenues of compromise are closed. *Id*., at 417. A union is not permitted to use interest arbitration

as a substitute for good faith bargaining because it likes its odds better at the CIR. At the very least, the summary judgment evidence creates a factual dispute as to whether IBEW engaged in good faith negotiations before submitting the dispute to CIR.

Plaintiff also argues that ASH never asked to negotiate over termination. This is incorrect. Almost every piece of correspondence about termination or negotiations from ASH expressed its desire to terminate the agreement, whether that agreement ended on June 1, 2024, or June 1, 2025. During negotiations IBEW's representative Diarmid Campbell discussed ASH's request to terminate the CBA as the reason why IBEW was requesting an entirely new three-year agreement and removal of the Zone III MOU. (Def. Resp. Appx. 274). Adam Johnke brought termination up in the negotiation sessions for ASH. (Id. 290). Not once did Campbell recognize ASH's desire to terminate the CBA as legitimate or respond to that request. IBEW's position has been since ASH stated it wanted to terminate the agreement it had to take out the Zone III MOU and could only make a three-year agreement. During negotiations ASH proposed a six-month agreement after which termination would be effective. IBEW rejected this proposal out right and would never discuss it or make any counteroffer. ASH also requested in its brief to CIR that the CBA be terminated or it receive a shortened contract with Zone III MOU included.

IBEW argues that the fraud or misrepresentation that ASH would only be committed for one-year would only be for one year is not a defense because ASH failed to read the almost 40-page CBA it was never given. At the time of the signing of the letter of assent, the only document ASH was presented with was the letter of assent. It was never provided with the terms of the CBA or told that the CBA was about to be renewed for another three-year period. Despite asking for a copy of the current agreement IBEW never provided it until this litigation began. ASH was never informed about the interest arbitration clause or what it meant about the ability

to terminate the CBA in the future. While ASH certainly should have insisted on reading the CBA and having a lawyer advise it on its meaning before signing the letter of assent, the undisputed fact is that ASH was told by IBEW representatives that they could get out of the agreement after a year. This is not just a failure to read the contract. This is a misrepresentation about the very nature of the relationship they were entering. Plaintiff's case law on this point actually supports Defendant's position. Plaintiff ignores the misrepresentation made by its own representatives and provides no evidence to contradict Defendant's summary judgment evidence establishing that this took place.

**FAILURE TO DRAW ESSENCE FROM THE CBA**

The imposed CBA goes far beyond the CBA to which Defendant thought it was assenting. It in effect imposes the CIR's sense of industrial justice and is not an interpretation or application of the prior CBA.

Plaintiff argues that significant changes to the terms and conditions do not constitute failure to draw essence from the CBA. Instead, it cites a Sixth Circuit decision holding that to run afoul of the essence requirement occurs only if the award converts the CBA between the parties into something else. This is not the law in the Fifth Circuit. As already articulated in Defendant's response to Plaintiff's Motion for Summary Judgment, an award fails to draw its essence from the CBA if it ventures into new matters not contemplated by the original.

In this case the CIR completely removed any consideration of local economic conditions or wage rates and completely removed the Zone III MOU. This was a specific part of the agreement that ASH assented to. This was not just a standard raise in wages. It completely removed a key aspect of the CBA which ASH relied on in agreeing to be bound by the CBA in the first place. It removed any consideration of the difference in the cost of living, cost of doing

business, and wages between the Austin area and San Angelo, which are located 200 miles apar. The Austin metropolitan area has a population of over 2.5 million, while San Angelo has a population of around 120,602. The GDP of the Austin area is $268 billion. The GDP of the San Angelo area is $9.6 billion. The fact that electrical contractors may be bidding special projects like proposed data centers, at higher rates does not change the fact that not every job a small electrical contractor in West Texas will work in construction of a data center. Data center construction is also speculative as the Governor has placed data center construction on hold. Very few are being constructed and there was no evidence that ASH had been awarded any contract to work on a data center. In fact no evidence was offered that ASH had been awarded a contract on a data center or any of its employees ever worked in one.

A key part of the CBA that ASH assented to was the Zone III MOU, which IBEW refused to even discuss in negotiations because ASH wanted to terminate the CBA. ASH never would have assented to be bound by a CBA that did not include the Zone III MOU or some other provision allowing it to pay lower wages than large commercial contractors in Austin, Texas. This was not just a decision on what the wages should be. It was retaliation against ASH for seeking to terminate the agreement and the award did not draw its essence from the agreement the parties were negotiating about.

WHEREFORE, Defendant asks the Court grant Defendant's Motion for Summary Judgment on its Counterclaim and for any other relief to which it is entitled.

Respectfully submitted,

By: /s/ *Jon Mark Hogg*
Jon Mark Hogg
State Bar No. 00784286

JON MARK HOGG PLLC
1 East Twohig Ave, 2nd Floor
San Angelo, Texas 76903
(325) 777-0455
jmh@jmhogglaw.com

ATTORNEY FOR DEFENDANT A.S.H.
ELECTRICAL SERVICES

## CERTIFICATE OF SERVICE

This is to certify that on August 25, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record on file.

*/s/ Jon Mark Hogg*
Jon Mark Hogg